## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF DELAWARE

| | |
|---|---|
| PENNY NINIVAGGI et al., individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNIVERSITY OF DELAWARE,<br><br>*Defendant.* | Civil Action No. 20-cv-1478-SB |
| HANNAH RUSSO, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>UNIVERSITY OF DELAWARE,<br><br>*Defendant*. | Civil Action No. 20-cv-1693-SB |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Penny Ninivaggi, Michael Ninivaggi, Todd Mickey, Jake Mickey, James Nigrelli, Cailin Nigrelli and Hannah Russo ("Plaintiffs"), by and through undersigned counsel, bring this action against Defendant, the University of Delaware ("Defendant" or the "University") on behalf of themselves and all others similarly situated, and make the following allegations upon information, attorney investigation and belief, and upon Plaintiffs' own knowledge:

## PRELIMINARY STATEMENT

1.    Plaintiffs bring this case a result of Defendant's decision not to issue appropriate refunds for the Spring 2020 term after canceling in-person classes and changing all classes to an

online/remote format, closing most campus buildings, and requiring all students who could leave campus to do so as a result of the Novel Coronavirus Disease ("COVID-19").

2.      Defendant's decision deprived Plaintiffs and other members of the Classes from recognizing the benefits of on-campus enrollment, access to campus facilities, student activities, and other benefits and services in exchange for which they had already paid fees and tuition.

3.      Defendant has either refused to provide reimbursement for the tuition, fees and other costs that Defendant is no longer providing, or has provided inadequate and/or arbitrary reimbursement that does not fully compensate Plaintiffs and members of the Classes for their loss.

4.      This action seeks refunds of the amount Plaintiffs and other members of the Classes are owed on a pro-rata basis, together with other damages as pled herein.

## PARTIES

5.      Defendant University of Delaware is a corporation pursuant to 14 *Del. C.* § 5101 Newark, Delaware.

6.      Defendant is the largest university in Delaware, with approximately 18,500 undergraduate and 4,500 graduate students. Defendant offers 148 bachelor's programs, 121 master's programs (with 13 joint degrees) and 55 doctoral programs across its eight colleges.[1]

7.      Defendant has an endowment of approximately $1.466 billion in 2019.

8.      Plaintiff Penny Ninivaggi is an individual and a resident of the state of New York.

9.      Plaintiff Michael Ninivaggi, a 2020 graduate of the University of Delaware, is an individual and a resident of the state of New York.

10.      Plaintiff Todd Mickey is an individual and a citizen of the state of New Jersey.

---

[1] https://sites.udel.edu/graduate-dean-search/about-ud/

2

11.     Plaintiff Jake Mickey is an individual and an undergraduate student at the University of Delaware.  Plaintiff Jake Mickey presently resides in the state of New Jersey.

12.     Plaintiff James Nigrelli is an individual who resides in the state of Massachusetts.

13.     Plaintiff Cailin Nigrelli is an individual and an undergraduate student at the University of Delaware.  She presently resides in the state of Massachusetts.

14.     Plaintiff Hannah Russo is an individual and a resident and citizen of the state of New Jersey.

15.     Plaintiffs Hannah Russo, Michael Ninivaggi, Jake Mickey, and Cailin Nigrelli were students enrolled at the University during the Spring term of 2020.

16.     Plaintiffs Penny Ninivaggi, Todd Mickey, and James Nigrelli are the parents of the other respective plaintiffs and financially interested parties.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive on interest and costs.

18.     This Court has personal jurisdiction over Defendant because it is organized under Delaware law, maintains its principal place of business in this district, regularly and systematically transacts business in this district, and the wrongful conduct complained of in this Complaint occurred in this district.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this district and a substantial part of the events or omissions giving rising to the Complaint occurred in this district.

## BACKGROUND FACTS

20.     Student Plaintiffs were enrolled as full-time students for the Spring term in 2020 (the "Spring 2020 term") at the University.

21.     Parent Plaintiffs provided financial consideration to the University in exchange for their children's on-campus enrollment.

22.     As a precondition for enrollment, Plaintiffs were required to and did pay substantial tuition for the Spring 2020 term either out of pocket or by utilizing student loan financing, as did all members of the putative Tuition Class (defined below).  There are hundreds, if not thousands, of institutions of higher learning in this country.

23.     Some institutions of higher learning provide curriculum and instruction that are offered on a remote basis through online programming which do not provide for physical attendance by the students.

24.     Defendant distinctly offers, on the one hand, in-person, on-campus, live, hands-on program, and, on the other, a fully online, distance-learning program, which it markets and prices as separate and distinct products.

25.     Plaintiffs and members of the proposed Tuition Class did not choose to attend another institution of higher learning, or to seek an online program or degree, but instead chose to attend Defendant's on-campus degree program.

26.     For example, UD's course catalog specified that courses would be "In Person (P)," not "Online Site (OS)" or "Online and In Person (OP)":



27.    UD's online course catalog also specified that students' classes would be at UD's "Main Campus (SA-NEWARK)," for example, and not through "UD Online (SA-VIRTUAL)":



28.    Thus, the live, in-person nature of the courses that students selected was part of the benefit of the bargain, Plaintiffs would not have paid as much, if any, tuition and fees for the Spring 2020 semester at UD had they known that the courses would not, in fact, be taught in-person

29.    Defendant markets the on-campus experience as a benefit of enrollment.

30.     Defendant has recognized and admitted the inherent difference between its in-person and online products, and markets them separately throughout its website and other publications and circulars.

31.     As an initial matter, it is important to note that Defendant only offered certain degrees through its online program, suggesting that not every field of study is even suitable for online learning.

32.     However, Defendant charges significantly lower tuition for online degrees and courses than for on-campus degrees and courses.

33.     Accordingly, when students pay tuition in exchange for enrollment in the on-campus program, such students expect to receive, and Defendant has promised to provide, benefits and services above and beyond basic academic instruction, which include but are not limited to:

- Face-to-face interaction with professors, mentors, and peers;

- Access to and use of campus facilities such as dorms, computer labs, study rooms, laboratories, libraries, etc.;

- Student governance and student unions;

- Extra-curricular activities, groups, intramurals, etc.;

- Student art, cultures, and other activities;

- Exposure to community members of diverse backgrounds, cultures, and schools of thought;

- Social development and independence;

- Hands-on learning and experimentation; and

- Networking and mentorship opportunities.

