**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PENNY NINIVAGGI et al., individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNIVERSITY OF DELAWARE,<br><br>*Defendant*. | Civil Action No. 20-cv-1478-SB |
| HANNAH RUSSO, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>UNIVERSITY OF DELAWARE,<br><br>*Defendant*. | Civil Action No. 20-cv-1693-SB |

**MOTION TO EXCLUDE THE EXPERT TESTIMONY OF
<u>STEVEN P. GASKIN</u>**

**SAUL EWING ARNSTEIN & LEHR LLP**

James D. Taylor, Jr. (#4009)
Marisa R. De Feo (#6778)
Juliana G. Clifton (#6980)
1201 N. Market Street, Suite 2300
Wilmington, DE  19801
(302) 421-6800
james.taylor@saul.com
marisa.defeo@saul.com
juliana.clifton@saul.com

**OF COUNSEL
SAUL EWING ARNSTEIN & LEHR
LLP**

*Counsel for Defendant University of Delaware*

Jonathan A. Singer (admitted *pro hac vice*)
1001 Fleet Street, 9th Floor
Baltimore, MD 21202
(410) 332-8690
jon.singer@saul.com
Dated: September 30, 2022

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

NATURE AND STAGE OF THE PROCEEDINGS ............................................. 1

SUMMARY OF THE ARGUMENT ..................................................................... 1

STATEMENT OF FACTS ...................................................................................... 3

    I.      PLAINTIFFS' THEORY OF LIABILITY AND DAMAGES .......................... 3

    II.     GASKIN'S "CLASS ACTION CONJOINT" IS CREATED FOR LITIGATION ............................................................................................. 4

ARGUMENT ........................................................................................................... 6

    I.      LEGAL STANDARD ..................................................................................... 6

    II.     THE HYPOTHETICAL MODEL SHOULD BE EXCLUDED BECAUSE IT REJECTS APPLICABLE REAL-WORLD DATA, IS NOT BASED ON RELIABLE METHODS, AND DOES NOT FIT THE FACTS OF THE CASE ............................................................................................................ 7

          A.   *Dispositive Real-World Data from the Fall 2020 Semester Contradicts the Hypothetical Model and Establishes No Change in Students' Willingness to Pay* . 7

          B.   *The Hypothetical Model is Incompatible with Plaintiffs' Liability Theory Because it Assumes Plaintiffs and the Putative Class Were Damaged at the Time and Point of Sale, Not When the University Allegedly Breached an Implied Contract By Transitioning Online Due to the COVID-19 Pandemic* ..................... 8

          C.   *The Hypothetical Model is Unreliable Because it Generates a Wide Range of Alleged Overpayment Percentages and a High Error Rate* ................................... 9

          D.   *The Hypothetical Model Suffers from Multiple and Significant Methodological Flaws and is Unreliable* ............................................................ 12

    III.    GASKIN IS NOT QUALIFIED AND LACKS A SUFFICIENT FACTUAL BASIS TO TESTIFY REGARDING THE HYPOTHETICAL MODEL ...... 18

          A.   *Gaskin Failed to Supervise AMS and AMS Did the Majority of the Work* .... 18

          B.   *Gaskin Has Never Performed a Conjoint to Assess Tuition Market Price Outside of Litigation and Plaintiffs Have Not Shown that the Hypothetical Model is Accepted in the Community or Used by Others Outside of Litigation* .............. 19

          C.   *Gaskin is Unfamiliar with the Facts and Documents* ................................... 20

# TABLE OF AUTHORITIES

**Page**

CASES

*Adams v. Target Corp.*,
  2014 WL 12558858 (C.D. Cal. Nov. 25, 2014).....................................................18

*Apple, Inc. v. Samsung Elecs. Co.*,
  2014 WL 976898 (N.D. Cal. Mar. 6, 2014) ..........................................................12

*Ayers v. Robinson*,
  887 F. Supp. 1049 (N.D. Ill. 1995) ......................................................................11

*Beaty v. Ford Motor Co.*,
  2020 WL 639408 (W.D. Wash. Feb. 11, 2020)................................................14, 15

*In re Blood Reagents Antitrust Litig.*,
  783 F.3d 183 (3d Cir. 2015)....................................................................................7

*Brown v. The Am. Tobacco Co.*,
  2013 WL 7154428 (Cal. Super. Ct. Sept. 23, 2013)................................................8

*Comcast Corp. v. Behrend*,
  133 S.Ct. 1426 (2013)..........................................................................................7, 9

*Daubert v. Merrill Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ...............................................................................................6

*In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*,
  2017 WL 1196990 (N.D. Ill. Mar. 31, 2017).........................................................18

*Herron v. Best Buy Stores, LP*,
  2016 WL 1572909 (E.D. Cal. Apr. 19, 2016).........................................................12

*In re NJOY Consumer Class Action Litig.*,
  120 F.Supp. 3d 1050 (C.D. Cal. 2015) .................................................................12

*Kannankeril v. Terminix Int'l, Inc.*,
  128 F.3d 802 (3d Cir. 1997) ...................................................................................6

*J & J Snack Foods, Corp. v. Earthgrains Co.*,
  220 F. Supp. 2d 358 (D.N.J. 2002) .......................................................................15

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007).....................................................................18

*McLaughlin v. Am. Tobacco Co.*,
   522 F.3d 215 (2d Cir. 2008)........................................................................................12

*Numatics, Inc. v. Balluff, Inc.*,
   66 F. Supp.3d 934 (E.D. Mich. 2014)........................................................................19

*Oddi v. Ford Motor Co.*,
   234 F.3d 136 (3d Cir. 2000)..........................................................................................6

*Oracle Am., Inc. v. Google Inc.*,
   2012 WL 850705 (N.D. Cal. Mar. 13, 2012) .............................................................18

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994).............................................................................................6

*Pharmacia Corp. v. Alcon Lab., Inc.*,
   201 F. Supp. 2d 335 (D.N.J. 2002) ............................................................................11

