EXHIBIT 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF DELAWARE
 3
        PENNY NINIVAGGI, et al.,     )
 4      individually and on behalf   )
        of all others similarly      )
 5      situated                     )
                                     )
 6           Plaintiffs             )
                                     )
 7      v.                           )   Civil Action No.
                                     )   20-cv-1478-SB
 8      UNIVERSITY OF DELAWARE       )
                                     )
 9           Defendant              )
                                     )
10                                   )
        HANNAH RUSSO, individually   )
11      and on behalf of all         )
        others similarly situated    )
12                                   )
             Plaintiffs             )
13                                   )   Civil Action No.
        v.                           )   20-cv-1693-SB
14                                   )
        UNIVERSITY OF DELAWARE       )
15                                   )
             Defendant
16
17           The remote video-recorded deposition STEVEN P.
        GASKIN of was taken pursuant to notice before Ellen
18      Corbett Hannum, Registered Merit Reporter, in Wilmington,
        Delaware, on Friday, August 12, 2022, beginning at
19      9:32 a.m., there being present:
20
21                   VERITEXT LEGAL SOLUTIONS
                          Mid-Atlantic Region
22              300 Delaware Avenue  Suite 815
                       Wilmington, DE 19801
23                        (302) 571-0510
24
```

STEVEN P. GASKIN

1   I arranged with my people to produce all the responsive
2   documents.
3       BY MR. SINGER:
4           Q.  Who did you have that conversation with and
5   when?
6           A.  With Mr. Arisohn and -- not long ago.  I'm not
7   sure exactly when.
8           Q.  What's your best estimate?
9           A.  Either last week or this week.  I just don't
10  remember.
11          Q.  You said you talked with your people about
12  gathering documents.  Who was that that you spoke with?
13          A.  There is a woman named Patricia Yanes of
14  Applied Marketing Science who helped me.
15          Q.  Anyone else?
16          A.  Not that I know of.
17          Q.  Let me be clear, is AMS part of this
18  engagement?  Is AMS doing work on behalf of the
19  plaintiffs in this case?
20          A.  Yes, under my direction.
21          Q.  Who are the -- who is the team at AMS that is
22  involved beyond Patricia, if anybody?
23          A.  There's a woman named Carrie Blasko and then
24  an analyst named Rachael, I can't remember her exact last

1   name.
2           Q.  And I apologize.  Patricia's last name again?
3           A.  Yanes, Y-A-N-E-S.
4           Q.  And all three of them, Patricia, Carrie and
5   Rachael, they are all with AMS?
6           A.  That's correct.
7           Q.  What is Patricia's title?
8           A.  She is a whatever -- oh, a principal.
9           Q.  What's her background?
10          A.  She went -- has a master's in business from --
11  or went to -- well, she attended Boston College as an
12  undergrad.  I think she has a master's in business from
13  Bentley.  And she has been working there about ten years
14  maybe, awhile.
15          Q.  And Carrie Blasko, what is her title?
16          A.  She is, perhaps a senior manager.  I'm not
17  sure of her exact title.
18          Q.  What's her background?
19          A.  Again, a college degree, perhaps a business
20  degree, but I'm not sure what it is.
21          Q.  And Rachael, what is her title?
22          A.  She is an analyst so as far as I know with a
23  college degree, I'm not sure from where.
24          Q.  What were each of their roles with respect to

1   the work you have performed in this case?
2           A.  Ms. Yanes is manager of the practice at AMS
3   that works on class action conjoints.  So she was
4   participating in this, the work on this case.
5               Ms. Blasko is the manager of the case or
6   has been helping out certainly.  And Rachael is the
7   analyst and does a lot of the data processing and things
8   like that.
9           Q.  Would you be able to tell me who did what
10  substantively with respect to the surveys performed in
11  this case as between those three individuals?
12          A.  I think that the description I just gave you
13  is about all I can do.
14          Q.  Okay.  So the specific tasks and functions
15  associated with developing the survey, doing any
16  pretesting, getting the survey out, getting -- analyzing
17  the responses, you can't give me any more specific
18  information as to these three individuals' roles in those
19  regards other than what you have already testified; is
20  that correct?
21              MR. ARISOHN:  I object to form.
22              THE WITNESS:  They work collaboratively.
23  And I am working remotely from them, so it's hard to tell
24  exactly what each did.

1   BY MR. SINGER:
2           Q.  Anyone else at AMS or any other entity
3   involved in the work that was performed to generate your
4   report and opinion in this case?
5           A.  It's possible that, I believe she is the field
6   manager at AMS, Sarah Schomp, S-C-H-O-M-P, may have been
7   involved.
8           Q.  You said it's possible.  Do you know, as you
9   are sitting here today, whether or not she was?
10          A.  She typically is.  I didn't speak to her
11  directly, that's why I say that.
12          Q.  So I'm not worried about typically or not.  As
13  you sit here, you have no knowledge one way or the other
14  whether or not she worked on this?  She may have or she
15  may not have; is that right?
16          A.  As I said, she generally works on these.  I
17  have not spoken to her, that's why I couched my answer;
18  but it's my belief that she did.
19          Q.  You are not aware of any work that Ms. Schomp
20  performed specifically in connection with the report that
21  was generated in this case; correct?
22          A.  Well, her work would have been to deal with
23  the field suppliers.
24          Q.  Mr. Gaskin, I'm not asking what it typically

STEVEN P. GASKIN

Page 38

1   part of the data that you relied on in rendering your
2   opinions in this case; correct?
3       A.  No.
4       Q.  Okay.  How does that design file factor in to
5   the analysis that you did?
6       A.  It's used by the Lighthouse, Sawtooth
7   Lighthouse Studio software to help read in and process
8   the data.
9       Q.  Okay.  And that reflects, I think as you just
10  said, that reflects survey respondents' answers to some
11  of the questions posed to them; is that correct?
12      A.  I'm sorry --
13          MR. ARISOHN:  I object to form.
14          THE WITNESS:  Sorry, Josh.
15          I'm sorry, what does?
16  BY MR. SINGER:
17      Q.  The design file.
18      A.  No, I don't think so.  Could you ask it again?
19      Q.  Did you hear my question or no?
20      A.  Well, I said no.  I would like to hear it
21  again just to make sure I answered properly.
22      Q.  Yeah.  My question was the design file
23  contains some information from respondents to your
24  surveys; is that correct?

Page 39

1       A.  No, that's not correct.
2       Q.  Okay.  Why is that not correct?
3       A.  Well, as I have explained to you, it contains
4   the level, attribute levels for each product profile in
5   each choice task.  And that is not respondents' inputs,
6   it's just a design.
7       Q.  And that is part of the design of your survey;
8   correct?
9       A.  Yes.
10      Q.  Okay.  And you have not produced that to us in
11  advance of this deposition; correct?
12      A.  As I have explained to you, it is part of the
13  Lighthouse Studio software, which I have provided.  I did
14  not explicitly print it out and view it, nor did AMS.
15  It's inherent in our work.  So it's possible to print it
16  out, but we did not do so.
17      Q.  Okay.  That's something that you could get
18  over to Mr. Arisohn after this deposition; correct?
19      A.  It's possible, but I have never reviewed it or
20  I didn't print it out as part of the work for my report.
21      Q.  Okay.  Is there other data or information
22  apart from the design file that is inherent in the work
23  that you did that you did not produce in advance of this
24  deposition?

Page 40

1       A.  Could you ask that again, please?
2       Q.  Yes.  You said that the design file was
3   inherent in the work that you did in this case.
4           My question to you is:  Is there other
5   data or other files that are inherent in the work that
6   you did in this case that you did not produce in advance
7   of the deposition?
8       A.  I gave you all the input data needed to
9   conduct the analysis and the Lighthouse Studio software
10  files needed to conduct the analysis.  That's all you
11  need.
12      Q.  Do you agree that one can't interpret the
13  results without the design file?
14      A.  No, I don't.
15      Q.  Why not?
16      A.  Because whoever is reproducing this,
17  Cornerstone, or whoever, can just print out the design
18  file if they so wish using Sawtooth Software.
19      Q.  How could you confirm the validity of the
20  results without reviewing the design file?
21      A.  The design file is very, very long.  It's
22  produced by Sawtooth software, which is the leading
23  conjoint analysis software provider.  They are known to
24  provide good software and dependable reliable software.

Page 41

1   So I don't think it's appropriate to read each and every
2   entry in a vast design file, nor would it do me much
3   good.  I know that it's generated according to a certain
4   design and it performs well.  I have used it many times.
5       Q.  My question was:  How can you confirm the
6   validity of the results without reviewing the design file
7   itself?
8       A.  I just answered.
9           MR. ARISOHN:  Objection.  Asked and
10  answered.  Go ahead.
11          THE WITNESS:  I just told you.
12  BY MR. SINGER:
13      Q.  If you say so.
14          Mr. Gaskin, did you work with any other
15  experts in preparing this report?
16      A.  Well, I have a -- Mr. Weir, the economics
17  expert, works with me.
18      Q.  Okay.  Did you have any communications with
19  Mr. Weir in writing?
20      A.  No, I did not.
21      Q.  And you have worked with Mr. Weir in the past;
22  is that correct?
23      A.  Yes, that's correct.
24      Q.  On how many occasions, approximately?

11 (Pages 38 - 41)

STEVEN P. GASKIN

Page 42

1    A.  Maybe 30 or so.  I'm not sure.

2    Q.  And have they all been in the context of

3  providing conjoint analyses and damages opinions?

4    A.  I'm not a legal expert, but yes.  It's this

5  type of case.

6    Q.  Okay.  Let me back up.  You have never worked

7  at a university; correct?

8    A.  In terms of having a paid job?

9    Q.  Yes.

10    A.  No, I've not.

11    Q.  Have you ever been retained or engaged by a

12  university to conduct a conjoint analysis?

13    A.  Yes.

14    Q.  What university was that?

15    A.  The Massachusetts Institute of Technology or

16  MIT.

17    Q.  When was that?

18    A.  It's a few years ago.

19    Q.  Any other universities for which you have been

20  engaged to perform a conjoint analysis?

21    A.  Not that I know of.

22    Q.  Okay.  And what was the -- what were you

23  studying in the conjoint that you did for MIT?

24    A.  We were studying the need for or demand for

Page 43

1  grad student housing.

2    Q.  Was that in the context of litigation?

3    A.  No, it was not.

4    Q.  And did you perform the same type of conjoint

5  analysis for MIT as you did in this case or did you use

6  different methods?

7    A.  It was the same methods.

8    Q.  What was it specifically that you were looking

9  at in terms of the demand for grad student housing?  Can

10  you be more specific?

11    A.  I think how much grad student housing they

12  needed.

13    Q.  In terms of quantity of, like, available

14  housing?

15    A.  Quantity and pricing.

16    Q.  You were not studying tuition in that

17  engagement; correct?

18    A.  That's correct.  I was not asked to.

19    Q.  Okay.  And before your engagement -- before

20  being retained to conduct conjoints in these higher ed

21  tuition and fee class actions, you had never performed a

22  conjoint to determine pricing for university tuition;

23  correct?

24    A.  Yes.  I mean, you asked me if I'd ever -- what

Page 44

1  work I had done with universities for conjoint, that was

2  the one.

3    Q.  I understand.

4       MR. ARISOHN:  Jon, we are coming up on an

5  hour, when you get to a natural breaking spot, can we

6  take a short bathroom break?

7       MR. SINGER:  We can take a break right now

8  because we are about to dive in.

9       THE VIDEOGRAPHER:  The time is 10:28.

10  Going off the video record.  This concludes Media Unit 1.

11       (A brief recess was taken.)

12       MR. SINGER:  Before we go back on,

13  Juliana, would you mind marking the engagement letter and

14  AMS invoices as Exhibits 8 and 9.

15       (Two documents were marked as Exhibit Nos.

16  8 and 9 for identification.)

17       THE VIDEOGRAPHER:  The time is 10:50.  We

18  are back on the video record.  This begins Media Unit 2.

19  BY MR. SINGER:

20    Q.  Mr. Gaskin, could you please pull up the

21  engagement letter we received during the break that's

22  marked as Exhibit 8.

23    A.  Yes.

24    Q.  Let me know when you have it in front of you.

Page 45

1    A.  All right.  I have it in front of me.

2    Q.  In the first paragraph you state in your

3  engagement letter that "AMS will send you a separate

4  engagement letter, and will bill you separately."

5       Do you see that?

6    A.  Yes.

7    Q.  Just to be clear, you do not have a copy of

8  that engagement letter from AMS; correct?

9    A.  That's correct.

10    Q.  And is it your understanding that AMS's

11  engagement with the plaintiffs is separate and distinct

12  from your engagement with the plaintiffs?

13    A.  Well, I said they will send you a separate

14  engagement letter, isn't that what it means?

15    Q.  Thank you.

16       And you state down in paragraph 4 of this

17  engagement letter, "I will take all necessary measures to

18  ensure that my communications with you remain privileged

19  and are not disclosed to third parties (other than AMS or

20  other experts working on this matter, as appropriate and

21  authorized by you)."

22       Do you see that?

23    A.  Yes.

24    Q.  Mr. Weir is one of those third parties working

12 (Pages 42 - 45)

STEVEN P. GASKIN

Page 50

1   put this on the record now.  I have serious concerns
2   about the witness's responsiveness and obstructionist
3   tactics during this deposition.  The record is what the
4   record is.  I see you shaking your head but, nonetheless,
5   I am putting it on notice right now that if this
6   continues, we will be filing a motion with the Court,
7   because we are not going to be deprived of our time to
8   depose Mr. Gaskin based on his delay and obstruction.
9           MR. ARISOHN:  Okay.  I don't know what the
10  point of saying that on the record is.  You can file
11  whatever you want to file, I guess.  I can't stop you.
12          MR. SINGER:  That's right.
13          MR. ARISOHN:  If you want better answers,
14  I guess ask better questions.
15          MR. SINGER:  The point of putting it on
16  the record is because now is your opportunity to talk
17  with him on a break and tell him to answer the questions.
18  If you choose not to do so, that's at your risk.
19          THE WITNESS:  All right.  So I looked at
20  those invoices.  There appear to be, I would say, at
21  least 100 hours on there; I didn't add each number up.
22  BY MR. SINGER:
23      Q.  Okay.  So at a minimum, based on your
24  estimation right there, AMS has spent over five times the

Page 51

1   amount of time on this engagement, on the work that went
2   into your report, than you did; correct?
3       A.  I think your mathematics is wrong.  If I put
4   in about -- wait.  If I put in about 16 and they put in
5   over 100, that would be six times, I think.
6       Q.  Even better.  Thank you.
7           Do you know whether AMS was a disclosed
8   expert witness in this case, Mr. Gaskin?
9       A.  Not to my knowledge.
10      Q.  Okay.  Do you receive any payments from AMS
11  for the work that AMS is billing plaintiffs in this case?
12      A.  No, I do not.
13      Q.  Do you hold any equity interest in AMS?
14      A.  No, I do not.
15      Q.  Are you completely separate from AMS?
16      A.  How do you define separate?
17      Q.  How do you understand separate?
18      A.  Well, I don't work for them.  I live in a
19  different place.  I don't know exactly what you mean.
20      Q.  You don't share in any revenues or profits
21  from AMS; correct?
22      A.  That's correct.
23      Q.  And there is no affiliation between Steven
24  Gaskin, LLC and AMS; correct?

Page 52

1       A.  Well, we do work together, but there's no
2   official legal affiliation.
3       Q.  Thank you.
4           Are all of the higher education tuition or
5   fee class actions in which you have been engaged as an
6   expert witness identified on your C.V. marked as Exhibit
7   A?
8       A.  I believe so.  At least the ones for which I
9   have submitted some sort of opinions.
10      Q.  Do you know whether any Daubert motions have
11  been filed against you or your reports in any of the
12  higher ed tuition fee reimbursement cases in which you
13  have been retained as an expert?
