## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PENNY NINIVAGGI et al., individually and on behalf of all others similarly situated, | Civil Action No. 20-cv-1478-SB |
| *Plaintiffs,* | |
| v. | |
| UNIVERSITY OF DELAWARE, | |
| *Defendant.* | |
| HANNAH RUSSO, individually and on behalf of all others similarly situated, | Civil Action No. 20-cv-1693-SB |
| *Plaintiff,* | |
| v. | |
| UNIVERSITY OF DELAWARE, | |
| *Defendant.* | |

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF COLIN B. WEIR

**SAUL EWING ARNSTEIN & LEHR LLP**

James D. Taylor, Jr. (#4009)
Marisa R. De Feo (#6778)
Juliana G. Clifton (#6980)
1201 N. Market Street, Suite 2300
Wilmington, DE  19801
(302) 421-6800
james.taylor@saul.com
marisa.defeo@saul.com
juliana.clifton@saul.com

*Counsel for Defendant University of Delaware*

**OF COUNSEL**
**SAUL EWING ARNSTEIN & LEHR LLP**

Jonathan A. Singer (admitted *pro hac vice*)
1001 Fleet Street, 9th Floor
Baltimore, MD 21202
(410) 332-8690
jon.singer@saul.com

Dated: September 30, 2022

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................................. iii

NATURE AND STAGE OF THE PROCEEDINGS ......................................................... 1

SUMMARY OF THE ARGUMENT ............................................................................... 2

STATEMENT OF FACTS .............................................................................................. 3

    1.   *Plaintiffs' Theory of Liability and Damages* ......................................................... 3

    2.   *Gaskin's "Class Action Conjoint" is Created for Litigation* ................................ 4

ARGUMENT ................................................................................................................... 9

    I.     LEGAL STANDARD ......................................................................................... 9

    II.    WEIR'S BLIND ACCEPTANCE OF THE 15.2% OVERPAYMENT PERCENTAGE FROM THE UNRELIABLE AND FLAWED HYPOTHETICAL MODEL MUST BE EXCLUDED ................................... 10

    III.   WEIR FAILED TO ISOLATE THE "PRICE PREMIUM" FROM THE BENEFITS RECEIVED ......................................................................... 11

    IV.   WEIR MISCALCULATED THE NUMBER OF DAYS AND THIS RENDERS THE HYPOTHETICAL MODEL CALCULATION AND MISSED DAYS CALCULATION UNRELIABLE AND ERRONEOUS ...... 12

    V.    THE MISSING DAYS CALCULATION LACKS SUFFICIENT FACTUAL BASIS .................................................................................... 14

    VI.   WEIR LACKS A SUFFICIENT FACTUAL BASIS TO OPINE ON "NET TUITION" ................................................................................................ 15

    VII.  WEIR IS NOT QUALIFIED AND LACKS SUFFICIENT FACTUAL BASIS TO TESTIFY REGARDING THE HYPOTHETICAL MODEL CALCULATION AND THE MISSED DAYS CALCULATION ................. 16

        A.   *Weir Blindly Accepted Gaskin's "Class Action Conjoint" That He Accepted from AMS* ..................................................................................... 16

        B.   *Weir Failed to Review Critical Documents to Competently Testify* .......... 18

# <u>TABLE OF AUTHORITIES</u>

<span style="font-variant:small-caps">Page(s)</span>

<span style="font-variant:small-caps">Cases</span>

*In re Blood Reagents Antitrust Litig.*,
  783 F.3d 183 (3d Cir. 2015)......................................................................................10

*Britton v. Servicelink Field Servs., LLC,*
  2019 WL 3400683 (E.D. Wash. July 26, 2019)..........................................................14

*Brown v. Burlington N. Santa Fe Ry. Co.*,
  765 F.3d 765 (7th Cir. 2014) .....................................................................................13

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)..............................................................................................10, 12

*In re ConAgra Foods, Inc.*,
  302 F.R.D. 537 (C.D. Cal. 2014) .................................................................11, 12, 13, 14

*Dart v. Kitchens Bros. Mfg. Co.*,
  253 Fed. App'x 395 (5th Cir. 2007) ..........................................................................13

*Daubert v. Merrill Dow Pharm., Inc.*,
  509 U.S. 579 (1993)....................................................................................................9

*Earley Info. Sci., Inc., v. Omega Eng'g, Inc.*,
  575 F. Supp. 3d 242 (D. Mass. 2021) ........................................................................13

*Hughes v. The Ester C Co.*,
  317 F.R.D. 333 (S.D.N.Y. 2016) ...............................................................................11

*Kannankeril v. Terminix Int'l, Inc.*,
  128 F.3d 802 (3d Cir. 1997) ...................................................................................9, 10

*Kingsbury v. U.S. Greenfiber, LLC*,
  2013 WL 7018657 (C.D. Cal. Nov. 5, 2013)..............................................................10

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007).........................................................................17

*Numatics, Inc. v. Balluff, Inc.*,
  66 F.Supp.3d 934 (E.D. Mich. 2014)..........................................................................17