34.     Plaintiffs' education experience was changed by Defendant from in-person, hands-on learning to online instruction during the Spring 2020 term.

35.     When this change happened, Plaintiffs were forced from campus and deprived of the benefit of the bargain for which they had paid, and in exchange for which Defendant had accepted, tuition as set forth more fully above.

36.     In addition to tuition, Defendant charges certain mandatory fees, including but not limited to a $119 Student Center Fee, a $429 Comprehensive Student Fee, and a $227 Student Wellbeing Fee.

37.     The Student Center Fee covers amortization of bonds used in the construction of the Trabant University Center and in renovations to the Perkins Student Center.  It also supports the operating costs of these student centers.[2]

38.     The Comprehensive Student Fee supports the student fitness center, recreational programs, student activities, concerts, performing arts, and the activities of registered student organizations.[3]

39.     The Student Wellbeing Fee is charged to all full-time students, entitling them to use the Student Health and Counseling Centers.[4]

40.     Defendant also charges a number of course-related fees in support of special equipment or services provided, as well as miscellaneous fees charged for various activities of services.[5]  As a result of being instructed to stay off campus for the latter portion of the Spring 2020 term, Plaintiffs and members of the Classes (defined below) lost the benefit of the services

---

[2] https://catalog.udel.edu/content.php?catoid=29&navoid=3576
[3] Id.
[4] Id.
[5] Id.

7

for which these fees had been paid.  For example, Plaintiffs and members of the Classes could not access the computer labs or recreational facilities; could not participate in student activities and events; and were not able to seek basic on-campus health and treatment services.

41.     Plaintiffs and members of the Fees Class were required to and did pay all mandatory fees associated with the Spring 2020 term.

42.     Upon information and belief, Defendant was allocated more than $12.1 million in federal stimulus funds under the CARES Act.[6]

## FACTUAL ALLEGATIONS

43.     Upon information and belief, Defendant's 2020 Spring term began with the first day of classes on or about February 10, 2020.[7]

44.     Upon information and belief, Defendant's 2020 Spring term was scheduled to conclude with the last day of examinations on or about May 28, 2020.[8]

45.     Defendant's Spring Break began on or about March 14, 2020 and was supposed to end on or about March 22, 2020, with students returning for in-person classes on Monday, March 23, 2020.[9]

46.     However, on or about March 11, 2020, Defendant announced that classes would be suspended on March 12-13, 2020[10] and that it was extending its Spring Break by one week[11] before moving all classes online.

---

[6] https://www2.ed.gov/about/offices/list/ope/allocationsforsection18004a1ofcaresact.pdf
[7] http://www1.udel.edu/registrar/cal-old/2019-2020.pdf
[8] Id.
[9] Id.
[10] Id
[11] https://www.udel.edu/udaily/2020/march/coronavirus-update-march-15-2020/

47.     Online learning was initially planned to begin on March 23, 2020, but was later postponed to March 30, 2020.

48.     Although Defendant continued to offer some level of academic instruction via online classes, Plaintiffs and members of the proposed Tuition Class were deprived of the benefits of on-campus enrollment for which they paid as set forth more fully above.

49.     However, Defendant has refused and continues to refuse to offer any pro-rated discounts or refunds on tuition and fees charged for the 2020 Spring term.[12]



Will tuition be reduced for those whose classes are all online?

While the delivery of courses may be different, the University is committed to maintaining the high quality of instruction that students expect from UD to earn their degree. UD's distinguished faculty continue to teach these courses, and the course curricula continue to prioritize the learning outcomes that faculty have established. In fact, the cost for online instruction is actually higher, reflecting the expense of computer equipment, software, instructional technology expertise and other needs. UD has invested significantly in education technology over the summer to ensure that students can continue their academic progress and graduate on time; those higher costs are not being passed on to students.

50.     Likewise, Plaintiffs and members of the proposed Fees Class were deprived of utilizing services for which they have already paid, such as access to campus facilities, student activities, health services and other opportunities.

51.     Whereas Defendant charges a $429 Comprehensive Student Fee for its on-campus students prior to the COVID-19 pandemic, it charges only $50 for its fully online students,[13] a recognition that students not physically present on campus are not afforded access to nor the benefit of most of the things the fee is intended to cover.

52.     However, in regard to fee refunds, Defendant has stated that the Comprehensive Student Fee will be discounted by 15% for the next year.[14]

---

[12] https://www.udel.edu/home/coronavirus/return/faq/
[13] https://www.pcs.udel.edu/tuition/
[14] https://www.udel.edu/home/coronavirus/return/faq/

53.     On Defendant's FAQ webpage, Defendant attempts to justify the reasoning for its lack of refunds:[15]

**Why am I paying fees if my courses are all online?**                                              —

Whether studying on campus or remotely, our students need the essential services covered by our student fees. The Student Wellbeing Fee continues to provide medical and health services, both in person and virtually, for every full-time student. Students can schedule virtual appointments with Student Health Services and online counseling sessions with the Center for Counseling and Student Development. The Comprehensive Fee and Student Center Fees continue to support a wide range of student support and engagement opportunities, including the UD Career Center, diversity and inclusion programming, the recreation center (Little Bob), the Office of the Dean of Students and other units, as well as the nearly 400 registered student organizations (RSO's) at UD. These are essential services to help students find internships and jobs, and help students connect with each other through shared interests and goals. RSO's will continue to host meetings virtually, eSports remain available as well as other programming. We recognize that there will be diminished activity on campus this fall, and thus, reduced the Comprehensive Fee by 15 percent this year.

54.     Defendant announced that it will be issuing *pro-rata* refunds for housing, dining, and parking fees. Accordingly, this action does not seek to certify an On-Campus Housing Class, Meals Class or Parking Class for the recovery of those funds. However, Plaintiffs reserve the right to amend these allegations should Defendant fail or refuse to issue these refunds as promised.

## CLASS ACTION ALLEGATIONS

55.     Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Classes:

**The Tuition Class:**

All people who paid tuition for or on behalf of students enrolled in classes at the University for the Spring 2020 semester but were denied live, in-person instruction and forced to use online distance learning platforms for the latter portion of that semester.

**The Fees Class:**

---

[15] Id.

10

All people who paid fees for or on behalf of students enrolled in classes at the University for the Spring 2020 semester.