*Pittsburgh Press Club v. United States*,
   579 F.2d 751 (3d Cir. 1978) ........................................................................................15

*Pineda v. Ford Motor Co.*,
   520 F.3d 237 (3d Cir. 2008) ..........................................................................................6

*In re POM Wonderful LLC*,
   2014 WL 1225184 (C.D. Cal. Mar. 25, 2014).............................................................9

*Saavedra v. Eli Lilly & Co.*,
   2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) .......................................................4, 12

*Schechner v. Whirlpool*,
   2019 WL 4891192 (E.D. Mich. Aug. 13, 2019) .........................................................14

*Townsend v. Monster Beverage Corp.*,
   303 F. Supp. 3d 1010 (C.D. Cal. 2018) .....................................................................18

*Traharne v. Wayne Scott Fetzer Co.*,
   156 F. Supp.2d 717 (N.D. Ill. 2001) ..........................................................................19

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442, 457-61 (2016) .........................................................................................7

*United States v. Downing*,
   753 F.2d 1224 (3d Cir. 1985) ........................................................................................7

*Villoldo v. BNP Paribas S.A.*,
   648 Fed. App'x 53 (2d Cir. 2016) ..............................................................................12

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prod. Liab. Litig.,*
500 F. Supp. 3d 940 (N.D. Cal. 2020) ................................................................11, 14, 15, 17

*Water Pik, Inc. v. Med-Sys., Inc.,*
726 F.3d 1136 (10th Cir. 2013) ........................................................................18

**STATUTES**

Fed. R. Civ. P. 37(c)(1) ........................................................................19

FED. R. CIV. P. 23(a) (b) ........................................................................7

FED. R. CIV. P. 26(a) ........................................................................19

FED. R. EVID.702 ........................................................................ passim

FED. R. EVID.703 ........................................................................1

**OTHER AUTHORITIES**

Bryan K. Orme & Keith Chrzan, *Becoming an Expert in Conjoint Analysis* 241
(2d ed. 2021) ........................................................................20

Bryan K. Orme, *Getting Started With Conjoint Analysis* 195 (4th ed. 2020) ........................11

*What is a Conjoint Analysis & How Is It Used?*, SAWTOOTH SOFTWARE (last
accessed Sept. 30, 2022), https://sawtoothsoftware.com/conjoint-analysis ...........................4

## NATURE AND STAGE OF THE PROCEEDINGS

Defendant, the University of Delaware (the "University"), moves to exclude the testimony of Plaintiffs' expert Steven P. Gaskin ("Gaskin").  Plaintiffs allege that they and their putative class sustained damages resulting from the transition to virtual education in the wake of the COVID-19 global pandemic, which required the University to cease in-person instruction. In support, Gaskin intends to opine both that such alleged damages are capable of class wide measurement (which they are not) and that such alleged damages flow from a purported reduction in the market value of the tuition Plaintiffs and the putative class allegedly paid to the University for the Spring 2020 semester.  To enable his testimony, Gaskin purportedly manufactured a "class action conjoint"[1] seeking to quantify "the difference in market value of in-person classes and full access to the University's campus and facilities, compared to the market value of online classes and no access to the University's campus or facilities, at the time and point of sale" (the "Hypothetical Model").[2] The Hypothetical Model is unnecessary, unreliable, lacks a factual basis, and should be excluded under Rules 702 and 703.

## SUMMARY OF THE ARGUMENT

1.      The Hypothetical Model is inappropriate and unnecessary because ***there is real-world data from the Fall 2020 semester establishing that 89.7% of University undergraduate***

---

[1] Gaskin uses the phrase "class action conjoint" as if the mere performance of a conjoint in class litigation withstands scrutiny because it is a "class action conjoint."  (Ex. 1 at 16:3; 127:9; 128:12-20; 129:12-15; 137:20-23; 139:14; and 140:23).  Yet no such thing exists and Gaskin instead just uses the term "class action conjoint" to dismiss methodological flaws inherent in his choice-based conjoint analysis.  (Ex. 1 at 81:21:23 (confirming use of choice-based conjoint)).

[2] Plaintiffs also retained Colin B. Weir ("Weir") to calculate the putative class's alleged damages using the alleged percentage difference in market value between in-person classes/full campus access and online classes/no campus access purportedly generated through the Hypothetical Model. The University has contemporaneously filed a separate Motion to Exclude Weir's Testimony, which it adopts and incorporates by reference herein to the extent applicable.

***students who were in their first year re-enrolled at the same list price knowing that most classes would be online and their access to campus services would be limited.*** The Hypothetical Model intentionally ignores this dispositive real-world data altogether in favor of a concocted alternative reality because Plaintiffs could not otherwise allegedly demonstrate a reduction in market value using real-world data.

2. The Hypothetical Model is inconsistent with Plaintiffs' liability theory because it assumes that Plaintiffs and the putative class were damaged at the time and point of sale—*i.e.*, when students enrolled for Spring 2020 classes. Plaintiffs' liability theory, however, alleges students were damaged two months later—mid-semester, not at the time and point of sale—when the University allegedly breached an implied contract by transitioning online due to the COVID-19 global pandemic. It is illogical to assume damages before the alleged breach even occurred.

3. Even if the Hypothetical Model was necessary and consistent with Plaintiffs' liability theory (which it is not), it is nonetheless unreliable because (a) it generated a ***15.16%-57%*** range of alleged overpayment percentages and Gaskin randomly and unscientifically chose "the most conservative number;" and (b) Gaskin conceded that the Hypothetical Model is inaccurate one-third of the time.