14      A.  Well, I'm not a legal expert, but my reports
15  have all been challenged, if that's what you mean.
16      Q.  You are familiar with the Daubert standard in
17  federal court?
18      A.  Yes.
19          MR. ARISOHN:  Objection.  Hold on.  Calls
20  for a legal conclusion.
21          THE WITNESS:  Again, you know, there's --
22  BY MR. SINGER:
23      Q.  Mr. Gaskin, did you answer yes?  I think you
24  said yes; correct?

Page 53

1       A.  I believe I was just talking and you
2   interrupted me.  Would you like me to finish my answer?
3       Q.  I believe your counsel interrupted you
4   actually, but go ahead.
5       A.  No, you interrupted me.
6           I've heard of Daubert and Pomcast (sic).
7   It's my belief that it's Daubert.  But, again, I'm not a
8   legal expert.  I do know that rebuttal reports were filed
9   and that I had to respond to them, and then some sort of
10  ruling was made about class certification.
11      Q.  I'm not asking about class certification.  I'm
12  asking about Daubert motions on the reliability and
13  methodology of conjoint analyses that you have done in
14  the higher ed tuition and fee reimbursement cases.
15          With that context, are you aware of any
16  such motions being filed against you?
17          MR. ARISOHN:  Objection.  Calls for a
18  legal conclusion.  You can answer the question.
19          THE WITNESS:  I just answered your
20  question.
21  BY MR. SINGER:
22      Q.  Mr. Gaskin, you did not.  I'm asking the
23  question again and I need an answer.  Okay?
24          In the context of your engagements in

14 (Pages 50 - 53)

STEVEN P. GASKIN

Page 58

1    A.  So that's the immediate context for this
2  report.  I'm not saying I have never read anything about
3  conjoint analysis, for example.
4    Q.  Mr. Gaskin, you understand that you are
5  required to disclose to me the basis for all of your
6  opinions in this case; correct?
7    A.  Yes.  And I am telling you that having done
8  this many, many times, never would I disclose every book
9  I have ever read.  These are the ones I have cited and
10  provide the immediate basis for my opinions.
11    Q.  And there are no other documents apart from
12  those listed in Exhibit B that you are relying on in
13  support of your opinions that you deem worthy of
14  disclosing in this deposition; correct?
15    A.  Yes.
16    Q.  Thank you.  Look at paragraph 8, please.  This
17  is the section of your report where you start detailing
18  what you believe your assignment to be; correct?
19    A.  Yes.  It's right under the "Section II.
20  Assignment" label.
21    Q.  Yep.  In the middle of that, one of the things
22  you state is that you understood the university closed
23  most campus buildings.
24        Do you see that?

Page 59

1    A.  Yes.
2    Q.  Do you know which buildings remained opened
3  and which were closed?
4    A.  No, I do not.
5    Q.  You state also that the university required
6  all students who could leave campus to do so as a result
7  of the Novel Coronavirus Disease, to leave campus.
8        Do you have knowledge of the number of
9  students that left campus versus the number that stayed?
10    A.  I believe it's Novel, not No-vel.
11    Q.  Sorry.
12    A.  I'm not aware of that.  You have to remember
13  it's my job to assume that plaintiffs' allegations are
14  true in this case, but I don't vouch as an expert for
15  their validity.  It's just my obligation to assume they
16  are true.
17    Q.  Yeah.  I understand that.  And I am asking
18  you, you do not know, however, what percentage of
19  students remained on campus in the spring 2020 semester
20  and what percentage left; correct?
21    A.  That's correct.  Again, it's my job to assume
22  plaintiffs' allegations are true.
23    Q.  And for those students who remained on campus,
24  you don't know where they stayed; correct?

Page 60

1    A.  That's correct, nor did I need to.
2    Q.  And you don't know what services remained
3  available to them on campus; correct?
4    A.  Again, I don't know exactly.  It's my job to
5  assume that the plaintiffs' allegations are true.
6    Q.  You then state that -- quoting to the
7  Complaint, paragraph 48, you state that, the Complaint
8  indicates that the "Plaintiffs and members of the
9  proposed Class were deprived of the benefits of on-campus
10  enrollment for which they paid."
11        Do you know what specific benefits that
12  allegation refers to?
13    A.  In the Complaint there's a bulleted list of
14  benefits of in-person classes and being on campus, as I
15  recall.
16    Q.  I am just asking, as you sit here, do you know
17  which benefits that refers to?
18    A.  Well, I am saying that we could read that
19  list.
20    Q.  I understand we can read the list.  I am
21  asking what's in your head.  Do you know what benefits
22  that refers to?
23    A.  Again, I don't wish to undergo a memory test
24  here.  I know it's in the Complaint, and I would be glad

Page 61

1  to refer to it.
2    Q.  Okay.  You then state that, you cite the
3  Complaint as referring to the option to take courses in
4  person or online instead of solely online, access to
5  campus facilities, student activities, health services,
6  and other opportunities, which you define as the "Closure
7  of University Campus."
8        Do you see that?
9    A.  What paragraph are you talking about?
10    Q.  The same paragraph.
11    A.  Okay.  Yes.  I see that.
12    Q.  Do you know, is that closure of university
13  campus, is that your definition for purposes of this
14  report or is that in the Complaint?  Do you know?
15    A.  It's my distillation of what's in the
16  Complaint, but if there's any difference, I defer to the
17  Complaint.
18    Q.  But for purposes of this report, the defined
19  term closure of university campus, that is your defined
20  term; correct?
21    A.  I guess I would have to look back at the
22  Complaint to make sure.
23    Q.  So you are not sure as you sit here?
24    A.  No, I'm not.

16 (Pages 58 - 61)

STEVEN P. GASKIN

Page 62

1  Q.  Okay.  Do you know what student activities are
2  referring to in that definition?
3  A.  Again, I would refer us to the Complaint.
4  Q.  Do you know what access to campus facilities
5  are referring to in that definition?
6  A.  Again, I would refer us to the Complaint.
7  Q.  Do you know whether student activities are
8  paid for as part of tuition at the University of
9  Delaware?
10  A.  No, I do not.  Again, I'd would refer you to
11  the Complaint.
12  Q.  Do you know whether health services are paid
13  for as part of tuition at the University of Delaware?
14  A.  It's my recollection there's a mandatory
15  student fee called student well-being, and that may have
16  some medical content.
17  Q.  Do you know whether health services are
18  charged as part of tuition at the University of Delaware
19  or not?
20  A.  Well, those mandatory student fees are not
21  strictly part of tuition that I'm aware of.  I am just
22  telling you that I heard there's a mandatory student fee
23  that seems to have to do with medical services.
24  Q.  You used the definition closure of university

Page 63

1  campus throughout this report to refer to something that
2  the students lost in the spring of 2020; correct?
3  A.  Allegedly, yes.  I believe that's plaintiffs'
4  allegation.
5  Q.  And you are focused solely on determining the
6  difference in market value for tuition only; correct?
7  A.  That's my understanding, yes.  Tuition only.
8  Q.  So services provided by the university that
9  are not part of the cost of tuition should be irrelevant
10  to your calculations; correct?
11  A.  Not necessarily, in my view.
12  Q.  Why not?
13  A.  Well, for example, when I went to MIT, we went
14  to class, we spoke with professors, took lectures, we met
15  people.  There's no charge for that.  That was covered
16  under tuition that I'm aware of.
17  Q.  That's correct.  I agree.  That would be part
18  of what you are paying tuition for.  I agree.  I am
19  talking about services that are not part of tuition like
20  you mentioned health services and the student well-being
21  fee.  Those types of fees for services that are distinct
22  from tuition should be irrelevant to your analysis;
23  correct?
24  A.  Well, again, I'd refer you to the Complaint

Page 64

1  and to counsel for that.  I am doing -- I am looking at
2  tuition in my analysis.
3  Q.  So that being the case, and the fact that your
4  survey is based on the closure of the university campus,
5  why would you include items in that definition that are
6  covered by other fees outside of tuition such as health
7  services?
8  A.  I would say to see if they have any affect on
9  people's valuation of the services being provided by the
10  school or the general, their general experience that they
11  are paying for with tuition.
12  Q.  The fees for health services, for example, are
13  charged separate and apart from tuition at the
14  university; correct?
15  A.  That's my understanding.
16  Q.  Okay.  So in doing an assessment, in doing an
17  assessment of the market value of tuition, why would you
18  include in the definition material to that assessment
19  services that are covered by separate fees?
20  A.  Again, it's possible to me that they would
21  have some bearing on the students' decisions and the
22  market value of the tuition.
23  Q.  Did you factor in credits that were issued for
24  those fees into your calculations -- I'm sorry, into your

Page 65

1  analysis?
2  A.  I think you are really getting out of scope of
3  my assignment.  That's more a question for Mr. Weir, the
4  economist.  I, as I've told you, I am working with
5  tuition and I am describing to students' situation.
6  Q.  That's correct.  But that situation is defined
7  to be the closure of the university campus, which
8  includes things like the closure of health services,
9  student activities, and access to campus facilities that
10  are provided for separately in different fees apart from
11  tuition; correct?
12  A.  Could you read that list again, please?
13  Q.  It's your list.  It's on paragraph 8, at the
14  top of page 4 of your report, where you include in the
15  definition of closure of the university campus "access to
16  campus facilities, student activities, and health
17  services," all of which are provided for under separate
18  fees charged by the university; correct?
19  A.  Again, I would refer you to the Complaint, but
20  that's basically my understanding.  And I have already
21  answered the question.
22  Q.  And my question to you that you tried to defer
23  to Mr. Weir -- but I am focused on your definition -- is
24  if you are going to incorporate in your definition

17 (Pages 62 - 65)

STEVEN P. GASKIN

Page 66

1 closure of the university campus for purposes of
2 assessing tuition, if you are going to include in that
3 items that are charged separate and apart from tuition,
4 shouldn't you be including credits against those items in
5 your analysis somewhere?
6     A. Well, again, the only money I am looking at is
7 tuition. I think it's out of the scope of my assignment
8 to discuss how fees are dealt with. I suggest you talk
9 to Mr. Weir.
10     Q. You are not aware of the fees charged for
11 student activities that you reference within the
12 definition of closure of the university campus; correct?
13     A. There may be fees. I have told you what I am
14 dealing with in my survey.
15     Q. Mr. Gaskin, let's be perfectly clear. I
16 understand you are dealing with tuition only in your
17 survey and your opinion; correct?
18     A. In terms of damages calculations, yes.
19     Q. Okay. So we are on the same page on that. I
20 am focused on the definition. That's it.
21     You have defined the closure of the
22 university campus to include access to campus facilities,
23 student activities, and health services.
24     My question to you is: You do not know

Page 67

1 the fees that are charged to students separate and apart
2 from tuition for any of those three items; correct?
3     A. I'm sorry. I just answered that question,
4 that exact question.
5     Q. What was the answer?
6     A. We can read it back, if you'd like.
7     Q. You can just answer it again.
8     A. I would rather we read it back so I am not
9 inconsistent.
10     Q. I am asking the question again. Please answer
11 it, sir.
12     A. It's the same question.
13     Q. You still have an obligation to answer it.
14 Your counsel can jump in and object if they want. You
15 have to answer the question.
16     A. Could you read the question again?
17     MR. SINGER: Please read the question
18 back, Ellie. Thank you.
19     (The reporter read from the record as
20 requested.)
21     THE WITNESS: I have mentioned to you some
22 of the mandatory student fees, so that's not entirely
23 correct. But I just want to emphasize once more that I
24 am dealing with tuition and the impact that those factors

Page 68

1 would have on the market price of that tuition.
2 BY MR. SINGER:
3     Q. Do you know what specifically tuition covers
4 at the University of Delaware as opposed to other charges
5 on student ledgers?
6     A. I'm a market research expert. I have read
7 over -- I have reviewed the websites, but I don't
8 consider myself an expert on college tuition fees and
9 services. I am following plaintiffs' theory of liability
10 when making my report.
11     Q. Okay. My question is: Do you know
12 specifically at the University of Delaware what tuition
13 covers as opposed to other fees that are charged to
14 students?
15     A. For that I'd have to know the complete set of
16 fees, which I do not.
17     Q. Let me back up. You did not review any
18 student ledgers, account statements for the University of
19 Delaware students; correct?
20     A. Student ledgers? Is that the university keeps
21 you mean for their payments?
22     Q. Yes.
23     A. No, I did not. I was not asked to.
24     Q. And you did not review any of the plaintiffs'

Page 69

1 deposition testimony in this case; correct?
2     A. That's correct. I was not asked to.
3     Q. And you didn't review any documents that the
4 plaintiffs produced in this case; correct?
5     A. That seems like a legal question. I have
6 reviewed the Complaint. You know, I would have to look
7 at my materials reviewed to see if there are other
8 things.
9     Q. Do you know the names of the four plaintiffs
10 in this case?
11     A. It's Mr. or Ms. Ninivaggi, Mickey, Russo, and
12 I'd have to look for the fourth one.
13     Q. Do you know their first names?
14     A. Here, I will take a look.
15     Q. I am just asking if you know. I understand
16 you can take a look. I am just asking if you know.
17     A. Well, I have reviewed them. It's Michael
18 Ninivaggi, Jake Mickey, Caitlin Nigrelli, and Hannah
19 Russo.
20     Q. Did you review any documents produced by those
21 four individuals in this case?
22     A. Not that I'm aware of.
23     Q. Mr. Gaskin, you are ultimately only offering
24 one opinion in this case, and that is, that the reduction

18 (Pages 66 - 69)

STEVEN P. GASKIN

Page 74

1  of footnotes to that section you are referring to, the
2  analysis section, that referred to variations on the
3  analysis that I thought would be relevant.  There's many
4  things.
5      Q.  You are not giving any liability opinions in
6  this case; correct?
7      A.  I'm not a legal --
8          MR. ARISOHN:  Objection.  Calls for legal
9  conclusions.  Go ahead.
10          THE WITNESS:  I'm not a legal expert, so
11  I'm not really quite sure what you mean.
12  BY MR. SINGER:
13      Q.  You are not expressing any opinions on whether
14  any students at the University of Delaware reached a
15  contract, either expressed or implied, with the
16  university; correct?
17      A.  It's my understanding that they did from
18  counsel, but I -- that seems more like a legal question
19  out of the scope of my assignment.
20      Q.  You are not rendering any opinions on whether
21  or not it was possible for the university to provide
22  in-person instruction in the spring of 2020; correct?
23      A.  Again, that's out of the scope of my
24  assignment.  I am calculating damages at the time and

Page 75

1  point of purchase.
2      Q.  You are not giving any actual damages opinions
3  in this case in terms of what the actual monetary loss
4  was to any student at the University of Delaware as
5  alleged; correct?
6      A.  I believe the actual calculation of damages is
7  Mr. Weir's province.  I am providing him with my percent
8  reduction in market value.
9      Q.  And you are not expressing an opinion on the
10  actual reduction in value to any individual student at
11  the university, including the four named plaintiffs;
12  correct?
13      A.  I would disagree with that.  I am providing a
14  percent reduction in market value that applies to the
15  students.
16      Q.  You have reached an opinion as to an average
17  reduction in market value that is non-specific to any
18  individual student; correct?
19      A.  I wouldn't call it average.  I would call it
20  class-wide.
21      Q.  Your 15.2 percent reduction is not specific to
22  any individual student's circumstances; correct?
23          MR. ARISOHN:  Objection.  Asked and
24  answered.

Page 76

1          THE WITNESS:  It's a class-wide figure,
2  meant to apply to all of them.
3  BY MR. SINGER:
4      Q.  So is it your belief that every single student
5  at the University of Delaware in the spring of 2020
6  suffered a 15.2 percent reduction in market value for
7  tuition?
8      A.  Well, that's what I am providing to Mr. Weir.
9  That's what I am saying.
10      Q.  Did you account for any credits or offsets
11  that students received against tuition in the spring of
12  2020?
13      A.  That's out of the scope of my assignment.  I
14  would suggest you talk to Mr. Weir about that.