*Oddi v. Ford Motor Co.*,
  234 F.3d 136 (3d Cir. 2000)........................................................................................9

*Pacific Life Ins. Co. v. Bank of New York Mellon*,
  571 F. Supp. 3d 106 (S.D.N.Y. 2021).........................................................................17

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994) ...................................................................................10, 12

*Pfizer Inc. v. Ranbaxy Lab. Ltd.*,
    2005 WL 3525681 (D. Del. Dec. 22, 2005) .................................................................17

*Pineda v. Ford Motor Co.*,
    520 F.3d 237 (3d Cir. 2008) ........................................................................................10

*In re POM Wonderful LLC*,
    2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) .................................................11, 12

*Saavedra v. Eli Lilly & Co.*,
    2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ...............................................................4

*In re Scotts EZ Seed Litig.*,
    304 F.R.D. 397 (S.D.N.Y. 2015) ...........................................................................11, 12

*Traharne v. Wayne Scott Fetzer Co.*,
    156 F.Supp.2d 717 (N.D. Ill. 2001) .............................................................................17

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) .....................................................................................................10

*United States v. 400 Acres of Land*,
    2019 WL 4120802 (D. Nev. Aug. 29, 2019) ...............................................................10

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prod. Liab. Litig.*,
    500 F. Supp. 3d 940 (N.D. Cal. 2020) .........................................................................11

STATUTES

FED. R. CIV. P. 37(c)(1) ...........................................................................................................17

FED. R. CIV. P. 23(a) ................................................................................................................10

FED. R. CIV. P. 23(b) ................................................................................................................10

FED. R. CIV. P. 26(a) ................................................................................................................17

FED. R. EVID. 26(a)(2)(B) ........................................................................................................17

FED. R. EVID. 702 ............................................................................................................ passim

FED. R. EVID. 703 ......................................................................................................................2

**OTHER AUTHORITIES**

*What is a Conjoint Analysis & How Is It Used?*, SAWTOOTH SOFTWARE (last
    accessed Sept. 30, 2022), https://sawtoothsoftware.com/conjoint-analysis .............................3

## NATURE AND STAGE OF THE PROCEEDINGS

Defendant, the University of Delaware, (the "University") moves to exclude the testimony of Plaintiffs' expert Colin B. Weir ("Weir").  Plaintiffs allege that they and their putative class sustained damages resulting from the transition to virtual education in the wake of the COVID-19 global pandemic, which required the University to cease in-person instruction.  In support, Weir intends to opine that such alleged damages are capable of class wide measurement (which they are not) and that such alleged damages flow from a purported reduction in the market value of the tuition Plaintiffs and the putative class allegedly paid to the University for the Spring 2020 semester.  To enable his testimony, Weir blindly accepted Steven P. Gaskin's ("Gaskin")[1] manufactured "class action conjoint"[2] seeking to quantify "the difference in market value of in-person classes and full access to the University's campus and facilities, compared to the market value of online classes and no access to the University's campus and facilities, at the time and point of sale" (the "Hypothetical Model").  But Weir's involvement was extremely limited (he billed 5.75 hours in total) and relied exclusively on the unreliable data from Gaskin.  Weir's basic arithmetic also included a pro-rata calculation of the number of instructional days missed in the Spring 2020 semester.  However, his math is wrong, because he did not accurately count days on the University's Spring 2020 academic calendar that form the basis of his opinion.  Therefore, his

---

[1] Plaintiffs also retained Steven P. Gaskin ("Gaskin").  The University has contemporaneously filed a separate Motion to Exclude Gaskin's Testimony, which it adopts and incorporates by reference herein to the extent applicable.

[2] Gaskin uses the phrase "class action conjoint" as if the mere performance of a conjoint in class litigation withstands scrutiny because it is a "class action conjoint."  (Ex. 1 at 16:3; 127:9; 128:12-20; 129:12-15; 137:20-23; 139:14; and 140:23). Yet no such thing exists and Gaskin instead just uses the term "class action conjoint" to dismiss methodological flaws inherent in his choice-based conjoint analysis.  (Ex. 1 at 81:21:23 (confirming use of choice-based conjoint)).

opinion is unreliable, erroneous, lacks a sufficient factual basis, and should be excluded under Rules 702 and 703.

## SUMMARY OF THE ARGUMENT

1.      Even if a conjoint analysis was necessary, consistent with Plaintiffs' liability theory, generated reliable results, and was accepted for use in higher education to measure tuition (none of which are true), Weir conducted nothing more than basic arithmetic (that he got wrong). He took Gaskin's overpayment percentage (15.2%) that Gaskin "conservatively" selected, multiplied it by the "net tuition" received by the University for undergraduate students in Spring 2020, and multiplied that by his "% Prorate," which purports to account for the number of days in the semester where the learning format changed from in-person to online.  This methodology fails because Weir's opinion relies exclusively on the flawed Hypothetical Model, and for the reasons set forth in the University's *Motion to Exclude the Expert Opinion of Steven Gaskin*, it should likewise be stricken.

2.      Weir's damages model is unreliable because he failed to isolate the "price premium" from the benefits received by the putative class members in the Spring 2020 semester, such as course credit and progress towards graduation.