56.     Excluded from the Classes are the Board of Trustees of University of Delaware (or similar governing body) and any of their respective members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the judicial officers, and their immediate family members, and Court staff assigned to this case. Plaintiffs reserve the right to modify or amend the Class definitions, as appropriate, during the course of this litigation.

57.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claim on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

58.     This action has been brought and may be properly maintained on behalf of the Classes proposed herein under Rule 23.

**Numerosity: Fed. R. Civ. P. 23(a)(1)**

59.     The members of the Classes are so numerous and geographically dispersed that individual joinder of all members is impracticable.  Plaintiffs are informed and believe that there are thousands of members of the Classes, the precise number being unknown to Plaintiffs, but such number being ascertainable from Defendant's records.  Members of the Classes may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

**Commonality and Predominance: Fed. R. Civ. P. 23(a)(2)**

60.     This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, without limitation:

(a) Whether Defendant engaged in the conduct alleged herein;

(b) Whether there is a difference in value between enrollment in an online distance learning program and enrollment in a live, on-campus instructional program;

(c) Whether Defendant breached its contracts with Plaintiffs and the other members of the Tuition Class by retaining the portion of their tuition representing the difference between the value of online distance learning and on-campus, in-person enrollment;

(d) Whether Defendant was unjustly enriched by retaining the tuition payments of Plaintiffs and the Tuition Class representing the difference between the value of online distance learning and on-campus, in-person enrollment;

(e) Whether Defendant breached its contracts with Plaintiffs and the other members of the Fees Class by retaining fees of Plaintiffs and the other members of the Fees Class without providing the services, benefits and/or programs the fees were intended to cover;

(f) Whether Defendant was unjustly enriched by retaining the fees of Plaintiffs and the Fee Class without providing the services, benefits and/or programs the fees were contracted to cover;

(g) Whether certification of any or all of the classes proposed herein is appropriate under Rule 23;

(h) Whether Class members are entitled to declaratory, equitable, or injunctive relief, and/or other relief; and

(i) The amount and nature of relief to be awarded to Plaintiffs and the other members of the Classes.

**Typicality: Fed. R. Civ. P. 23(a)(3)**

61.     Plaintiffs' claims are typical of the claims of other members of the Classes because, among other things, all such members were similarly situated and were comparably injured through Defendant's wrongful conduct as set forth herein.

**Adequacy: Fed. R. Civ. P. (a)(4)**

62.     Plaintiffs are an adequate representative of the Classes because their interests do not conflict with the interests of other members of the Classes they seek to represent.  Plaintiffs have retained counsel competent and experienced in complex litigation and Plaintiffs intend to prosecute the action vigorously.  The interests of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

**Superiority: Fed. R. Civ. P. 23(b)(3)**

63.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and other members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Classes to individually seek redress for Defendant's wrongful conduct.

64.     Even if members of the Classes could afford individual litigation, the Court system likely could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, comprehensive supervision by a single court, and finality of the litigation.

**Certification of Particular Issues: Fed. R. Civ. P. 23(c)(4)**

65.     To the extent that any described Class herein does not meet the requirements of Rules 23(b)(2) or (b)(3), Plaintiffs seek the certification of issues that will drive the litigation toward resolution.

**Declaratory and Injunctive Relief: Fed. R. Civ. P. 23(b)(2)**

66.     Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described herein, with respect to the members of the Classes as a whole.

**CAUSES OF ACTION**

**FOR A FIRST COLLECTIVE CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(Plaintiffs and Other Members of the Tuition Class)**

67.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

68.     Plaintiffs bring this count on behalf of themselves and other members of the Tuition Class.

69.     Plaintiffs and the other members of the Tuition Class entered into contracts with Defendant which provided that Plaintiffs and other members of the Tuition Class would pay tuition for or on behalf of students and, in exchange, Defendant would enroll such students and admit them to campus; granting them the full rights and privileges of student status, including, but not limited to, access to campus facilities, access to campus activities, and live, in-person instruction in a physical classroom.

70.     The terms of this contract are as implied or set forth by Defendant through its website, academic catalogs, student handbooks, marketing materials and other circulars, bulletins, and publications.

71.     These rights and privileges form the basis of the bargain on which prospective students agree to accept Defendant's offer of enrollment in exchange for the payment of tuition and fees.

72.     One such right is the ability to be physically present on campus, and fully enjoy the facilities, services, and opportunities provided thereon, including the campus' location and surrounding opportunities within Newark, Delaware.

73.     Defendant's website and recruitment brochures are the primary means through which Defendant targets prospective new students and attempts to influence such students to apply for enrollment at the University as opposed to other institutions of higher learning.

74.     Through these publications, Defendant markets to and enrolls students in two separate and distinct products.

75.     Defendant specifically markets certain classes and degree programs as being offered on a fully online basis.

76.     Indeed, Defendant dedicates an entire website to these programs, which can be found at https://online.udel.edu.

77.     Defendant also offers Professional & Continuing Studies online, which can be found at https://www.pcs.udel.edu/programs-courses/.

78.     Conversely, Defendant's publications with respect to non-online classes are full of references to the on-campus experience, including numerous references to student activities;

campus amenities; class size and student/teacher ratios; campus diversity, campus location, and the like.

79.  Defendant's academic catalog opens with a section entitled, "A Message to Students" in which the President of Defendant states the following:



## A Message to Students

Welcome to the 2019-20 academic year at the University of Delaware.

We are thrilled that you have joined us on this lifelong journey of learning and discovery. We are committed to your success, both inside and outside the classroom, by helping you develop the interdisciplinary knowledge, creativity and critical thinking skills you'll need to solve the biggest challenges facing our world.

UD has it all! We are proud of our long tradition of scholarly excellence and our rich legacy of enduring contributions to nearly every aspect of modern life. We have outstanding faculty who believe in the power of active and experiential learning, and we have a dedicated staff whose hard work every day makes the UD experience possible. We have more than 180,000 loyal Blue Hen alumni around the world, eager to serve as your mentors and role models. Most importantly, we have *you*--students who are committed to acquiring and advancing knowledge in the arts, humanities, science, engineering, health, education, economics and many other fields.

In the pages of this catalog, you'll read about the many courses available at UD; they are the essential bricks and mortar of your degree curriculum. But getting a true education also requires your active participation and your contributions. We need your endless curiosity and your diligent effort. We need you to explore and to seek a better understanding of the world beyond what you've known. We need you to apply your passions and skills in service to others.