4. The Hypothetical Model rests on multiple and significant methodological flaws and fails to simulate the circumstances and real-world choice options confronting actual putative class members mid-Spring 2020, rendering it inadmissible, including that it: (a) failed to account for required supply-side considerations; (b) sampled survey respondents who were unrepresentative of University students; (c) failed to accurately define "Closure of the University Campus," conflating tuition and fees (the latter of which are no longer at issue in this case); (d) failed to account for the fact that putative class members were already University students and

instructed respondents to assume they were first-time enrollees, not re-enrollees like the putative class members; (e) suffered from an "abysmally low" response rate of actual University students, and otherwise low response/completion rates; (f) failed to adequately pre-test; (g) failed to identify appropriate competitors of the University; and (h) failed to include the most important attributes to University students, which are also inherently individualized.

5.      Gaskin is not qualified and lacks a sufficient factual basis to testify regarding the Hypothetical Model because: (a) a third-party, Applied Marketing Sciences (not Gaskin) did all of the work to design, execute, and analyze the unnecessary conjoint; (b) Gaskin has never performed a conjoint survey to assess tuition pricing in higher education, apart from manufacturing similar surveys in other tuition refund cases for purposes of litigation that were never subjected to scrutiny under *Daubert*; and (c) Gaskin did not review any facts, documents, or testimony in this case, precluding him from opining that the model accurately simulates the alleged reduction in market value of tuition for Plaintiffs and the putative class.

## STATEMENT OF FACTS

## I.    PLAINTIFFS' THEORY OF LIABILITY AND DAMAGES

Plaintiffs initiated this action as "a result of [the University's] decision not to issue appropriate refunds for the Spring 2020 term after canceling in-person classes and changing all classes to an online/remote format, closing most campus buildings, and requiring all students who could leave campus to do so as a result of the Novel Coronavirus Disease ('COVID-19')." (Consolidated Compl. ¶ 1).  Plaintiffs seek tuition refunds of the amount they and putative class members allegedly overpaid for the Spring 2020 semester, theorizing that they overpaid tuition for the online portion of the semester.  (*Id.* ¶ 4).

Plaintiffs retained Gaskin and Weir to opine on the alleged overpayment damages based on the Hypothetical Model even though conjoint analysis was never designed or intended to quantify alleged damages in litigation. Rather, it was developed as a market research tool for companies to "gain[] strategic insights and mak[e] better business decisions relating to product pricing, product feature development, branding and package design, [and] marketing messaging validation" by helping companies "learn what's truly important to customers." (*What is a Conjoint Analysis & How Is It Used?*, SAWTOOTH SOFTWARE (last accessed Sept. 30, 2022), https://sawtoothsoftware.com/conjoint-analysis)[3]  Conjoint merely allows companies to "tease out the value of a products different features and conduct choice simulations to estimate price sensitivity, **willingness to pay, and overall demand** for different product configurations" to inform strategic business decisions. *Id.*  As Sawtooth indicates, conjoint measures consumers' willingness to pay and demand only—not actual market price of consumer products, let alone the market price of a vastly different service like higher education. *Id.; see also Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, at \*4 (C.D. Cal. Dec. 18, 2014) ("Conjoint analysis is a statistical technique capable of using survey data to determine how consumers value a product's individual attributes—often called the market's willingness to pay," which "is a subjective concept distinct from the fair market value concept[.]").  Gaskin concedes that "willingness to pay only incorporates demand side," stating "that's the generally accepted wisdom." (Ex. 1 at 254:1-3).

## II.   GASKIN'S "CLASS ACTION CONJOINT" IS CREATED FOR LITIGATION

Gaskin admits that a conjoint analysis has **never been used in the real-world by any higher education institution in the country to establish tuition pricing.** (Ex. 1 at 83:19-84:3;

---

[3] Gaskin recognizes Sawtooth Software as "the leading conjoint analysis software provider," and relied heavily on the software to construct and design his conjoint.  (Ex. 1 at 40:19-41:4; 98:17-18; 100:23-101:5; 104:19-22; and 241:18-242:14; Ex. 2 at p. 7, 19, 27-28, 30).

100:5-17).  Despite allegedly designing the first-of-its-kind conjoint (and having no experience in higher education), Gaskin pawned the task of conducting the survey to Applied Marketing Sciences ("AMS").  (Ex. 1 at 42:11-44:2).  AMS was not disclosed by Plaintiffs as an expert, and AMS has not provided an expert report in this action.  (Ex. 1 at 14:17-20, 45:10-13, 51:6-9; Ex. 3).  AMS, however, is separately engaged by Plaintiffs and billed a total of ***327.5 hours*** for planning and design, fieldwork monitoring and coordination, programming and testing, online study, data entry, coding and analysis, and expert report development and support, while Gaskin, by contrast, billed a total of ***16.25 hours***.  (Ex. 1 at. 45:2-14; *see also* Exhibit 4 AMS & Gaskin invoices).  Unsurprisingly, Gaskin therefore could not answer simple questions regarding AMS' tasks and responsibilities, such as who at AMS conducted the preliminary pretesting, which was ultimately used to confirm the conjoint design and that it was free from ambiguity; could not identify their names; and testified that it was "hard to tell exactly what each did."  (Ex. 1 at 16:14-24; 178:2-9).

AMS invited 107,272 individuals from across the country, ages 16 and older, to complete the online survey.  (Ex. 2 at p. H-1).  The survey asked respondents to select one of three hypothetical universities to enroll in.  (Ex. 2 at p. 27).  The survey identified seven attributes: university name, undergraduate teaching ranking, student-faculty ratio, 4-year graduation rate, ethnic diversity index, class and campus format, and tuition per semester.  (Ex. 2 at p. 13). However, survey respondents were instructed to ***completely ignore the impact of the COVID-19 pandemic***.  (Ex. 2 at p. 21, n. 36).  The Hypothetical Model is based on 994 respondents, at most 17 of which were from the University's Student List, and yielded ***wildly different "overpayment" percentages, ranging from 15.2% to 57%.***  (Ex. 2 at p. 18-19, Ex. K-3, K-4; Ex. 1 at 189:11-19).  Gaskin then randomly and unscientifically simply chose to opine that the tuition

market value should be reduced by 15.2% due to the transition online because it was the "most conservative" number within the generated range.  (Ex. 2 at p. 31-32; Ex. 1 at 246:13-247:2).