15      Q.  Why is it -- if you are issuing an opinion on
16  the reduction in market value of tuition to students, why
17  is it outside the scope of your assignment to factor in
18  or consider or be aware of credits that the students
19  received against tuition?
20      A.  It's my understanding that I am calculating
21  damages at the time and point of purchase, and those
22  credits came afterwards.  So that's out of the scope of
23  my assignment.
24      Q.  Do you know what credits came?

Page 77

1      A.  No, it's out of the scope of my assignment.
2      Q.  You are not expressing an opinion on any
3  alleged overpayment factor?
4      A.  Could you define that for me, please?
5      Q.  Do you know what an overpayment factor is?
6      A.  That's why I am asking you to define it.
7      Q.  You're the expert.  I am asking if you know
8  what that term means.
9      A.  Really, I would like to hear what you think it
10  means because I'm not sure what it means.  You asked me
11  to clarify if I don't understand a question, and I'm
12  asking.
13      Q.  That's a term of art that's been used in the
14  expert reports in this case.  I am just asking if you are
15  issuing an opinion on overpayment factor?
16      A.  Is that in my report?
17      Q.  You wrote your report.  Is it in your report,
18  sir?
19      A.  I don't recall.
20      Q.  Okay.  So are you issuing an opinion on an
21  overpayment factor; yes or no?
22      A.  Again, I asked you to clarify the question
23  because I don't understand what you mean.
24      Q.  Okay.  Did you reference an overpayment factor

20 (Pages 74 - 77)

STEVEN P. GASKIN

Page 78

1   in your report?
2       A.   It's my recollection that I talked about a
3   reduction in market value.  I don't recall explicitly an
4   overpayment factor.  You can show me, if you'd like.
5       Q.   You are not expressing an opinion on any
6   alleged damages for missed classes during the days that
7   the university was closed; correct?
8       A.   Well, I think that that would -- is more of a
9   legal question.  I have presented two scenarios to
10  students and asked them to get the difference.  And I am
11  estimating the difference in market value based on that.
12      Q.   Yes.  And you have told me that that was at
13  the time and point of sale at the beginning of the
14  semester; correct?
15      A.   Yes.
16      Q.   Okay.  So now I am asking you about something
17  that occurred during the semester when the university
18  closed for several days.  You are not expressing an
19  opinion on any alleged damages for missed classes during
20  those days; correct?
21      A.   I really think that's out of the scope of my
22  assignment.  I provided two scenarios, and evaluated a
23  difference in market value between each of them.  It
24  involves the closure of the school, but I think you'd do

Page 79

1   better to ask Mr. Weir or counsel.
2       Q.   Thank you.
3            You are not expressing an opinion as to
4   whether or not the university was unjustly enriched in
5   any amount; correct?
6       A.   It's my job to assume that plaintiffs'
7   allegations are true and that they will be found to be
8   true during this stage of the trial.  However, I'm not an
9   expert in that area or do I vouch personally for those
10  allegations.
11      Q.   You have not reviewed the university's
12  financials from the spring of 2020; correct?
13      A.   Not to my knowledge, nor did I need to to do
14  my assignment.
15      Q.   Look at paragraph 10 in your report, please.
16      A.   Okay.
17           MR. ARISOHN:  Hold on.  Can you just wait
18  until the witness gets there before you ask your
19  question.  Is that okay?
20           MR. SINGER:  I can read it.  Josh, if he
21  has an issue, he'll tell me, okay.  He is fine.
22           MR. ARISOHN:  For the sake of me and the
23  witness and everyone following along, when you are
24  pointing to a specific paragraph of an exhibit, I am just

Page 80

1   asking you to wait until everyone gets there.  That's the
2   way that every deposition I have ever been in has been
3   conducted.  Really, if you are unable to, you know,
4   proceed with that sort of courtesy, that's really a
5   shame.
6            MR. SINGER:  No.  If you need to get
7   there, that's fine, say so.  The witness is fine.  I am
8   reading the questions.  We are good.
9            MR. ARISOHN:  I needed to get there.
10           MR. SINGER:  The witness didn't have an
11  issue.
12           MR. ARISOHN:  I needed to get there as
13  well.
14           MR. SINGER:  Thank you.
15           MR. ARISOHN:  If you are pointing us --
16  the witness or anyone else to a specific portion of a
17  document, would you just make sure that everybody is
18  there, or wait a second for everyone to get there.
19  BY MR. SINGER:
20      Q.   Mr. Gaskin, in paragraph 10 of your report,
21  you state, "I was asked by counsel for Plaintiffs to
22  design, describe, and execute a market research survey
23  (the 'University Survey') and to conduct an analysis that
24  would enable me to assess" "the reduction, if any, in

Page 81

1   market value resulting from the Closure of the University
2   Campus (measured in dollars and/or percentage terms.)"
3            Do you see that?
4       A.   I do.  And I had not gotten there when you
5   started reading it before, so I would appreciate your
6   waiting for me to say I'm there.
7       Q.   Okay.  That paragraph summarizes the scope of
8   the university's survey and your assignment; correct?
9       A.   I will just review it once more.  (Witness
10  reading.)  Yes, that does.
11      Q.   And the market value reduction that you were
12  calculating, results from that defined -- you assume
13  results from that defined term, closure of the university
14  campus, that we looked at in paragraph 8; right?
15      A.   Well, basically.  But I think if you read
16  through the report more thoroughly you will see the
17  definition of the levels I used for campus, class and
18  campus format, and that's what they're really reacting
19  to, that definition of the two levels used in the
20  conjoint survey.
21      Q.   You used choice-based conjoint as your
22  methodology; is that right?
23      A.   That is correct.
24      Q.   And there are other conjoint types that you

21 (Pages 78 - 81)

STEVEN P. GASKIN

1 could have used as well; correct?

2     A. Yes, but this is, choice-based conjoint is

3 regarded as the gold standard for this sort of thing.

4 It's the most highly regarded.

5     Q. Okay. And would you ever consider using menu

6 based, full profile, two attribute tradeoff, adaptive

7 self-application or Max differential, any of those

8 instead of choice based?

9         MR. ARISOHN: I object to form, compound

10 question.

11         THE WITNESS: One of the terms you used is

12 incorrect, by the way.

13 BY MR. SINGER:

14     Q. Which term?

15     A. Perhaps you would like to ask it again. Max

16 differential.

17     Q. Yeah, Max differential.

18     A. Yes, I said it's incorrect.

19     Q. What should it be?

20     A. MaxDiff.

21     Q. MaxDiff. Okay. I have written down MaxDiff

22 actually, believe it or not.

23     Would you ever use any of those conjoint

24 types over choice based in this setting?

1     A. Well, there's more than one way to skin a cat,

2 but as I have said, choice-based conjoint is held to be

3 the gold standard for this sort of thing, and it's the

4 most widely -- most highly regarded methodology for this.

5 So that's why I am using it.

6     Q. Just to be clear. When you reference at the

7 time and point of sale, I think you said, you are talking

8 at about what time specifically?

9     A. It's when students commit to pay the tuition

10 for that semester.

11     Q. When does that occur at UD?

12     A. It's my belief that it occurs at the start of

13 the semester, but it's either that or the start of the

14 year or the start of the semester.

15     Q. Do you need to know that in order to conduct

16 this analysis?

17     A. I just need to know that it's prior to the

18 start of the spring 2020 semester.

19     Q. Do you know the -- have you done any research

20 into the prevalence of conjoint analysis usage in the

21 context of setting tuition in the higher education

22 industry?

23     A. I have read a number of papers regarding

24 school choice. I don't recall any about setting tuition.

1 I think I may have heard that that occurs in another

2 case, from the opposing expert, but I can't say that

3 personally I'm aware of it.

4     Q. And you never interviewed anybody at the

5 University of Delaware in connection with your work;

6 correct?

7     A. Do you mean people that work for the

8 University of Delaware or were walking on the campus or

9 what?

10     Q. I mean people that worked at the university,

11 sir.

12     A. No, I have not.

13     Q. You never interviewed -- you never read any

14 deposition transcripts from any of the University Of

15 Delaware witnesses that were deposed in this case;

16 correct?

17     A. No, I have not nor was I asked to.

18     Q. So you are unaware of how the university

19 actually sets its tuition pricing; correct?

20     A. Again, that's out of the scope of my

21 assignment. I am asking students about the change in

22 market value according to them.

23     Q. Right. So you are focused only on the demand

24 side, the supply side is outside the scope of your

1 engagement; is that correct?

2         MR. ARISOHN: Objection. Misstates the

3 witness's prior testimony.

4         THE WITNESS: You have mischaracterized my

5 opinions and testimony. As I state in, I think it's

6 paragraph 22 of my report, I do account for supply-side

7 factors in my analysis. And so it's not just the demand-

8 side analysis.

9 BY MR. SINGER:

10     Q. Well, wouldn't the university's method of

11 setting pricing and how it goes about setting pricing be

12 relevant to the supply side?

13     A. It could be, but it's reflected in the price

14 range that I've used in the survey. And this sort of

15 economic question is really is out of -- is better

16 directed to Mr. Weir from whom I have learned any sort of

17 economic supply-side questions.

18     Q. Your work has been focused on what students

19 perceive, not on how universities actually set pricing;

20 right?

21     A. Again, you have mischaracterized my testimony.

22 While conjoint does work with the demand side by

23 appropriately marrying it with supply side

24 considerations, I can give a change in market value,

22 (Pages 82 - 85)

STEVEN P. GASKIN

Page 86

1 which I have.
2     Q. From your perspective, for the work that you
3 did, you would have no need to consider how the
4 University of Delaware actually goes about setting its
5 tuition pricing; is that correct?
6     A. Again, that's out of the scope of my
7 assignment. The way it sets it is reflected in the
8 historical market prices that I use, the range of market
9 prices that I use in the survey.
10     Q. How is it reflected in that?
11     A. Because those are the real-world market prices
12 for the defendant and the competitive schools, and those
13 reflect historic supply-and-demand conditions.
14     Q. But how does that reflect how the university
15 goes about setting that price?
16     A. Because it's the result of how they set that
17 price.
18     Q. I understand. I agree with you. It's the
19 result. And I'm not asking about the result, I'm asking
20 about how the university or any university gets to that
21 result.
22     Do you have any knowledge as to -- or am I
23 understanding correctly that for what you did, you are
24 not concerned with how the university or any university

Page 87

1 gets to that result of the tuition price that they will
2 charge?
3     A. I think you are, again, mischaracterizing me
4 and my opinions. Again, the price range, the market
5 price range I used in the survey reflects those
6 considerations. So while I am concerned about them, I
7 have properly dealt with them by making the supply side
8 -- or accounting for the supply-side factors that I -- in
9 the way that I have.
10     Q. Turn to page 7 of your report. Within
11 paragraph 15 you give Figure 1, a choice-task example.
12     A. All right. I will let you know when I am
13 there. Okay. I am there.
14     Q. And this is an actual example of a choice task
15 that was presented to survey respondents in this case;
16 correct?
17     A. It is an example. It's from the same
18 experimental design that was used for my survey. I'm not
19 sure exactly which respondent it would be shown to. It's
20 just an example.
21     Q. Right. Up at the top it says: "If these were
22 your only options and you had to choose a university to
23 enroll in, which university would you choose?"
24     Do you see that at the very top?

Page 88

1     A. Let me look. Yes, I do.
2     Q. This is not -- in the real world, these would
3 not be the respondents' only options; correct?
4     A. That's correct, but that's not how conjoint
5 works.
6     Q. I understand.
7     When it says, "If these were your only
8 options and you had to choose a university to enroll in,
9 which university would you choose?" when it's referring
10 to options, is it referring to the name of the
11 university, the attributes that are listed there or the
12 whole package for each?
13     A. The whole package for each that's shown there.
14     Q. And when you state: "Please assume that the
15 universities do not vary on any features other than the
16 features that are shown to vary," that's not true in the
17 real world either; correct?
18     A. No. But it happens in every conjoint
19 analysis, whether mine or anyone else's.
20     Q. I understand. And your conjoint tells
21 students to ignore any other features that may vary
22 between the schools for purposes of answering the survey
23 questions; correct?
24     A. I believe I just answered you that.

Page 89

1     Q. Is that correct?
2     A. It's correct. And I told you why, it's
3 because that's how every conjoint analysis, whether mine
4 or anyone else's, works.
5     Q. You then state: "As a reminder, please assume
6 you are actually considering enrolling as an under-
7 graduate at a college or university, and you are making
8 your university choices prior to the COVID-19 pandemic,
9 so it should not be a factor in your decisions."
10     Do you see that?
11     A. Yes, I do.
12     Q. How is it that you ensure that survey
13 respondents can exclude their memories and experiences
14 with the pandemic in answering the survey questions?
15     A. Well, I ask them to. And in the pretest, they
16 -- oh, are you laughing at me? I didn't think I was
17 making a joke.
18     Q. I am not laughing at you. I know you asked
19 them to. That's my question is how you know they did it.
20     A. It seemed like you were laughing at me.
21     Q. Go ahead, Mr. Gaskin.
22     A. As I said, I asked them to do so and, also, I
23 checked for that in the pretest. They had no problem
24 with doing so that I was aware of from their responses.

23 (Pages 86 - 89)

STEVEN P. GASKIN

Page 98

1 MR. ARISOHN: You have been screaming at
2 the witness all morning, and laughing.
3 MR. SINGER: This is a waste of time.
4 This is a waste of time.
5 MR. ARISOHN: I agree with that.
6 MR. SINGER: Let's proceed.
7 BY MR. SINGER:
8 Q. Mr. Gaskin, can you explain -- are you aware
9 of whether or not any universities use Sawtooth Software?
10 A. Yes.
11 Q. Beyond the MIT experience you had?
12 A. Well, they wouldn't necessarily use Sawtooth
13 Software when I conduct a conjoint for them, but they do
14 use it. And it's, from -- it's my understanding from
15 research papers I have read and conference talks that are
16 given by university professors that many of them do use
17 Sawtooth Software. It's the leading conjoint analysis
18 software.
19 Q. Can you explain the Hierarchical Bayes
20 regression analysis?
21 A. Well, there's books for that, so it could be a
22 very long explanation. But briefly, what it does is take
23 the information in the choice tasks, in other words,
24 which -- the characteristics of the products respondents

Page 99

1 chose from, their choices, and it, from there it comes up
2 with a set of what are called partworths, which help
3 characterize how each level of each attribute drives
4 consumer choices. And that's the chief benefit or novel
5 benefit of Hierarchical Bayes choice models which have
6 been around now or used in Sawtooth Software since about
7 1999 or 2000, if I am correct.
8 They provide partworths at the individual
9 level. Whereas, a standard Logit model, which was the
10 previous sort of mechanism, provides it just at the
11 aggregate level. And the way the Hierarchical Bayes
12 model works is that it can work off of a lot -- a very
13 small set of data. That's its chief -- another chief
14 virtue.
15 And there's no formula for solving the
16 equation that it's trying to solve. So what it does is
17 it uses conditional probability distributions and samples
18 from them successfully, something called a Monte Carlo
19 mark-off process that gradually converges on an answer
20 after many, many draws, perhaps 10,000. And then it
21 continues that process of narrowing in on the answer for
22 another 10,000 or so. It's up to the user, and whether
23 the results are stable at that point of the first 10,000,
24 to get an estimate of the partworths for each person, for

Page 100

1 each attribute, for each level.
2 Q. You mentioned earlier that universities use
3 conjoint, and it sounded like you were discussing
4 professors.
5 Are you aware of financial services or
6 accounting offices or administrative offices at
7 universities that actually use conjoint?
8 A. I'm not. But, in my experience, if the
9 university were going to do it for their financial
10 people, they would hire someone who knows about conjoint
11 analysis. That's way out of the job description of
12 people in those offices generally.
13 Q. Right. And my question was whether you were
14 aware of universities that hired people outside of those
15 offices for that purpose?