3.      Both of Weir's proposed damages models rely upon his ***inaccurate calculation*** of the number of academic days slated for the Spring 2020 semester (he tallied 74 days, but there were 73 days) or the number of days in the Spring 2020 semester where the modality was changed (he tallied 44 days, but there were 43 days).   This renders his calculations unreliable and erroneous.

4.      Weir's proposed damages models lacks a sufficient factual basis to conclude that the University's semester based tuition price can be divided into a "daily price."

5.     Weir lacks a sufficient factual basis to calculate the "net tuition" received by the University in the Spring 2020 semester, and thus overstates the amounts students paid because he based his calculations on the amounts the University received (from all sources), not the amounts students actually paid.  This erroneous "net tuition" figure is necessary for both of his damages models.

6.     Weir is not qualified to serve as an expert because he blindly accepts the results from the Hypothetical Model from Gaskin, which is further riddled by Gaskin's failure to supervise a third-party, Applied Marketing Sciences, an undisclosed expert.

<u>**STATEMENT OF FACTS**</u>

1.     ***Plaintiffs' Theory of Liability and Damages***

Plaintiffs initiated this action as "a result of [the University's] decision not to issue appropriate refunds for the Spring 2020 term after canceling in-person classes and changing all classes to an online/remote format, closing most campus buildings, and requiring all students who could leave campus to do so as a result of the Novel Coronavirus Disease ('COVID-19')." (Consolidated Compl. ¶ 1) (emphasis added).  Plaintiffs seek tuition refunds of the amount they and putative class members allegedly overpaid for the Spring 2020 semester, theorizing that they overpaid tuition for the online portion of the semester.  (*Id.* ¶ 4).

Plaintiffs retained Gaskin and Weir to opine on the alleged overpayment damages based on the Hypothetical Model even though conjoint analysis was never designed or intended to quantify alleged damages in litigation.  Rather, it was developed as a market research tool for companies to "gain[] strategic insights and mak[e] better business decisions relating to product pricing, product feature development, branding and package design, [and] marketing messaging validation" by helping companies "learn what's truly important to customers."  *What is a Conjoint*

*Analysis & How Is It Used?*, Sᴀᴡᴛᴏᴏᴛʜ Sᴏғᴛᴡᴀʀᴇ (last accessed Sept. 30, 2022), https://sawtoothsoftware.com/conjoint-analysis.  Conjoint merely allows companies to "tease out the value of a products different features and conduct choice simulations to estimate price sensitivity, willingness to pay, and overall demand for different product configurations" to inform strategic business decisions. *Id.*  As Sawtooth indicates, conjoint measures consumers' willingness to pay and demand only—not actual market price of consumer products, let alone market price of a vastly different service like higher education. *Id.*; *see also Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, at *4 (C.D. Cal. Dec. 18, 2014) ("Conjoint analysis is a statistical technique capable of using survey data to determine how consumers value a product's individual attributes—often called the market's willingness to pay," which "is a subjective concept distinct from the fair market value concept[.]").  Gaskin concedes that "willingness to pay only incorporates demand side," stating "that's the generally accepted wisdom." (Ex. 1 at 254:1-3).

### 2. *Gaskin's "Class Action Conjoint" is Created for Litigation*

Gaskin and Weir admit that a conjoint analysis has never been used in the real-world by any higher education institution in the country to establish tuition pricing.  (Ex. 1 at 83:19-84:3; 100:5-17; Ex. 2 at 108:23-109:3).  Despite allegedly designing the first-of-its-kind conjoint (and having no experience in higher education), Gaskin pawned the task of conducting the survey to Applied Marketing Sciences ("AMS"). (Ex. 1 at 42:11-44:2).  AMS was not disclosed by Plaintiffs as an expert, and AMS has not provided an expert report in this action.  (Ex. 1 at 14:17-20, 45:10-13, 51:6-9; Ex. 3).  AMS, however, is separately engaged by Plaintiffs and billed Plaintiffs a total of 327.5 hours for planning and design, fieldwork monitoring and coordination, programming and testing, online study, data entry, coding, and analysis, and expert report development and support while Gaskin, by contrast, billed a total of 16.25 hours.  (Ex. 1 at. 45:2-14; *see also* Ex. 4 and 5).

Unsurprisingly, Gaskin therefore could not answer simple questions regarding AMS' tasks and responsibilities, such as who at AMS conducted the preliminary pretesting, which was ultimately used to confirm the conjoint design and that it was free from ambiguity; could not identify their names; and testified that it was "hard to tell exactly what each did." (Ex. 1 at 16:14-24; 178:2-9).