At UD, you'll be challenged by new ideas, exposed to new cultures and encouraged to see yourself and the world from new perspectives. You will be engaged in a never-ending quest for knowledge and understanding. I look forward to seeing you on campus.

Sincerely,

Dennis Assanis, President

80.  Defendant's academic catalog goes on to boast about its traditions and innovations throughout its past and into the future:[16]

---

[16] Id.

The University of Delaware has a great tradition of excellence, from our roots extending back to a small private academy started in 1743, to the research-intensive, technologically advanced institution of today.

Our alumni tell our story of achievement, from our first class, which included three signers of the Declaration of Independence and one signer of the U.S. Constitution, to the more than 154,000 living Blue Hens who are making vital contributions to the world. Vice President Joseph R. Biden Jr. and his wife, Jill, are both UD alumni.

The University received its charter from the State of Delaware in 1833 and was designated one of the nation's historic Land Grant colleges in 1867. Today, UD is a Land Grant, Sea Grant and Space Grant institution. The Carnegie Foundation for the Advancement of Teaching classifies UD as a research university with very high research activity-a designation accorded less than three percent of U.S. colleges and universities. UD ranks among the nation's top 100 universities in federal R&D support for science and engineering.

A state-assisted, privately governed institution, UD offers a broad range of degree programs: three associate programs, 147 bachelor's programs, 119 master's programs, 54 doctoral programs, and 15 dual graduate programs through our seven colleges and in collaboration with more than 70 research centers. Our student body encompasses more than 17,000 undergraduates, more than 3,600 graduate students and nearly 800 students in professional and continuing studies from across the country and around the globe.

Our distinguished faculty includes internationally known authors, scientists and artists, among them a Nobel laureate, Guggenheim and Fulbright fellows, and members of the National Academy of Sciences, National Academy of Engineering and the American Association for the Advancement of Science.

State-of-the-art facilities support UD's academic and public service activities. Our 146-foot coastal research vessel, Hugh R. Sharp-the most advanced in the U.S.-helps scientists across the region explore the sea. World-class figure skaters train at our High Performance Figure Skating Center. Partnerships with Nemours/A. I. du Pont Hospital for Children, Christiana Care and Thomas Jefferson University; the U.S. Army; Winterthur; Longwood Gardens and Hagley Museum offer unparalleled experiences in health sciences, defense research, art conservation, horticulture and history. The University is now transforming a 272-acre parcel, the site of a former auto assembly plant, into the Science, Technology and Advanced Research (STAR) Campus.

Distinguished speaker series, symposia, 21 intercollegiate athletics programs and numerous intramural and club sports, more than 300 student organizations, concerts, exhibits and other arts and cultural activities enrich campus life.

Thomas Jefferson once described Delaware as a "jewel" among states due to its strategic location on the East Coast, halfway between Washington, D.C., and New York City. Today, however, the location of Delaware's flagship university increasingly is invoked as "halfway between Los Angeles and London."

In addition to our Georgian-inspired main campus in Newark, Del., UD has locations across the state–in Wilmington, Dover, Georgetown and Lewes. A thriving study-abroad program and expanding international partnerships further enhance our students' education as global citizens.

81.     Further, under Defendant's "Unique Research Opportunities" section of its academic catalog, Defendant goes on to claim that, "While some institutions provide only limited research opportunities for undergraduates, a long-standing tradition at the University of Delaware encourages hands-on experience in research laboratories, libraries, and field work for students," before concluding with, "Campus-wide, the University conducts a wide variety of basic and

applied research. Additionally, because the University cooperates with other research institutions, industry, major laboratories, and neighboring museums, students have access to an even wider range of advanced research facilities."[17]

82.     The "Student Life" section in Defendant's academic catalog states that, "The Division of Student Life helps Blue Hens build their sense of belonging and home at the University of Delaware as they develop personally, educationally, and professionally. From [the] New Student Orientation program to Career Services Center counseling and countless experiences in between, Student Life's 12 departments are here to help you make the most of your UD experience."[18]

83.     Defendant's website is similarly descriptive of the "UD experience."

84.     On the "About UD" section on Defendant's main website, visitors and prospective students are greeted with a large photo of Defendant's campus buildings, along with the following:[19]

**OUR STORY**

Our alumni tell our story of achievement -- from the first class that included three signers of the Declaration of Independence and a signer of the Constitution to a Nobel Prize–winning scientist, a Tony Award–winning choreographer and the former vice president of the United States.

Our distinguished faculty includes internationally known authors, scientists and artists. State-of-the-art facilities support UD's academic, research and service activities.

Campus life is welcoming -- enriched by distinguished guest speakers, NCAA Division I intercollegiate athletics, 300-plus engaged student organizations, concerts and other arts and cultural activities.

In addition to our vibrant main campus in Newark, UD has locations across the state -- in Wilmington, Dover, Georgetown and Lewes.

A thriving study-abroad program and expanding international partnerships further enhance our students' education as global citizens.

---

[17] Id.
[18] Id.
[19] https://www.udel.edu/about/

85.    On Defendant's "UD Community" webpage, Defendant makes the following claims:[20]

Engaged, dedicated, loyal and enthusiastic are some of the adjectives that describe the University of Delaware Community.

The University plays an integral role in the city of Newark and the state of Delaware, working to better the community with service projects, research benefiting local agencies and industries, and public outreach throughout the state.

Among the University's greatest strengths is its long and vibrant tradition of public service. In a recent national survey, 75 percent of UD students indicated that they participated in community service by the time they were seniors. In 2015, UD was recognized with the Community Engagement Classification from the Carnegie Foundation for the Advancement of Teaching.

UD is the place to hear world-renowned speakers, enjoy first-rate music and theatre, cheer on Fightin' Blue Hens teams and see compelling exhibits, all of which complement the rich academic experience.

86.    On Defendant's "Prospective Students" webpage, visitors and prospective students are met with a large aerial photo of campus with the words, "Become a Blue Hen."[21]  Defendant then goes on to lure students into learning more about its undergraduate admissions, graduate admissions, and professional and continuing studies.[22]

87.    For example, on the same webpage, under "Undergraduate Admission," Defendant states that, "The University of Delaware is a nationally renowned research university with an award-winning faculty.   We think big, but our smaller classroom sizes, hands-on learning opportunities, and collaborations with faculty means the focus is always on you."[23]

---

[20] https://www.udel.edu/about/ud-community/
[21] https://www.udel.edu/apply/
[22] Id.
[23] Id.