## ARGUMENT

### I.   LEGAL STANDARD

Federal Rule of Evidence 702 permits a witness to offer an expert opinion if he is qualified as an expert and if the opinion is helpful to the trier of fact, is based on sufficient facts or data, is the product of reliable principles and methods, and the expert has reliably applied those principles and methods to the facts of the case.  Fed. R. Evid. 702.  In deciding whether to admit expert testimony, the trial court serves as a "gatekeeper" tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 580 (1993).  The proponent of the expert testimony must prove these requirements by a preponderance of the evidence.  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000).

Expert testimony is inadmissible if it is not "based on valid reasoning and reliable methodology." *Id.* (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)).  This Court is to consider the following factors in evaluating reliability:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* at 156 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994)).  The "factors drawn from *Daubert* . . . are neither exhaustive nor applicable in every case."  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 248 (3d Cir. 2008) (quoting *Kannankeril*, 128 F.3d at 806-07).

Even if sufficiently reliable, an expert's opinion is not admissible if it will be "non-helpful" to the trier of fact and does not "fit" the facts of the case. *Daubert*, 509 U.S. at 590-91. "[A]dmissibility depends in part on 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" *Paoli*, 35 F.3d at 742-43 (quoting *United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir. 1985)). Therefore, "even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge for purposes of the case." *Id*.

Also relevant here, Rule 702's admissibility requirements apply at the class certification stage. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 457-61 (2016); *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187-88 (3d Cir. 2015). "Expert testimony that is insufficiently reliable to satisfy the *Daubert* standard cannot 'prove' that the Rule 23(a) prerequisites have been met 'in fact,' nor can it establish 'through evidentiary proof' that Rule 23(b) is satisfied." *Comcast Corp. v. Behrend,* 569 U.S. 27, 33 (2013)).

## II.   THE HYPOTHETICAL MODEL SHOULD BE EXCLUDED BECAUSE IT REJECTS APPLICABLE REAL-WORLD DATA, IS NOT BASED ON RELIABLE METHODS, AND DOES NOT FIT THE FACTS OF THE CASE

### A.   *Dispositive Real-World Data from the Fall 2020 Semester Contradicts the Hypothetical Model and Establishes No Change in Students' Willingness to Pay*

There is no need to use the Hypothetical Model to purportedly assess students' willingness to pay for in-person instruction compared to online instruction because ***89.7%*** of first-year University undergraduate students re-enrolled in the Fall 2020 semester and were charged at least the same tuition as the Spring 2020 semester, ***all while knowing that Fall 2020 semester classes would be at least partially online and campus access could be reduced.*** (Ex. 5

at p. 12-13; Ex. 6).[4]   A conjoint analysis that, as here, generates "nonsensical results" and contradicts real-world data is unreliable.  *Brown v. The Am. Tobacco Co.*, 2013 WL 7154428, at *6 (Cal. Super. Ct. Sept. 23, 2013).

Even Gaskin admits that conjoint analyses are "***abstractions of reality***."  (Ex. 1 at 121:9-13).  So why turn a blind eye to dispositive real-world data from Fall 2020 in favor of an abstraction of reality?  Because the real-world data did not benefit Plaintiffs.  When confronted with this question, Gaskin testified only that he "felt it wasn't appropriate" to consider the Fall 2020 semester (Ex. 1 at 157:15-21) because it was a "different situation"—without further explanation. (Ex. 1 at 160:3-19).  The fact that Gaskin chose to model a "different situation" from the Fall 2020—one that he concocted to avoid the Fall 2020 data—is no excuse for disregarding dispositive real-world data establishing that almost 9 out of 10 University first-year undergraduate students re-enrolled in the Fall 2020 semester at the same list prices as Spring 2020 semester knowing they would still be, at least partially, online.  The Hypothetical Model defies both common sense and market reality and, therefore, must be excluded.[5]

**B.**     ***The Hypothetical Model is Incompatible with Plaintiffs' Liability Theory Because it Assumes Plaintiffs and the Putative Class Were Damaged at the Time and Point of Sale, Not When the University Allegedly Breached an Implied Contract By Transitioning Online Due to the COVID-19 Pandemic***

Plaintiffs allege that putative class members were harmed mid-semester when the University transitioned from in-person to remote instruction when COVID-19 reached pandemic

---

[4] The University retained Dr. Benjamin S. Wilner ("Wilner") to assess and respond to Gaskin and Weir's proposed opinions. Wilner prepared a 99-page report (including exhibits thereto) that more fully describes the methodological and other flaws in the Hypothetical Model, which the University adopts and incorporates in full by reference herein.

[5] The Hypothetical Model further ignores reality by creating choice options ***that did not exist in the real-world*** at the time of the alleged breach when the University transitioned online by telling respondents to choose between in-person/campus access and online/no campus access when, instead, all higher education institutions transitioned online.  (Ex. 5 at p. 12-13).

levels. (Consolidated Compl. ¶ 1). The Hypothetical Model, however, assumed and was designed to purportedly measure damages *at the time and point of sale—i.e.*, when students registered for Spring 2020 classes *before* the semester began. (Ex. 1 at 131:7-10). It is therefore detached from Plaintiffs' liability theory because: (1) it purportedly measures respondents' willingness to pay tuition at the start of the Spring 2020 semester, before the University's alleged breach of contract mid-semester; and (2) it instructs respondents to assume they are making choices between in-person and online learning in a pre-pandemic world and disregarding COVID-19, notwithstanding that COVID-19 triggered the alleged breach.