16 A. Oh, I don't think that was your question, but
17 I don't know if they have or not.
18 Q. Thank you.
19 Does your conjoint assume that attributes
20 interact with one another?
21 A. I checked for that as part of my analysis, and
22 empirically here I have seen that they do not.
23 Q. How did you check for it?
24 A. There's a Sawtooth program called Model

Page 101

1 Explorer, and it does two things. It helps us determine
2 the prior variance and prior degrees of freedom to use in
3 the Hierarchical Bayes choice model, and then given that,
4 it checks for interactions. And so I have done that and
5 found no interactions.
6 Q. Do you have -- is there data that reflects
7 that work that was done?
8 A. There is -- there are the results, which are
9 presented in my exhibits, of what the prior degrees of
10 freedom and prior variance are. And it was discussed in
11 that exhibit, I believe, that we used Model Explorer to
12 do so.
13 Q. Which exhibit?
14 A. One of the ones at the very end, I think.
15 Q. Is that Exhibit J: Model Fit and Holdout
16 Diagnostics?
17 A. No.
18 Q. Can you tell me which exhibit?
19 A. I'm trying to get to the end of my report. I
20 think it would be in Exhibit O, the CBC/HB settings.
21 Q. Okay. Does decision theory underlie conjoint
22 analyses?
23 A. I think so, because Paul Green and Vithala
24 Rao, who wrote that seminal paper on conjoint analysis

26 (Pages 98 - 101)

STEVEN P. GASKIN

Page 102

1 back in 1971, referred to the work of a Professor Luce,
2 L-U-C-E, who did a lot of work, I believe, in decision
3 theory.
4      Q.  Do market simulations use regressions?
5      A.  No, that's the -- when partworths are
6 determined, that's when regression takes place.  The
7 simulation is something entirely different.
8      Q.  What is the covariance matrix?
9      A.  Well, there's no covariance matrix.  A
10 covariance matrix shows how the different variables in a
11 regression, say, covary with one another, how correlated
12 they are.
13      Q.  Right.  And have you shown one in your report
14 or in your exhibits?
15      A.  I have not, because it was not necessary for
16 me to print one out or view it as part of my analysis.
17      Q.  Why not?
18      A.  If we look at Exhibit O, you can see that
19 there's a set of check boxes near the end of the model
20 setting, which asks if I wish to print those things out
21 or create them.  It's not necessary to do it for my
22 purposes, and I didn't check those boxes.  It's possible,
23 if someone wishes to reproduce the analysis, to do it
24 quite easily, but I didn't do it.

Page 103

1      Q.  Okay.  So if we wanted to take a look at that
2 for the work you have done here, we would be able to do
3 so?
4      A.  Yes, you would.
5      Q.  If you were critiquing somebody else's
6 conjoint analysis, would you want to see their covariance
7 matrix?
8      A.  No, I would not.
9      Q.  Why not?
10      A.  Well, it's a very large matrix, and I just
11 don't have to see it to judge their results.  It's just
12 sort of a step along the way.  So I -- whenever I have
13 reviewed a conjoint analysis, I didn't ask to see it.
14 It's generated automatically by Sawtooth.  I wouldn't
15 even know if it's the right numbers or not, because it's
16 generated by Sawtooth.
17      Q.  Does your model allow for the degree to which
18 students care about the student/faculty ratio varying
19 with the school's academic ranking levels?
20      A.  It does take into account both of those
21 factors.  As I have said, there's no interactions that I
22 found in the model, if that's what you mean.
23      Q.  Yeah.  My question is:  Does the model allow
24 for the degree to which students care about the student/

Page 104

1 faculty ratio vary with the school's academic ranking
2 levels?
3           MR. ARISOHN:  Objection.  Asked and
4 answered.
5           THE WITNESS:  I'd say yes.
6 BY MR. SINGER:
7      Q.  How so?
8      A.  I just gave you the answer for that.
9      Q.  Could you give it to me again, please?
10      A.  It has -- it's reflected in people's choices,
11 in the partworths, and in the fact that there were no
12 interactions found during the analysis.
13      Q.  Does the model allow for students to care more
14 about one attribute than another if another attribute
15 changes?
16      A.  Yes.  But again, that would be an interaction.
17 And I have checked for interactions, and there are none
18 worth including.
19      Q.  When you say there are none worth including,
20 who makes that determination?
21      A.  I do, based on standards identified by
22 Sawtooth Software.
23      Q.  What standards, specifically?
24      A.  In the -- I think it's in "Getting Started

Page 105

1 With Conjoint Analysis" or it might be in their other
2 book, "Becoming an Expert in Conjoint Analysis," but
3 there's a passage that talks about how an interaction
4 should improve the hit rate at least 2 percent to be
5 worth including.  That's a general rule of thumb they
6 provide.  And none of the interactions that I examined --
7 and I examined all the possible ones -- was remotely
8 close to that.
9      Q.  So using the attributes you looked at, any
10 changes in one attribute do not have a meaningful change
11 in other attributes; is that right?
12      A.  No, that doesn't make any sense.
13      Q.  Do not have a meaningful change in the value,
14 in the students' answers?
15           MR. ARISOHN:  I object to form.
16           THE WITNESS:  Well, again, there's no
17 interactions that I found and that relates to whether the
18 partworths or students' choices are meaningful influenced
19 by the value or the level of another attribute.
20 BY MR. SINGER:
21      Q.  You reference paragraph 22 of your report
22 earlier.  Do you have that in front of you still?
23      A.  I don't think.  Let me go to it.  Okay.  There
24 I am, yes.

27 (Pages 102 - 105)

STEVEN P. GASKIN

Page 118

1    model, so it's not necessary for me to know.  It's
2    necessary for me to hold the conditions in the analysis
3    such that it would remain constant.
4        Q.   How is it that you hold the number of students
5    constant in the simulation you run without knowing what
6    that number is?
7        A.   I have explained this to you, with all do
8    respect.  It's a share model.  And I have kept the shares
9    the same between the two alternatives, and that
10   accomplishes that goal.
11       Q.   Paragraph 23, you list out the Ohio State and
12   Miami University cases.  Those aren't --
13       A.   Excuse me, I'm not there yet.  Okay.  Now I am
14   there.
15       Q.   Let me back up.  In paragraph 23, is this the
16   universe of cases in which you have performed similar
17   conjoint analyses throughout the paragraph, 20 cases I
18   think you conclude at the end of the paragraph?
19       A.   No, it is not.
20       Q.   Okay.  Why did you list these 20 and not the
21   balance?
22       A.   These are the ones which received a favorable
23   class certification ruling.
24       Q.   Were there others that received unfavorable

Page 119

1    class certification rulings?
2        A.   Many of them received no ruling at all.  But
3    there are a very few that received some sort of -- I
4    don't know what the word is -- not favorable ruling.
5        Q.   Which ones were those?
6        A.   Ones that come to mind are, let's see, Shannon
7    versus -- Shannon Adams v. Target, in which the judge
8    didn't have any problems with my expertise or with
9    conjoint in general, he just thought that it would be
10   difficult to apply it to the product in that case.
11           Simply Orange, again, the judge had no
12   problems with conjoint, with the supply side even, or
13   with my qualifications, but found that the level that I
14   used supplied to me by counsel was biased.
15           Then Zeiger v. WellPet, the judge made a
16   calculation that I did not propose to use.  Although, he
17   is a fine judge.  And I don't know what the phrase is,
18   but did not accept the conjoint without prejudice.  And
19   then Nemeth v. Volkswagen, the judge excluded my opinion
20   for reasons with which I did not agree, with all due
21   respect to him.
22       Q.   What were the reasons in Volkswagen?
23       A.   I can't remember all of them.  One of them was
24   that the pretest didn't have any close-ended questions in

Page 120

1    it.  It was just free form, which a simple reading of the
2    exhibits and my report would show is incorrect.  I think
3    he had a problem with the supply side.  You can talk to
4    Mr. Weir about that.  And I can't remember what the rest
5    of them were.
6        Q.   Why would I talk to Mr. Weir about that?
7        A.   Because he's the expert on the supply side, so
8    he would remember it better.
9        Q.   Do you consider the manuals and guidance of
10   Sawtooth Software authoritative?
11       A.   They are very good.  They haven't thought
12   about -- the people there haven't thought about class
13   action conjoint analyses to the degree Mr. Weir and I
14   have, so we might have some slight disagreement there,
15   but generally they are very good.
16       Q.   Do you agree that conjoint analysis is
17   imperfect?
18           MR. ARISOHN:  Objection, vague.  Go ahead.
19           THE WITNESS:  Well, imperfect in what way?
20   BY MR. SINGER:
21       Q.   Any way.
22       A.   Well, every mathematical model is an
23   abstraction of reality, no matter how highly regarded or
24   well used, like conjoint.  So in some sense, I guess you

Page 121

1    could say it was imperfect.  But again, it's used very
2    widely.  It's the most widely used and researched
3    marketing science quantitative technique.
4        Q.   Does the literature indicate that conjoint is
5    imperfect?
6        A.   Well, again, any multivariate analysis
7    technique involves a certain amount of statistical error.
8    So in that sense, I guess you could say so.
9        Q.   And what are some of the imperfections with
10   conjoint analysis, generally?
11       A.   Well, again, just generally, mathematical
12   models are an abstraction of reality, which is their
13   benefit actually.  But I can't really speak to any
14   particular problems with it.  It's very widely used in
15   research.
16       Q.   Has Orme indicated that conjoint has
17   imperfections and weaknesses?
18       A.   He may well have.  I wouldn't be surprised.
19       Q.   Do you have to test how much abstraction from
20   reality exists in an analysis, in a conjoint analysis?
21       A.   How much abstraction from reality?
22       Q.   Yep.
23       A.   I'm not sure what you mean.  I don't know how
24   you would test for that.  It works even if it is

31 (Pages 118 - 121)

STEVEN P. GASKIN

Page 126

1 right?
2     A.  Depending on how you describe it, I'm not sure
3 if you could or not.
4     Q.  You could have included sports programming;
5 correct?
6     A.  Again, that's rather vague.  I'd have to think
7 about it more.  Possibly.
8     Q.  People choose universities sometimes because
9 they are fans of the sports teams; right?  That could
10 have been an attribute that you included; correct?
11     A.  Perhaps.  I'm an MIT student, so I'm not
12 holding myself out as an expert in college sports.
13     Q.  You could have included geographic proximity
14 to their home; correct?
15     A.  I believe I did.  In the university attribute
16 it shows the location of the campus, so they can make
17 their own conclusions from that.
18     Q.  So you believe that would incorporate that?
19     A.  Sure.  If you tell people it's in Delaware,
20 and they live in Pennsylvania, then they know it's closer
21 than someone reviewing it from California.
22     Q.  There are a number of reasons why students
23 choose to attend a university that were not part of the
24 attribute list you selected; correct?

Page 127

1     A.  What evidence are you presenting for that?
2     Q.  I am just asking you a question, sir.  Yes or
3 no?
4     A.  I'm not sure what you are referring to.
5     Q.  Are there reasons that students choose
6 universities other than the attributes you listed in your
7 survey?
8     A.  There could be.  But again, it doesn't matter
9 due to the nature of how a class action conjoint uses the
10 attributes.
11     Q.  And it matters not because why?
12     A.  I have already explained it to you.  If you
13 would like to go to that paragraph, I can read it to you.
14     Q.  Which paragraph?
15     A.  I will find it.  Just a moment.  Paragraph 24.
16     Q.  How is it that you selected these attributes
17 to the exclusion of others?
18     A.  Well, I gave you my methodology right there.
19 It's basically the choice of attributes is both an art
20 and a science.  So it's hard to give a computer formula
21 for it.  But, in my judgment, I had the best set of
22 attributes among the ones I considered.
23     Q.  And that's what I am trying to pin down.  The
24 ones you considered, you cut some and you chose these.

Page 128

1 Why these to the exclusion of the others you considered?
2     A.  Like I said, I can't remember the others I
3 considered, so it's hard to tell you why I chose these
4 versus them.
5     Q.  Do you agree that conjoint analyses do not
6 provide accurate results if the surveyor does not
7 properly identify the entire set of competitive choices
8 and product characteristics that consumers consider when
9 making purchase decisions?
10     A.  Well, it depends on the application.  That's
11 much more helpful in the new product development
12 application.  In a class action conjoint, it's not so
13 critical.
14     Q.  Why is that?
15     A.  Well, I have explained it to you.  I could do
16 it again, if you'd like.
17     Q.  My follow-up question asks you to explain it.
18 Thank you.
19     A.  You are welcome.
20         In a class action conjoint, in the
21 simulation, there's two products that vary only on the
22 key attribute levels and price.  All of the other
23 attribute levels are held constant and the same across
24 the two alternatives, so they have no affect on the

Page 129

1 calculation.
2         So in that sense they don't matter.  In
3 addition, the way conjoints are designed, the partworths
4 value is achieved or estimated between any pair of
5 attributes are generally independent of all the other
6 attributes.  And there's academic literature to that
7 regard that states that the exact choice of attributes or
8 inclusion or exclusion of an attribute doesn't affect
9 that sort of relative relationship between my key
10 attribute and price.
11         So for those reasons, I think it matters
12 less in a class action conjoint.
13     Q.  Are there any academic publications on class
14 action conjoints?
15     A.  Class action conjoints are mentioned, at the
16 very least, in the book "Applied Conjoint Analysis" by
17 Vithala Rao.  He was one of the coauthors of a seminal
18 academic paper on conjoint analysis.
19     Q.  Do you agree that profiles presented in
20 conjoint analysis should be believable and should
21 resemble existing products as much as possible?
22     A.  I think that quote is cherry-picked from a
23 longer passage that I often read.  So perhaps if I can't
24 see the rest of that passage, I think I would rather

33 (Pages 126 - 129)

STEVEN P. GASKIN

Page 130

1 reserve judgment on it. I think that it justifies what I
2 do, the whole passage, if you read it right.
3      Q. My question to you is: Do you agree that
4 profiles presented in conjoint analysis should be
5 believable and should resemble existing products as much
6 as possible?
7      A. Well, as I said, that's a quote, a section, or
8 a small quotation from a longer passage. And I think
9 that in fact it is not always true. There are certain
10 caveats or conditions that I meet that make it not so
11 important or it shows that, at least if I am remembering,
12 that my survey meets those criteria.
13      Q. How does your survey resemble UD's -- let me
14 back up.
15          I understand that quote or that statement
16 is talking about products. Here the, quote-unquote,
17 product is the on campus versus online learning in the
18 spring of 2020; correct?
19          MR. ARISOHN: I object to form.
20          THE WITNESS: Basically, I suppose.
21 BY MR. SINGER:
22      Q. Okay. So, and that was a decision or issue
23 that came about as a result of the COVID-19 pandemic;
24 correct?

Page 131

1      A. Yes, that's my belief.
2      Q. So how -- understanding the issue that you are
3 looking at in your survey came about only as a result of
4 the COVID-19 pandemic, how does your survey resemble that
5 issue as much as possible when you tell survey
6 participants to ignore the COVID-19 pandemic?
7      A. Because the damages occur at the time and
8 point of purchase, and that time and point of purchase
9 occurred prior to the COVID pandemic. That's the time
10 period I am modeling. COVID was not present then.
11      Q. But for COVID there would be no need to do a
12 model at all; correct?
13          MR. ARISOHN: I object to form, vague.
14          THE WITNESS: It's sort of a vague
15 statement. This case probably wouldn't have come about,
16 if that's what you mean. But again, I am modeling a
17 different time period.
18 BY MR. SINGER:
19      Q. Why are you modeling a time period that
20 predates the event that gave the -- that created the
21 circumstance for consumers to have to move online?
22          MR. ARISOHN: Objection. Asked and
23 answered.
24          THE WITNESS: It's kind of a legal

Page 132

1 question, I think. But it's my understanding that the
2 damages occur at the time and point of purchase. And
3 that was before the COVID epidemic, so I am measuring my
4 real and but-for worlds at that time. And at that time,
5 COVID did not exist. So it would not be appropriate to
6 model COVID in my analysis.