AMS invited 107,272 individuals from across the country ages 16 and older to complete the online survey. (Ex. 6 at Ex. H-1). The survey asked respondents to select one of three hypothetical universities to enroll in. (Ex. 6 at p. 27). The survey identified seven attributes: university name, undergraduate teaching ranking, student-faculty ratio, 4-year graduation rate, ethnic diversity index, class and campus format, and tuition per semester. (Ex. 6 at p. 13). However, survey respondents were instructed to completely ignore the impact of the COVID-19 pandemic. (Ex. 6 at p. 21 n.36). The Hypothetical Model is based on 994 respondents, at most 17 of which were from the University's Student List, and yielded wildly different "overpayment" percentages, ranging from 15.2% to 57%. (Ex. 6 at p. 18-19, Ex. K-3, K-4; Ex. 1 at 189:11-19). Gaskin then randomly and unscientifically simply chose to opine that the tuition market value should be reduced by 15.2% due to the transition online because it was the "most conservative" number within the generated range. (Ex. 6 at p. 31-32; Ex. 1 at 246:13-247:2). As explained in the *Motion to Exclude the Expert Testimony of Steven P. Gaskin*, his "methodology" fails Daubert and Rule 702.

### 3. *Weir Relied on Gaskin's Unreliable "Overpayment" Percentage and Miscalculated the Number of Academic Days Necessary for His Models*

Plaintiffs tasked Weir with simple arithmetic (or so one would think). He provided two purported damages models in his Declaration. The first took the overpayment percentage (15.2%), calculated and "conservatively" selected by Gaskin, multiplied it by the "net tuition" paid by University undergraduate students in Spring 2020, and multiplied that by his "% Prorate," which

purports to account for the number of days in the semester where the learning format changed from in-person to online (the "Hypothetical Model Calculation"). (Ex. 7 at p. 13). The below chart summarizes the Hypothetical Model Calculation:

| Table 1. Overpayment Damages | | | |
|---|---|---|---|
| % Overpayment Factor | $ Tuition | % Prorate | Overpayment Damages |
| 15.2% | $165,982,732 | 59.46% | $15,001,250.16 |

(*Id.*) However, as to each figure:

- "% Overpayment Factor" – Weir blindly accepted the 15.2% from Gaskin. (Ex. 2 at 124:5-10 ("Q: Did you perform any of your own review or analysis to confirm the validity of the statistical result that [Gaskin] achieved? A: ***Based on the fact that Mr. Gaskin ran those tests himself, no, I did not reproduce them***.")). But that was not the case, Gaskin relied almost exclusively on AMS. And Weir did not understand "how the division of labor was laid out as between Mr. Gaskin and AMS." (Ex. 2 at 125:22-126:3).

- "$ Tuition" – Weir's Declaration dedicated ***one paragraph*** to explain how he arrived at the across-the-board ***"$ Tuition"*** amount. (Ex. 7 at p. 12). He claims to do so by taking the gross tuition for Spring 2020 ($221,673,166) (pulled from ***one*** of 50,000 documents the University produced) and subtracting the "total undergraduate student aid" ($55,690,434) (taken from that same document), to conclude that the "net tuition" was $165,982,732. (*Id.*). But Weir did not base his calculations on net prices students paid. (Wilner Rpt. at p. 57). Instead, because he only subtracted institutional aid from the University's list price, his calculations are based on the net prices the University received, not the net prices students paid. (*Id.*). Because the former exceeds the latter, Weir overstated the alleged damages. (*Id.*).

- "% Prorate" – Lastly, to calculate the 59.46%, Weir reviewed the University's Spring 2020 academic calendar to determine the number of "academic" days in the semester. When asked how he did so, he said:

    I looked at the calendar and understood the number of weeks that were shown in the 16 calendar and subtracted from the total of weeks times five days, things like -- sorry. I subtracted from the total number of days, weekends, spring break days, days that were not -- days that were not full weeks like at the end where I think it ends on a Thursday, those sorts of things.

(Ex. 2 at 185:12-22). Certainly not a model of clarity, nor accuracy. Weir counted 74 "academic" days in the Spring 2020 semester. (Ex. 7 at p. 11) **However, he miscounted.** (Ex. 8). **There were actually 73 days**: 66 instructional days, 6 final exam days, and one reading day before finals began. (*Id.*; *see also* Ex. 9); *see also* Figure 1; *see also* Ex. 10 at ¶¶ 9-11). This error also impacted his calculation of the number of days in the Spring 2020 semester where the modality of instruction was changed from in-person to virtual. Weir concluded there were 44 days. (Ex. 7 at p. 11). **There were actually 43 days**. (*Id.*; *see also* Ex. 9); *see also* Figure 1; *see also* Ex. 10 at ¶¶ 9-11).

The below is a rendering of the University's Spring 2020 academic calendar that demonstrates the basic calculation Weir failed to do. Weir does not explain why he included the University's reading day or final examination days in this calculations, as no class instruction were provided on those days.