88.     Further, Defendant states, "What's unique about UD? Find Out!"[24] "Our students

appreciate the unique character of our campus – a classic college town with an urban vibe."[25]

89.     Defendant's webpage then goes on to make the following promises:

- **Pursue Your Passion.** At UD we have over 150 majors, over 100 minors and over bachelor's plus accelerated master's degree programs (4+1 programs). That's a lot of options, giving you the ability to customize your education. We've made it easy for you to compare majors and get an idea of what each of your four years ag UD will look like by using our Major Finder.[26]

- **Graduate Into Greatness.** UD's job and career placement rates have historically been well above the national average, according to data from the National Association of Colleges and Employers.[27]

- **Honors College.** If you are the type of student who wants to work hard academically, but also be part of a bright and vibrant community of scholars, the UD Honors College is a good fit for you. Regardless of your major, you will find yourself immersed in a world of opportunities from small Honors classes, residence hall programming and more.[28]

- **Enrichment Opportunities.** We know how important it is for you not only to graduate with a strong career pathway, but also to have a competitive edge. We are looking for creative thinkers like you to join one or more of our *Scholars* and *Fellows* programs, learning and enrichment experiences that will push the boundaries of your intellectual curiosity while giving you specialized skills and career connections.[29]

- **World Scholars.** Looking to immerse yourself in global study? Our innovative UD World Scholars Program will give you an extraordinary four years, beginning with your first semester abroad in Italy, Spain or New Zealand. You will have specialized coursework, internships, a second study abroad, interaction with key individuals on the international stage, and career guidance and mentorship. There's no other program like it.[30]

90.     On Defendant's "Current Student" webpage and subpages, Defendant makes the

following promises:

---

[24] https://www.udel.edu/apply/undergraduate-admissions/plan-your-visit/
[25] Id.
[26] https://www.udel.edu/apply/undergraduate-admissions/first-year-out-of-state-students/
[27] Id.
[28] Id.
[29] Id.
[30] Id.

- **Residence Life & Housing.** We partner with students to create a welcoming on-campus experience.[31]

  - Learn more about how we partner with students to create welcoming, vibrant, and inclusive residence hall communities. Students do more than simply live in our halls; they take the opportunity to learn and engage as they develop as citizens and leaders.[32]

  - Are you excited for your new life at UD? We definitely are! Here you can get connected to helpful housing information for where you are in your Blue Hen journey. If you can't find what you're looking for, or just want to talk to someone, we're here for you.[33]

  - Each year, we house over 7,500 students in 22 buildings on 4 areas of campus: Central, East, Laird and Apartment-style living. Central campus hosts our most historic buildings, lining the green and offering a nostalgic collegiate atmosphere. East of Academy Street and Perkins Student Center, you can find East campus, home to two-thirds of the University's first-year population. North of the Memorial Hall and the Little Bob, you'll find Laird Campus, home to all of our suite-style rooms.[34]

  - The residence halls are our Blue Hens' home at UD. We provide students with different activities and programs that will help them make connections with others, and support their personal growth and development. Students can learn through workshops, programs, and even by meeting with their RA individually or as a group.[35]

- **Campus Dining.** Learn about our locations, view our menus, and discover available meal plans.[36]

  - Our chefs and dietitians are here to help take the mystery out of healthy eating. We recognize and accommodate food allergies, preferences, and special dietary needs in a way that's personalized, sensitive and supportive. In fact, we pride ourselves on working with you to make sure you can find the food that fits your life.[37]

- **Career Services.** This one-stop-shop helps prepare you for the next phase in life.[38]

---

[31] https://www.udel.edu/students/
[32] https://web.archive.org/web/20200204152059/https://www.udel.edu/students/reslife/
[33] https://web.archive.org/web/20200407105806/https://www.udel.edu/students/reslife/prospective/
[34] https://web.archive.org/web/20200601160802/https://www.udel.edu/students/reslife/explore/
[35] https://www.udel.edu/students/reslife/life-in-our-halls/
[36] https://www.udel.edu/students/
[37] https://udel.campusdish.com/HealthAndWellness
[38] https://www.udel.edu/students/

- o  A comprehensive resource for all things career related. Whether you are exploring career options, pursuing an internship or employment, or considering graduate school, the most effective career decisions start here![39]

- o  The Career Center team is here to partner with you in your career planning process as you engage in thinking about and taking steps towards realizing your career goals. The Career Center has developed several initiatives to provide you with fun, interactive ways to reach your career destination. Start as early as you can; your first year is ideal![40]

- o  Rather than choosing a major by flipping a coin or random guessing, approach the process in a wise and thoughtful way. The Career Center offers a variety of tools and assessments for pointing you to a fulfilling career path. Alternatively, if you already have an area or several areas of career interest, the career center provides tailored services based on industry focused career communities. These career communities supply guidance on preparation steps, experiences, and connections needed to be competitive in the workplace.[41]

- o  Joining Career Communities gives you access to: Meetings with career counselors who specialize in your areas of interest; Jobs and internships, professional development opportunities, events, programs and resources; and Alumni, employer and graduate school connections.[42]

- o  For students exploring a variety of career paths and interests, the Career Center offers: Individual career counseling; Career assessments; Career exploration; and "What Can I Do With This Major" programming and information.[43]

- **University Library.** We provide research tools, collections and services for students.[44]

  - o  The Library, Museums and Press is a hub for activity, collaboration and concentration. You will find opportunities to discover, consumer and create content throughout the organization's various locations.[45]

  - o  The main library, Morris Library, sits in the heart of campus on the Green. In addition, there are four branch libraries: the Chemistry Library, the Physics Library, and the Education Resource Center are also on the Newark campus, and the Marine Studies Library is on the Lewes campus.