The Hypothetical Model's purported measurement of survey respondents' willingness to pay for in-person/campus access versus online/no campus access in a *pre-pandemic* world is completely irrelevant and detached from Plaintiffs' claims that they overpaid in a *post-pandemic* world. Moreover, by the time of the University's alleged breach, (mid-semester) students had no option for in-person/campus access at any university in the country due to COVID-19. Thus, any overpayment percentage that the model purportedly generated from respondents' unrealistic choice options does not square with Plaintiffs' actual liability theory claiming a mid-semester breach of contract and resulting damages. *See Comcast*, 569 U.S. at 35 (establishing that any model supporting "plaintiff's damages case must be consistent with its liability case" and must measure only those damages attributable to that theory); *In re POM Wonderful LLC*, 2014 WL 1225184, at *5 n.7 (C.D. Cal. Mar. 25, 2014) (holding that failure to put forward a sound damages model pursuant to *Comcast* necessitated striking the opinion). The Hypothetical Model does not "fit" the facts of the case and is thus inadmissible under *Daubert* and Rule 702.

C.     ***The Hypothetical Model is Unreliable Because it Generates a Wide Range of Alleged Overpayment Percentages and a High Error Rate***

A trial court may consider several factors in evaluating whether a particular methodology is reliable, including "the known or potential rate of error." *Daubert*, 509 U.S. at 589. Here, the Hypothetical Model fails to generate any reliable alleged overpayment percentage and is admittedly inaccurate one-third of the time, rendering it inadmissible under Rule 702.

       1.    <u>Gaskin Arbitrarily Selected an Overpayment Percentage from the Wide Range Generated by the Model</u>

In opining that the tuition market value dropped 15.2%, Gaskin did not utilize actual results from his survey. He made up the market value decline by combining data points from different survey scenarios in an attempt to mask the extreme variation that the Hypothetical Model actually generates. (Ex. 5 at p. 63). The overpayment percentages range from ***15.16% to 56.72%*** —a vast difference of 41.56%:

| Figure 8 | | | | | | |
|---|---|---|---|---|---|---|
| **Mr. Gaskin's Range of Alleged Overcharge Percentages Based Upon Price** | | | | | | |
| **Description** | **Price 1** | **Price 2** | **Price 3** | **Price 4** | **Price 5** | **Gaskin** |
| Classes held online; no access to campus or facilities | $3,250 | $6,750 | $10,250 | $13,750 | $17,250 | n/a |
| Randomized First Choice Simulation Result (Alleged In-Person Premium) | $4,260 | 2,614 | $3,195 | $2,866 | n/a | 2,614 |
| Simulated In-Person Price | $7,510 | $9,364 | $13,445 | $16,616 | $17,250 | $17,250 |
| Alleged Overcharge Percentage | 56.72% | 27.92% | 23.76% | 17.25% | n/a | 15.16% |

(Ex. 5. at p. 63, Figure 8). The Hypothetical Model is therefore inherently unreliable, and Gaskin's testimony has previously been excluded for this very reason:

> [t]he results of Mr. Gaskin's analysis indicate that his methodology was not reliable….Further, Mr. Gaskin calculated radically different "overcharge" percentages depending on the price of the vehicle (ranging from 8.5% to 60.5%). An overpayment ratio might sensibly vary depending on price, *see* Gaskin Reply ¶24, ***but a range that resembles 'somewhere between almost nothing and almost everything' is facially unrealistic. Merely picking the lowest number in that range does not remove doubt."***

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prod. Liab. Litig.,* 500 F. Supp. 3d 940, 950 (N.D. Cal. 2020) (emphasis added).

Despite claiming the 15.2% overpayment percentage he manufactured was "conservative," Gaskin never explained how or why that selection was an economically sound or a reliable scientific assumption.  (Ex. 2 at p. 31-32; Ex. 1 at 246:13-247:2).  "A conservative opinion . . . does not equate to a scientific one."  *Ayers v. Robinson*, 887 F. Supp. 1049, 1060 (N.D. Ill. 1995) (granting motion to exclude expert testimony because the "conservative" selection was improper).  As in *Volkswagen*, Gaskin cannot arbitrarily and unscientifically manufacture a "conservative" overpayment percentage from a model that generates a range of potential percentages (particularly where, as discussed below, the model is wrong one-third of the time).  This Court should likewise exclude such speculative, unreliable testimony.

2.    The Hypothetical Model is Inaccurate One-Third of the Time

Exhibit J-2 of Gaskin's report indicates the Hypothetical Model has a 65% hit rate—meaning that ***one-third of the time, the model is simply inaccurate***.  (Ex. 1 at 242:16-21).  Gaskin claimed that a 65% hit rate is a "very acceptable number in the world of conjoint," but when pressed, could not point specifically to any literature to support that contention.  (Ex. 1 at 241:15-242:15).  Moreover, Orme, who Gaskin relies upon extensively throughout his report, states that "[h]it rates for hold-out choice tasks involving three of four product alternatives usually range from 70-85 percent," indicating that even in the world of market research, a 65% hit rate is unacceptably low.  (Bryan K. Orme, *Getting Started With Conjoint Analysis* 195 (4th ed. 2020)).  Without any support, Gaskin asserts that his low hit rate somehow "still provides good estimators."  (Ex. 1 at 242:16-21).  It does not and courts have excluded opinions with high error rates.  *See, e.g., Pharmacia Corp. v. Alcon Lab., Inc.*, 201 F. Supp. 2d 335, 355 (D.N.J.

2002) (excluding defendant's expert report because the statistical model was unreliable due to its high error rate).   Whether or not useful in the world of market research, a model that is inaccurate one-third of the time is insufficient and unreliable under Rule 702 and *Daubert* to permit Gaskin to testify that tuition market value dropped by 15.2%.