7 BY MR. SINGER:
8      Q. Okay. So just -- and bear with me because I
9 am not a conjoint expert, as you have made clear today.
10          Damages -- if I understood you correctly
11 just now, your statement is that the damages occurred at
12 the time and the point of sale, which is before the COVID
13 pandemic. Is that right?
14      A. That's correct.
15          And I did not mean to insult you.
16 Conjoint isn't something that people sit around reading
17 about on the beach, you know. So please don't take it
18 personally.
19      Q. So then if the pandemic never happened, there
20 would be no damages; is that correct?
21      A. Well, if, if for some other reason during the
22 spring 2020 semester, University of Delaware decided to
23 switch to purely online classes and shut down its campus,
24 et cetera, et cetera, then there would be reason for a

Page 133

1 case or for damages.
2      Q. Understood. But that's not what we are
3 talking about here; right? The reason we are talking
4 about in this case is COVID-19; correct?
5      A. Yes. But I think your question asked me if
6 there was some other possible reason, and I said, sure,
7 it's just -- if there were another reason that the class
8 -- that the college shut down. It could be another
9 disease.
10      Q. So if you are measuring damages at the time
11 and point of sale before COVID takes place, do you do
12 anything to account for what happens after that time of
13 point of sale as an offset to the alleged damage
14 calculation?
15          MR. ARISOHN: Objection, vague.
16          THE WITNESS: Yeah, I'm not sure I
17 understand what you mean. To offset what, my reduction
18 in market value, or what?
19 BY MR. SINGER:
20      Q. Your testimony is that the students were
21 damaged at the time and point of sale, which you
22 testified earlier occurred at the beginning or shortly
23 before the beginning of the semester; correct?
24      A. That's correct.

34 (Pages 130 - 133)

STEVEN P. GASKIN

1    Q.  Okay.  If the damage occurs at that point in
2  time, should you or Mr. Weir be factoring in offsets or
3  credits that occur after that point in time against the
4  damages that you say occurred earlier?
5       MR. ARISOHN:  I object to form.
6       THE WITNESS:  Well, I will leave
7  Mr. Weir's calculations and the need for that to him,
8  because I'm not the economics expert.  My -- and I'm not
9  a legal expert, either.  But my understanding is that I
10  don't need to do that.
11  BY MR. SINGER:
12    Q.  How could a consumer be damaged at the time
13  and point of sale as you calculate it when nothing had
14  happened at that point in time?
15       MR. ARISOHN:  Objection.  Calls for a
16  legal conclusion.
17       THE WITNESS:  That's really not a conjoint
18  analysis market research survey question.  It really is
19  kind of a legal question.  It's my understanding that at
20  that very point they didn't get the benefit of their
21  bargain.
22  BY MR. SINGER:
23    Q.  But they did at that point in terms of going
24  to online -- I mean, going to in-person classes and

1  living on campus for the beginning part of the semester;
2  correct?
3    A.  Perhaps.
4       MR. ARISOHN:  Objection.  Go ahead.
5       THE WITNESS:  Sorry.  The bargain covered
6  the entire semester.
7  BY MR. SINGER:
8    Q.  Did you do pretesting to identify relevant
9  attributes?
10    A.  Well, actually a pretest is, as I understand
11  it, is not designed to do that.
12    Q.  Did you use the pretest at all in connection
13  with determining the attributes that you would use?
14    A.  The attributes had already been determined at
15  that point.  I could have changed them or altered them if
16  one turned out to be inappropriate, but I didn't find
17  that.
18    Q.  Could you have done pretesting to identify the
19  most appropriate attributes for use in the conjoint?
20    A.  Well, it would be awkward, as I said, because
21  the conjoint is actually already made at that point.  I
22  mean, you can check that they are good ones, but you
23  shouldn't start from ground zero then because a conjoint
24  has to be already built.

1    Q.  Did you do any work to determine what
2  attributes Delaware believes are important to its student
3  population?
4    A.  Delaware is a state, right?  I don't know how
5  a state would believe anything like that.
6    Q.  Mr. Gaskin, you know you are testifying
7  against the University of Delaware.  Okay?  So I
8  appreciate the nuance you are trying to point out, but
9  please just answer the question.
10    A.  I am just listening to your questions and
11  answering them, I'm sorry.  The question seemed vague to
12  me.
13       I have looked at university websites,
14  including University of Delaware, to develop my set of
15  attributes and levels.  So in that sense, yes.
16    Q.  Do you agree that the important attributes to
17  individual students vary by student?
18    A.  That's quite possible.  And it's allowed and
19  accounted for in my survey and model and analysis.
20    Q.  Did plaintiffs' counsel participate in the
21  process of determining the attributes that you would use
22  for the survey?
23    A.  I believe that -- we could go back and review
24  those paragraphs that show the sources.  My belief is

1  that they were involved mainly with the key attribute,
2  class and campus format, and they were involved in the
3  tuition discussions.
4    Q.  Do you recall any specific attributes that
5  plaintiffs' counsel indicated should be included or
6  should not be included?
7    A.  Well, certainly they wanted the class and
8  campus format and price or else we wouldn't have been
9  able to do the -- give them an answer that they wished
10  for.  As for the others, I don't think they made any
11  specific recommendations.
12    Q.  Do you agree that missing attributes can be a
13  real problem?
14    A.  It --
15       MR. ARISOHN:  Objection, vague.
16       THE WITNESS:  Sorry.  Sorry, Josh.
17       It depends on the context in which the
18  conjoint is used.  If it's a new product development or
19  patent infringement conjoint, it's perhaps a problem,
20  but -- and could be, but in a class action conjoint, it's
21  much less so.
22  BY MR. SINGER:
23    Q.  But even in a class action conjoint, it could
24  be a problem; correct?

35 (Pages 134 - 137)

STEVEN P. GASKIN

Page 138

1    A.  No.  I think I have explained to you why it's
2  not a problem, how the other attributes other than the
3  key attribute and price serve chiefly as distractors, and
4  to make the conjoint a more reasonable and engaging task,
5  if I am remembering what I said.
6    Q.  So would it be of any benefit to you to have
7  reviewed the plaintiffs' depositions and determined the
8  attributes that mattered to them in making their decision
9  to attend UD as part of your work to determine the
10  appropriate attributes for use in your survey?
11    A.  I'm always happy to review new information,
12  but for the reasons I have discussed, I think that it
13  would not have been critical to the development of my
14  list of attributes.
15    Q.  Do you know whether any of the four plaintiffs
16  in this case identified any of these attributes that you
17  used among the list of reasons that they chose to attend
18  University of Delaware?
19    A.  I believe that the in-person courses were
20  important, but I haven't reviewed their depositions, so
21  it's hard for me to say.  Again, I don't think it's
22  necessary for my purposes, given the nature of the class
23  action conjoint, how attributes are selected.
24    Q.  Do you agree that conjoint analysis

Page 139

1  predictions assume that all relevant attributes that
2  influence that share at issue have been measured?
3    MR. ARISOHN:  I object to form.
4    THE WITNESS:  Well, what -- did you say,
5  calculations?  There's a lot of calculations.
6  BY MR. SINGER:
7    Q.  No.  I said do you agree that conjoint
8  analysis predictions assume that all relevant attributes
9  that influence that share have been measured?
10    MR. ARISOHN:  The same objection.
11    THE WITNESS:  Again, conjoint is used for
12  many of -- a wide variety of uses.  In some cases that I
13  have mentioned, such as new product development, that's
14  very helpful.  But in a class action conjoint, it's not
15  so helpful.
16  BY MR. SINGER:
17    Q.  And when you use the term class action
18  conjoint, what does that term mean when you are using it?
19    A.  It means a conjoint analysis for a class
20  action litigation.
21    Q.  Okay.  Is a conjoint analysis for a class
22  action litigation like you have done in this case any
23  different from what you would do in terms of a conjoint
24  analysis if the University of Delaware hired you to

Page 140

1  determine the reduction in market price for tuition in
2  the spring of 2020 in a non-litigation setting?
3    A.  I think that if it were -- for that question
4  in itself, which is my sort, the class action sort of
5  question, I don't think it would be different.  But a new
6  product development conjoint -- maybe not always, but
7  when it does try to give a numerical answer is going
8  after different -- measures of different things.  And
9  that's where the choice of attributes comes in a little
10  handier.
11    Q.  You don't structure or perform a conjoint
12  differently because you are doing it in a setting of a
13  class action lawsuit as a retained expert than if you
14  were to do it outside a class action context; correct?
15    A.  I think you have mischaracterized my
16  testimony.  I said if you are trying to calculate the
17  exact same thing, then it would be the same analysis, but
18  if you are trying to calculate something else, like what
19  feature might give rise to the most profits for the
20  company or something like that, that's a different sort
21  of analysis and has different requirements.
22    Q.  Right.  So when you are saying you don't need
23  to do something in a class action conjoint, there's
24  nothing unique about a class action that means you don't

Page 141

1  need to do something in the methodology of the conjoint
2  as distinct as measuring the same thing in a non-class
3  action setting for business reasons, for example?
4    A.  If my goal is to estimate the exact same
5  quantity, price premium or reduction in market value,
6  then -- and I have done that in both business and
7  litigation worlds, to me the methodologies are very
8  similar.
9    Q.  Thank you.
10    Have you heard of the concept called
11  omitted variable bias?
12    A.  Yes.  Something to that effect.
13    Q.  And what is that?
14    A.  Well, in a regression analysis, for example,
15  if you are leaving out a variable, it may not be able to
16  explain the -- the model may not be able to explain all
17  that it could otherwise, depending on the application.
18    Q.  Does ignoring relevant attributes cause
19  omitted variable bias?
20    A.  Well, I have already answered this question,
21  but I will answer again for you, if you'd like.  It
22  depends on the application.  In new product development,
23  where you are trying to model the -- if you are going a
24  certain quantitative route to calculate sales and profits

STEVEN P. GASKIN

Page 142

1 from a share model, you need to have the major
2 competitors in there needing to explain their model, what
3 would cause -- lead to their market shares and to the
4 exact level of sales. So there's a number of things that
5 you need to take into account.
6           For a class action, where you are
7 calculating the utility -- or the price difference needed
8 to compensate for a loss in utility due to the absence of
9 a feature or features, it's not so necessary.
10     Q. Could the -- could the absence of relevant
11 attributes in this case lead to omitted variable bias?
12     A. I don't think so. And I have academic
13 articles that say otherwise.
14     Q. Can you name them for me, please?
15     A. I'm sure your expert is familiar with them,
16 but there's an article by Huber and McCann and another by
17 Huber himself. And I could -- I would be glad to produce
18 them whenever anyone likes.
19     Q. Could you look at paragraph 27 of your report,
20 please.
21     A. Sure. Just a moment. All right. I'm there.
22     Q. This describes the seventh attribute that you
23 used, class and campus format; correct?
24     A. Yes. I'm not sure it's necessarily the

Page 143

1 seventh, but it's one of them.
2     Q. This is the seventh that's not listed on your
3 paragraph 25. I just wanted to make sure that I
4 understood that, because that said six and this is, I
5 believe, the seventh; right?
6     A. That is correct, yes.
7     Q. Okay. And then you state that -- well, let me
8 ask you. Why is it -- when you say class and campus
9 format, that is referring to both whether or not classes
10 are online and whether or not campus facilities are open
11 for in person or remote access as well; correct?
12     A. That's correct.
13     Q. Why is it that you combine class and campus
14 format into a single attribute as opposed to breaking
15 them apart into separate attributes?
16     A. Well, I have laid out the levels in a way that
17 enables me to vary each, but the larger reason is that
18 all I have been asked to do is compare the real and
19 but-for worlds. And the but-for world differs on both of
20 those aspects. So I should test the real that -- where
21 the college has changed both of those aspects.
22     Q. And just so I am clear, when you use the terms
23 real and but-for world, I want to make sure that I
24 understand. With respect to this attribute, can you tell

Page 144

1 me what was the real world and what was the but-for world
2 in terms of what you just stated?
3     A. Yes. The real world is what was offered,
4 which is the in person, the choice of in-person or online
5 course and the access to the campus and its facilities
6 and experience, et cetera. And the but-for world is what
7 happened during COVID basically, which is that the
8 classes were made to be solely online and the campus was
9 shut down. That closure that we spoke about earlier in
10 this deposition.
11     Q. And does the -- and that but for refers to but
12 for COVID happening?
13           MR. ARISOHN: Objection. Asked and
14 answered.
15           THE WITNESS: That is probably the reason
16 that it occurred, but the but-for world differs from the
17 real world solely in the absence of defendant's harmful
18 act. So it doesn't really speak to the motivation. It
19 just speaks to what the students actually received for
20 whatever reason.
21 BY MR. SINGER:
22     Q. Does this account for the circumstance where
23 some students remained on campus in the spring of 2020
24 after the COVID shutdown?

Page 145

1           MR. ARISOHN: I object to form.
2           THE WITNESS: I guess you will have to be
3 more specific. Were they taking only online classes?
4 Did they have access to the campus and its facilities?
5 BY MR. SINGER:
6     Q. Do you have knowledge as to the subset of
7 students that remained on campus after the closure of the
8 university campus in the spring of 2020?
9           MR. ARISOHN: Objection. Asked and
10 answered.
11           THE WITNESS: That's really out of the
12 scope of my assignment. I am here -- it's my job to
13 assume that plaintiffs' allegations are true, and my
14 but-for world models plaintiffs' allegations.
15 BY MR. SINGER:
16     Q. Understood.
17     A. So I am just modeling two scenarios.
18     Q. Okay. And your but-for world does not include
19 this third scenario where some students in the real world
20 stayed on campus after the university closure; is that
21 correct?
22     A. Well, I do have a middle level in that
23 attribute where courses go online, but there's still
24 access to the campus and its facilities and services. So

37 (Pages 142 - 145)

STEVEN P. GASKIN

Page 146

1  in that sense, it could model that, model the outcome for
2  that group of people.  So...  Again, that wasn't my
3  assignment.  I was asked to model the two levels or get
4  the difference in market value between the two levels
5  that I did.
6      Q.  Right.  So your 15.2 percent does not account
7  for that middle level that you just described; correct?
8      A.  Well, again you are talking out of the scope
9  of my assignment.  The middle level could account for it,
10  but I wasn't asked to make that calculation.  I could.
11      Q.  I understand.  I understand you could.  And I
12  understand it was outside the scope of your assignment.
13          As a result of that fact that it was
14  outside the scope, you did not; correct?
15      A.  Well, it was not my assignment, so I did not.
16      Q.  Did Mr. Weir; do you know?
17      A.  I don't know.
18      Q.  How is it that the inclusion of additional
19  attributes reduces demand artifacts?
20      A.  Well, if I had, for example, run a conjoint
21  with only two attributes, the class and campus format and
22  price, it would be pretty obvious what the conjoint is
23  about.  Whereas, if you have other attributes, they serve
24  as distractors so that the respondents have a much more

Page 147

1  difficult time guessing what the survey is about.  And if
2  they don't know what it's about, it's much more difficult
3  for them to answer it the way they believe someone is
4  demanding or requesting because they don't know what that
5  is.
6      Q.  And how is it that you know that these other
7  attributes serve as distractors as opposed to the leading
8  attribute upon which the decision is actually based?
9      A.  I'm sorry, by the students or -- could you ask
10  that again, please?  I'm not trying to be stubborn, but I
11  don't get what you are asking.
12      Q.  Yeah.  My understanding of what you are saying
13  with regard to attributes reducing demand artifacts is
14  the more you have in there, the less likely a survey
15  respondent is able to determine what you are actually
16  studying; correct?
17      A.  Well, perhaps it would be better said:  what
18  attribute is most of interest.
19      Q.  Okay.  And I understand that, but how does the
20  inclusion of more important attributes versus less
21  important attributes affect the ultimate decision that
22  students make?
23      A.  I'm sorry.  Did you mean versus and not verse?
24  Did you say verse?

Page 148

1      Q.  I might have.  I don't know.
2      A.  Just for the record, I'm not trying to be
3  condescending, but it's versus.
4          So please ask the question again with
5  versus.
6          MR. SINGER:  Could you please read the
7  question back to the witness.