**Figure 1:**

## University Spring 2020 Academic Calendar



#### February 2020

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    |    |    |    | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 26 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |

#### March 2020

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 |    |    |    |    |

#### April 2020

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 |    |    |

#### May 2020

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    |    |    | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 |    |    |    |    |    |    |

Legend:
- Instructional Day
- Spring Break
- Exam Period
- Memorial Day
- Reading Day
- First Day of Classes
- Last Day of Finals

4. ***Weir's Second Calculation on the Amount Allegedly Owed for Missed Days is Likewise Flawed***

Weir's second opinion purports to quantify the alleged amount of a tuition refund due by counting the number of days missed in the Spring 2020 semester when the University transitioned to virtual classes ("the Missed Days Calculation"). (Ex. 7 at p. 13). In his attempt to do so, Weir takes "$ Tuition" figure ($165,982,732) and multiplies by the "% Prorate" figure (9.46%). (Ex. 7 at p. 14). To determine the "% Prorate" amount, he again relied on his inaccurate tally of the University's Spring 2020 academic calendar. Weir took the 7 missed "academic days"[3] and

---

[3] "Academic days" is not a defined term in Weir's Declaration. Nor is it used universally. *Compare* Ex. 7 at p. 11 ("there were 74 academic days slated…") to Ex. 7 at p. 12 ("[t]he 44 days for which the learning format was changed…").

divided that by his inexact number (74 days, which should have been 73 days, as explained above). (Ex. 7 at p. 11-12).  The below chart summarizes the Missed Days Calculation:

| Table 2. | | |
|---|---|---|
| **Return of Tuition for Missed Days** | | |
| $ Tuition | % Prorate | Overpayment Damages |
| $165,982,732 | 9.46% | $15,701,069.24 |

## ARGUMENT

### I.  LEGAL STANDARD

Federal Rule of Evidence 702 permits a witness to offer an expert opinion if he is qualified as an expert and if the opinion is helpful to the trier of fact, is based on sufficient facts or data, is the product of reliable principles and methods, and the expert has reliably applied those principles and methods to the facts of the case.  FED. R. EVID. 702.  In deciding whether to admit expert testimony, the trial court serves as a "gatekeeper" tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 580 (1993).  The proponent of the expert testimony must prove these requirements by a preponderance of the evidence.  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000).

Expert testimony is inadmissible if it is not "based on valid reasoning and reliable methodology."  *Id.* (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)).  The Court is to consider the following factors in evaluating reliability:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to

> methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* at 156 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994)). The

"factors drawn from *Daubert* . . . are neither exhaustive nor applicable in every case." *Pineda v.*

*Ford Motor Co.*, 520 F.3d 237, 248 (3d Cir. 2008) (quoting *Kannankeril*, 128 F.3d at 806-07).

As is relevant here, Rule 702's admissibility requirements apply at the class certification

stage. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 457-61 (2016); *In re Blood Reagents*

*Antitrust Litig.*, 783 F.3d 183, 187-88 (3d Cir. 2015). "Expert testimony that is insufficiently

reliable to satisfy the *Daubert* standard cannot 'prove' that the Rule 23(a) prerequisites have been

met 'in fact,' nor can it establish 'through evidentiary proof' that Rule 23(b) is satisfied." *Blood*

*Reagents*, 783 F.3d at 187 (quoting *Comcast Corp. v. Behrend,* 569 U.S. 27, 33 (2013)).

## II.  WEIR'S BLIND ACCEPTANCE OF THE 15.2% OVERPAYMENT PERCENTAGE FROM THE UNRELIABLE AND FLAWED HYPOTHETICAL MODEL MUST BE EXCLUDED

Weir adds nothing to Gaskin's "class action conjoint."  He simply took the unreliable

overpayment percentage "***conservatively***" selected by Gaskin (15.2%) and used basic arithmetic

to apply it uniformly to all students, regardless of their status as full-time or part-time, the amount

of tuition they actually paid, the number of credits they received, the various differential fees

amongst different programs, or whether the student was enrolled in online courses before the

pandemic, among other individualized factors.  Because Weir's Hypothetical Model Calculation

is entirely dependent upon Gaskin's flawed overpayment percentage, it must be excluded.  (Ex. 1

at 170:8-11; Ex. 2 at 54:19-55:10).  *See Kingsbury v. U.S. Greenfiber, LLC*, 2013 WL 7018657, at

\*4 (C.D. Cal. Nov. 5, 2013) (where expert "relie[d] on opinions [of other experts] that the Court

exclude[d] . . . her report and testimony must also be excluded."); *United States v. 400 Acres of*

*Land,* 2019 WL 4120802, at *29 (D. Nev. Aug. 29, 2019) (excluding survey as unreliable and excluding all expert testimony that relied on the excluded survey).  .  In fact, Weir's testimony has been deemed unreliable and inadmissible when he previously blindly relied on Gaskin's "class action conjoint." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prod. Liab. Litig.,* 500 F. Supp. 3d 940, 950 (N.D. Cal. 2020) ("Without a reliably calculated emissions premium [from Gaskin], Plaintiffs' depreciation analysis [from Weir] is useless because it lacks a starting point from which to calculate a decline in value for low emissions.")

## III.   WEIR FAILED TO ISOLATE THE "PRICE PREMIUM" FROM THE BENEFITS RECEIVED

Noticeably absent from the Hypothetical Model Calculation is any acknowledgement of the benefits of tuition received by students in the Spring 2020 semester.  For example, it is undisputed that the named Plaintiffs received course credit, progressed towards graduation, and enjoyed continued to access to University services, even after the transition to online instruction because of COVID-19.  (*See* Ex. 11).