---

[39] https://web.archive.org/web/20200210083545/https://www.udel.edu/students/career-center/
[40] https://www.udel.edu/students/career-center/students/
[41] https://web.archive.org/web/20191206104531/https://www.udel.edu/students/career-center/students/exploremajor/
[42] Id.
[43] Id.
[44] https://www.udel.edu/students/
[45] https://library.udel.edu/about/

Four Special Collections and Museums gallery spaces—including Mechanical Hall Galley, the Mineralogical Museum in Penny Hall, Old College Gallery and the Special Collections Gallery in Morris Library—display rotating exhibitions that are free and open to the public. The editorial offices of the UD Press, which publishes scholarly works for researchers, are situated in Morris Library.[46]

o   Should you have any questions about the Library or its resources, feel free to ask staff at any service desk. They are your best source for taking full advantage of what the UD Library, Museums and Press has to offer.[47]

91.     Visitors and prospective students seeking further information about the University can connect to Defendant through its numerous official social media accounts.

92.     Upon information and belief, there were no references or disclaimers in any of Defendant's websites, circulars, bulletins, publications, brochures, or other advertisements prior to announcement of campus closure that even referenced the possibility of in-person classes being changed to fully online classes at Defendant's discretion or for any other reason whatsoever after the start of a given term.[48]

93.     Students paid a higher price for an in-person education than they would have paid for an online education.   For instance, Defendant charges $1,898 per credit for its on-campus Education Technology graduate program, and only $697 for the same online variant.   Defendant charges $1,350 per credit for its in-person Accounting Practice graduate program, but only $900 per credit for the same online variant.

94.     In fact, it is clear that, prior to COVID-19 interruption, Defendant had no plans whatsoever to offer its in-person classes via an online delivery model.   This intention is evident

---

[46] Id.
[47] Id.
[48] Students who withdrew or added/dropped a course after February 21, 2020 would not receive any tuition rebate.

from the fact that the University had to cancel classes and extend spring break by a week while its professors hurriedly and ineffectively scrambled to make the switch.

95.     Based upon these advertisements and other promises and inducements made by Defendant, those prospective students who were interested in enrolling at the University after consuming the marketing materials described above were invited to complete applications, and some were selected for and offered admission.

96.     When a student is offered admission to the University, that student receives a number of further communications and has a number of additional interactions with Defendant.

97.     Initially, the student will receive an official offer letter.  For example, at least one version of Defendant's offer letter from the Director of Admissions read, "UD is committed to providing the strong foundation, support and skills you need to succeed and become part of that legacy—from your first day on campus all the way to graduation and starting your career."

98.     The letter goes on to state, "We take pride in attracting extraordinary students like you, and I am confident that our community will benefit from the contributions of your many talents.  I urge you to take advantage of the wide variety of ways in which the University of Delaware can engage and broaden your academic and co-curricular interests.  Our welcoming campus will help you feel like part of a caring community, giving you confidence to dream, explore and challenge yourself. We are pleased to welcome you."

99.     Accepted students are to acknowledge acceptance of the offer of admission by a certain deadline and pay a requisite deposit.

100.     Accepted students and their families are also invited to attend an admitted student visit, where they can spend a day on campus to learn about the next steps in becoming a Blue Hen such as touring the campus and speaking with admissions representatives.[49]

101.     On Defendant's "First-Year Information Session & Campus Tour" webpage, Defendant states, "Visiting is one of the best ways to know if a college is right for you.  Experience the beauty and history of the University of Delaware, located at the very center of the East Coast."[50]

102.     Before COVID-19, Defendant even offered self-guided tours and campus tours, stating, "Visit our Newark campus and take a look around using our map for self-guided tours as an introduction to what life on our beautiful campus will be like," and "Come see for yourself how the University of Delaware can prepare you for a bright future in any field.  Throughout the tour, hear from our Blue Hen Ambassadors.  They're not only student tour guides, but your resource for the real student experience."[51]

103.     Defendant also invited admitted students and families to "Decision Day" where Defendant hosts an open house on-campus to persuade students to accept their offers.  Decision Day gives students the opportunities to learn more about campus life, speak with current students, meet with faculty to gain insight about particular majors, and talk to staff about housing and clubs. Students will get another campus tour and even get to peek inside Defendant's residence halls.[52]

104.     When students officially accept their offers, they are flooded with a number of other communications from the school each referencing the University "community" and extolling the virtues of the on-campus experience.

---

[49]     https://web.archive.org/web/20200101233041/https://www.udel.edu/apply/undergraduate-admissions/plan-your-visit/
[50]     https://web.archive.org/web/20180627171040/https://apply.udel.edu/portal/ugrd-campus-tours
[51]     https://www.udel.edu/apply/undergraduate-admissions/plan-your-visit/
[52]     https://events.udel.edu/event/decision_day_-_admitted_student_open_house#.X5mmJS-z1hE

105.    Before classes start, Defendant requires students to attend a new student orientation or transition program, called OTP.  "OTP's primary goal is to provide you and your family with the information and tools you need to explore UD's offerings, access important resources, learn about a wide range of activities and programs, and discover what it means to be a "Fightin' Blue Hen."[53]

106.    After OTP, students begin to register for classes through their UDSIS accounts. This is another area where Defendant specifically emphasizes the distinction between its in-person and online course offerings through the academic catalogs and course listing on the website.

107.    Each of Defendant's tuition and fees are listed separately on the University's Finances and Aid webpage depending on student status (undergraduate, graduate, professional & continuing studies, special sessions, DE resident, non-resident, etc.).[54]  Further, on Defendant's website for its online variant, fees are listed depending on credit hour and/or chosen program or course.

108.    When students log on to their student accounts to register for in-person classes, each class is listed by description, instructor, meeting time, and physical classroom, among other things.

109.    If students wish to register for online classes, "UD Online (SA-VIRTUAL)" must be selected for Course Location and the online classes are have no mentioned day, time, or room location.

110.    Given the synchronous nature of the in-person classes, students may not register for courses whose meeting times overlap.

---

[53] https://sites.udel.edu/nso/
[54] https://www.udel.edu/students/student-financial-services/coa/

111.    Upon registration, students in many of Defendant's on-campus schools and programs were subject to strict personal attendance requirements as set forth in various departmental policies and handbooks, evidencing Defendant's requirement and the student's acceptance of the requirement that such students physically attend such classes on campus.

112.    That Defendant offered to provide, and members of the Tuition Class expected to receive, instruction on the physical campus is further evidenced by the parties' prior course of conduct.

113.    Those classes for which students expected to receive in-person instruction began the Spring 2020 semester by offering in-person instruction.

114.    Each day for the weeks and months leading up to announced campus closures, students attended physical classrooms to receive in-person instruction, and Defendant provided such in-person instruction.