      **D.**     ***The Hypothetical Model Suffers from Multiple and Significant Methodological Flaws and is Unreliable***

      The Hypothetical Model is significantly methodologically flawed because it:

- **Failed to Account for Required Supply-Side Considerations.** Multiple courts have held that conjoint surveys, like the one here, that seek to "quantify the relative value of a class of consumers ascribed" to an attribute are insufficient to establish "an absolute valuation to be awarded as damages."   *See, e.g., Saavedra*, 2014 WL 7338930, at *4-5.[6]   That is because, as explained above, "willingness to pay" metrics look only to the "demand side of the market equation," whereas the "ultimate price of a product is a combination of market demand and market supply."   *In re NJOY Consumer Class Action Litig.*, 120 F.Supp. 3d 1050, 1119 (C.D. Cal. 2015) (quoting *Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 976898, at *11 (N.D. Cal. Mar. 6, 2014)); *see also Herron v. Best Buy Stores, LP*, 2016 WL 1572909, at *10 (E.D. Cal. Apr. 19, 2016) (finding "fault with the damages evaluation method proposed by Plaintiff because a laptop's relative value . . . does not equal its sale price").

      Gaskin claims to have accounted for supply-side factors, as he must, but in explaining what was actually done, his answer makes clear that he did not:

---

[6] *See also, e.g., McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 229 (2d Cir. 2008) (rejecting damages model based on conjoint survey where the court was "asked to conceptualize the impossible—a healthy cigarette—and then to imagine what a consumer might have paid for such a thing"), *abrogated on other grounds Villoldo v. BNP Paribas S.A.*, 648 Fed. App'x 53 (2d Cir. 2016).   The same is true here – how can one imagine a world without the COVID-19 pandemic after it came to be?

> Q:      So you are unaware of how the University actually sets its tuition pricing, correct?
>
> A:      Again, that's outside the scope of my assignment. I am asking students about the change in market value according to them.

(Ex. 1 at 84:18-22).   That explanation of what the Hypothetical Model actually sought is consistent with Sawtooth's explanation of what a conjoint actually is—a measurement of consumers' willingness to pay/demand.   It also establishes that Gaskin does not care how the University actually sets pricing, whether demand-side factors even influence pricing, or whether the University's tuition pricing is determined through separate and unrelated policies unaffected by demand, such that he could not possibly have accounted for required supply-side factors.

Wilner spends 8 pages in his report explaining why the Hypothetical Model explored willingness to pay only and why it did not and cannot measure tuition market value at all. (Ex. 5 at p. 50-58).  The Hypothetical Model fails because it ignores: (1) how the University sets tuition and pricing; (2) the University's costs or its cost sensitivity; (3) the price sensitivity of all putative class members; (4) that individuals generally purchase tuition together with various fees, room and board, and other expenditures in a bundle; and (5) the innate characteristics of higher education – that a lower cost could be perceived to mean an inferior institution, such that universities may not actually lower tuition despite reduced demand.  (*Id.*)

Gaskin also claims that Weir—who did not construct or oversee the Hypothetical Model—"is the expert on supply-side factors," not Gaskin.  (Ex. 1 at 85:10-17; 106:8-107:2). Regardless of who was responsible for supply-side factors, the only two grounds upon which the Hypothetical Model allegedly accounts for such factors are: (1) the alleged use of actual market prices; and (2) holding enrollment constant.  (Ex. 2 at p. 11).  As Wilner explains, however, Gaskin used tuition list prices only, excluding "financial aid, work-study, scholarships, or other

forms of tuition support," and thus did not use the net prices the University receives or that students (or others) actually pay, which therefore does not accurately account for supply-side considerations.  (Ex. 5 at p. 55-57).  Moreover, despite claiming to hold student enrollment constant, Gaskin acknowledged that he ran his simulation by identifying the tuition cost at which half of the market chose the University with the Closure of the University Campus and half of the market chose the University without the Closure of the University Campus, such that enrollment was not held constant. (Ex. 2 at p. 31-32; Ex. 5 At p. 58-59).

Gaskin's conjoint also failed to account for supply-side factors in *Volkswagen*, where the court correctly held that:

> Mr. Gaskin's analysis could not reliably estimate the market price premium in the matter….***Mr. Gaskin does not actually calculate a market price premium; he examines only what consumers say they would be willing to pay for certain vehicles.***  As Defendants point out, this ignores the "supply" part of the supply/demand curve.  ***"[D]istrict courts across the country have excluded choice-based conjoint analyses that fail to accurately account for supply-side considerations."***

*Volkswagen*, 500 F. Supp. 3d at 949 (emphasis added) (citations omitted).  Other courts have rejected variations of the Hypothetical Model too.  *See also Schechner v. Whirlpool*, 2019 WL 4891192, at *7 (E.D. Mich. Aug. 13, 2019) ("Weir did not adequately address these supply-side considerations" and instead "unconvincingly recited suppliers' statements about the competitive importance of prices and relied upon historical retail sales and market data as his supply-side considerations."); *Beaty v. Ford Motor Co.*, 2020 WL 639408, at *7 (W.D. Wash. Feb. 11, 2020) (concluding that the Gaskin-Weir conjoint "[d]id not (and perhaps cannot) account for factors in a functioning marketplace other than consumers' willingness to pay" and was "not competent evidence of the quantum of damages."), *rev'd on other grounds Beaty v. Ford Motor Co.*, 854 Fed. App'x 845 (9th Cir. 2021).  Like in *Volkswagen, Whirlpool,* and *Ford*, the Hypothetical

Model's failure to account for supply-side factors is fatal because it reflects nothing more than "consumers' willingness to pay," which cannot be relied upon as "competent evidence of the quantum of damages." *Ford*, 2020 WL 639408, at *7.