8          (The reporter read from the record as
9  requested.)
10          THE WITNESS:  How does the inclusion of
11  more important attributes versus less important
12  attributes affect the decisions students make?  I have
13  answered that question and explained why the tradeoff
14  students make -- or respondents or students or whatever
15  you want to call them -- between the class and campus
16  format attribute and the, and price is not affected by
17  the inclusion or exclusion of any other particular
18  attribute, that they are there to mask the purpose of the
19  survey.
20          So I believe I've answered it.  If I
21  haven't, I am glad to try again.
22  BY MR. SINGER:
23      Q.  What's the basis for that statement?  What do
24  you rely upon for that statement?

Page 149

1      A.  I referenced papers a few minutes ago.  The
2  Huber and McCann paper, for example, vouches for that.
3      Q.  When was the research performed to determine
4  tuition levels?
5      A.  I do a lot of cases, so I can't remember the
6  exact timeline.  Sometime between my engagement and the
7  presentation -- well, here, wait.  Let me give you a
8  better answer.
9          I have done similar cases before for the
10  Ohio public universities, for example, and these are
11  similar attributes, although they differ in some details
12  to those.  So although the final nature of the attributes
13  was determined for this case, that was a starting point.
14      Q.  So you used different attributes in this case
15  than you did in the Ohio cases; is that right?
16      A.  I think it was the same attributes but
17  different levels.
18      Q.  What do you mean?
19      A.  Well, do you understand what a level is as
20  opposed to an attribute?  I could explain.
21      Q.  Mr. Gaskin, I am asking you the question
22  because I want you to explain.  So please do.
23      A.  I was just trying not to waste your time.  So
24  a level of an attribute is one of the values that

38 (Pages 146 - 149)

STEVEN P. GASKIN

Page 154

1  that that's a demand side only sort of calculation.  And
2  because I have married it with appropriate accounting for
3  supply-side factors, I am coming up with a change in
4  market value or a reduction in market value.
5      Q.  And those supply-side factors again are just
6  the two we looked at in paragraph 22; right?
7      A.  I am afraid you're mischaracterizing my
8  testimony.  I said that's how I account for supply-side
9  factors, but those two things that I do account for many,
10  many supply-side factors.
11     Q.  I agree that what you have purported to do is
12  calculate a willingness-to-pay feature of 15.2 percent
13  reduction of what students would be willing to pay as a
14  result of the closure of the university's campus on an
15  aggregate level, not an individualized level.
16         But my question to you is:  Isn't it true
17  that if we take each student by student, some might
18  actually be willing to pay more than you've calculated?
19     A.  Well, I have in my report that I don't
20  calculate individual willingness to pay nor do I
21  recommend doing so because of problems with that
22  calculation that I can -- that top experts in the field
23  are in agreement with me about those problems.  If you
24  were, nevertheless, to make that calculation, it would

Page 155

1  vary because people's partworths vary.  But as I am
2  saying, I neither calculate it nor average it nor believe
3  that it should be used.
4      Q.  I understand you didn't do that.  I get that.
5         Did you consider the fall 2020 semester in
6  your -- in forming your opinions or the work you did in
7  this case?
8      A.  I have had discussions about it come up in
9  depositions and rebuttals, so I have thought about in
10  that sense.
11     Q.  But I mean, did you -- you didn't address that
12  semester at all in your report; correct?
13     A.  Well, the class period, which is what Mr. Weir
14  addresses, I suppose, is the spring 2020 semester.  And I
15  am calculating damages prior to that.  So in that sense I
16  didn't really have to consider the fall 2020 semester.
17     Q.  Isn't the fall 2020 semester the best
18  real-world data that we have as to market value of online
19  classes versus in-person classes?
20     A.  That was the argument that was proposed, that
21  I was referring to, but because the students didn't have
22  a choice of what to do in terms of course format and
23  campus format at that time.
24     Q.  At what time?

Page 156

1      A.  The fall of 2020 semester.
2      Q.  What do you mean they didn't have a choice?
3      A.  Well, I think that the campus was still closed
4  down to some degree.
5      Q.  So they didn't have a choice to do what?
6      A.  They didn't have a choice to act as if COVID
7  did not exist or -- so they didn't have a choice to take,
8  to follow either my real or but-for worlds in my level
9  descriptions.
10     Q.  They had the choice as to whether or not they
11  would pay the list price for tuition to the University of
12  Delaware in the fall of 2020 knowing that the courses
13  would be online, didn't they?
14     A.  Yes.  This is the argument.  But I'm saying
15  that they didn't have the choice to take them in both
16  ways.  They were forced to take it, to take them a
17  certain way.
18     Q.  They were not forced to enroll in the fall of
19  2020, were they?
20     A.  Well, in my analysis, people -- the quantity
21  stays constant, the number of students enrolled stays
22  constant.  They are not switching what they are doing,
23  they are just -- I am looking at the change in price that
24  would compensate for the loss of services.

Page 157

1      Q.  Yeah, Mr. Gaskin, I know what you did.  I read
2  your report and know what you did.  I am talking about
3  right now what you did not do.  And I want to focus on
4  the fall 2020 semester, not the simulation you ran, the
5  real world fall 2020 semester.
6         In that real world, students had the
7  choice whether or not to enroll in online courses at the
8  university's list price or to not enroll in those
9  courses; correct?
10     A.  Perhaps.  But that's not the choice that I
11  present in my conjoint.
12     Q.  I am well aware that you don't present that
13  choice in your conjoint, but that's the choice that I am
14  asking you about right now.
15         Did you do any work to determine what
16  percentage of students decided to reenroll at the
17  University of Delaware in the fall of 2020 at the same
18  list price knowing that courses would be online?
19     A.  Well, that's really apples and oranges
20  compared to what I am doing.  It's a sufficiently
21  different circumstance that I felt it wasn't appropriate.
22     Q.  Were you aware that 89.7 percent of University
23  of Delaware undergraduates, who were in their first year
24  at the University of Delaware in the spring of 2020,

40 (Pages 154 - 157)

STEVEN P. GASKIN

1  reenrolled in the fall of 2020 for online classes despite
2  tuition remaining exactly the same?
3      A.  I'm not aware of a precise number.  I'm aware
4  that many did.  But again, it's a different situation
5  from the one I am modeling.
6      Q.  I understand that it's different from the one
7  you modeled.  You have made that clear.
8          Doesn't the real-world data showing us
9  that almost 90 percent of first-year undergrads
10 reenroll in online-only classes at the same exact list
11 price as the beginning of the spring 2020 established
12 that there was no change in market value?
13     A.  Again, it's a different situation.  It does
14 not.
15     Q.  Tell me why not.
16     A.  That's what I have been telling you exactly.
17 That it's a different situation.  So that data -- those
18 data or that situation doesn't apply to what I am doing.
19     Q.  It's a different situation than what you did,
20 but it's the actual real-world situation, which means
21 that what you did does not match up with the real world;
22 correct?
23     A.  It's at a different time.  It's a different
24 circumstance.  I am modeling the difference in market

1  value between what students were offered before the
2  spring 2020 semester and what they actually received
3  during the spring 2020 semester.  And you're analogy to
4  the fall of 2020 falls short in many ways of being
5  comparable to that.
6      Q.  Let me be clear.  You just said you measured
7  the difference in value between what they asked for and
8  what they actually received; is that correct?
9      A.  I'm sorry.  I am not a legal expert.  I was
10 trying to lay out a benefit of the bargain kind of
11 situation where students were promised something, but
12 they didn't receive the benefit of their bargain.  They
13 received something else.
14     Q.  I have understood your analysis to say this is
15 the market value for online, no campus tuition, not this
16 is the value that the students did not receive during the
17 spring semester.
18         Am I understanding you correctly?
19     A.  I'm calculating the difference in market value
20 and price between the real and but-for worlds, if that
21 helps.
22     Q.  So you are calculating that at the beginning
23 of the spring 2020 semester; you did not calculate that
24 at the beginning of the fall 2020 semester; correct?

1      A.  Right.  It's a different situation.  The
2  damages didn't occur then.
3      Q.  Okay.  And the fact that in the real world we
4  have 90 percent first-year students that reenrolled in
5  the University Of Delaware at the full list price tuition
6  the same as the beginning of spring 2020, they were
7  willing to pay more in the real world in the fall than
8  you are saying they were willing to pay in the
9  hypothetical world in the spring?
10     A.  I have answered this many times.  It's a
11 different situation, so it doesn't apply.
12     Q.  You keep saying it's a different situation, so
13 it doesn't apply, but you are not telling me why.
14     A.  Actually, I have, with all due respect.  They
15 did not have the choice between what I have characterized
16 as a real and but-for world.  They had one choice to
17 reenlist -- if we are in the Navy -- or resign up or
18 reenroll or could go somewhere else.  That's not the
19 situation I am modeling.
20     Q.  I understand.  You could model a situation
21 that has no applicability to the real world and keep
22 telling me it's not the situation you are modeling.  I am
23 talking about the real world, though.
24         So I don't -- what I am struggling to

1  understand is why that fall 2020 has no bearing -- let me
2  strike that.
3          I want to narrow in on the spring 2020.
4  What is the choice that you are saying the students had
5  at that point in time in the real world, not in your
6  simulation, in the real world?
7      A.  Well, in the real world they had chosen to
8  enroll at University of Delaware as undergrads for that
9  semester under normal conditions, preCOVID conditions.
10     Q.  And in the fall 2020 they made the same
11 decision in the real world to reenroll at the university
12 in COVID conditions; correct?
13     A.  Right.  But they didn't have the choice
14 between the real and but-for worlds that I am modeling in
15 my survey.
16     Q.  I don't understand that.  In the real world,
17 they didn't have the choice between the real world and
18 the fake world that you are modeling?
19     A.  I agree that sounds a little awkward.
20     Q.  Yes.
21     A.  Perhaps I should say they didn't have the
22 choice between in-person or online courses and access to
23 the campus and its facility on the one hand, which in my
24 survey is called the real world for pre-spring 2020

41 (Pages 158 - 161)

STEVEN P. GASKIN

1  you stated there were ten preliminary pretest interviews
2  and ten final pretest interviews.
3        Was it the same or different participants
4  that were part of the preliminary pretest and the final
5  pretest?
6     A.  Different.
7     Q.  Okay.  So there were 20 total people that were
8  involved in the pretesting?
9     A.  As respondents, yes.
10    Q.  Who conducted the pretesting?
11    A.  The staff at AMS, under my direction.
12    Q.  And the pretesting consisted of verbal
13  interviews?
14    A.  Yes, over the telephone.
15    Q.  And did you conduct any of those 20
16  interviews?
17    A.  I listened in on a number of them for quality
18  control purposes.
19    Q.  How many of the 20?
20    A.  Two or three, I think.
21    Q.  Were they preliminary or final?
22    A.  A mix.
23    Q.  How were the 20 respondents identified and
24  selected to participate in the pretesting?

1     A.  There's a service that provides it for us, and
2  I never know their full names.
3     Q.  What service provided it in this case?
4     A.  I can't remember specifically.  We often use a
5  company called Rocket.io, but I'd have to check.
6     Q.  And does Rocket.io participate in that
7  pretesting or just in finding the pretest respondents?
8     A.  Just in finding the pretest respondents.
9     Q.  Are there notes or documents completed in
10  connection with that pretesting by you or AMS?
11    A.  The notes are those exhibits that I have
12  already submitted.
13    Q.  Which exhibits?
14    A.  Here, I'll look.  Just a moment.  It was
15  exhibits F and G.
16    Q.  F does not include any actual pretest, any
17  preliminary pretesting; right?
18    A.  Here, let me look again.  It says, "Changes
19  Made to Conjoint Survey Due to Preliminary Pretesting";
20  doesn't it?
21    Q.  Yes.  It talks about changes made to the
22  survey.  It doesn't state the actual data gathered from
23  any of those ten pretest respondents; correct?
24    A.  Well, that's what --

1     Q.  As far as their responses.
2     A.  Well, that's what was gathered in terms of
3  notes from the preliminary pretests.
4     Q.  Turning to Exhibit G, and looking at the final
5  pretests, how they were asked a lot of questions and the
6  answers are purportedly there.
7        Do you see that?
8     A.  Yes.
9     Q.  Okay.  Is there something like this for the
10  preliminary pretests?
11    A.  No.
12    Q.  Were they -- were the respondents asked
13  questions in this manner as they were in the final
14  pretest?
15    A.  No.  This is a very specific set of questions.
16  In the preliminary pretest, the interviewer follows along
17  with the respondent as they take the survey and asks
18  questions about -- as they go along, and the respondent
19  talks as they go along.
20        The final pretest is completed once the
21  final pretest respondents have completed the survey and a
22  specific set of closed-ended questions.
23    Q.  And is there a list of questions that the
24  pretest interviewers use during the pretest?

1     A.  No.  They are just trained to do the pretests.
2     Q.  There's no document that tells the pretest
3  interviewers what questions are to be asked during the
4  pretest; is that right?
5     A.  There's a set protocol that they follow, and
6  that's what they have got.  They know it.
7     Q.  And is that protocol written down somewhere?
8     A.  No.  It's very common pretest protocol.  You
9  are just following along with the respondent, getting
10  them to give you their sort of stream of consciousness
11  and just identifying things that might be problems or
12  not, and just discussing it with them as you go along.
13    Q.  Are the respondents' answers to those
14  questions recorded in any fashion?
15    A.  No, they are not.  Just the changes we've
16  made, and that's in the exhibit.
17    Q.  I understand these are the changes that you
18  made based on the preliminary testing, but are the
19  respondents' answers to the questions that are being
20  asked during the pretesting actually recorded anywhere?
21        MR. ARISOHN:  Objection.  Asked and
22  answered.
23        THE WITNESS:  As I said, this is the only
24  record.

45 (Pages 174 - 177)

STEVEN P. GASKIN

Page 178

BY MR. SINGER:

Q. Who conducted the preliminary pretesting, individuals?

A. The staff at AMS. I'm not sure which ones did each and every pretest.

Q. Did the same individual at AMS conduct all ten preliminary pretests?

A. Could be. I'm not positive. They are all competent to do it.

Q. And in order to ensure -- if it's multiple individuals, in order to ensure that they conduct the pretesting in the same way according to that protocol, are they given any documents to guide the pretesting?

A. No. These are highly trained individuals. They are business and litigation -- or out of litigation, if they also work out of litigation -- is to interview respondents. So they are very good at it and they know what they are doing.

Q. And your testimony is that AMS doesn't make notes of the information they learned during preliminary pretesting for purposes of discussion after the pretesting; is that right?

A. I'm saying that the notes made are shown in exhibits F and G.

Page 179

Q. You have not reviewed or relied upon any documents related to the pretesting other than what's in Exhibit F and G; is that correct?

A. That's correct.

Q. Looking at Exhibit G, were these pretests administered verbally or in writing?

A. Verbally, over the phone.

Q. So did the pretest, the final pretest interviewers have this script in Exhibit G to work off of when asking the respondents the questions?

A. Yes. And they filled it in as they went along.

Q. But they don't have that same type of script for the preliminary pretesting; is that right?

A. Well, as we've discussed, it's a different kind of interview. It's a very organized and fixed set of questions in the final pretest. It's a different kind of interview.

Q. Are either the pretests, the preliminary pretests or the final pretest recorded by audio or visual means?

A. No, they are not.

Q. Who prepared this script for the final pretest?

Page 180

A. I'm not sure. It's our standard sort of script for the final pretest.

Q. Whose standard -- Steven L. Gaskin, LLC's, Colin Weir's, AMS's? Whose standard script is it?

A. Actually, my middle initial is not L, but you are close. It had been in existence when I was back at AMS. It has been around for a while.

Q. So you did not prepare this pretest, this final pretest in Exhibit G for purposes of the conjoint in this case; correct?

A. I signed off on it. I found it to be satisfactory, but I didn't prepare it. It's similar to other ones that I have done.