Ignorance is not bliss because it is fundamental that a valid damages model must account ***for the benefits that consumers received as a result of buying the product.*** *See In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 579 (C.D. Cal. 2014).  Courts have previously rejected damages models which "assum[e] that consumers received no benefit from the product[.]"  *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413 (S.D.N.Y. 2015); *see Hughes v. The Ester C Co.*, 317 F.R.D. 333, 355 n.31 (S.D.N.Y. 2016) (rejecting full refund model proposed by Weir which "rest[ed] on the assumption that [P]laintiffs received no benefit whatsoever from [their] purchas[e.]").  Weir should know so much as his opinion has previously been excluded on this basis in *ConAgra Foods* where he failed to control for the various ways that some of the benefits implied by an allegedly false logo were in fact delivered to consumers.  *ConAgra Foods*, 302 F.R.D. at 579;  *see also In re POM*

*Wonderful LLC*, 2014 WL 1225184, at *5 n.6 (C.D. Cal. Mar. 25, 2014) (expert report inadmissible under Daubert where expert merely "assumed that 100% of that price difference was attributable to Pom's alleged misrepresentations").

Moreover, the failure to isolate the "price premium" from the benefits received by students in the Spring 2020 semester confirms that the Hypothetical Model Calculation and Missed Days Calculation is divorced from Plaintiffs' theory of liability. That is improper under *Daubert* and *Comcast*. *See POM Wonderful*, 2014 WL 1225184, at *5 n.6 (striking expert report for failure to "draw any link between Pom's actions and the price difference"). Price premium methodologies which "do not attempt to isolate the premium due only to [a defendant's] allegedly," wrongful conduct are "routinely rejected[ed] . . . under *Comcast*" because they do not account for the fact that "consumers may pay a higher price for a product for many reasons that have nothing to do with [plaintiff's] claims[.]" *Scotts EZ Seed*, 304 F.R.D. at 413. To properly tie the damages model to Plaintiffs' theory of liability as required by *Comcast*, therefore, "Weir must be able to isolate the price premium associated with," those claims. *ConAgra Foods*, 302 F.R.D. at 579. Weir fails to do so. By neglecting to measure "only those damages attributable" to the University's alleged wrongdoing, *Comcast*, 569 U.S. at 34-36, and because Weir did not isolate the portion of the alleged "price premium" that the putative class allegedly did not receive, his opinion should be excluded under Rule 702.

## IV. WEIR MISCALCULATED THE NUMBER OF DAYS AND THIS RENDERS THE HYPOTHETICAL MODEL CALCULATION AND MISSED DAYS CALCULATION UNRELIABLE AND ERRONEOUS

"An expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is **reliable**." *Paoli*, 35 F.3d at 742 (emphasis added). When an analysis contains many obvious errors and mistakes, and the "factual deficiencies" evidence faulty methods

and lack of investigation, courts will exclude the opinion.  *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773 (7th Cir. 2014); *see also Dart v. Kitchens Bros. Mfg. Co.*, 253 Fed. App'x 395, 399 (5th Cir. 2007) (noting that "***basic mathematical errors and flaws in methodology***" were appropriate reasons to exclude an expert) (emphasis added)).  Importantly, "Rule 702 also requires the [C]ourt to examine whether the methods have been reliably applied."  *Earley Info. Sci., Inc., v. Omega Eng'g, Inc.*, 575 F. Supp. 3d 242, 244 (D. Mass. 2021).

Here, Weir failed to accurately count days on a calendar.  That is not surprising since he spent a total of 5.75 hours on his analysis and two Declarations.  (Ex. 14).  Nor could Weir clearly articulate how he calculated the number of days in the Spring 2020 semester.  (Ex. 2 at 185:12-22).  Weir ultimately counted 74 "academic" days, failing to account for Memorial Day, a University and Federally recognized holiday.  (Ex. 7 at p. 11).  ***There were actually 73 days in the Spring 2020 semester – he is off by one day.***  (*Id.*; *see also* Ex. 9); *see also* Figure 1; *see also* Ex. 10 at ¶¶ 9-11).  His calculation of the number of academic days in the Spring 2020 semester where the modality of instruction was changed from in-person to virtual is also wrong.  He concluded there were 44 days of remote learning, again failing to account for Memorial Day.  (Ex. 7 at 11).  ***There were 43 days.***  (*Id.*; *see also* Ex. 9); *see also* Figure 1; *see also* Ex. 10 at ¶¶ 9-11).  Both calculations also include the University's reading day and final examination days; however, Weir failed to explain why these days where no instruction is provided should be part of the calculation.  These errors impact both the Hypothetical Model Calculation and the Missed Days Calculation.  (*See* Ex. 7 at 11).

This case is not the first instance in which Weir has put forward an incoherent damages model.  In *ConAgra Foods*, the district court found that "Weir does not provide a damages model that lacks certain variables or functionality" but rather that "***he provides no damages model at***

*all.*" *ConAgra Foods*, 302 F.R.D. at 552.  Under Rule 702, Weir's opinion must be excluded because it is unreliable and erroneous.