115.    Likewise, upon information and belief, most students were provided with syllabi and other documents that referenced class meeting schedules, locations, and physical attendance requirements.

116.    Each day for the weeks and months prior to announced closures, students had access to the full campus.

117.    Accordingly, it is clear that Defendant offered to provide live, in-person education, together with a full on-campus experience and that members of the Tuition Class accepted that offer by paying tuition and attending classes during the beginning of the Spring 2020 semester.

118.    It is also clear that Defendant recognized and treated online enrollment vs. on-campus enrollment as two separate and distinct products.

119.     Based on mutual assent, Plaintiffs and other members of the Tuition Class fulfilled their end of the bargain when they paid tuition for the Spring 2020 semester, either by paying out of pocket or by using student loan financing, or otherwise.

120.     However, the University breached the contract with Plaintiffs and other members of the Tuition Class by moving all classes for the Spring 2020 semester to online distance learning platforms, and restricting the on-campus experience without reducing or refunding tuition accordingly.

121.     This cause of action does not seek to allege "educational malpractice."

122.     Rather, it is clear from the facts and circumstances that Defendant offered two separate and distinct products, one being live, in-person, on-campus education, with its featured ancillary and related services, and the other being online distance education.

123.     Plaintiffs and members of the Tuition Class accepted Defendant's offer to provide in-person on-campus education and paid valuable consideration in exchange.

124.     However, after accepting such consideration from Plaintiffs and other members of the Tuition Class, Defendant provided a materially different product, which deprived Plaintiffs and other members of the Tuition Class of the benefit of the bargain for which they had already paid.

125.     Defendant retained tuition monies paid by Plaintiffs and other members of the Tuition Class, without providing them the full benefit of their bargain.

126.     Plaintiffs and other members of the Tuition Class have suffered damage as a direct and proximate result of Defendant's breach amounting to the difference in the fair market value of the services and access for which they contracted, and the services and access which they actually received.

127.    As a direct and proximate result of Defendant's breach, Plaintiffs and other members of the Tuition Class are legally entitled to damages, to be decided by the trier of fact in this action, to include disgorgement of the difference between the fair market value of the online learning provided versus the fair market value of the live, in-person instruction in a physical classroom on a physical campus with all the attendant benefits for which they contracted.

128.    Defendant's performance under the contract is not excused due to the pandemic. Indeed, Defendant should have refunded the pro-rated portion of any education services not provided.  Even if performance was excused or impossible, Defendant would nevertheless be required to return the funds received for services they did not provide.

## FOR A SECOND COLLECTIVE CAUSE OF ACTION
## UNJUST ENRICHMENT
### (Plaintiffs and Other Members of the Tuition Class)

129.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

130.    Plaintiffs brings this count on behalf of themselves and other members of the Tuition Class.

131.    This claim is pled in the alternative to, and to the extent it is determined a contract does not exist or otherwise apply, the contract-based claim set forth in the First Cause of Action above.

132.    Plaintiffs and other members of the Tuition Class paid substantial tuition for live, in-person instruction in physical classrooms on a physical campus with all the attendant benefits.

133.    Plaintiffs and other members of the Tuition Class conferred a benefit on Defendant when they paid this tuition.

134.    Defendant has realized this benefit by accepting such payment.

135.    However, Plaintiffs and other members of the Tuition Class did not receive the full benefit of their bargain.

136.    Instead, Plaintiffs and other members of the Tuition Class conferred this benefit on Defendant in expectation of receiving one product, *i.e.*, live in-person instruction in a physical classroom along with the on-campus experience of campus life as described more fully above, but they were provided with a materially different product carrying a different fair market value, *i.e.*, online instruction devoid of the on-campus experience, access, and services.

137.    Defendant has retained this benefit, even though Defendant has failed to provide the services for which the tuition was collected, making Defendant's retention unjust under the circumstances.

138.    As a result of closing campus and moving classes online, Defendant saved significant sums of money in the way of reduced utility costs, reduced maintenance and staffing requirements, reduced or eliminated hours for hourly employees, reduced or eliminated hours for paid work study students, and otherwise.

139.    Simply put, it is significantly cheaper to operate a remote, on-line campus than a fully open physical campus. But even if it was not, it is not the product that students were offered and not the product the students expected to receive.

140.    Equity and good conscience require that the University return a *pro-rata* portion of the monies paid in tuition to Plaintiffs and other members of the Tuition Class.

141.    This is particularly true where, as here, Defendant's campus is supported by over a billion dollars in endowment funds, while its students, upon information and belief, do not have access to such immense financial resources, and further where, upon information and belief, a

substantial portion of its students have incurred substantial debt to finance an educational experience that they did not receive.

142.    It would be unjust and inequitable for Defendant to retain the benefit, and Defendant should be required to disgorge this unjust enrichment to the extent that Defendant has retained more than the fair market value for the product that Defendant was able to provide.

### FOR A THIRD COLLECTIVE CAUSE OF ACTION
### BREACH OF CONTRACT
### (Plaintiffs and Other Members of the Fees Class)

143.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

144.    Plaintiffs bring this count on behalf of themselves and other members of the Fees Class.

145.    In addition to tuition, Defendant charges a number of mandatory fees.

146.    In its publications, academic catalogs, and particularly on its website, Defendant specifically describes the nature and purpose of each fee.

147.    Some fees apply broadly to all or certain groups of students, while other fees are program or course-based.

148.    As such, it is axiomatic that the monies Plaintiffs and other members of the Fees Class paid towards these fees were intended by both the students and Defendant to cover the services, access, benefits and programs for which the fees were described and billed.

149.    By way of example, Defendant describes its Student Center Fee as covering amortization of bonds used in the construction of the Trabant University Center and in renovations to the Perkins Student Center.  It also supports the operating costs of these student centers.[55]

---

[55] https://catalog.udel.edu/content.php?catoid=29&navoid=3576

150.    The Comprehensive Student Fee supports the student fitness center, recreational programs, student activities, concerts, performing arts, and the activities of registered student organizations.[56]

151.    The Student Wellbeing Fee is charged to all full-time students, entitling them to use the Student Health and Counseling Centers.[57]

152.    Defendant also charges a number of additional optional and/or access-based fees such as lab fees for certain courses and parking permit charges.