- **Sample Survey Respondents were Unrepresentative of University Students and the Putative Class.**  For a survey to be properly designed, "an appropriate target population must be identified" and a "sample that accurately represents the target population must be selected." *Id*.; *see also J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 369 (D.N.J. 2002) (a key characteristic of a "properly conducted survey" is that a "proper universe must be examined and a representative sample must be chosen" (quoting *Pittsburgh Press Club v. United States*, 579 F.2d 751, 758 (3d Cir. 1978)).  Without any basis, Gaskin relied on a target population of U.S. residents over 16 years old who indicated they had personally applied to, been accepted, or attended the University or one of its competitors for undergraduate education ***in the past 20 years***.  (Ex. 2 at p. 16-17).  This is not a representative sample because it: (1) likely excluded University students from Spring 2020; (2) allowed respondents to be 55 years old or more; (3) does not account for the possibility of multiple decisionmakers (like parents who may pay for their child's education); (4) the geographic location of respondents was not representative – only 3.4% of the respondents lived in Delaware (compared to 36% of University undergraduates in Spring 2020); and (5) does not distinguish between in-state and out-of-state putative class members who were charged different tuition prices.  (Ex. 5 at p. 70-71).[7]

---

[7] Interestingly, in tuition refund class actions involving other universities, Gaskin actually designed ***two separate conjoint surveys*** to account for differences between in-state and out-of-state tuition prices.  (Ex. 1 at 215:16-216:16).

- **Failed to Accurately Define "Closure of the University Campus," Conflating Tuition and Fees.**  The definition of "Closure of the University Campus"[8] in Gaskin's report includes lost "access to campus facilities, student activities, health services, and other opportunities." (Ex. 2 at p. 3-4).  However, those are paid through specific fees at the University.  (Ex. 5 at p. 2). Gaskin was engaged solely to calculate the students' alleged ***tuition overpayment***, not fees.  (Ex. 1 at 63:5-7; 66:15-18).   As a result, the Hypothetical Model is unreliable because it conflated tuition and fees when it only intended to measure the former.

- **Failed to Account for the Fact that Class Members Were Already University Students, Not First-Time Enrollees.**  Gaskin instructed respondents to assume that they were enrolling as first-time students, contradicting the real-world fact that all named Plaintiffs and nearly all other students enrolled at the University in the Spring 2020 Semester were already enrolled at the University during the Fall 2019 semester.   (Ex. 5 at p. 3).   By instructing respondents to make an assumption that placed them in a different position than the Plaintiffs, the Hypothetical Model fails to simulate a real-world choice option and/or model the circumstances of putative class members.  (*Id.*).

- **Suffered from an "Abysmally Low" Response Rate of University Students, and Otherwise Low Response and Completion Rates.**   A mere ***0.2%*** of the 15,000 University students Gaskin attempted to complete in the survey responded, which he conceded at his deposition was "abysmally low."  (Ex. 1 at 190:18-22).  Only ***1%*** of the total survey invitations were validly completed, with only ***0.1%*** from the 15,000 University students.  (Ex. 5 at p. 5).

---

[8] At his deposition, Gaskin did not know if "Closure of the University Campus" – a term critical to the Hypothetical Model – was one that he (or AMS) created or if it was from the Complaint in this action.   Gaskin likewise did not know how campus access was limited or what student activities, if any, were covered by tuition.  (EX. 1 at 61:18-62:11).

With such a low response rate, Gaskin should have demonstrated that this high non-response rate did not bias his conclusions but failed to do so.  (Ex. 1 at p. 72).

- **Failed to Adequately Perform the Pre-Test to Eliminate Ambiguity Inherent in Conjoint Surveys.**  The pre-tests were conducted by AMS – Gaskin testified that he attended 2-3 total (which equated to 10-15% of the pre-tests).  (Ex. 1 at 174:10-20).  However, the pre-tests were free-flowing, conducted by different people, with no list of questions asked, no recording, no transcript, and no notes; therefore, neither Gaskin (nor the University) could confirm if the pre-tests were performed appropriately or if the conjoint was appropriately designed.  (Ex. 1 at 176:23-179:23).  This creates inherent ambiguity in the Hypothetical Model that no one, including this Court, can assess.  (Ex. 5 at p. 68).  The *Volkswagen* court excluded Gaskin's testimony on this basis, explaining that such pre-testing consisting of unstandardized conversations in a "highly informal manner" is methodologically unsound under *Daubert* and Rule 702.  *See Volkswagen*, 500 F. Supp. 3d at 950.  This Court should do the same.

- **Failed to Identify Appropriate Competitors of the University.**  Gaskin self-selected the competitor universities without any factual basis to establish that actual University students (or the University itself) considered these universities as competitors.  (Ex. 5 at p. 4).  In fact, of the four named Plaintiffs, only Ms. Russo applied to any of the schools Gaskin included as competitors (University of Maryland – College Park).  (Ex. 7 at 29:18-21).  In addition, the University's Vice President of Enrollment Management explained that of the universities Gaskin identified as "competitors," the University only considers the University of Maryland – College Park to be a competitor of the University.  (Ex. 8 at ¶ 19).

- **Failed to Include Important Attributes to University Students.**  As noted above, the survey included seven attributes Gaskin randomly selected, but excluded important attributes that

students generally consider such as: family history/legacy; types and availability of majors; reputation with anticipated employers; internship programs; access to and quality of faculty; sports; Greek life; class size; guidance and counseling support; campus safety; and past graduates' career outcomes and job opportunities, the importance of each varies from student to student.[9]   (Ex. 5 at p. 3; Ex. 8 ¶ 15).   Moreover, by using only seven attributes and excluding other more important attributes, the survey artificially overstated the importance of the chosen attributes.   This is "focalism bias," whereby "respondents pay more attention to a product attribute or feature in the choice exercise than they ordinarily would in the actual purchase process," and thus "increase[d] the apparent relative subjective value they assign to the attribute in the conjoint study."   *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1049 (C.D. Cal. 2018).   Survey designs that suffer from focalism bias are routinely excluded.   *See id.* at 1050.[10]

## III.   GASKIN IS NOT QUALIFIED AND LACKS A SUFFICIENT FACTUAL BASIS TO TESTIFY REGARDING THE HYPOTHETICAL MODEL

### A.   *Gaskin Failed to Supervise AMS and AMS Did the Majority of the Work*

"The expert witness must in the end be giving his own opinion.   He cannot simply be a conduit for the opinion of an unproduced expert."   *Malletier v. Dooney & Bourke, Inc.*, 525 F.