Q. When was the preliminary pretesting conducted?

A. I can't recall. If it doesn't say so in the report, I'm not sure. It was before the survey was fielded, I know that.

Q. The same thing for final pretest interviews?

A. Yes.

Q. How did you test that respondents did not have difficulty with the questions and instructions during the preliminary pretest?

A. That part of that sentence and the other things around it in that paragraph are all related to

Page 181

questions in the final pretests, as well as the general nature of the preliminary pretest.

Q. When you say "general nature of the preliminary pretest," what do you mean?

A. Well, I believe you are referring to problems with the questions, that's the sort of thing that could be found in the preliminary pretest. Also, we have a question, if we look at the final pretest script or answers that asks: Were you able to answer all the questions? And there's other sort of similar questions that help indicate their understanding.

Q. Is there data that -- or anything you rely on that indicates the appropriate sample size for pretesting?

A. Yes.

Q. Okay. What is that?

A. There's been a lot of work done on qualitative research and, by professors I have worked with, which I helped with, back in the '80s. And it's generally well known that a sufficient sample for qualitative surveys, or even for pretests of a concrete notion like the final pretest, 10 or 20 is enough. Just as there's general rules for quantitative surveys or conjoints.

Q. Did you utilize the pretest to identify the

46 (Pages 178 - 181)

STEVEN P. GASKIN

Page 186

1  to actual 18-year-old University of Delaware students?
2        MR. ARISOHN: I object to form. Compound
3  question.
4        THE WITNESS: I think that those students
5  were sufficiently similar in that they were making a
6  similar decision, and they were considering similar types
7  of schools. So I felt -- and whether it was in the past
8  or not, I feel that they are able to make this sort of
9  consideration. So I felt it was appropriate.
10  BY MR. SINGER:
11        Q. Can you identify any authority that supports
12  your feeling that a 40-year-old who applied to UC
13  Riverside in 2002 is representative of an 18-year-old who
14  attended the University of Delaware in the spring of
15  2020?
16        A. Well, your question is a little awkward
17  because you are putting a number of different things in
18  there, but what I am saying is that preferences or
19  customer needs do not change much over time. And so the
20  response would be similar, I think, for the two types of
21  person you mentioned.
22        Q. So you cannot identify any authorities;
23  correct?
24        A. Well, I am quoting an article from a respected

Page 187

1  conjoint analysis professor.
2        Q. What article?
3        A. Or actually it was testimony from a conjoint
4  analysis professor in the Anthem case. It was Dr. Peter
5  Rossi. But it's a well-known fact anyway.
6        Q. How is it that you decided that the University
7  of California Riverside is a competitor to the University
8  of Delaware?
9        A. Well, there's no bright red line for
10  competitors. People can apply to a number of schools of
11  different natures, and they make tradeoffs and decide
12  which one to enroll in. So people could have enrolled in
13  both of them. So, in that sense, they are competitors.
14        Q. Have you done any work to determine who the
15  University of Delaware perceives to be its actual
16  competitors?
17        A. It's been a while. I can't remember if I read
18  that or not, but there was some consideration of the
19  school list. It's just been a while, so I can't remember
20  exactly how we did it.
21        Q. Have you looked at the demographics of the
22  student population at University of California Riverside
23  compared to those of the University of Delaware in terms
24  of where they come from geographically?

Page 188

1        A. I have not looked at that specifically. But,
2  again, wherever they come from, that doesn't necessarily
3  tell me they will react differently to the issues in this
4  case.
5        Q. Have you done any work to determine whether
6  any University of Delaware students ever applied to the
7  University of California Riverside or vice versa?
8        A. I have not. But, again, you have to remember
9  that this university attribute is just a distractor.
10  They were applying for a university, so -- with a campus,
11  so, you know, they are similar in many ways.
12        Q. Well, Mr. Gaskin, you told me earlier that you
13  factored in geographic as an attribute into your survey
14  by virtue of the name of the university such that
15  students were considering that; right?
16        A. That's not entirely correct, no. I provided
17  the campus location in addition to the name.
18        Q. Wouldn't it be, if you are going to target
19  individuals who applied to, accepted, or attended the
20  University of Delaware or one of its competitors, to use
21  your language, isn't it important to determine they are
22  actual competitors?
23        A. Well, again, I'm not saying I didn't look at
24  the University of Delaware website, it's just been a

Page 189

1  while, I can't quite remember. But there's no set
2  definition for competitors. There's no bright red line
3  that this school is a competitor and that one is not. So
4  I have done what research I can, and I believe that all
5  of these would be regarded as competitors.
6        Q. You also relied on a list of 15,000 records
7  provided by the University of Delaware containing email
8  addresses of current and former University of Delaware
9  students; correct?
10        A. I attempted to, yes.
11        Q. What do you mean? Your report doesn't say you
12  attempted to, it says you relied on a list. Did you not
13  rely on that list?
14        A. Let's say I relied on that list. I am just
15  saying that not many of my respondents are from that
16  list.
17        Q. What percentage of your respondents are from
18  that list?
19        A. I think 17 are from that list.
20        Q. Out of how many?
21        A. 994.
22        Q. So less than 1 percent of the survey
23  respondents are actual University of Delaware students;
24  correct?

48 (Pages 186 - 189)

1    A.  Gee, I think 1 percent of 994 is 9.94 and I
2  have 17, so I wouldn't say less than 1 percent, if I am
3  doing my math correctly.
4    Q.  1.7 percent.  I must have left off the 1 on my
5  calculator.  1.7 percent of your survey respondents were
6  students from the University of Delaware, is that
7  correct, at some point in time?
8    A.  Well, they came from that list.
9    Q.  So more than 98 percent of your survey
10 respondents did not attend the University Of Delaware;
11 correct?
12   A.  No, that's not correct.
13   Q.  Okay.  More than 98 percent of your students,
14 of your survey respondents did not come from the list of
15 15,000 student emails that the university provided;
16 correct?
17   A.  That is correct.
18   Q.  And do you recall what the response rate was
19 from the 15,000 student emails you received?
20   A.  It was abysmally low, because they
21 systematically went to the respondents' junk files.
22   Q.  How do you know that?
23   A.  That's what I was told by Luth Research.
24   Q.  How does Luth Research know where email survey

1  invitations went to third-party recipients?
2    A.  I'm sorry, I don't know.  They do that for a
3  living.  They work with lists.  I am not sure how they
4  know.
5    Q.  Okay.  And apart from that, you have no idea
6  whether or not all 15,000 students received the email and
7  ignored them or whether none of them received it besides
8  the respondents; right?
9    A.  I am just telling you what I have learned from
10 Luth Research, that the vast majority went to their junk
11 files.
12   Q.  But you don't know how they know that?
13   A.  They have assured me of that, but I'm not sure
14 precisely how they know.
15   Q.  Do you know whether any of the four named
16 plaintiffs in this case considered any of the
17 universities that you identified as competitor
18 universities when deciding to enroll at University Of
19 Delaware?
20   A.  I do not.  But, again, I don't think it
21 matters because of the nature of -- or the use of the
22 attributes in my survey.
23   Q.  Wouldn't it give a better indication as to
24 actual competitor universities?

1    A.  It might give some indication, but there are
2  only a few of those people.  It's better to just use more
3  aggregate criteria like I did.
4    Q.  Did you look for schools that have programs,
5  that have, like, highly ranked programs similar to those
6  that are highly ranked at the University of Delaware?
7         MR. ARISOHN:  I object to form.
8         THE WITNESS:  Yeah, I am not quite sure
9  what you mean.  Like, major by major?  Because they offer
10 a lot of majors.
11 BY MR. SINGER:
12   Q.  Yeah.  Like University Of Delaware has higher
13 rankings for certain programs than others.  Did you look
14 at those rankings list to try to compare competitors
15 based on other universities that excel in similar
16 programs?
17   A.  I don't think I needed to.  I looked at
18 schools of what I perceived to be reasonably similar
19 quality, and took it from there.
20   Q.  Why didn't you include Penn State?
21   A.  You have to make a choice, so I found that
22 these would be sufficient.  Remember the purpose of the
23 attributes in my study.
24   Q.  Why not look at other schools within the

1  Colonial Athletic Association?
2    A.  I think I'd give the same answer.  The exact
3  same set of competitors in the conjoint is not that
4  critical.
5    Q.  How did you choose UC Riverside and University
6  of California Merced as competitors instead of USC and
7  UCLA?
8    A.  Again, there's no bright line saying this is a
9  competitor and that is not.  I think this is a useful
10 list, and I got a good selection of people from it.  So
11 there's many universities out there.  You could ask the
12 very same question about all of them, but you have to
13 make a decision at some point.
14   Q.  Do you agree that the prevailing literature on
15 conjoint analysis calls for there to be a discussion of
16 the difference between the target population and the
17 sampling frame, along with an evaluation of the
18 consequences of that difference?
19        MR. ARISOHN:  Object to form.
20        THE WITNESS:  You are saying the conjoint
21 literature talks about that?  It sounds more like market
22 research literature.
23 BY MR. SINGER:
24   Q.  Sure.  I said conjoint, but if you think

49 (Pages 190 - 193)

STEVEN P. GASKIN

Page 214

1　　　　THE WITNESS: You are misunderstanding
2　what I am saying. The directions to hold all other
3　attributes constant are true in any conjoint analysis.
4　They are presented with the location of each school.
5　They know which state they are from. They can make that
6　decision. It's -- people know what state they live in or
7　lived in when they applied to school. They generally
8　know where they live, what state.
9　BY MR. SINGER:
10　　　Q. You did not segment for full-time or part-time
11　tuition either, did you?
12　　　A. When you say segment, that's usually an
13　analysis decision. I don't understand what you mean. At
14　what point in the conjoint are you talking about?
15　　　Q. At any point. There is nothing within the
16　conjoint setup to allow you to conduct a segmentation
17　analysis based on full-time or part-time tuition price;
18　correct?
19　　　A. I am presenting them with the full-time
20　tuition list price. They can make their decisions based
21　on that.
22　　　Q. But some of the -- do you know how many of the
23　respondents were full-time students at a four-year
24　university ever?

Page 215

1　　　A. I'd say many of them, but I'm presenting them
2　with the list price. They can say, oh, I am part time, I
3　pay less than that, and make their judgments. It's like
4　when you present them with MSRP of an automobile and they
5　can negotiate. They are allowed to bring in their own
6　knowledge about their specific circumstances when judging
7　the price.
8　　　Q. Mr. Gaskin, when you said that you'd say many
9　of them were full-time students, you actually did not do
10　any work to evaluate or confirm how many of the 994
11　respondents were actually full-time college students;
12　correct?
13　　　A. That's because they are allowed to make that
14　sort of decision in the conjoint, so I don't have to
15　know.
16　　　Q. Did you segment for in state and out of state
17　in the Ohio conjoint that you ran or in either of the
18　Ohio conjoints that you ran?
19　　　A. I did, because all of those schools were in
20　Ohio.
21　　　Q. I don't understand.
22　　　A. That way, if someone is from Ohio, all of the
23　schools would always be an in-state school. And if they
24　qualify -- do not qualify as an Ohio resident, they are

Page 216

1　always an out-of-state school. This survey has
2　universities from different states, so I can't do it the
3　same way.
4　　　Q. So you are saying that the Ohio -- let me be
5　clear. Did you do two conjoints for Ohio universities?
6　　　A. Yes.
7　　　Q. Was it Ohio State and Miami, University of
8　Ohio?
9　　　A. Oh, that's what you mean. No, I mean two
10　conjoint surveys per case where I did a fielding and
11　analysis.
12　　　Q. No, I mean which two universities, Ohio State
13　and Miami of Ohio?
14　　　A. I'm not sure I have conducted the survey yet
15　in any of those. I am just saying the design is two
16　surveys, one in state and one out of state.
17　　　Q. In the cases for both of those universities is
18　what I am asking you.
19　　　A. For all of the Ohio public universities for
20　which I have done work.
21　　　Q. Which is what universities, sir?
22　　　A. It's listed in my report under those 20 cases,
23　because five of them got class certification. We could
24　look there or in my C.V.

Page 217

1　　　Q. I am looking there. Paragraph 23, you
2　reference Ohio State and Miami University. Are there any
3　others?
4　　　A. Let me look. So I am seeing Ohio State, Ohio
5　University, Bowling Green State, Miami University, and I
6　just got deposed on University of Cincinnati. So there
7　might be one more, but those are all in my C.V.
8　　　Q. And for all of those universities, is your
9　design to run two surveys for each of them for in state
10　and out of state?
11　　　A. Yes. Again, because they are all in Ohio.
12　　　Q. Okay. So understanding -- is this the only
13　university in which you've been retained in a case where
14　you did a conjoint survey where you are not breaking them
15　out in the in-state and out-of-state surveys?
16　　　A. It's not the only survey that I have designed,
17　it's because I have done -- there are others that are out
18　of Ohio, but this is the one I have executed.
19　　　Q. I need you to explain to me why you set it up
20　differently for the schools in Ohio than Delaware,
21　because I am not understanding your explanation on that.
22　　　A. Okay. I will try again. If you have
23　respondents who are from Ohio, say, and all the
24　universities are from Ohio, I can present those people

55 (Pages 214 - 217)

1    THE WITNESS: Five minutes?

2    MR. SINGER: Sure.

3    THE VIDEOGRAPHER: The time is 5:31. We

4 are going off the video record. This concludes Media

5 Unit 5.

6    (A brief recess was taken.)

7    THE VIDEOGRAPHER: The time is 5:50. We

8 are on the video record. This begins Media Unit 6.

9 BY MR. SINGER:

10    Q. I think when we broke we were looking at

11 Exhibit J. Do you still have that in front of you,

12 Mr. Gaskin?

13    A. I do.

14    Q. Can you just briefly explain what information,

15 besides what's written here, can you just generally

16 explain what information you are conveying in Exhibit J?

17    A. It shows the hit rate performance for three

18 separate tries, and then the average for the calibration

19 sample and the holdout sample. And the result is good.

20    Q. And you indicate that you chose a price

21 constrained model; correct?

22    A. That's correct.

23    Q. And what other model types were available to

24 you?

1    A. Well, there's an unconstrained price model,

2 which I talk -- I talk about this choice in my report.

3 Between those two, the constrained model makes more

4 sense.

5    Q. Why is that?

6    A. Because it says all other things equal,

7 consumers would generally prefer to pay a lower price

8 than a higher one.

9    Q. What is a main effects model?

10    A. It's a model with a partworth for each level

11 of each attribute. It has no interaction effects.

12    Q. What are price partworths?

13    A. They are the partworths derived from the

14 Hierarchical Bayes choice model for the different price

15 levels in the survey.

16    Q. What does it mean to monotonically decrease?

17    A. It means that people are in fact not

18 preferring a higher price to a lower price.

19    Q. You said you did it for three tries; correct?

20    A. Well, three -- I successively removed three

21 different choice tasks and estimated on the other 11, and

22 then I averaged the results of the hit rates.

23    Q. And what's considered a try?

24    A. What I just described to you: Removing a

1 choice task, one out of the 12 choice tasks, estimating

2 the model based on the remaining 11. And then

3 calculating a hit rate for the 11 choice tasks used in

4 the estimation, and a hit rate for the one choice task

5 not used in the estimation.

6    Q. How did you choose those three choice tasks to

7 be removed?

8    A. I typically just pick three different choice

9 tasks. Since everyone faces different compositions of

10 their choice tasks, that effectively is just making a

11 random choice.

12    Q. What would happen if your survey results do

13 not pass the fit and predictability test that you

14 describe in your report?

15    A. Well, I don't know. They always have. I

16 guess I'd have to think about it. I am just saying that

17 it performs well. There's no bright red line number.

18 This is just a good number.

19    Q. On J-2, on page J-2, what statistics are you

20 presenting there?

21    A. Those are the hit rates I was speaking of.

22 You can see on the left-hand column it talks -- it says

23 hit rates.

24    Q. What does it mean to "Holdout Choice Task 4, 8

1 and 12"?