## V.    THE MISSING DAYS CALCULATION LACKS SUFFICIENT FACTUAL BASIS

Weir's erroneous Missed Days Calculation concludes (without any support) that a college education can be chopped into a daily rate.  But even Weir admitted that "***students don't pay based on what's going to happen [or not happen] on a particular day.***"  (Ex. 2 at 98:13-23).  So then why does Weir's own model calculate a daily rate that does just that?  Because that is the only way he avoids an individualized assessment of alleged damages.  It is axiomatic that each student has his or her own schedule and selects courses that may meet once a week, twice a week, or three times a week, for example.  (Ex. 10 at ¶¶ 5-8).  Perhaps the student does not meet for courses at all – rather, it's an independent study class or a student may have been enrolled in an asynchronous course at the beginning of the Spring 2020 semester.  What if there is a snow day – would Weir also expect the school to issue a *per diem* refund then?  None of these circumstances matter under the Missed Days Calculation.  Nor does the varying impact that in-person classes and campus access may have for each student – some students may never step foot in the University's library, others may go every day, for example.  (Ex. 12 at p. 7).

*Britton v. Servicelink Field Services, LLC* is analogous and highlights the flaws in the Weir's Missed Days Calculation.  2019 WL 3400683 (E.D. Wash. July 26, 2019).  There, plaintiffs sought to certify a class of all property owners who had been locked out of their properties post-default, but pre-foreclosure.  *Id.* at *3.  The plaintiffs proposed a damages model that involved calculating a rental rate and then multiplying that rate by the number of days the property owner was "locked out."  *Id.* at *8.  Plaintiffs' expert measured the days beginning with the date of the lock-change and ending with the date the property was sold.  *Id.*  The court found this model completely inadequate because it "ignore[d] the fact: (1) that many members were never

completely locked out and (2) that many others that were locked out were able to gain access to the home before foreclosure or some other sale occurred (the sticker left by Defendant informed the owner that they can recover the keys)." *Id*. The court reasoned that allowing such a calculation to stand in as the damages model "would result in a windfall to Plaintiffs[.]" *Id*.

The same is true here. Weir cannot unbundle an entire semester's worth of education to a fixed daily rate. As is telling, even Weir agrees that a class wide damages model is incapable of determining on a student-by-student basis what amounts may be due. "***What I would say is that every individual has suffered a similar type of damage, but that based on what they have paid, the amounts that derive from each student as it rolls up into the aggregate amount may be a different amount of money.***" (Ex. 2 at 92:21-93:1). Because Weir lacks a sufficient factual basis to render an opinion under Rule 702, his opinion should be excluded.

## VI.   WEIR LACKS A SUFFICIENT FACTUAL BASIS TO OPINE ON "NET TUITION"

The "Net Tuition" figure is critical to both the Hypothetical Model Calculation and the Missed Days Calculation. How did he determine the "Net Tuition"? He claims he did so by taking the "gross tuition" from the Spring 2020 semester ($221,673,166) and subtracting "undergraduate student aid" ($55,690,434). (Ex. 7 at p. 12). To determine those amounts, Weir relied on ***one document*** from the University's production (Ex. 13) and a ***"representation" from Plaintiffs' counsel*** to determine the net tuition was $165,982,732.00. (Ex. 2 at 76:7-18). Weir lacks a sufficient factual basis to form an opinion for the following reasons.

*First,* Weir blindly accepted Gaskin's "class action conjoint," that was based on List Prices. (Ex. 12 at p. 57). Without any support or explanation, he converted those List Prices (that is based on a price that is definitionally higher) to a population that is based on a definitionally lower price (*e.g.*, the net price). (*Id.*). This conversion is not apples to apples and Weir has not demonstrated

this should be applied to the higher education industry.  (*Id.*).  *Second*, Weir overstates the amounts that students paid because he only subtracted institutional aid from the List Price and his calculations are based on the net prices the University received, not the net prices the students paid. (*Id.*).  Because the former exceeds the latter, Weir overstated the alleged damages by failing to account for the amounts actually paid by students.  (*Id.*).

*Third,* Weir lacks a sufficient understanding to quantify "gross tuition" and "total undergraduate aid."   As to the "gross tuition" amount, Weir fails to explain how he is capable of making this calculation, particularly since he did not review any of the University's financial projections or budgets, nor review the deposition transcript from the University designee who discussed tuition.  (Ex. 2 at 64:6-22).  As to the "total undergraduate student aid" figure, Weir confirmed that amounts paid by third-parties are ***not accounted*** for in this number.  (Ex. 2 at 156:14-157:9).  Weir also ***intentionally excluded any costs incurred by the University in the Spring 2020*** that could have impacted his figures.  (Ex. 2 at 158:22-25 (Q:  COVID costs could not have been then an element either, right?  A: They were not in existence at the time of the bargain.)).  Weir has no basis to determine the "net tuition" allegedly received by the University, and because the Hypothetical Model Calculation and Missed Days Calculation rely on that figure, his opinions must be excluded.