153.    As such, in accepting these terms and paying such fees, a contract was formed between Plaintiffs, including the Fees Class, and Defendant, which provided that Plaintiffs and other members of the Fees Class would pay these fees for or on behalf of themselves and, in exchange, Defendant would provide or make available the services, access, benefits, and/or programs related to those fees, as promised.

154.    It is undisputed that Defendant did not provide student activities or organizations, access to recreational facilities, access to certain campus resources, or access to any other workshops, panel presentations, performances, or events.

155.    Plaintiffs and other members of the Fees Class fulfilled their end of the bargain when they paid these fees for the Spring 2020 semester, either by paying out of pocket or by using student loan financing, or otherwise.

156.    However, Defendant breached the contract with Plaintiffs and other members of the Fees Class by moving all classes for the Spring 2020 semester to online distance learning

---

[56] Id.
[57] Id.

platforms, constructively evicting students from campus, closing most campus buildings and facilities, and cancelling most student activities.

157.    By retaining fees paid by Plaintiffs and other members of the Fees Class, without providing them the full benefit of their bargain, Defendant has failed to perform its contractual obligations.

158.    The decision not to discount or refund any fees stands in contrast to Defendant's prior course of conduct and acknowledgements.

159.    While Defendant charges a $429 Comprehensive Student Fee for its on-campus students prior to the COVID-19 pandemic, it charges only $50 for its fully online students,[58] a recognition that students not physically present on campus are not afforded access to or the benefit of most of the things such fees are intended to cover.

160.    Plaintiffs and other members of the Fees Class have suffered damage as a direct and proximate result of Defendant's breach, namely being deprived of the value of the services, access, benefits and/or programs the fees were intended to cover.

161.    As a direct and proximate result of Defendant's breach, Plaintiffs and other members of the Fees Class are legally and equitably entitled to damages, to be decided by the trier of fact in this action, to include disgorgement of the pro-rata amount of fees that were collected but for which services were not provided.

**FOR A FOURTH COLLECTIVE CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(Plaintiffs and Other Members of the Fees Class)**

162.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

---

[58] https://www.pcs.udel.edu/tuition/

33

163.    Plaintiffs bring this count on behalf of themselves and other members of the Fees Class.

164.    This claim is pled in the alternative to, and to the extent it is determined a contract does not exist or otherwise apply, the contract-based claim set forth in the Third Cause of Action above.

165.    Defendant has received a benefit at the expense of Plaintiffs and other members of the Fees Class to which it is not entitled.

166.    Plaintiffs and other members of the Fees Class paid substantial student fees for on-campus services, access, benefits, and/or programs and did not receive the full benefit of the bargain.

167.    Plaintiffs and other members of the Fees Class conferred this benefit on Defendant when they paid the fees.

168.    Defendant realized this benefit by accepting such payment.

169.    Defendant has retained this benefit, even though Defendant has failed to provide the services, access, benefits and/or programs for which the fees were collected, making Defendant's retention unjust under the circumstances.

170.    As a result of closing campus and moving classes online, Defendant saved significant sums of money in the way of reduced utility costs, reduced maintenance and staffing requirements, reduced or eliminated hours for hourly employees, reduced or eliminated hours for paid work study students, and otherwise.

171.    Simply put, it is significantly cheaper to operate a remote, on-line campus than a fully open physical campus.

172.    Equity and good conscience require that Defendant return a *pro-rata* portion of the monies paid in fees to Plaintiffs and other members of the Fees Class.

173.    This is particularly true where, as here, Defendant's campus is supported by over a billion dollars in endowment funds, while its students, upon information and belief, do not have access to such immense financial resources, and further where, upon information and belief, a substantial portion of its students have incurred substantial debt to finance an educational experience that they did not receive.

174.    Defendant should be required to disgorge this unjust enrichment to the extent that Defendant has retained more than the fair market value for the product that Defendant was able to provide.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, each individually and on behalf of members of the Classes, pray for judgment in their favor and against Defendant as follows:

A.    Certifying the Classes as proposed herein, designating Plaintiffs as Class representatives, and appointing undersigned counsel as Class Counsel;

B.    Declaring that Defendant is financially responsible for notifying the Class members of the pendency of this action;

C.    Declaring that Defendant has wrongfully kept monies paid for tuition and fees;

D.    Requiring that Defendant disgorge amounts wrongfully obtained for tuition and fees;

E.    Awarding injunctive relief as permitted by law or equity, including enjoining Defendant from retaining the pro-rated, unused monies paid for tuition and fees;

F.    Scheduling a trial by jury in this action;

G.      Awarding Plaintiffs' reasonable attorney's fees, costs and expenses, as permitted by law;

H.      Awarding pre and post-judgment interest on any amounts awarded, as permitted by law; and

I.      Awarding such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff's demand trial by jury in this action of all issues so triable.

Dated: September 3, 2021                    **CROSS & SIMON, LLC**

                                             _/s/ Christopher P. Simon_
                                            Christopher P. Simon (No. 3697)
                                            Michael L. Vild (No. 3042)
                                            1105 N. Market Street, Suite 901
                                            P.O. Box 1380
                                            Wilmington, Delaware 19801-1380
                                            (302) 777-4200
                                            csimon@crosslaw.com
                                            mvild@crosslaw.com

                                            -AND-

                                            **ANASTOPOULO LAW FIRM, LLC**
                                            Eric M. Poulin*
                                            Roy T. Willey, IV*
                                            Blake G. Abbott*
                                            32 Ann Street
                                            Charleston, SC 29403
                                            (843) 614-8888
                                            eric@akimlawfirm.com
                                            roy@akimlawfirm.com
                                            blake@akimlawfirm.com

                                            CHIMICLES SCHWARTZ KRINER
                                            & DONALDSON-SMITH LLP

Robert J. Kriner, Jr. (#2546)
Scott M. Tucker (#4925)
2711 Centerville Rd., Suite 201
Wilmington, DE 19808
Tel: (302) 656-2500

BURSOR & FISHER, P.A.
Joshua D. Arisohn
888 Seventh Avenue
New York, NY 10019
Tel: (646) 837-7150
Facsimile: (212) 989-9163
Email: jarisohn@bursor.com

BURSOR & FISHER, P.A.
Sarah N. Westcot
2665 S. Bayshore Drive, Suite 220
Miami, FL 33133
Tel: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com

*Pro Hac Vice*

**Attorneys for Plaintiffs**