---

[9] Importantly, US News, a source relied upon by Gaskin elsewhere, recognizes some of the University's most significant attributes, including its "400+ student clubs/organizations, large Greek system, Division I athletics, and proximity to other large cities[.]"   (Ex. 5 at p. 37 (citing *University of Delaware*, USNews (last accessed Sept. 27, 2022), https://www.usnews.com/best-colleges/university-of-delaware-1431); *see also* Ex 2 at B-3-B-4). Gaskin did not explain why he ignored these attributes in the survey design.

[10] *See also Adams v. Target Corp.*, 2014 WL 12558858, at *3 & n.3 (C.D. Cal. Nov. 25, 2014); *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1147-48 (10th Cir. 2013); *Oracle Am., Inc. v. Google Inc.*, 2012 WL 850705, at *10-11 (N.D. Cal. Mar. 13, 2012); *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, 2017 WL 1196990, at *30-31 (N.D. Ill. Mar. 31, 2017).

Supp. 2d 558, 664 (S.D.N.Y. 2007) (excluding testimony of expert witness who purported to rely on another expert over whom he "exercised little if any supervision").  Moreover, an expert who spends a *de minimis* amount of time formulating and drafting a report is similarly unqualified to provide expert testimony.  *See Traharne v. Wayne Scott Fetzer Co.*, 156 F. Supp. 2d 717, 722 (N.D. Ill. 2001) (excluding expert who spent "less than 30 hours," "'designing' and 'testing' his," analysis as unqualified); *see also Numatics, Inc. v. Balluff, Inc.*, 66 F. Supp. 3d 934, 944 (E.D. Mich. 2014) (excluding expert who devoted less than 30 hours developing his opinions about the matter[.]").  That is exactly what happened here with AMS, an undisclosed expert, spending ***twenty times*** the amount of hours on the conjoint than Gaskin.[11]  It is inconceivable that Gaskin could have supervised AMS' 327.5 hours designing, executing, and analyzing the conjoint and drafted his 475-page report in just 16 hours.  (Ex. 1 at 16:14-24; 178:2-9).

**B.**     ***Gaskin Has Never Performed a Conjoint to Assess Tuition Market Price Outside of Litigation and Plaintiffs Have Not Shown that the Hypothetical Model is Accepted in the Community or Used by Others Outside of Litigation***

Neither Gaskin or Weir can identify any court that has accepted a completed conjoint analysis to determine tuition in higher education in the face of a *Daubert* motion as presented here.  (Ex. 9 at 177:5-21; Ex. 1 at 100:5-17).[12]  Nor could either cite any textbook, treatise, or academic article concerning conjoint analyses conducted to set tuition in higher education

---

[11] Plaintiffs did not identify AMS as an expert.  Under Fed. R. Civ. P. 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  FED. R. CIV. P. 31(c)(1).

[12] Plaintiffs will likely direct the Court to several other tuition and/or fee refund cases in which Gaskin and Weir were permitted to proceed in performing their conjoint, but to the University's knowledge, none of those cases proceeded to the current stage of this litigation where the proposed conjoint was actually completed ***and*** subjected to *Daubert* scrutiny.  Though other courts have scrutinized Gaskin's conjoints as explained herein, the University believes this Court will have the first opportunity to do so in the context of a higher education tuition refund case.

generally.  (Ex. 9 at 177:5-21; Ex. 1 at 100:5-17).  The cases cited in Gaskin's report in which his conjoint analyses were allegedly accepted, all involved traditional consumer products such as automobiles, televisions, energy drinks, treadmills, and chainsaws.  (Ex. 2 at p. 11-12).  A college education, however, is fundamentally different, and includes a myriad of factors and intangibles that cannot be properly measured by a conjoint analysis—and were not properly measured in this case—rendering his alleged experience in other industries immaterial.  Orme recognizes as much, making clear that "prior to trusting results of an optimization algorithm, it is best to have gained experience through multiple applications of conjoint analysis to the particular market of interest so that you are confident that the predictions from the choice simulator indeed track reasonably well with actual market choices"—experience that Gaskin admittedly lacks. (Bryan K. Orme & Keith Chrzan, *Becoming an Expert in Conjoint Analysis* 241 (2d ed. 2021)).

### C.     *Gaskin is Unfamiliar with the Facts and Documents*

It was not surprising then that, after spending only sixteen hours total, Gaskin admitted that he did not review Plaintiffs' deposition transcripts, account statements, or transcripts; Plaintiffs' document production; or the University's documents or witnesses' testimony.  (Ex. 1 at 68:11-69:2; 69:20-22; 84:13-17; Ex. 2 at Ex. B-1 to B-4).  Nor did he understand the basics of tuition and fee—when asked if he knew what tuition covered, compared to other fees, he answered: "***[f]or that I'd have to know the complete set of fees, which I do not.***"  (Ex. 1 at 68:11-16).  He likewise did not know how campus access was limited or what student activities, if any, were covered by tuition.  (Ex. 1 at 61:18-62:11).

## <u>CONCLUSION</u>

Gaskin's proposed testimony fails Rules 702 and 703 and, consequently, should be excluded.

SAUL EWING ARNSTEIN & LEHR LLP

/s/ *Marisa R. De Feo*
James D. Taylor, Jr. (#4009)
Marisa R. De Feo (#6778)
Juliana G. Clifton (#6980)
1201 N. Market Street, Suite 2300
Wilmington, DE  19801
(302) 421-6800
james.taylor@saul.com
marisa.defeo@saul.com
juliana.clifton@saul.com

*Counsel for Defendant University of Delaware*

**OF COUNSEL**
**SAUL EWING ARNSTEIN & LEHR LLP**

Jonathan A. Singer (admitted *pro hac vice*)
1001 Fleet Street, 9th Floor
Baltimore, MD 21202
(410) 332-8690
jon.singer@saul.com
Dated: September 30, 2022