2    A. Well, as I mentioned, I was picking a choice

3 task each time to remove from estimation for each

4 respondent. And I picked their 4th choice task, their

5 8th choice task or their 12th.

6    Q. And what are you presenting in the fit rows,

7 the hit rate fit?

8    A. That, as I mentioned, is the hit rate for the

9 -- well, holdout tasks that were used for estimation, the

10 11 out of the 12.

11    Q. And what are you presenting in the holdout

12 rows?

13    A. That's the fit for the choice task that was

14 held out during estimation.

15    Q. Your holdouts show that the hit rate is

16 approximately .66; correct?

17    A. For the holdout, yes.

18    Q. Does that mean that it was accurate two-thirds

19 of the time?

20    A. Yes, basically. And that's judged to be a

21 very acceptable number in the world of conjoint.

22    Q. What is the basis for that statement that

23 that's judged to be an acceptable number in the world of

24 conjoint?

61 (Pages 238 - 241)

STEVEN P. GASKIN

1    A.  My recollection is it's in the Sawtooth
2  literature, and the MIT professors I've worked with have
3  also informed me of that.
4    Q.  Apart from the Sawtooth literature -- let me
5  back up.
6        Where specifically in the Sawtooth
7  literature is that stated?
8    A.  It's in one of those books.  I am not sure
9  exactly where it is sitting right here today.
10    Q.  Apart from the Sawtooth literature, can you
11  identify any other literature in which that's stated?
12    A.  I can't think of any.  That doesn't mean there
13  isn't any, but it's the most practitioner-oriented
14  conjoint literature, so it would talk about something
15  like that, whereas a theoretical paper would not.
16    Q.  So if this was accurate two-thirds of the
17  time, does that mean it's inaccurate one-third of the
18  time?
19    A.  Yes.  But that doesn't mean it's too
20  inaccurate to use.  It means it still provides good
21  estimators.
22    Q.  Let's turn to Exhibit K, please.
23    A.  All right.
24    Q.  And can you tell me generally the information

1  that you are conveying on pages K-1 and K-2 before we get
2  to the charts?
3    A.  Generally, I am telling you how -- as
4  described in paragraph, say, 55 to 60, or so, in my
5  report, the analysis using the market-based simulator.
6  And so I used different starting prices.  Go up or down
7  for each of them, if possible, and come up with an
8  estimate.  Then I choose the lowest dollar value amongst
9  those and use that as a basis for my percentage reduction
10  in value.
11    Q.  The lowest dollar value being the 2,614.33?
12    A.  I believe so.  Let me take a look.  That rings
13  a bell.  Yes.
14    Q.  But your simulation generated a number of
15  different dollar values; correct?
16    A.  Yes.
17    Q.  And depending on which dollar value you used,
18  you would reach a different reduction in market value
19  percentage; correct?
20    A.  Yes.  That's a function of the price partworth
21  curve being piecewise non-linear, which is a well
22  accepted way to do things.  And it becomes a judgment
23  call as to which one to use, and so I used the lowest.
24    Q.  Is there any literature that dictates which --

1  that dictates to use the lowest versus one of the other
2  prices that's returned?
3    A.  No.  But that is the most conservative.  So
4  since this is litigation, I tried to do that.  I also
5  present, as you will recall, linear price partworths
6  where this sort of decision is not needed, but it's in
7  one of the footnotes, but you get a higher reduction in
8  market value.
9    Q.  Looking at K-3, how is it that you calculated
10  the 2,614.33 figure?
11    A.  It's described in great detail in my report.
12  The market simulator has two identical University of
13  Delaware configurations except for the presence of the or
14  absence -- or except for variations on the class and
15  campus format attribute and price.  And I either raised
16  the price of the more favorably regarded class and campus
17  format or lowered the price of the less favorably
18  regarded class and campus format option until I get a
19  50/50 share.
20        And then the difference in price between
21  the two products at that point is, say, here 2,614.33, if
22  I remember.
23    Q.  Does that 2,614.33 -- well, let me back up.
24  Let me back up.  Let me ask you:  What does that 2,614.33

1  represent?
2    A.  So reduction in market value in dollar form.
3    Q.  And can that number be used to -- and that
4  number was used to determine an overcharge percentage;
5  right?
6    A.  That's correct.
7    Q.  And that was the -- that number was used to
8  determine the 15.2 percent; right?
9    A.  Yes, it was.
10    Q.  And that was by dividing that into the 17,250
11  per semester; correct?
12    A.  That's correct.
13    Q.  That overcharge percentage would vary based on
14  the actual tuition, though; correct?
15    A.  No.  The percentage will be applied to the
16  actual tuition paid by Mr. Weir is my understanding.
17    Q.  No.  But my point is if tuition -- I mean, you
18  reached a number that the students overpaid, based on
19  your analysis, by $2,614.33; right?
20    A.  That's the dollar version, yes.
21    Q.  The percentage version would differ based on
22  the tuition that that is divided into; correct?
23    A.  If you did that, but I'm dividing it into a
24  specific tuition value and using it for everyone.

62 (Pages 242 - 245)

STEVEN P. GASKIN

Page 246

1    Q.   And where are you getting the 17,250 from that
2  you are using?
3    A.   It's the maximum price in the range of prices
4  in my conjoint analysis.
5    Q.   You could have chosen to divide that 2,614.33
6  into other tuition figures within your conjoint analysis
7  and turned out an opinion and a percentage basis by doing
8  it that way as well; correct?
9    A.   I suppose; but that's not my methodology, so I
10  don't.
11    Q.   And doing that would yield different
12  overpayment percentages; correct?
13    A.   Yes, but mine is the most conservative choice.
14    Q.   And you divided it into the 17,250 just
15  because that was the decision you made; correct?
16    A.   I believe it's 17,250, not 15,250.
17    Q.   Yes, I said 17.
18    A.   As I said, I made the most conservative
19  choice.
20    Q.   I understand that, but you made that choice
21  just based on your own doing, your own choosing; correct?
22  You could have chosen something else; right?
23    A.   Well, my methodology is -- that I have used
24  over and over and has been accepted many times -- is to

Page 247

1  make the most conservative choice.  I don't choose the
2  others.
3    Q.   But your overcharge payment -- your overcharge
4  percentage is purely based on whatever you choose to use
5  for the tuition; correct?
6    A.   It reflects the market price of the school in
7  the conjoint, so it's not made up.
8    Q.   My point is that you could have chosen any of
9  these numbers from the randomized first choice simulation
10  and divided any of them into any of the tuition prices to
11  reach your overpayment percentage; correct?
12    A.   If I were not following my method.  Again, I
13  presented a linear price partworth model that doesn't
14  involve the choice of which starting price to base it on.
15  If you all would prefer to use that, it's fine with me.
16  But I am trying to make the most conservative choice.
17    Q.   Conjoint methodology doesn't require you to
18  make any specific choice to get to an accurate
19  percentage; correct?
20    A.   Well, I have used this method many times.  It
21  has worked very well.  It's conservative, but I also
22  found it to be accurate.
23    Q.   That's not my question.  Conjoint methodology
24  does not require you to use any specific one of the

Page 248

1  randomized first choice simulation prices or any of the
2  tuitions, you just get to pick, divide, and spit out your
3  percentage; correct?
4    A.   Well, as I said, it's a matter of my judgment.
5  And my judgment is do it in the most conservative manner
6  possible.
7    Q.   And that is the exact same approach that you
8  took in the Volkswagen case that the Court said was
9  unreliable; correct?
10    A.   I don't know that they said that in particular
11  was unreliable, but in the 20 that I presented in my
12  report, it was judged to be reliable.
13    Q.   In the Volkswagen case, the Court stated that
14  merely picking the lowest number in the range of
15  overpayment percentages does not remove doubt; correct?
16    A.   I don't remember.  You would have to show me
17  the document.  But even if it did, that's one case.  I
18  have 20 that say otherwise.  And I have offered you a
19  linear price partworth model that removes that obstacle
20  should you wish -- should you agree to use it.
21    Q.   Just like you did in the Volkswagen case, you
22  made the same choice in this case to use the lowest
23  number to calculate your overcharge amount; correct?
24    A.   Yes.  And in the 20 that have been accepted,

Page 249

1  which that judge ignored, with all due respect, when he
2  made that decision, or failed to differentiate it from
3  all those other cases.
4    Q.   But, again, in those 20 cases, you were not
5  subject to a Daubert motion in any of them were you?
6    A.   I was in every one of them.
7    Q.   Every one of them?
8    A.   They always challenge my reports.  By top
9  marketing scientists in the world.  I am always
10  challenged, and I have won 20 times.
11    Q.   You actually calculated an overpayment
12  percentage ranging from 14.2 percent to 57 percent,
13  didn't you?
14    A.   No.  I selected my values, and then I did the
15  one single percentage based on my method.  I did not do
16  all of those.
17    Q.   If we take the data that you've put together
18  here in Exhibit K-3 and K-4, and we look at all of the
19  various overpayment percentages that your data allows to
20  be determined, what we have is a range in overpayment
21  percentages from 14 to 57 percent; isn't that correct?
22    MR. ARISOHN:  Objection.  Asked and
23  answered.
24    THE WITNESS:  Look, you can do any math

63 (Pages 246 - 249)

STEVEN P. GASKIN

Page 254

1    Q.  And that's because willingness to pay only
2  incorporates demand side; correct?
3    A.  That's the generally accepted wisdom.
4    Q.  You use the same pretesting methodology in
5  this case as you used in the Volkswagen case; correct?
6    A.  That's correct.  And in all those 20 cases
7  that were accepted, and Judge Orrick, who did, say,
8  Maldonado v. Apple, reviewed that and said there's
9  nothing wrong here.  He did a fine pretest.  Right after
10  Nemeth.  And, again, the judge misunderstood what I did.
11        MR. SINGER:  Matt, can we go off the
12  record for a minute for me to take a look at my notes,
13  please.
14        THE VIDEOGRAPHER:  The time is 6:19.
15  Going off the video record.
16        (A brief recess was taken.)
17        THE VIDEOGRAPHER:  The time is 6:35.  We
18  are on the video record.
19  BY MR. SINGER:
20    Q.  Mr. Gaskin, could you turn to Exhibit I,
21  please.
22    A.  All right.
23    Q.  And can you just generally explain what is
24  being conveyed in Exhibit I?

Page 255

1    A.  Where is my report?  Oh, here it is, Exhibit
2  10.
3        Okay, here is I.  Those are average
4  partworths.
5    Q.  Can you just generally explain what is being
6  conveyed with the data, the values in the right-hand
7  column?
8    A.  It shows the average partworth for each level
9  of each attribute.  And the higher the number, the
10  better.  And the lower the number, the less preferred.
11  And so that's what this shows.
12    Q.  Can you explain what Exhibit M conveys?
13    A.  Just a moment.  Exhibit N in the conjoint data
14  listing.  It's the data from the tradeoff exercises that
15  go into Sawtooth Software.
16    Q.  You said N as in Nancy?
17    A.  N as in Nancy or November.  That's what I
18  thought you asked me.
19    Q.  That's okay.  So that's Exhibit N as in Nancy.
20  What is Exhibit M as in Mary?
21    A.  Ah, that would be the data listing for the
22  screener data, the screener portion of the questionnaire.
23    Q.  And your design file would help somebody
24  understand Exhibit N in more detail; correct?

Page 256

1    A.  I suppose so, but, like, as I may have said,
2  if you have Lighthouse Studio software, you don't need
3  the design file.  Within the version we've sent you, you
4  can just read it in with a push of a button.  It knows.
5    Q.  Can you explain what Exhibit O is please?
6    A.  It is the CBC-HB settings for running the
7  Hierarchical Bayes choice model.
8    Q.  What does that mean?  What do those settings
9  refer to?
10    A.  Well, there's various forms you encounter
11  while running the model.  And this shows what you can --
12  how you can set those to do various things.  And it
13  shows -- and everything else we don't explicitly discuss
14  as a default.  So it's an aid in reproducing the
15  analysis.
16    Q.  In your report, Footnote 52, you state:  "The
17  reduction in market value is significantly different from
18  zero at the 95 percent confidence level."
19        What does that mean?
20    A.  Well, we just went over that confidence
21  interval output, and you saw how the lower bound of the
22  95 percent confidence interval was, I think, 14.04
23  percent.  That's considerably above zero, so that's what
24  that means.

Page 257

1    Q.  Okay.  What is focalism bias?
2    A.  It's a kind of bias that was thought of where
3  the presentation of something in a survey gives that
4  thing undue attention and causes it to get more attention
5  than it would otherwise.
6    Q.  Do you agree that evaluation tasks
7  intentionally force respondents to attend to attributes
8  that they might otherwise not notice?
9    A.  No.  And in this case it certainly is an
10  important attribute, so I don't -- and it's presented no
11  more vividly than the others, so I don't -- well, you
12  asked generally.  What's your question?
13    Q.  My question was:  Do you agree that evaluation
14  tasks intentionally force respondents to attend to
15  attributes that they might otherwise not notice?
16    A.  Well, I don't agree with the general sentiment
17  of that, because it implies bias.  It's not clear that it
18  does.
19        There's in new product development
20  applications, for example, you are you often testing a
21  feature that's entirely new and does not exist in the
22  marketplace.  And you must include it to test it.  And
23  there's no general rule that that causes a bias.
24    Q.  How about in the higher ed, how about with

65 (Pages 254 - 257)

STEVEN P. GASKIN

1  matrix and a couple of other documents that I believe
2  came up earlier in the deposition.
3        So we certainly reserve the right to keep
4  this deposition open and come back and ask additional
5  questions on materials that we didn't receive in response
6  to the deposition notice in advance of the deposition.
7        MR. ARISOHN:  I was not told that there
8  were files that the defendant was unable to access, so I
9  am not going to take responsibility for that.
10        But thank you everybody for your time
11  today.  Thank you to the court reporter.  And the
12  plaintiff has no questions.
13        THE VIDEOGRAPHER:  Did you say the
14  plaintiffs have no questions?
15        MR. ARISOHN:  Correct.  We are done.
16  Thank you.  Thank you, Matt.
17        THE VIDEOGRAPHER:  The time is 6:58.  We
18  are going off the video record.  This concludes the video
19  deposition of Steven Gaskin.
20            - - -
21  (Witness excused.)
22            - - -
23  (Deposition concluded at 6:58 p.m.)
24

1      C E R T I F I C A T E
2
3
4      I do hereby certify that I am a Notary Public in
5  good standing, that the aforesaid testimony was taken
6  before me, pursuant to notice, at the time and place
7  indicated; that said deponent was by me duly sworn to
8  tell the truth, the whole truth, and nothing but the
9  truth; that the testimony of said deponent was correctly
10  recorded in machine shorthand by me and thereafter
11  transcribed under my supervision with computer-aided
12  transcription; that the deposition is a true and correct
13  record of the testimony given by the witness; and that I
14  am neither of counsel nor kin to any party in said
15  action, nor interested in the outcome thereof.
16
17      WITNESS my hand this 25th day of August, 2022.
18
19
20
21
22      _____
                Notary Public
23
24

1  Joshua Arisohn, Esquire
2  jarisohn@bursor.com
3            August 26, 2022
4  RE:   Ninivaggi, Penny Et Al v. University Of Delaware
5    8/12/2022, Steven P. Gaskin (#5363838)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-midatlantic@veritext.com
16
17    Return completed errata within 30 days from
18  receipt of transcript.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25

1  Ninivaggi, Penny Et Al v. University Of Delaware
2  Steven P. Gaskin (#5363838)
3      E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Steven P. Gaskin            Date
25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 270

1   Ninivaggi, Penny Et Al v. University Of Delaware

2   Steven P. Gaskin (#5363838)

3        ACKNOWLEDGEMENT OF DEPONENT

4    I, Steven P. Gaskin, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11  _____   _____

12  Steven P. Gaskin          Date

13  *If notary is required

14        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15        _____ DAY OF _____, 20___.

16

17

18        _____

19        NOTARY PUBLIC

20

21

22

23

24

25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830