## VII.   WEIR IS NOT QUALIFIED AND LACKS SUFFICIENT FACTUAL BASIS TO TESTIFY REGARDING THE HYPOTHETICAL MODEL CALCULATION AND THE MISSED DAYS CALCULATION

Rule 702 requires the testimony be "based on sufficient facts or data."  For the reasons set forth below, Weir's opinion is not.

### A.   *Weir Blindly Accepted Gaskin's "Class Action Conjoint" That He Accepted from AMS*

"The expert witness must in the end be giving his own opinion.  He cannot simply be a conduit for the opinion of an unproduced expert." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007) (excluding testimony of expert witness who purported to rely on another expert over whom he "exercised little if any supervision[.]"); *see also Pacific Life Ins. Co. v. Bank of New York Mellon*, 571 F. Supp. 3d 106, 116 (S.D.N.Y. 2021) (excluding expert because he "relied on [his staffs'] hours to collect data, to analyze data, and to, you know, produce the product.").

That is exactly what happened here.  AMS billed a total of ***327.5 hours*** to planning and design, fieldwork monitoring and coordination, programming and testing, online study, data entry, coding, and analysis, and expert report development and support.  (Ex. 4).  Gaskin billed a total of ***16.25 hours***.  (Ex. 5).  Whereas, Weir spent "***a couple of hours***" on the Hypothetical Model (Ex. 2 at 47:15-19) and billed a total of ***5.75 hours*** to conduct his calculations and draft two Declarations.[4] (Ex. 14).  In other words, Weir relied on Gaskin's "class action conjoint," and Gaskin relied on AMS, an undisclosed expert who was not supervised by Gaskin.[5]  This *ipse dixit* must end.  Weir's opinion should be excluded like in *Malletier* and *Pacific Life*.

---

[4] The fact that Weir only spent 5.75 total hours is further grounds to exclude his testimony.  *See Traharne v. Wayne Scott Fetzer Co.,* 156 F.Supp.2d 717, 722 (N.D. Ill. 2001) (excluding expert as unqualified due in part to his spending "less than 30 hours," "'designing' and 'testing' his," analysis); *see also Numatics, Inc. v. Balluff, Inc.*, 66 F.Supp.3d 934, 944 (E.D. Mich. 2014) (excluding expert in part because he "devoted less than 30 hours developing his opinions about the case, nearly half of which was spent at or traveling to the law office of [defendant's] attorneys.").

[5] Pursuant to Fed. R. Civ. P. 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  *See also Pfizer Inc. v. Ranbaxy Lab. Ltd.*, 2005 WL 3525681, at *2 (D. Del. Dec. 22, 2005) ("Pursuant to Federal Rule of Evidence 26(a)(2)(B), an expert report 'shall contain a complete statement of all opinions to be expressed and the basis and reasons therefore.'  Failure to

## B.    *Weir Failed to Review Critical Documents to Competently Testify*

It was not surprising then that, ***after spending only "a couple of hours,"*** Weir admitted that he:

- Never read the named Plaintiffs' deposition transcripts (Ex. 2 at 64:23-65:2);

- Only reviewed *two* University produced documents totaling five pages (out of the 244,061 pages produced by the University), that included: (1) the Spring 2020 academic calendar (that he got wrong); and (2) the Undergraduate Tuition and Financial Aid document (Ex. 2 at 66:19-67:3; *see also* Ex. 15, Ex. 9, Ex. 13;

- Never reviewed the named Plaintiffs' interrogatory responses (Ex. 2 at 67:14-16);

- Only reviewed one of the deposition transcripts from University officials (Ex. 2 at 64:23-65:2);

- Never met with the named Plaintiffs (Ex. 2 at. 64:17-19); and

- Never reviewed the University's budget, year-end financials, or budget projections (Ex. 2 at 81:3-12).

Despite Weir's acknowledgement that to conduct these calculations, you need to have a "***good understanding of the inputs that should be used in that calculation***" (Ex. 2 at 53:15-17), he does not.  Because Weir lacks a factual basis as required by 702(b), his opinions should be excluded.

## <u>CONCLUSION</u>

Plaintiffs have failed to meet their burden to offer proof of damages, or that damages can be determined on a class-wide basis, Weir's opinion should be excluded.

---

disclose information required by this Rule may result in the exclusion of evidence based on that information, unless the failure to disclose is harmless." (citing FED. R. CIV. P. 37(c)(1)).

**SAUL EWING ARNSTEIN & LEHR LLP**

/s/ *Marisa R. De Feo*
James D. Taylor, Jr. (#4009)
Marisa R. De Feo (#6778)
Juliana G. Clifton (#6980)
1201 N. Market Street, Suite 2300
Wilmington, DE  19801
(302) 421-6800
james.taylor@saul.com
marisa.defeo@saul.com
juliana.clifton@saul.com

*Counsel for Defendant University of Delaware*

 **OF COUNSEL**
**SAUL EWING ARNSTEIN & LEHR LLP**

Jonathan A. Singer (admitted *pro hac vice*)
1001 Fleet Street, 9th Floor
Baltimore, MD 21202
(410) 332-8690
jon.singer@saul.com
Dated: September 30, 2022