# EXHIBIT 1

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF DELAWARE
 3
        PENNY NINIVAGGI, et al.,     )
 4      individually and on behalf   )
        of all others similarly      )
 5      situated                     )
                                     )
 6           Plaintiffs             )
                                     )
 7      v.                           )   Civil Action No.
                                     )   20-cv-1478-SB
 8      UNIVERSITY OF DELAWARE       )
                                     )
 9           Defendant              )
                                     )
10                                   )
        HANNAH RUSSO, individually   )
11      and on behalf of all         )
        others similarly situated    )
12                                   )
             Plaintiffs             )
13                                   )   Civil Action No.
        v.                           )   20-cv-1693-SB
14                                   )
        UNIVERSITY OF DELAWARE       )
15                                   )
             Defendant
16
17           The remote video-recorded deposition STEVEN P.
        GASKIN of was taken pursuant to notice before Ellen
18      Corbett Hannum, Registered Merit Reporter, in Wilmington,
        Delaware, on Friday, August 12, 2022, beginning at
19      9:32 a.m., there being present:
20
21                   VERITEXT LEGAL SOLUTIONS
                        Mid-Atlantic Region
22              300 Delaware Avenue  Suite 815
                      Wilmington, DE 19801
23                      (302) 571-0510
24
```

STEVEN P. GASKIN

Page 14

1  I arranged with my people to produce all the responsive
2  documents.
3      BY MR. SINGER:
4      Q.  Who did you have that conversation with and
5  when?
6      A.  With Mr. Arisohn and -- not long ago.  I'm not
7  sure exactly when.
8      Q.  What's your best estimate?
9      A.  Either last week or this week.  I just don't
10  remember.
11      Q.  You said you talked with your people about
12  gathering documents.  Who was that that you spoke with?
13      A.  There is a woman named Patricia Yanes of
14  Applied Marketing Science who helped me.
15      Q.  Anyone else?
16      A.  Not that I know of.
17      Q.  Let me be clear, is AMS part of this
18  engagement?  Is AMS doing work on behalf of the
19  plaintiffs in this case?
20      A.  Yes, under my direction.
21      Q.  Who are the -- who is the team at AMS that is
22  involved beyond Patricia, if anybody?
23      A.  There's a woman named Carrie Blasko and then
24  an analyst named Rachael, I can't remember her exact last

Page 15

1  name.
2      Q.  And I apologize.  Patricia's last name again?
3      A.  Yanes, Y-A-N-E-S.
4      Q.  And all three of them, Patricia, Carrie and
5  Rachael, they are all with AMS?
6      A.  That's correct.
7      Q.  What is Patricia's title?
8      A.  She is a whatever -- oh, a principal.
9      Q.  What's her background?
10      A.  She went -- has a master's in business from --
11  or went to -- well, she attended Boston College as an
12  undergrad.  I think she has a master's in business from
13  Bentley.  And she has been working there about ten years
14  maybe, awhile.
15      Q.  And Carrie Blasko, what is her title?
16      A.  She is, perhaps a senior manager.  I'm not
17  sure of her exact title.
18      Q.  What's her background?
19      A.  Again, a college degree, perhaps a business
20  degree, but I'm not sure what it is.
21      Q.  And Rachael, what is her title?
22      A.  She is an analyst so as far as I know with a
23  college degree, I'm not sure from where.
24      Q.  What were each of their roles with respect to

Page 16

1  the work you have performed in this case?
2      A.  Ms. Yanes is manager of the practice at AMS
3  that works on class action conjoints.  So she was
4  participating in this, the work on this case.
5          Ms. Blasko is the manager of the case or
6  has been helping out certainly.  And Rachael is the
7  analyst and does a lot of the data processing and things
8  like that.
9      Q.  Would you be able to tell me who did what
10  substantively with respect to the surveys performed in
11  this case as between those three individuals?
12      A.  I think that the description I just gave you
13  is about all I can do.
14      Q.  Okay.  So the specific tasks and functions
15  associated with developing the survey, doing any
16  pretesting, getting the survey out, getting -- analyzing
17  the responses, you can't give me any more specific
18  information as to these three individuals' roles in those
19  regards other than what you have already testified; is
20  that correct?
21          MR. ARISOHN:  I object to form.
22          THE WITNESS:  They work collaboratively.
23  And I am working remotely from them, so it's hard to tell
24  exactly what each did.

Page 17

1  BY MR. SINGER:
2      Q.  Anyone else at AMS or any other entity
3  involved in the work that was performed to generate your
4  report and opinion in this case?
5      A.  It's possible that, I believe she is the field
6  manager at AMS, Sarah Schomp, S-C-H-O-M-P, may have been
7  involved.
8      Q.  You said it's possible.  Do you know, as you
9  are sitting here today, whether or not she was?
10      A.  She typically is.  I didn't speak to her
11  directly, that's why I say that.
12      Q.  So I'm not worried about typically or not.  As
13  you sit here, you have no knowledge one way or the other
14  whether or not she worked on this?  She may have or she
15  may not have; is that right?
16      A.  As I said, she generally works on these.  I
17  have not spoken to her, that's why I couched my answer;
18  but it's my belief that she did.
19      Q.  You are not aware of any work that Ms. Schomp
20  performed specifically in connection with the report that
21  was generated in this case; correct?
22      A.  Well, her work would have been to deal with
23  the field suppliers.
24      Q.  Mr. Gaskin, I'm not asking what it typically

5 (Pages 14 - 17)

STEVEN P. GASKIN

Page 42

1    A.  Maybe 30 or so.  I'm not sure.
2    Q.  And have they all been in the context of
3  providing conjoint analyses and damages opinions?
4    A.  I'm not a legal expert, but yes.  It's this
5  type of case.
6    Q.  Okay.  Let me back up.  You have never worked
7  at a university; correct?
8    A.  In terms of having a paid job?
9    Q.  Yes.
10   A.  No, I've not.
11   Q.  Have you ever been retained or engaged by a
12  university to conduct a conjoint analysis?
13   A.  Yes.
14   Q.  What university was that?
15   A.  The Massachusetts Institute of Technology or
16  MIT.
17   Q.  When was that?
18   A.  It's a few years ago.
19   Q.  Any other universities for which you have been
20  engaged to perform a conjoint analysis?
21   A.  Not that I know of.
22   Q.  Okay.  And what was the -- what were you
23  studying in the conjoint that you did for MIT?
24   A.  We were studying the need for or demand for

Page 43

1  grad student housing.
2    Q.  Was that in the context of litigation?
3    A.  No, it was not.
4    Q.  And did you perform the same type of conjoint
5  analysis for MIT as you did in this case or did you use
6  different methods?
7    A.  It was the same methods.
8    Q.  What was it specifically that you were looking
9  at in terms of the demand for grad student housing?  Can
10  you be more specific?
11   A.  I think how much grad student housing they
12  needed.
13   Q.  In terms of quantity of, like, available
14  housing?
15   A.  Quantity and pricing.
16   Q.  You were not studying tuition in that
17  engagement; correct?
18   A.  That's correct.  I was not asked to.
19   Q.  Okay.  And before your engagement -- before
20  being engaged to conduct conjoints in these higher ed
21  tuition and fee class actions, you had never performed a
22  conjoint to determine pricing for university tuition;
23  correct?
24   A.  Yes.  I mean, you asked me if I'd ever -- what

Page 44

1  work I had done with universities for conjoint, that was
2  the one.
3    Q.  I understand.
4        MR. ARISOHN:  Jon, we are coming up on an
5  hour, when you get to a natural breaking spot, can we
6  take a short bathroom break?
7        MR. SINGER:  We can take a break right now
8  because we are about to dive in.
9        THE VIDEOGRAPHER:  The time is 10:28.
10  Going off the video record.  This concludes Media Unit 1.
11       (A brief recess was taken.)
12       MR. SINGER:  Before we go back on,
13  Juliana, would you mind marking the engagement letter and
14  AMS invoices as Exhibits 8 and 9.
15       (Two documents were marked as Exhibit Nos.
16  8 and 9 for identification.)
17       THE VIDEOGRAPHER:  The time is 10:50.  We
18  are back on the video record.  This begins Media Unit 2.
19  BY MR. SINGER:
20   Q.  Mr. Gaskin, could you please pull up the
21  engagement letter we received during the break that's
22  marked as Exhibit 8.
23   A.  Yes.
24   Q.  Let me know when you have it in front of you.

Page 45

1    A.  All right.  I have it in front of me.
2    Q.  In the first paragraph you state in your
3  engagement letter that "AMS will send you a separate
4  engagement letter, and will bill you separately."
5        Do you see that?
6    A.  Yes.
7    Q.  Just to be clear, you do not have a copy of
8  that engagement letter from AMS; correct?
9    A.  That's correct.
10   Q.  And is it your understanding that AMS's
11  engagement with the plaintiffs is separate and distinct
12  from your engagement with the plaintiffs?
13   A.  Well, I said they will send you a separate
14  engagement letter, isn't that what it means?
15   Q.  Thank you.
16       And you state down in paragraph 4 of this
17  engagement letter, "I will take all necessary measures to
18  ensure that my communications with you remain privileged
19  and are not disclosed to third parties (other than AMS or
20  other experts working on this matter, as appropriate and
21  authorized by you)."
22       Do you see that?
23   A.  Yes.
24   Q.  Mr. Weir is one of those third parties working

12 (Pages 42 - 45)

STEVEN P. GASKIN

Page 50

1  put this on the record now.  I have serious concerns
2  about the witness's responsiveness and obstructionist
3  tactics during this deposition.  The record is what the
4  record is.  I see you shaking your head but, nonetheless,
5  I am putting it on notice right now that if this
6  continues, we will be filing a motion with the Court,
7  because we are not going to be deprived of our time to
8  depose Mr. Gaskin based on his delay and obstruction.
9          MR. ARISOHN:  Okay.  I don't know what the
10  point of saying that on the record is.  You can file
11  whatever you want to file, I guess.  I can't stop you.
12          MR. SINGER:  That's right.
13          MR. ARISOHN:  If you want better answers,
14  I guess ask better questions.
15          MR. SINGER:  The point of putting it on
16  the record is because now is your opportunity to talk
17  with him on a break and tell him to answer the questions.
18  If you choose not to do so, that's at your risk.
19          THE WITNESS:  All right.  So I looked at
20  those invoices.  There appear to be, I would say, at
21  least 100 hours on there; I didn't add each number up.
22  BY MR. SINGER:
23      Q.  Okay.  So at a minimum, based on your
24  estimation right there, AMS has spent over five times the

Page 51

1  amount of time on this engagement, on the work that went
2  into your report, than you did; correct?
3      A.  I think your mathematics is wrong.  If I put
4  in about -- wait.  If I put in about 16 and they put in
5  over 100, that would be six times, I think.
6      Q.  Even better.  Thank you.
7          Do you know whether AMS was a disclosed
8  expert witness in this case, Mr. Gaskin?
9      A.  Not to my knowledge.
10      Q.  Okay.  Do you receive any payments from AMS
11  for the work that AMS is billing plaintiffs in this case?
12      A.  No, I do not.
13      Q.  Do you hold any equity interest in AMS?
14      A.  No, I do not.
15      Q.  Are you completely separate from AMS?
16      A.  How do you define separate?
17      Q.  How do you understand separate?
18      A.  Well, I don't work for them.  I live in a
19  different place.  I don't know exactly what you mean.
20      Q.  You don't share in any revenues or profits
21  from AMS; correct?
22      A.  That's correct.
23      Q.  And there is no affiliation between Steven
24  Gaskin, LLC and AMS; correct?

Page 52

1      A.  Well, we do work together, but there's no
2  official legal affiliation.
3      Q.  Thank you.
4          Are all of the higher education tuition or
5  fee class actions in which you have been engaged as an
6  expert witness identified on your C.V. marked as Exhibit
7  A?
8      A.  I believe so.  At least the ones for which I
9  have submitted some sort of opinions.
10      Q.  Do you know whether any Daubert motions have
11  been filed against you or your reports in any of the
12  higher ed tuition fee reimbursement cases in which you
13  have been retained as an expert?
14      A.  Well, I'm not a legal expert, but my reports
15  have all been challenged, if that's what you mean.
16      Q.  You are familiar with the Daubert standard in
17  federal court?
18      A.  Yes.
19          MR. ARISOHN:  Objection.  Hold on.  Calls
20  for a legal conclusion.
21          THE WITNESS:  Again, you know, there's --
22  BY MR. SINGER:
23      Q.  Mr. Gaskin, did you answer yes?  I think you
24  said yes; correct?

Page 53

1      A.  I believe I was just talking and you
2  interrupted me.  Would you like me to finish my answer?
3      Q.  I believe your counsel interrupted you
4  actually, but go ahead.
5      A.  No, you interrupted me.
6          I've heard of Daubert and Pomcast (sic).
7  It's my belief that it's Daubert.  But, again, I'm not a
8  legal expert.  I do know that rebuttal reports were filed
9  and that I had to respond to them, and then some sort of
10  ruling was made about class certification.
11      Q.  I'm not asking about class certification.  I'm
12  asking about Daubert motions on the reliability and
13  methodology of conjoint analyses that you have done in
14  the higher ed tuition and fee reimbursement cases.
15          With that context, are you aware of any
16  such motions being filed against you?
17          MR. ARISOHN:  Objection.  Calls for a
18  legal conclusion.  You can answer the question.
19          THE WITNESS:  I just answered your
20  question.
21  BY MR. SINGER:
22      Q.  Mr. Gaskin, you did not.  I'm asking the
23  question again and I need an answer.  Okay?
24          In the context of your engagements in

14 (Pages 50 - 53)

STEVEN P. GASKIN

1  in your report?

2       A.  It's my recollection that I talked about a

3  reduction in market value.  I don't recall explicitly an

4  overpayment factor.  You can show me, if you'd like.

5       Q.  You are not expressing an opinion on any

6  alleged damages for missed classes during the days that

7  the university was closed; correct?

8       A.  Well, I think that that would -- is more of a

9  legal question.  I have presented two scenarios to

10  students and asked them to get the difference.  And I am

11  estimating the difference in market value based on that.

12      Q.  Yes.  And you have told me that that was at

13  the time and point of sale at the beginning of the

14  semester; correct?

15      A.  Yes.

16      Q.  Okay.  So now I am asking you about something

17  that occurred during the semester when the university

18  closed for several days.  You are not expressing an

19  opinion on any alleged damages for missed classes during

20  those days; correct?

21      A.  I really think that's out of the scope of my

22  assignment.  I provided two scenarios, and evaluated a

23  difference in market value between each of them.  It

24  involves the closure of the school, but I think you'd do

1  better to ask Mr. Weir or counsel.

2       Q.  Thank you.

3           You are not expressing an opinion as to

4  whether or not the university was unjustly enriched in

5  any amount; correct?

6       A.  It's my job to assume that plaintiffs'

7  allegations are true and that they will be found to be

8  true during this stage of the trial.  However, I'm not an

9  expert in that area or do I vouch personally for those

10  allegations.

11      Q.  You have not reviewed the university's

12  financials from the spring of 2020; correct?

13      A.  Not to my knowledge, nor did I need to to do

14  my assignment.

15      Q.  Look at paragraph 10 in your report, please.

16      A.  Okay.

17          MR. ARISOHN:  Hold on.  Can you just wait

18  until the witness gets there before you ask your

19  question.  Is that okay?

20          MR. SINGER:  I can read it.  Josh, if he

21  has an issue, he'll tell me, okay.  He is fine.

22          MR. ARISOHN:  For the sake of me and the

23  witness and everyone following along, when you are

24  pointing to a specific paragraph of an exhibit, I am just

1  asking you to wait until everyone gets there.  That's the

2  way that every deposition I have ever been in has been

3  conducted.  Really, if you are unable to, you know,

4  proceed with that sort of courtesy, that's really a

5  shame.

6           MR. SINGER:  No.  If you need to get

7  there, that's fine, say so.  The witness is fine.  I am

8  reading the questions.  We are good.

9           MR. ARISOHN:  I needed to get there.

10          MR. SINGER:  The witness didn't have an

11  issue.

12          MR. ARISOHN:  I needed to get there as

13  well.

14          MR. SINGER:  Thank you.

15          MR. ARISOHN:  If you are pointing us --

16  the witness or anyone else to a specific portion of a

17  document, would you just make sure that everybody is

18  there, or wait a second for everyone to get there.

19  BY MR. SINGER:

20      Q.  Mr. Gaskin, in paragraph 10 of your report,

21  you state, "I was asked by counsel for Plaintiffs to

22  design, describe, and execute a market research survey

23  (the 'University Survey') and to conduct an analysis that

24  would enable me to assess" "the reduction, if any, in

1  market value resulting from the Closure of the University

2  Campus (measured in dollars and/or percentage terms.)"

3           Do you see that?

4       A.  I do.  And I had not gotten there when you

5  started reading it before, so I would appreciate your

6  waiting for me to say I'm there.

7       Q.  Okay.  That paragraph summarizes the scope of

8  the university's survey and your assignment; correct?

9       A.  I will just review it once more.  (Witness

10  reading.)  Yes, that does.

11      Q.  And the market value reduction that you were

12  calculating, results from that defined -- you assume

13  results from that defined term, closure of the university

14  campus, that we looked at in paragraph 8; right?

15      A.  Well, basically.  But I think if you read

16  through the report more thoroughly you will see the

17  definition of the levels I used for campus, class and

18  campus format, and that's what they're really reacting

19  to, that definition of the two levels used in the

20  conjoint survey.

21      Q.  You used choice-based conjoint as your

22  methodology; is that right?

23      A.  That is correct.

24      Q.  And there are other conjoint types that you

21 (Pages 78 - 81)

Page 82

1  could have used as well; correct?
2      A.  Yes, but this is, choice-based conjoint is
3  regarded as the gold standard for this sort of thing.
4  It's the most highly regarded.
5      Q.  Okay.  And would you ever consider using menu
6  based, full profile, two attribute tradeoff, adaptive
7  self-application or Max differential, any of those
8  instead of choice based?
9          MR. ARISOHN:  I object to form, compound
10 question.
11         THE WITNESS:  One of the terms you used is
12 incorrect, by the way.
13 BY MR. SINGER:
14     Q.  Which term?
15     A.  Perhaps you would like to ask it again.  Max
16 differential.
17     Q.  Yeah, Max differential.
18     A.  Yes, I said it's incorrect.
19     Q.  What should it be?
20     A.  MaxDiff.
21     Q.  MaxDiff.  Okay.  I have written down MaxDiff
22 actually, believe it or not.
23         Would you ever use any of those conjoint
24 types over choice based in this setting?

Page 83

1      A.  Well, there's more than one way to skin a cat,
2  but as I have said, choice-based conjoint is held to be
3  the gold standard for this sort of thing, and it's the
4  most widely -- most highly regarded methodology for this.
5  So that's why I am using it.
6      Q.  Just to be clear.  When you reference at the
7  time and point of sale, I think you said, you are talking
8  at about what time specifically?
9      A.  It's when students commit to pay the tuition
10 for that semester.
11     Q.  When does that occur at UD?
12     A.  It's my belief that it occurs at the start of
13 the semester, but it's either that or the start of the
14 year or the start of the semester.
15     Q.  Do you need to know that in order to conduct
16 this analysis?
17     A.  I just need to know that it's prior to the
18 start of the spring 2020 semester.
19     Q.  Do you know the -- have you done any research
20 into the prevalence of conjoint analysis usage in the
21 context of setting tuition in the higher education
22 industry?
23     A.  I have read a number of papers regarding
24 school choice.  I don't recall any about setting tuition.

Page 84

1  I think I may have heard that that occurs in another
2  case, from the opposing expert, but I can't say that
3  personally I'm aware of it.
4      Q.  And you never interviewed anybody at the
5  University of Delaware in connection with your work;
6  correct?
7      A.  Do you mean people that work for the
8  University of Delaware or were walking on the campus or
9  what?
10     Q.  I mean people that worked at the university,
11 sir.
12     A.  No, I have not.
13     Q.  You never interviewed -- you never read any
14 deposition transcripts from any of the University Of
15 Delaware witnesses that were deposed in this case;
16 correct?
17     A.  No, I have not nor was I asked to.
18     Q.  So you are unaware of how the university
19 actually sets its tuition pricing; correct?
20     A.  Again, that's out of the scope of my
21 assignment.  I am asking students about the change in
22 market value according to them.
23     Q.  Right.  So you are focused only on the demand
24 side, the supply side is outside the scope of your

Page 85

1  engagement; is that correct?
2          MR. ARISOHN:  Objection.  Misstates the
3  witness's prior testimony.
4          THE WITNESS:  You have mischaracterized my
5  opinions and testimony.  As I state in, I think it's
6  paragraph 22 of my report, I do account for supply-side
7  factors in my analysis.  And so it's not just the demand-
8  side analysis.
9  BY MR. SINGER:
10     Q.  Well, wouldn't the university's method of
11 setting pricing and how it goes about setting pricing be
12 relevant to the supply side?
13     A.  It could be, but it's reflected in the price
14 range that I've used in the survey.  And this sort of
15 economic question is really is out of -- is better
16 directed to Mr. Weir from whom I have learned any sort of
17 economic supply-side questions.
18     Q.  Your work has been focused on what students
19 perceive, not on how universities actually set pricing;
20 right?
21     A.  Again, you have mischaracterized my testimony.
22 While conjoint does work with the demand side by
23 appropriately marrying it with supply side
24 considerations, I can give a change in market value,

22 (Pages 82 - 85)

STEVEN P. GASKIN

Page 98

1      MR. ARISOHN:  You have been screaming at
2  the witness all morning, and laughing.
3      MR. SINGER:  This is a waste of time.
4  This is a waste of time.
5      MR. ARISOHN:  I agree with that.
6      MR. SINGER:  Let's proceed.
7  BY MR. SINGER:
8      Q.  Mr. Gaskin, can you explain -- are you aware
9  of whether or not any universities use Sawtooth Software?
10      A.  Yes.
11      Q.  Beyond the MIT experience you had?
12      A.  Well, they wouldn't necessarily use Sawtooth
13  Software when I conduct a conjoint for them, but they do
14  use it.  And it's, from -- it's my understanding from
15  research papers I have read and conference talks that are
16  given by university professors that many of them do use
17  Sawtooth Software.  It's the leading conjoint analysis
18  software.
19      Q.  Can you explain the Hierarchical Bayes
20  regression analysis?
21      A.  Well, there's books for that, so it could be a
22  very long explanation.  But briefly, what it does is take
23  the information in the choice tasks, in other words,
24  which -- the characteristics of the products respondents

Page 99

1  chose from, their choices, and it, from there it comes up
2  with a set of what are called partworths, which help
3  characterize how each level of each attribute drives
4  consumer choices.  And that's the chief benefit or novel
5  benefit of Hierarchical Bayes choice models which have
6  been around now or used in Sawtooth Software since about
7  1999 or 2000, if I am correct.
8      They provide partworths at the individual
9  level.  Whereas, a standard Logit model, which was the
10  previous sort of mechanism, provides it just at the
11  aggregate level.  And the way the Hierarchical Bayes
12  model works is that it can work off of a lot -- a very
13  small set of data.  That's its chief -- another chief
14  virtue.
15      And there's no formula for solving the
16  equation that it's trying to solve.  So what it does is
17  it uses conditional probability distributions and samples
18  from them successfully, something called a Monte Carlo
19  mark-off process that gradually converges on an answer
20  after many, many draws, perhaps 10,000.  And then it
21  continues that process of narrowing in on the answer for
22  another 10,000 or so.  It's up to the user, and whether
23  the results are stable at that point of the first 10,000,
24  to get an estimate of the partworths for each person, for

Page 100

1  each attribute, for each level.
2      Q.  You mentioned earlier that universities use
3  conjoint, and it sounded like you were discussing
4  professors.
5      Are you aware of financial services or
6  accounting offices or administrative offices at
7  universities that actually use conjoint?
8      A.  I'm not.  But, in my experience, if the
9  university were going to do it for their financial
10  people, they would hire someone who knows about conjoint
11  analysis.  That's way out of the job description of
12  people in those offices generally.
13      Q.  Right.  And my question was whether you were
14  aware of universities that hired people outside of those
15  offices for that purpose?
16      A.  Oh, I don't think that was your question, but
17  I don't know if they have or not.
18      Q.  Thank you.
19      Does your conjoint assume that attributes
20  interact with one another?
21      A.  I checked for that as part of my analysis, and
22  empirically here I have seen that they do not.
23      Q.  How did you check for it?
24      A.  There's a Sawtooth program called Model

Page 101

1  Explorer, and it does two things.  It helps us determine
2  the prior variance and prior degrees of freedom to use in
3  the Hierarchical Bayes choice model, and then given that,
4  it checks for interactions.  And so I have done that and
5  found no interactions.
6      Q.  Do you have -- is there data that reflects
7  that work that was done?
8      A.  There is -- there are the results, which are
9  presented in my exhibits, of what the prior degrees of
10  freedom and prior variance are.  And it was discussed in
11  that exhibit, I believe, that we used Model Explorer to
12  do so.
13      Q.  Which exhibit?
14      A.  One of the ones at the very end, I think.
15      Q.  Is that Exhibit J:  Model Fit and Holdout
16  Diagnostics?
17      A.  No.
18      Q.  Can you tell me which exhibit?
19      A.  I'm trying to get to the end of my report.  I
20  think it would be in Exhibit O, the CBC/HB settings.
21      Q.  Okay.  Does decision theory underlie conjoint
22  analyses?
23      A.  I think so, because Paul Green and Vithala
24  Rao, who wrote that seminal paper on conjoint analysis

26 (Pages 98 - 101)

STEVEN P. GASKIN

1 right?

2    A. Depending on how you describe it, I'm not sure
3 if you could or not.

4    Q. You could have included sports programming;
5 correct?

6    A. Again, that's rather vague. I'd have to think
7 about it more. Possibly.

8    Q. People choose universities sometimes because
9 they are fans of the sports teams; right? That could
10 have been an attribute that you included; correct?

11    A. Perhaps. I'm an MIT student, so I'm not
12 holding myself out as an expert in college sports.

13    Q. You could have included geographic proximity
14 to their home; correct?

15    A. I believe I did. In the university attribute
16 it shows the location of the campus, so they can make
17 their own conclusions from that.

18    Q. So you believe that would incorporate that?

19    A. Sure. If you tell people it's in Delaware,
20 and they live in Pennsylvania, then they know it's closer
21 than someone reviewing it from California.

22    Q. There are a number of reasons why students
23 choose to attend a university that were not part of the
24 attribute list you selected; correct?

1    A. What evidence are you presenting for that?

2    Q. I am just asking you a question, sir. Yes or
3 no?

4    A. I'm not sure what you are referring to.

5    Q. Are there reasons that students choose
6 universities other than the attributes you listed in your
7 survey?

8    A. There could be. But again, it doesn't matter
9 due to the nature of how a class action conjoint uses the
10 attributes.

11    Q. And it matters not because why?

12    A. I have already explained it to you. If you
13 would like to go to that paragraph, I can read it to you.

14    Q. Which paragraph?

15    A. I will find it. Just a moment. Paragraph 24.

16    Q. How is it that you selected these attributes
17 to the exclusion of others?

18    A. Well, I gave you my methodology right there.
19 It's basically the choice of attributes is both an art
20 and a science. So it's hard to give a computer formula
21 for it. But, in my judgment, I had the best set of
22 attributes among the ones I considered.

23    Q. And that's what I am trying to pin down. The
24 ones you considered, you cut some and you chose these.

1 Why these to the exclusion of the others you considered?

2    A. Like I said, I can't remember the others I
3 considered, so it's hard to tell you why I chose these
4 versus them.

5    Q. Do you agree that conjoint analyses do not
6 provide accurate results if the surveyor does not
7 properly identify the entire set of competitive choices
8 and purchase characteristics that consumers consider when
9 making purchase decisions?

10    A. Well, it depends on the application. That's
11 much more helpful in the new product development
12 application. In a class action conjoint, it's not so
13 critical.

14    Q. Why is that?

15    A. Well, I have explained it to you. I could do
16 it again, if you'd like.

17    Q. My follow-up question asks you to explain it.
18 Thank you.

19    A. You are welcome.

20      In a class action conjoint, in the
21 simulation, there's two products that vary only on the
22 key attribute levels and price. All of the other
23 attribute levels are held constant and the same across
24 the two alternatives, so they have no affect on the

1 calculation.

2      So in that sense they don't matter. In
3 addition, the way conjoints are designed, the partworths
4 value is achieved or estimated between any pair of
5 attributes are generally independent of all the other
6 attributes. And there's academic literature to that
7 regard that states that the exact choice of attributes or
8 inclusion or exclusion of an attribute doesn't affect
9 that sort of relative relationship between my key
10 attribute and price.

11      So for those reasons, I think it matters
12 less in a class action conjoint.

13    Q. Are there any academic publications on class
14 action conjoints?

15    A. Class action conjoints are mentioned, at the
16 very least, in the book "Applied Conjoint Analysis" by
17 Vithala Rao. He was one of the coauthors of a seminal
18 academic paper on conjoint analysis.

19    Q. Do you agree that profiles presented in
20 conjoint analysis should be believable and should
21 resemble existing products as much as possible?

22    A. I think that quote is cherry-picked from a
23 longer passage that I often read. So perhaps if I can't
24 see the rest of that passage, I think I would rather

33 (Pages 126 - 129)

STEVEN P. GASKIN

1    Q.  Okay.  If the damage occurs at that point in
2   time, should you or Mr. Weir be factoring in offsets or
3   credits that occur after that point in time against the
4   damages that you say occurred earlier?
5        MR. ARISOHN:  I object to form.
6        THE WITNESS:  Well, I will leave
7   Mr. Weir's calculations and the need for that to him,
8   because I'm not the economics expert.  My -- and I'm not
9   a legal expert, either.  But my understanding is that I
10  don't need to do that.
11  BY MR. SINGER:
12       Q.  How could a consumer be damaged at the time
13  and point of sale as you calculate it when nothing had
14  happened at that point in time?
15       MR. ARISOHN:  Objection.  Calls for a
16  legal conclusion.
17       THE WITNESS:  That's really not a conjoint
18  analysis market research survey question.  It really is
19  kind of a legal question.  It's my understanding that at
20  that very point they didn't get the benefit of their
21  bargain.
22  BY MR. SINGER:
23       Q.  But they did at that point in terms of going
24  to online -- I mean, going to in-person classes and

1   living on campus for the beginning part of the semester;
2   correct?
3        A.  Perhaps.
4        MR. ARISOHN:  Objection.  Go ahead.
5        THE WITNESS:  Sorry.  The bargain covered
6   the entire semester.
7   BY MR. SINGER:
8        Q.  Did you do pretesting to identify relevant
9   attributes?
10       A.  Well, actually a pretest is, as I understand
11  it, is not designed to do that.
12       Q.  Did you use the pretest at all in connection
13  with determining the attributes that you would use?
14       A.  The attributes had already been determined at
15  that point.  I could have changed them or altered them if
16  one turned out to be inappropriate, but I didn't find
17  that.
18       Q.  Could you have done pretesting to identify the
19  most appropriate attributes for use in the conjoint?
20       A.  Well, it would be awkward, as I said, because
21  the conjoint is actually already made at that point.  I
22  mean, you can check that they are good ones, but you
23  shouldn't start from ground zero then because a conjoint
24  has to be already built.

1        Q.  Did you do any work to determine what
2   attributes Delaware believes are important to its student
3   population?
4        A.  Delaware is a state, right?  I don't know how
5   a state would believe anything like that.
6        Q.  Mr. Gaskin, you know you are testifying
7   against the University of Delaware.  Okay?  So I
8   appreciate the nuance you are trying to point out, but
9   please just answer the question.
10       A.  I am just listening to your questions and
11  answering them, I'm sorry.  The question seemed vague to
12  me.
13       I have looked at university websites,
14  including University of Delaware, to develop my set of
15  attributes and levels.  So in that sense, yes.
16       Q.  Do you agree that the important attributes to
17  individual students vary by student?
18       A.  That's quite possible.  And it's allowed and
19  accounted for in my survey and model and analysis.
20       Q.  Did plaintiffs' counsel participate in the
21  process of determining the attributes that you would use
22  for the survey?
23       A.  I believe that -- we could go back and review
24  those paragraphs that show the sources.  My belief is

1   that they were involved mainly with the key attribute,
2   class and campus format, and they were involved in the
3   tuition discussions.
4        Q.  Do you recall any specific attributes that
5   plaintiffs' counsel indicated should be included or
6   should not be included?
7        A.  Well, certainly they wanted the class and
8   campus format and price or else we wouldn't have been
9   able to do the -- give them an answer that they wished
10  for.  As for the others, I don't think they made any
11  specific recommendations.
12       Q.  Do you agree that missing attributes can be a
13  real problem?
14       A.  It --
15       MR. ARISOHN:  Objection, vague.
16       THE WITNESS:  Sorry.  Sorry, Josh.
17       It depends on the context in which the
18  conjoint is used.  If it's a new product development or
19  patent infringement conjoint, it's perhaps a problem,
20  but -- and could be, but in a class action conjoint, it's
21  much less so.
22  BY MR. SINGER:
23       Q.  But even in a class action conjoint, it could
24  be a problem; correct?

35 (Pages 134 - 137)

STEVEN P. GASKIN

Page 138

1    A.  No.  I think I have explained to you why it's
2   not a problem, how the other attributes other than the
3   key attribute and price serve chiefly as distractors, and
4   to make the conjoint a more reasonable and engaging task,
5   if I am remembering what I said.
6    Q.  So would it be of any benefit to you to have
7   reviewed the plaintiffs' depositions and determined the
8   attributes that mattered to them in making their decision
9   to attend UD as part of your work to determine the
10  appropriate attributes for use in your survey?
11   A.  I'm always happy to review new information,
12  but for the reasons I have discussed, I think that it
13  would not have been critical to the development of my
14  list of attributes.
15   Q.  Do you know whether any of the four plaintiffs
16  in this case identified any of these attributes that you
17  used among the list of reasons that they chose to attend
18  University of Delaware?
19   A.  I believe that the in-person courses were
20  important, but I haven't reviewed their depositions, so
21  it's hard for me to say.  Again, I don't think it's
22  necessary for my purposes, given the nature of the class
23  action conjoint, how attributes are selected.
24   Q.  Do you agree that conjoint analysis

Page 139

1   predictions assume that all relevant attributes that
2   influence that share at issue have been measured?
3         MR. ARISOHN:  I object to form.
4         THE WITNESS:  Well, what -- did you say,
5   calculations?  There's a lot of calculations.
6   BY MR. SINGER:
7    Q.  No.  I said do you agree that conjoint
8   analysis predictions assume that all relevant attributes
9   that influence that share have been measured?
10        MR. ARISOHN:  The same objection.
11        THE WITNESS:  Again, conjoint is used for
12  many of -- a wide variety of uses.  In some cases that I
13  have mentioned, such as new product development, that's
14  very helpful.  But in a class action conjoint, it's not
15  so helpful.
16  BY MR. SINGER:
17   Q.  And when you use the term class action
18  conjoint, what does that term mean when you are using it?
19   A.  It means a conjoint analysis for a class
20  action litigation.
21   Q.  Okay.  Is a conjoint analysis for a class
22  action litigation like you have done in this case any
23  different from what you would do in terms of a conjoint
24  analysis if the University of Delaware hired you to

Page 140

1   determine the reduction in market price for tuition in
2   the spring of 2020 in a non-litigation setting?
3    A.  I think that if it were -- for that question
4   in itself, which is my sort, the class action sort of
5   question, I don't think it would be different.  But a new
6   product development conjoint -- maybe not always, but
7   when it does try to give a numerical answer is going
8   after different -- measures of different things.  And
9   that's where the choice of attributes comes in a little
10  handier.
11   Q.  You don't structure or perform a conjoint
12  differently because you are doing it in a setting of a
13  class action lawsuit as a retained expert than if you
14  were to do it outside a class action context; correct?
15   A.  I think you have mischaracterized my
16  testimony.  I said if you are trying to calculate the
17  exact same thing, then it would be the same analysis, but
18  if you are trying to calculate something else, like what
19  feature might give rise to the most profits for the
20  company or something like that, that's a different sort
21  of analysis and has different requirements.
22   Q.  Right.  So when you are saying you don't need
23  to do something in a class action conjoint, there's
24  nothing unique about a class action that means you don't

Page 141

1   need to do something in the methodology of the conjoint
2   as distinct as measuring the same thing in a non-class
3   action setting for business reasons, for example?
4    A.  If my goal is to estimate the exact same
5   quantity, price premium or reduction in market value,
6   then -- and I have done that in both business and
7   litigation worlds, to me the methodologies are very
8   similar.
9    Q.  Thank you.
10        Have you heard of the concept called
11  omitted variable bias?
12   A.  Yes.  Something to that effect.
13   Q.  And what is that?
14   A.  Well, in a regression analysis, for example,
15  if you are leaving out a variable, it may not be able to
16  explain the -- the model may not be able to explain all
17  that it could otherwise, depending on the application.
18   Q.  Does ignoring relevant attributes cause
19  omitted variable bias?
20   A.  Well, I have already answered this question,
21  but I will answer again for you, if you'd like.  It
22  depends on the application.  In new product development,
23  where you are trying to model the -- if you are going a
24  certain quantitative route to calculate sales and profits

36 (Pages 138 - 141)

STEVEN P. GASKIN

1    Q.   Are you aware of any basis for Mr. Weir's
2  overpayment factor other than the conjoint that you
3  performed that yielded your opinion that there's a 15.2
4  percent market value reduction?
5    A.   Well, again, it's not the only number going in
6  there.  I believe that my reduction in market value is an
7  input into his model.
8    Q.   Right.  My question was:  Are you aware of any
9  other input that he used for overpayment factor other
10  than your 15.2 percent?
11    A.   No, I'm not.
12    Q.   Can you describe what customer segmentation
13  is?
14    A.   It's -- in my view, it's a market research
15  term in which consumers are grouped based on demographics
16  or preferences or behavior or some combination of the
17  three.  And then analyses are done within each segment,
18  and the segments are compared.
19    Q.   And how does segmentation affect the conjoint
20  analysis that you performed?
21    A.   Well, given that there's just one tuition list
22  price for everyone, I don't think it does.
23    Q.   What is the marketplace that you used in your
24  study?

1    A.   Again, you are using a term that doesn't quite
2  seem applicable to me, but just to work with you,
3  students are choosing among universities of a certain
4  group which they would like, they are interested in
5  attending or would consider attending.
6    Q.   In paragraph 20 of your report you state, "HB
7  CBC partworth estimates are best suited for calculating
8  statistics at the market level."
9          So it's that market that I'm asking about.
10  What market level is that referring to?
11    A.   What I am saying is that while Hierarchical
12  Bayes estimation is really as good as it gets for
13  conjoint analysis or choice-based conjoint analysis, the
14  partworths that are achieved or estimated would have a
15  considerable amount of random sampling noise because
16  there's not that much data backing up each partworth.
17  And that's true for any choice-based conjoint with
18  Hierarchical Bayes estimation.
19          So what I am saying is that you should
20  not, that you should acknowledge that level of noise.  It
21  doesn't mean that the partworth has nothing to say and
22  that it's not useful.  It's just that you may not have
23  enough information to judge its statistical significance
24  either way.  But when it is in a group, those random

1  errors are washed out and those individual partworths are
2  quite useful for getting an estimate for a group of
3  people.  That's what I mean by more aggregate level.  It
4  could be the total sample.  It could be individual
5  groups.
6    Q.   Do you know what the University Of Delaware
7  does to assess tuition pricing, market value?
8    A.   Not specifically, no.  Though, I don't really
9  have to, I think.
10    Q.   Do you know if the University of Delaware
11  prices tuition with the intention of achieving a certain
12  enrollment?
13    A.   I'm not sure what their goals are, but
14  whatever their goals are and methods are reflected in the
15  range of prices used in my constraint.
16    Q.   Just by virtue of the output being whatever
17  price they set?
18    A.   Right.
19    Q.   But don't the goals dictate on some level what
20  they will do with respect to pricing?  In other words, if
21  they want to achieve a certain enrollment, isn't that
22  important to you in order to be able to determine how to
23  set pricing?
24    A.   Well, A, I think that's question for Mr. Weir,

1  an economics question.  And B, I am keeping the
2  enrollment level constant in my analysis as is Mr. Weir.
3  So I am not sure of the pertinence of your question.
4    Q.   Do you also think it's impertinent to know
5  whether or not the university sets pricing in comparison
6  to its perceived competitors?
7    A.   Well, again, that's something that's factored
8  into my range of market prices used in my survey.
9    Q.   Factored in just by virtue of the actual list
10  prices that you have seen; right?
11    A.   Yes.  It reflects that sort of competition.
12    Q.   But when you say that Delaware's, University
13  of Delaware's objectives in setting tuition prices are
14  factored into your survey by virtue of you knowing what
15  the prices are, you don't actually have any knowledge --
16  you don't incorporate it in any other material way or any
17  other way at all apart from just stating this is the
18  price; is that correct?
19    A.   I don't believe I state:  This is the price.
20  I give a range of market prices that reflect the supply
21  and demand conditions extant at that time.
22    Q.   I want to move to paragraph 33 in your report.
23  The pretesting questionnaire.  We already talked about
24  the fact that it was pretested with 20 respondents.  And

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

STEVEN P. GASKIN

Page 178

BY MR. SINGER:

1  Q.  Who conducted the preliminary pretesting,
2  individuals?
3  A.  The staff at AMS.  I'm not sure which ones did
4  each and every pretest.
5  Q.  Did the same individual at AMS conduct all ten
6  preliminary pretests?
7  A.  Could be.  I'm not positive.  They are all
8  competent to do it.
9  Q.  And in order to ensure -- if it's multiple
10  individuals, in order to ensure that they conduct the
11  pretesting in the same way according to that protocol,
12  are they given any documents to guide the pretesting?
13  A.  No.  These are highly trained individuals.
14  They are business and litigation -- or out of litigation,
15  if they also work out of litigation -- is to interview
16  respondents.  So they are very good at it and they know
17  what they are doing.
18  Q.  And your testimony is that AMS doesn't make
19  notes of the information they learned during preliminary
20  pretesting for purposes of discussion after the
21  pretesting; is that right?
22  A.  I'm saying that the notes made are shown in
23  exhibits F and G.

Page 179

1  Q.  You have not reviewed or relied upon any
2  documents related to the pretesting other than what's in
3  Exhibit F and G; is that correct?
4  A.  That's correct.
5  Q.  Looking at Exhibit G, were these pretests
6  administered verbally or in writing?
7  A.  Verbally, over the phone.
8  Q.  So did the pretest, the final pretest
9  interviewers have this script in Exhibit G to work off of
10  when asking the respondents the questions?
11  A.  Yes.  And they filled it in as they went
12  along.
13  Q.  But they don't have that same type of script
14  for the preliminary pretesting; is that right?
15  A.  Well, as we've discussed, it's a different
16  kind of interview.  It's a very organized and fixed set
17  of questions in the final pretest.  It's a different kind
18  of interview.
19  Q.  Are either the pretests, the preliminary
20  pretests or the final pretest recorded by audio or visual
21  means?
22  A.  No, they are not.
23  Q.  Who prepared this script for the final
24  pretest?

Page 180

1  A.  I'm not sure.  It's our standard sort of
2  script for the final pretest.
3  Q.  Whose standard -- Steven L. Gaskin, LLC's,
4  Colin Weir's, AMS's?  Whose standard script is it?
5  A.  Actually, my middle initial is not L, but you
6  are close.  It had been in existence when I was back at
7  AMS.  It has been around for a while.
8  Q.  So you did not prepare this pretest, this
9  final pretest in Exhibit G for purposes of the conjoint
10  in this case; correct?
11  A.  I signed off on it.  I found it to be
12  satisfactory, but I didn't prepare it.  It's similar to
13  other ones that I have done.
14  Q.  When was the preliminary pretesting conducted?
15  A.  I can't recall.  If it doesn't say so in the
16  report, I'm not sure.  It was before the survey was
17  fielded, I know that.
18  Q.  The same thing for final pretest interviews?
19  A.  Yes.
20  Q.  How did you test that respondents did not have
21  difficulty with the questions and instructions during the
22  preliminary pretest?
23  A.  That part of that sentence and the other
24  things around it in that paragraph are all related to

Page 181

1  questions in the final pretests, as well as the general
2  nature of the preliminary pretest.
3  Q.  When you say "general nature of the
4  preliminary pretest," what do you mean?
5  A.  Well, I believe you are referring to problems
6  with the questions, that's the sort of thing that could
7  be found in the preliminary pretest.  Also, we have a
8  question, if we look at the final pretest script or
9  answers that asks:  Were you able to answer all the
10  questions?  And there's other sort of similar questions
11  that help indicate their understanding.
12  Q.  Is there data that -- or anything you rely on
13  that indicates the appropriate sample size for
14  pretesting?
15  A.  Yes.
16  Q.  Okay.  What is that?
17  A.  There's been a lot of work done on qualitative
18  research and, by professors I have worked with, which I
19  helped with, back in the '80s.  And it's generally well
20  known that a sufficient sample for qualitative surveys,
21  or even for pretests of a concrete notion like the final
22  pretest, 10 or 20 is enough.  Just as there's general
23  rules for quantitative surveys or conjoints.
24  Q.  Did you utilize the pretest to identify the

46 (Pages 178 - 181)

STEVEN P. GASKIN

Page 186

1  to actual 18-year-old University of Delaware students?
2      MR. ARISOHN: I object to form. Compound
3  question.
4      THE WITNESS: I think that those students
5  were sufficiently similar in that they were making a
6  similar decision, and they were considering similar types
7  of schools. So I felt -- and whether it was in the past
8  or not, I feel that they are able to make this sort of
9  consideration. So I felt it was appropriate.
10 BY MR. SINGER:
11     Q. Can you identify any authority that supports
12 your feeling that a 40-year-old who applied to UC
13 Riverside in 2002 is representative of an 18-year-old who
14 attended the University of Delaware in the spring of
15 2020?
16     A. Well, your question is a little awkward
17 because you are putting a number of different things in
18 there, but what I am saying is that preferences or
19 customer needs do not change much over time. And so the
20 response would be similar, I think, for the two types of
21 person you mentioned.
22     Q. So you cannot identify any authorities;
23 correct?
24     A. Well, I am quoting an article from a respected

Page 187

1  conjoint analysis professor.
2      Q. What article?
3      A. Or actually it was testimony from a conjoint
4  analysis professor in the Anthem case. It was Dr. Peter
5  Rossi. But it's a well-known fact anyway.
6      Q. How is it that you decided that the University
7  of California Riverside is a competitor to the University
8  of Delaware?
9      A. Well, there's no bright red line for
10 competitors. People can apply to a number of schools of
11 different natures, and they make tradeoffs and decide
12 which one to enroll in. So people could have enrolled in
13 both of them. So, in that sense, they are competitors.
14     Q. Have you done any work to determine who the
15 University of Delaware perceives to be its actual
16 competitors?
17     A. It's been a while. I can't remember if I read
18 that or not, but there was some consideration of the
19 school list. It's just been a while, so I can't remember
20 exactly how we did it.
21     Q. Have you looked at the demographics of the
22 student population at University of California Riverside
23 compared to those of the University of Delaware in terms
24 of where they come from geographically?

Page 188

1      A. I have not looked at that specifically. But,
2  again, wherever they come from, that doesn't necessarily
3  tell me they will react differently to the issues in this
4  case.
5      Q. Have you done any work to determine whether
6  any University of Delaware students ever applied to the
7  University of California Riverside or vice versa?
8      A. I have not. But, again, you have to remember
9  that this university attribute is just a distractor.
10 They were applying for a university, so -- with a campus,
11 so, you know, they are similar in many ways.
12     Q. Well, Mr. Gaskin, you told me earlier that you
13 factored in geographic as an attribute into your survey
14 by virtue of the name of the university such that
15 students were considering that; right?
16     A. That's not entirely correct, no. I provided
17 the campus location in addition to the name.
18     Q. Wouldn't it be, if you are going to target
19 individuals who applied to, accepted, or attended the
20 University of Delaware or one of its competitors, to use
21 your language, isn't it important to determine they are
22 actual competitors?
23     A. Well, again, I'm not saying I didn't look at
24 the University of Delaware website, it's just been a

Page 189

1  while, I can't quite remember. But there's no set
2  definition for competitors. There's no bright red line
3  that this school is a competitor and that one is not. So
4  I have done what research I can, and I believe that all
5  of these would be regarded as competitors.
6      Q. You also relied on a list of 15,000 records
7  provided by the University of Delaware containing email
8  addresses of current and former University of Delaware
9  students; correct?
10     A. I attempted to, yes.
11     Q. What do you mean? Your report doesn't say you
12 attempted to, it says you relied on a list. Did you not
13 rely on that list?
14     A. Let's say I relied on that list. I am just
15 saying that not many of my respondents are from that
16 list.
17     Q. What percentage of your respondents are from
18 that list?
19     A. I think 17 are from that list.
20     Q. Out of how many?
21     A. 994.
22     Q. So less than 1 percent of the survey
23 respondents are actual University of Delaware students;
24 correct?

48 (Pages 186 - 189)

STEVEN P. GASKIN

Page 246

1    Q.  And where are you getting the 17,250 from that
2    you are using?
3        A.  It's the maximum price in the range of prices
4    in my conjoint analysis.
5        Q.  You could have chosen to divide that 2,614.33
6    into other tuition figures within your conjoint analysis
7    and turned out an opinion and a percentage basis by doing
8    it that way as well; correct?
9        A.  I suppose; but that's not my methodology, so I
10   don't.
11       Q.  And doing that would yield different
12   overpayment percentages; correct?
13       A.  Yes, but mine is the most conservative choice.
14       Q.  And you divided it into the 17,250 just
15   because that was the decision you made; correct?
16       A.  I believe it's 17,250, not 15,250.
17       Q.  Yes, I said 17.
18       A.  As I said, I made the most conservative
19   choice.
20       Q.  I understand that, but you made that choice
21   just based on your own doing, your own choosing; correct?
22   You could have chosen something else; right?
23       A.  Well, my methodology is -- that I have used
24   over and over and has been accepted many times -- is to

Page 247

1    make the most conservative choice.  I don't choose the
2    others.
3        Q.  But your overcharge payment -- your overcharge
4    percentage is purely based on whatever you choose to use
5    for the tuition; correct?
6        A.  It reflects the market price of the school in
7    the conjoint, so it's not made up.
8        Q.  My point is that you could have chosen any of
9    these numbers from the randomized first choice simulation
10   and divided any of them into any of the tuition prices to
11   reach your overpayment percentage; correct?
12       A.  If I were not following my method.  Again, I
13   presented a linear price partworth model that doesn't
14   involve the choice of which starting price to base it on.
15   If you all would prefer to use that, it's fine with me.
16   But I am trying to make the most conservative choice.
17       Q.  Conjoint methodology doesn't require you to
18   make any specific choice to get to an accurate
19   percentage; correct?
20       A.  Well, I have used this method many times.  It
21   has worked very well.  It's conservative, but I also
22   found it to be accurate.
23       Q.  That's not my question.  Conjoint methodology
24   does not require you to use any specific one of the

Page 248

1    randomized first choice simulation prices or any of the
2    tuitions, you just get to pick, divide, and spit out your
3    percentage; correct?
4        A.  Well, as I said, it's a matter of my judgment.
5    And my judgment is do it in the most conservative manner
6    possible.
7        Q.  And that is the exact same approach that you
8    took in the Volkswagen case that the Court said was
9    unreliable; correct?
10       A.  I don't know that they said that in particular
11   was unreliable, but in the 20 that I presented in my
12   report, it was judged to be reliable.
13       Q.  In the Volkswagen case, the Court stated that
14   merely picking the lowest number in the range of
15   overpayment percentages does not remove doubt; correct?
16       A.  I don't remember.  You would have to show me
17   the document.  But even if it did, that's one case.  I
18   have 20 that say otherwise.  And I have offered you a
19   linear price partworth model that removes that obstacle
20   should you wish -- should you agree to use it.
21       Q.  Just like you did in the Volkswagen case, you
22   made the same choice in this case to use the lowest
23   number to calculate your overcharge amount; correct?
24       A.  Yes.  And in the 20 that have been accepted,

Page 249

1    which that judge ignored, with all due respect, when he
2    made that decision, or failed to differentiate it from
3    all those other cases.
4        Q.  But, again, in those 20 cases, you were not
5    subject to a Daubert motion in any of them were you?
6        A.  I was in every one of them.
7        Q.  Every one of them?
8        A.  They always challenge my reports.  By top
9    marketing scientists in the world.  I am always
10   challenged, and I have won 20 times.
11       Q.  You actually calculated an overpayment
12   percentage ranging from 14.2 percent to 57 percent,
13   didn't you?
14       A.  No.  I selected my values, and then I did the
15   one single percentage based on my method.  I did not do
16   all of those.
17       Q.  If we take the data that you've put together
18   here in Exhibit K-3 and K-4, and we look at all of the
19   various overpayment percentages that your data allows to
20   be determined, what we have is a range in overpayment
21   percentages from 14 to 57 percent; isn't that correct?
22       MR. ARISOHN:  Objection.  Asked and
23   answered.
24       THE WITNESS:  Look, you can do any math

63 (Pages 246 - 249)

STEVEN P. GASKIN

Page 254

1    Q.  And that's because willingness to pay only
2    incorporates demand side; correct?
3       A.  That's the generally accepted wisdom.
4       Q.  You use the same pretesting methodology in
5    this case as you used in the Volkswagen case; correct?
6       A.  That's correct.  And in all those 20 cases
7    that were accepted, and Judge Orrick, who did, say,
8    Maldonado v. Apple, reviewed that and said there's
9    nothing wrong here.  He did a fine pretest.  Right after
10   Nemeth.  And, again, the judge misunderstood what I did.
11         MR. SINGER:  Matt, can we go off the
12   record for a minute for me to take a look at my notes,
13   please.
14         THE VIDEOGRAPHER:  The time is 6:19.
15   Going off the video record.
16         (A brief recess was taken.)
17         THE VIDEOGRAPHER:  The time is 6:35.  We
18   are on the video record.
19   BY MR. SINGER:
20      Q.  Mr. Gaskin, could you turn to Exhibit I,
21   please.
22      A.  All right.
23      Q.  And can you just generally explain what is
24   being conveyed in Exhibit I?

Page 255

1       A.  Where is my report?  Oh, here it is, Exhibit
2    10.
3           Okay, here is I.  Those are average
4    partworths.
5       Q.  Can you just generally explain what is being
6    conveyed with the data, the values in the right-hand
7    column?
8       A.  It shows the average partworth for each level
9    of each attribute.  And the higher the number, the
10   better.  And the lower the number, the less preferred.
11   And so that's what this shows.
12      Q.  Can you explain what Exhibit M conveys?
13      A.  Just a moment.  Exhibit N in the conjoint data
14   listing.  It's the data from the tradeoff exercises that
15   go into Sawtooth Software.
16      Q.  You said N as in Nancy?
17      A.  N as in Nancy or November.  That's what I
18   thought you asked me.
19      Q.  That's okay.  So that's Exhibit N as in Nancy.
20   What is Exhibit M as in Mary?
21      A.  Ah, that would be the data listing for the
22   screener data, the screener portion of the questionnaire.
23      Q.  And your design file would help somebody
24   understand Exhibit N in more detail; correct?

Page 256

1       A.  I suppose so, but, like, as I may have said,
2    if you have Lighthouse Studio software, you don't need
3    the design file.  Within the version we've sent you, you
4    can just read it in with a push of a button.  It knows.
5       Q.  Can you explain what Exhibit O is please?
6       A.  It is the CBC-HB settings for running the
7    Hierarchical Bayes choice model.
8       Q.  What does that mean?  What do those settings
9    refer to?
10      A.  Well, there's various forms you encounter
11   while running the model.  And this shows what you can --
12   how you can set those to do various things.  And it
13   shows -- and everything else we don't explicitly discuss
14   as a default.  So it's an aid in reproducing the
15   analysis.
16      Q.  In your report, Footnote 52, you state: "The
17   reduction in market value is significantly different from
18   zero at the 95 percent confidence level."
19          What does that mean?
20      A.  Well, we just went over that confidence
21   interval output, and you saw how the lower bound of the
22   95 percent confidence interval was, I think, 14.04
23   percent.  That's considerably above zero, so that's what
24   that means.

Page 257

1       Q.  Okay.  What is focalism bias?
2       A.  It's a kind of bias that was thought of where
3    the presentation of something in a survey gives that
4    thing undue attention and causes it to get more attention
5    than it would otherwise.
6       Q.  Do you agree that evaluation tasks
7    intentionally force respondents to attend to attributes
8    that they might otherwise not notice?
9       A.  No.  And in this case it certainly is an
10   important attribute, so I don't -- and it's presented no
11   more vividly than the others, so I don't -- well, you
12   asked generally.  What's your question?
13      Q.  My question was:  Do you agree that evaluation
14   tasks intentionally force respondents to attend to
15   attributes that they might otherwise not notice?
16      A.  Well, I don't agree with the general sentiment
17   of that, because it implies bias.  It's not clear that it
18   does.
19          There's in new product development
20   applications, for example, you are you often testing a
21   feature that's entirely new and does not exist in the
22   marketplace.  And you must include it to test it.  And
23   there's no general rule that that causes a bias.
24      Q.  How about in the higher ed, how about with

65 (Pages 254 - 257)

STEVEN P. GASKIN

Page 266

1  matrix and a couple of other documents that I believe
2  came up earlier in the deposition.
3        So we certainly reserve the right to keep
4  this deposition open and come back and ask additional
5  questions on materials that we didn't receive in response
6  to the deposition notice in advance of the deposition.
7        MR. ARISOHN:  I was not told that there
8  were files that the defendant was unable to access, so I
9  am not going to take responsibility for that.
10       But thank you everybody for your time
11 today.  Thank you to the court reporter.  And the
12 plaintiff has no questions.
13       THE VIDEOGRAPHER:  Did you say the
14 plaintiffs have no questions?
15       MR. ARISOHN:  Correct.  We are done.
16 Thank you.  Thank you, Matt.
17       THE VIDEOGRAPHER:  The time is 6:58.  We
18 are going off the video record.  This concludes the video
19 deposition of Steven Gaskin.
20            - - -
21 (Witness excused.)
22            - - -
23 (Deposition concluded at 6:58 p.m.)
24

Page 267

1            C E R T I F I C A T E
2
3
4      I do hereby certify that I am a Notary Public in
5  good standing, that the aforesaid testimony was taken
6  before me, pursuant to notice, at the time and place
7  indicated; that said deponent was by me duly sworn to
8  tell the truth, the whole truth, and nothing but the
9  truth; that the testimony of said deponent was correctly
10 recorded in machine shorthand by me and thereafter
11 transcribed under my supervision with computer-aided
12 transcription; that the deposition is a true and correct
13 record of the testimony given by the witness; and that I
14 am neither of counsel nor kin to any party in said
15 action, nor interested in the outcome thereof.
16
17      WITNESS my hand this 25th day of August, 2022.
18
19
20
21
22  _____
            Notary Public
23
24

Page 268

1  Joshua Arisohn, Esquire
2  jarisohn@bursor.com
3            August 26, 2022
4  RE:   Ninivaggi, Penny Et Al v. University Of Delaware
5    8/12/2022, Steven P. Gaskin (#5363838)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12   The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-midatlantic@veritext.com
16
17   Return completed errata within 30 days from
18 receipt of transcript.
19   If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25

Page 269

1  Ninivaggi, Penny Et Al v. University Of Delaware
2  Steven P. Gaskin (#5363838)
3          E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Steven P. Gaskin          Date
25

68 (Pages 266 - 269)

Page 270

1  Ninivaggi, Penny Et Al v. University Of Delaware

2  Steven P. Gaskin (#5363838)

3  　　　ACKNOWLEDGEMENT OF DEPONENT

4  　I, Steven P. Gaskin, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____  _____

12  Steven P. Gaskin　　　　　　Date

13  *If notary is required

14  　　　SUBSCRIBED AND SWORN TO BEFORE ME THIS

15  　　　_____ DAY OF _____, 20___.

16

17

18  　　　_____

19  　　　NOTARY PUBLIC

20

21

22

23

24

25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

EXHIBIT 2

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

3     _____

4     Penny NINIVAGGI, et al., individually and

5     on behalf of all others similarly situated,

6          Plaintiffs,

7     v.                    Civil Action No. 20-cv-1478-SB

8     UNIVERSITY OF DELAWARE,

9          Defendant.

10    _____

11    HANNAH RUSSO, individually and

12    on behalf of all others similarly situated,

13          Plaintiffs,

14    v.                    Civil Action No. 20-cv-1693-SB

15    UNIVERSITY OF DELAWARE,

16          Defendant.

17    _____

18

19        VIDEO-RECORDED REMOTE ZOOM VIDEOCONFERENCE

20            DEPOSITION OF COLIN B. WEIR

21           Taken Friday, August 19, 2022

22           Scheduled for 9:30 a.m. EDT

23

24    REPORTED BY:  DANA S. ANDERSON-LINNELL

25    Job No.:  5363898

Page 46

1  long would you estimate it takes to do the
2  front end work, prepare the survey and then
3  actually go out to the field with it?
4  A.  It's usually six to eight weeks, but that
5  can be potentially -- it's never going to be
6  much shorter, but it could potentially be
7  longer than that.
8  Q.  And if you would, just in terms of hours
9  is this a hundred-hour project, a couple
10  hundred-hour project?  What's your estimate in
11  terms of the time required to actually build
12  it?
13  A.  I don't have an estimate for that.  I hear
14  Steve quote budgets for projects like this, and
15  it's always in dollars and cents, not number of
16  hours.
17  Q.  And when you hear kind of a
18  dollar-and-cent budget, what ballpark do you
19  hear?
20  A.  That a full conjoint with results is
21  probably around a $100,000 affair, could be a
22  little bit less and might be more depending
23  upon the facts and circumstances of the case.
24  Q.  And do you have an understanding of, you
25  know, about how many hours that entails to get

Page 47

1  to that ballpark hundred-thousand-dollar
2  figure?
3  A.  I mean, I guess we could do some
4  back-of-the-envelope and say if people are
5  charging several hundred dollars an hour, that
6  it has to translate into hundreds of hours.
7  But, again, I really am not in the best
8  position to tell you how many hours Steve or
9  his staff spent on this particular project.
10  Q.  And do you have any understanding of how
11  much time Mr. Gaskin spent versus AMS in this
12  particular project?
13  A.  I don't have any independent knowledge of
14  that.
15  Q.  How much time did you spend on the
16  conjoint portion of this case, you know, sort
17  of providing the high-level input, as you
18  described it?
19  A.  A couple of hours.
20  Q.  So we've got your August 1 declaration in
21  front of you.  And we were talking about the
22  sort of exhibit piece of it.  Let's turn to the
23  narrative portion, if you will.
24  A.  Okay.  Do you have a particular page or
25  paragraph?

Page 48

1  Q.  Yeah, I'm going to get you there.  Yep.
2  So in paragraph 6 -- and this is going to some
3  of the questions we were just talking about, so
4  maybe it's already covered, but you say there
5  roughly in the middle of paragraph 6 that you
6  were asked to work with Gaskin, Mr. Gaskin
7  "...to help design (from an economic
8  perspective), and to evaluate the economic
9  suitability of a conjoint survey (to be
10  designed, implemented, and analyzed by
11  Mr. Gaskin)..."
12      Do you see that?
13  A.  Yes.
14  Q.  Okay.  When you say "to help design (from
15  an economic perspective)," is that what you
16  just told me about?
17  A.  Yes, relating to market prices, the supply
18  side, controls and other related factors to
19  that.
20  Q.  Anything else that you would add beyond
21  that description?
22  A.  I mean, I guess we could get very nuanced
23  about that, but I think those are the
24  high-level things along with, again, ensuring
25  that there was an attribute and level that was

Page 49

1  designed to measure plaintiffs' theory of
2  liability.
3  Q.  Why do you believe that higher ed
4  selections can be broken down into measurable
5  attributes?
6  A.  I'm sorry.  I guess I don't understand
7  that question.
8  Q.  The fundamental point is ultimately
9  getting at why do you think conjoint works in a
10  case like this.  But I understand that you,
11  know, in your world when you're talking about
12  from a marketing perspective, talking about a
13  particular product, and let's just say
14  hypothetically, right, a dishwasher, you can
15  breakdown a consumer's preferences and options
16  into particular measurable attributes, right?
17  A.  I do believe that you could do a conjoint
18  about dishwashers.  Whether or not it could
19  answer questions about every particular
20  attribute I think would -- I would need to do
21  some work to get to that level.
22  Q.  Yeah.  And I'm certainly not asking that.
23  I'm just asking more generally.  In your field
24  you can break down consumer -- consumer
25  thoughts about dishwashers into various

Page 50

1  attributes, right?
2  A.  That sounds maybe like a misdescription of
3  what we do.  I do believe that you can design a
4  conjoint survey that could tell you how
5  consumers respond and/or how a market would
6  respond to changes in the features or levels of
7  those types of products.
8  Q.  And what role do the attributes that you
9  come up with play in that analysis?
10  A.  That is a complicated question and depends
11  a lot on the facts and circumstances of the
12  research objective of the study that one is
13  conducting.
14  Q.  So -- but it is -- but it is discernable
15  when you're using my dishwasher example, do we
16  agree?
17  A.  Is what discernable?
18  Q.  The attributes.
19  A.  If you do a conjoint survey about
20  dishwashers, there are going to have to be some
21  attributes and levels in the survey by
22  definition of what conjoint is.
23  Q.  Why do you think the same analysis or
24  process can be used in the higher ed world?
25  A.  Well, the literature on conjoint very

Page 51

1  broadly indicates that it is both robust and
2  very flexible and isn't designed, for example,
3  to study only dishwashers.  And then there is
4  peer-reviewed literature on people that have
5  studied higher education using conjoint.  So
6  that's another data point that would indicate
7  that this is a reliable use of the method.  And
8  I'm just aware generally that colleges and
9  universities use conjoint not only as they
10  teach their students how to use that technique
11  but to make their own decisions about various
12  things.  So those sort of general things guide
13  me to believe and feel very comfortable with
14  the use of conjoint as it relates to higher
15  education.
16  Q.  Did any of what you just described in
17  terms of your familiarity with the literature
18  or familiarity with the teaching at
19  institutions involve a calculation measuring
20  purported damages based on educational
21  modality?
22  A.  I don't recall.
23  Q.  Paragraph 28 of your declaration, and you
24  can certainly turn there, but it just says,
25  again, that you worked with Mr. Gaskin to

Page 52

1  develop parts of the survey.  So same question
2  as what I was asking you:  Is that what you
3  already described, or was there any other
4  particular contribution you made to the survey
5  itself?
6  A.  Again, if we accept that what we've talked
7  about has been discussed at a high level, then
8  yes, I'm referring to those same topics.
9  Q.  Did you provide any particular survey
10  questions to Mr. Gaskin?
11  A.  Well, I mean, all the conjoint questions
12  are the same, which one of these schools would
13  you pick.  So no, I did not provide additional
14  questions to Mr. Gaskin.
15  Q.  Did you provide any particular attributes
16  to Mr. Gaskin?
17  A.  Again, we discussed price, and we
18  discussed what I would describe as the
19  attribute and level of interest.  Beyond that
20  the remainder of the attributes and levels were
21  selected by Mr. Gaskin.
22  Q.  High level, your declaration ultimately
23  boils down to two calculations, one regarding
24  overpayment damages, as you refer to it, and
25  one regarding the return of tuition for missed

Page 53

1  days.  Do you agree with that?
2  A.  I would say those are the two frameworks
3  for damages that I set forth in the report,
4  yes.
5  Q.  The second calculation, return of tuition
6  for missed days, as you phrase it, does not
7  hinge on any work performed by Mr. Gaskin or
8  AMS, is that correct?
9  A.  Not to the best of my knowledge, no.
10  Q.  Okay.  And I don't mean this to be
11  disparaging, but frankly, it's a pretty simple
12  calculation multiplying the net tuition total
13  by your calculation of the percentage of missed
14  days for that semester, right?
15  A.  I think one probably needs to have some
16  good understanding of the inputs that should be
17  used in that calculation and why they are
18  appropriate and why they match plaintiffs'
19  theory of liability, but I agree the underlying
20  mathematics are not complicated once you've
21  done the homework to understand that that is a
22  reasonable method to calculate damages and,
23  again, to understand and process the inputs
24  that go into it.
25  Q.  And we'll go over obviously a little bit

14 (Pages 50 - 53)

1 later in more detail just sort of high level.
2 So then the overpayment damages calculation,
3 that, am I correct, derives directly from the
4 approximately 15 percent that Mr. Gaskin has
5 come up with from the conjoint?
6 A. There are three primary elements of the
7 calculation. One is indeed the Gaskin
8 overpayment factor, another is the tuition
9 payments, and the third is a prorating factor
10 that reflects the fraction of the semester
11 that's in question.
12 Q. But without Mr. Gaskin's output from a
13 conjoint analysis you could not perform that
14 calculation, right?
15 A. My framework is very flexible and could
16 use any economically reliable measure of
17 overpayment. It does not have to come from
18 Mr. Gaskin or per se a conjoint analysis.
19 Q. In this particular case and in this
20 particular calculation, without that input you
21 could not complete that calculation here?
22 A. I don't think that comports with what I
23 just said. I'm not going to suggest that I
24 don't use the Gaskin number. I do use it. But
25 if for some reason Mr. Gaskin were to say: Oh,

1 that's erroneous, but there was a different
2 overpayment factor, it could be used in just
3 the same way that I've used the Gaskin
4 overpayment number.
5 Q. But you have not pointed to another
6 alternative one here, correct?
7 A. Because I have the Gaskin number and
8 because I believe that is economically
9 reliable, no, I have not used an additional
10 source for overpayment.
11 Q. And if hypothetically the conjoint
12 analysis or its output was faulty here, then
13 your calculation would fail in this case too,
14 right?
15 A. I would need to know in what way you
16 believe the calculation is faulty for me to
17 answer that question.
18 Q. I'm asking a simpler question.
19 Hypothetically assume that there is something
20 faulty with the Gaskin calculation in this case
21 where that's the -- one of the three inputs, as
22 you just put it, then your calculation would
23 fail as well, correct?
24 A. No. My response would be the same. I
25 need to understand what it is that you're

1 saying is faulty about the Gaskin conjoint.
2 Q. I understand your testimony. What other
3 economic methodologies could be used to
4 determine the overpayment factor then?
5 A. I could conceive of constructing a
6 different type of survey, which would be known
7 as contingent valuation, that could potentially
8 answer that question. I'm not sure whether or
9 not it would be possible to do it in this case,
10 but maybe a hedonic regression of university
11 tuition payments along with enough explanatory
12 variables that would allow you to isolate the
13 impact of the switch from in-person classes to
14 otherwise. That's another potential method.
15          MR. ARISOHN: Jim, if you -- when
16 you get to a good chance, can we just take a
17 quick restroom break?
18          MR. TAYLOR: Yeah. How about one
19 minute and I'll be done with this section?
20          MR. ARISOHN: Perfect. Thanks.
21 BY MR. TAYLOR:
22 Q. And on those other alternatives, Mr. Weir,
23 that you just mentioned just so that I'm clear
24 on the record, that -- those alternative
25 calculations or methodologies were not used

1 here, correct?
2 A. I apologize if I misunderstood your
3 question. I thought you were asking generally
4 about available methods, not per se what has
5 been conducted. But no, I have not used those
6 other methods because we have the Gaskin
7 analysis in this case.
8 Q. Yeah, you didn't misunderstand. I just
9 wanted to make sure that that was clear on the
10 record.
11          All right. I asked you earlier about
12 conversations with Mr. Gaskin, and so this may
13 already be covered, but in paragraph 37 of your
14 declaration, and, again, you can certainly turn
15 there, but it's a simple point, it says that
16 you and Mr. Gaskin had several discussions
17 concerning the design of the survey where you
18 provided input. Is that what we've discussed
19 at a high level already?
20 A. Yes.
21 Q. All right. And it's the handful of
22 conversations that you mentioned earlier?
23 A. Yes.
24 Q. And if you had to guesstimate, about how
25 long in time do you believe you and Mr. Gaskin

15 (Pages 54 - 57)

Page 62

1   the differences in educational services or
2   offerings?
3   A.   Yeah, I think all five or six of those
4   Ohio cases have been accepted.
5   Q.   And is it your understanding, and I'm just
6   asking your understanding, that the Court there
7   has accepted the conjoint as an appropriate
8   measure for the alleged damages?
9   A.   I'm not an attorney, and I can't say that
10  I've seen everything, but it's my understanding
11  that the Court found that was acceptable enough
12  to certify the class based upon that proposed
13  damages methodology.
14  Q.   Are you aware of any other conjoint
15  analyses that have been performed in the
16  COVID-19 context?
17  A.   That's quite possible, but I would have to
18  go back and check.  Nothing is coming to mind
19  as I sit here right now.
20  Q.   And how did you determine that -- the
21  economic suitability of a conjoint survey to
22  measure the alleged overpayment of tuition in
23  this case?
24  A.   That related to the conversations that we
25  discussed that happened between me and

Page 63

1   Mr. Gaskin about the use of market-based prices
2   in the survey and subsequent analyses as well
3   as controls for the supply side.
4   Q.   And is it your testimony that you could
5   have performed the conjoint yourself in this
6   case?
7   A.   If you're asking do I have the credentials
8   to have done all of the work in this place,
9   then I would say yes.  Whether or not I would
10  have been able to do it from a practical
11  standpoint in terms of time and resources, I
12  don't know the answer to that.
13  Q.   Is it fair to say then that in your view
14  the limiter is the sort of manpower, the
15  resources, not the skill set?
16  A.   There are many -- or many reasons that
17  people might hire Mr. Gaskin, but one of the
18  reasons I tend to work with him is that I could
19  not do all of the congrenic work that we do
20  together if it was all my responsibility just
21  in terms of the practical sense of time and
22  effort.
23  Q.   Exhibit 2 to your declaration, and, again,
24  it's not enumerated, but it's the last several
25  pages of your declaration, identifies the

Page 64

1   documents that you reviewed.  You're familiar
2   with that?
3   A.   Yes.  I'm just fanning to it in case we
4   need to refer to it.  But yes, I'm generally
5   familiar with Exhibit 2.
6   Q.   And you have not relied on any documents
7   other than those identified in that exhibit for
8   your opinions in this case, correct?
9   A.   Certainly don't think there are any
10  documents that I expressly rely on.  Obviously
11  I bring to bear my expertise, which comes from
12  having reviewed other documents in the past.
13  Q.   But no other documents in connection with
14  this case specifically or the facts in this
15  case?
16  A.   I think that's right.
17  Q.   Okay.  You did not speak with the
18  plaintiffs, correct?
19  A.   No, I did not.
20  Q.   You've not read their deposition
21  transcripts?
22  A.   I don't think so.
23  Q.   You identify, and I think it's the fourth
24  line in your Exhibit B, the deposition of Robin
25  Morgan.  Let me pause there.  Is that the only

Page 65

1   deposition in this case that you did review?
2   A.   To the best of my recollection, yes.
3   Q.   And you go on in that line to say "...and
4   calendar exhibits."  Those were calendar
5   exhibits to the deposition of Robin Morgan,
6   correct?
7   A.   To the best of my understanding, yes.
8   Q.   Did you review the other exhibits to her
9   deposition?
10  A.   Not that I recall.
11  Q.   So all that you do recall is reviewing the
12  calendar exhibits along with her transcript?
13  A.   Yes.
14  Q.   Did you review Gaskin's deposition --
15  Mr. Gaskin's deposition transcript from last
16  week?
17  A.   It was sent to me, and I read parts of it.
18  Q.   Do you recall anything in particular that
19  you read?
20  A.   Not particularly.
21  Q.   Anything surprise you from the transcript?
22  A.   No.
23  Q.   Anything from the transcript change in any
24  way any of the opinions you hold in the case?
25  A.   No.

17 (Pages 62 - 65)

1   Q.   The only University of Delaware document
2   that I see listed here is in the -- I think by
3   my count it's the sixth line, the
4   defendant's -- sorry, Defendant's Tuition Data.
5       Do you see that?
6   A.   I'm going to disagree with the preamble to
7   the question, but I do see the line in
8   question.
9   Q.   Okay.  So let me ask you two questions.
10  That is, to your understanding, a document that
11  came from whom?
12  A.   We're talking about the defendant's
13  answers?
14  Q.   No, sir.  The one below that.
15  A.   The tuition data?
16  Q.   Yes.
17  A.   To the best of my understanding, that
18  would have been data produced by U Delaware.
19  Q.   Okay.  And I said that from my review that
20  looked like the only document from the
21  University of Delaware that you reviewed, and I
22  think you said you disagree with that.  Tell me
23  why.
24  A.   I think the calendars that are exhibits to
25  the deposition of Robin Morgan were University

1   documents, and this is a semantic issue, but in
2   some ways I would view the defendant's answers
3   as having come from the University as well.
4   Q.   Fair enough.  Other than those, any
5   other -- any University documents that you
6   reviewed?
7   A.   Sorry.  I'm just eyeballing the list very
8   quickly here.  I had also looked at the
9   University website that's down on the last page
10  of the exhibit.  I think beyond that those are
11  probably the documents from the University that
12  I have reviewed at least to this point as it
13  relates to this case.
14  Q.   Okay.  You did not review, am I correct,
15  the plaintiffs' interrogatory responses?
16  A.   I don't believe so, no.
17  Q.   You just mentioned that on the last page
18  of this exhibit there are, I think, six
19  websites listed, I think.  What do you recall
20  reviewing from the University of Delaware's
21  website?
22  A.   Things relating to tuition, calendar and
23  other things as they are presented to students
24  on the website.
25  Q.   Do you know from which year?

1   A.   I believe I have seen whatever is the most
2   recent data as well as information as it
3   related to the time period in question.
4   Q.   Did you visit the website yourself, or
5   were you sent excerpts?
6   A.   I looked at the website myself.
7   Q.   Do you recall when approximately?
8   A.   My guess is that would have taken place in
9   the month of June of this year.
10  Q.   You also list here Collegefactual.com.
11  What do you recall looking at on that website?
12  A.   I think tuition information.
13  Q.   For which school or schools?
14  A.   A number of the universes that are listed
15  in the Gaskin conjoint.
16  Q.   Why were you looking for tuition
17  information for those schools?
18  A.   That relates to the conversation that I
19  had with Mr. Gaskin about using market-based
20  tuition price points within the survey, and
21  that those price points are reflective both of
22  University of Delaware and other schools that
23  are included in the survey.
24  Q.   You list here Delawareonline.  What do you
25  recall -- sorry.  Let me back up.

1       College Factual, that was a website that
2   you visited yourself, you were not sent
3   excerpts?
4   A.   All of the websites here are things that I
5   viewed in person.  I was not sent any website
6   excerpts.
7   Q.   Thank you.  Delawareonline, what do you
8   recall viewing yourself?
9   A.   I don't have a precise recollection of
10  what I saw on that particular website.
11  Q.   Do you know what you were looking for?
12  A.   The largest category of information that I
13  was seeking related to the market pricing.  So
14  if I had to hazard a guess, that would be what
15  I would have been looking for there.
16  Q.   NCSU.edu is the next website.  What do you
17  recall looking at there?
18  A.   Again, my best recollection would be
19  tuition data.
20  Q.   How about for USMD.edu?
21  A.   Same.
22  Q.   And then same question for Usnews.com.
23  A.   Same answer.
24  Q.   All right.  Do you know how many
25  undergraduate students were enrolled at the

18 (Pages 66 - 69)

Page 78

1    A.  I think you asked that or something
2    similar, and my answer is there may very well
3    be data that would show that, but as I sit here
4    today I don't have that statistic memorized.
5    Q.  Why do you believe that's not important to
6    calculate as part of your number?
7    A.  Again, because I can remove the aid in the
8    aggregate as I have done, the fraction of
9    students that are on aid wouldn't change the
10   aggregate amount of tuition that is due as
11   damages should plaintiffs prevail on the merits
12   in this case.
13   Q.  Do you have a view as to whether or not
14   that should be taken into account in terms of,
15   assuming plaintiffs are successful, what
16   dollars would be owed to individual students?
17   A.  I'm not offering an opinion about how much
18   any one person should receive as part of claims
19   administration with the one caveat that how the
20   funds are distributed to individual students
21   does not change the aggregate amount of
22   class-wide harm that is calculated in this
23   case.
24   Q.  Do you have a -- I understand what you
25   just said, and I appreciate it.  Do you have a

Page 79

1    view as to whether or not financial aid would
2    come into play at that stage?
3    A.  At this point, I have not been asked to
4    give advice to the Court on how to conduct
5    claims administration, so I'm not offering an
6    opinion about that.
7    Q.  Do you know whether the individual
8    plaintiffs received financial aid for spring of
9    2020?
10   A.  Again, that's a data point that I might
11   have known at one point, but I would need to
12   refresh my recollection if you need an answer
13   to that question.
14   Q.  Am I correct, though, that you did not
15   review their individual billing statements?
16   A.  Because I have this aggregate financial
17   statement, I did not need to look at individual
18   billing statements, including for the named
19   plaintiffs, and did not do so.
20   Q.  All right.  After accounting for the two
21   numbers we just discussed, you subtract one
22   from the other with math that even I can do,
23   and you get to a net tuition paid by
24   undergraduate students of just under
25   $166 million, right?

Page 80

1    A.  I believe you have the calculus correct.
2    Q.  Okay.  And am I correct that that's how
3    you get there, right, you take the 55 from the
4    22 and get to about 165, 166?
5    A.  That's right.
6    Q.  Okay.  Do you know if the University
7    provided online courses prior to the onset of
8    COVID-19?
9    A.  It's my understanding that that was an
10   option at least under certain circumstances.
11   Q.  Do you have any familiarity with the
12   nature of those courses, how many -- how many
13   students were enrolled?
14   A.  Certainly not memorized.
15   Q.  Have you seen any information to that
16   effect?
17   A.  I don't recall.
18   Q.  Do you know what was charged for those
19   online courses that were offered prior to
20   spring of 2020?
21   A.  Similar answer.  I don't have that data
22   memorized.
23   Q.  Do you know whether any of the plaintiffs
24   were enrolled in online courses prior to spring
25   2020?

Page 81

1    A.  I don't have a specific recollection of
2    that one way or the other.
3    Q.  You did not review the University of
4    Delaware's budget, correct?
5    A.  Not that I can recall.
6    Q.  You did not review its year-end financials
7    for 2020 or indeed any year, correct?
8    A.  Same answer.
9    Q.  Did not review any of the University's
10   budget projections for any period of time,
11   correct?
12   A.  I don't recall doing that, no.
13   Q.  Is it fair to say that you were, for
14   purposes of your calculations, told to assume
15   that the allegations in the Complaint were
16   true?
17   A.  I don't know if that was told to me, but
18   assuming that defendant will be found liable
19   for its allegedly harmful acts is a starting
20   point for most calculations of damages as set
21   forth in the Reference Manual on Scientific
22   Evidence as it relates to damages
23   quantification, and I am assuming for purposes
24   of my calculations that plaintiffs will prevail
25   on the merits of their case.

21 (Pages 78 - 81)

Page 90

1  Q.  Am I correct that your analysis does not
2  distinguish in any way between those students
3  who paid in-state tuition and those who paid
4  out-of-state tuition, just you calculated it on
5  an aggregate basis?
6  A.  I think that question could potentially be
7  misinterpreted.  I do differentiate to the
8  extent that the underlying data reflects that
9  some people paid more and other people paid
10  less, but I do not go person by person as part
11  of my calculations and identify whether they
12  are in state or out of state.
13  Q.  And your report does not conclude any
14  calculation aggregating, for example, the total
15  amount of in-state tuition or the total amount
16  of out-of-state tuition, right?
17  A.  I have not set forth that calculation,
18  though.  I suppose it would be possible to make
19  it.
20  Q.  But those breakdowns, if you will, are not
21  a feature of your overall calculation, correct?
22  A.  Because I was asked to calculate
23  class-wide damages in the aggregate, I did not
24  present breakdowns of the aggregate class-wide
25  amounts.

Page 91

1  Q.  Continuing in that same paragraph but now
2  on the top of the next page, about the third
3  line down it says that, "Classes moved online
4  and campus services ceased being provided."
5      Do you see that?
6  A.  Yes.
7  Q.  Similar question to before:  Do you know
8  what campus services continued to be offered by
9  the University of Delaware in the spring of
10  2020 after the COVID onset?
11  A.  I could be faulted for not citing it over
12  and over again for every sentence in this
13  paragraph, but, again, this is intended to be a
14  recitation of what plaintiffs say, not an
15  opinion from me.
16  Q.  And understood.  Simpler question, I
17  think:  Did you have any personal knowledge
18  about what campus services continued to be
19  offered?
20  A.  Anything that I would know about that
21  would have come from reading the Complaint.  I
22  don't have that memorized as I sit here today.
23  Q.  How would you describe the alleged loss
24  suffered by undergraduate students in spring of
25  2020?

Page 92

1  A.  Again, I describe two types of harm that
2  are alleged in this case.  One is that students
3  were not given the promised number of days as
4  part of their semester, and that there's a
5  financial harm that stems from having paid for
6  more days than were received.  And similarly,
7  it's alleged that people were forced into
8  taking classes online and without regular
9  access to the campus, and that that represents
10  a change in the value from what had been
11  bargained for at the time of enrollment, which
12  would have involved the choice to take classes
13  in person and with access to the campus, and
14  the -- there is financial harm that comes with
15  the reduction in value from the removal of that
16  choice and those services.
17  Q.  Is it your view that every student
18  suffered the same alleged loss?
19  A.  I think -- I want to be careful because
20  I'm not offering opinions about individuals'
21  damages.  What I would say is that every
22  individual has suffered a similar type of
23  damage, but that based on what they have paid,
24  the amounts that derive from each student as it
25  rolls up into the aggregate amount may be a

Page 93

1  different amount of money.
2  Q.  I'm going to ask you a slightly different
3  question then.  Is it your view that every
4  student -- every undergraduate student at the
5  University in the spring of 2020 suffered a
6  loss?
7  A.  I think every student suffered some kind
8  of loss in the sense that they missed days and
9  didn't have the same opportunities that were
10  bargained for, whether that translates to a
11  legal entitlement, that I'm not offering an
12  opinion about.
13  Q.  What in your view -- you just used the
14  word "bargained for."  What do you believe that
15  students bargain for when they pay tuition?
16  A.  The ability to have classes on an
17  in-person basis and to have regular access to
18  the campus and facilities.
19  Q.  Do they bargain for that or academic
20  credit?
21  A.  In some way those things are related, and
22  in some ways those things could be different.
23  Q.  Might some students have valued academic
24  credit over the things you just described?
25  A.  I can't really testify about what any

24 (Pages 90 - 93)

Page 98

1     A.  It's my understanding that those seven
2  days were not made up.
3     Q.  What was not made up, the actual day or
4  the work that would have been and subjects that
5  would have been covered during those days?
6     A.  Again, I'm talking about the days.
7     Q.  Yeah.  But is it days that matters or the
8  content that would be covered during those
9  days?
10    A.  Again, it's my understanding that
11  plaintiffs allege that it's the days that are
12  missed.
13    Q.  And your opinion calculates those days
14  regardless of the content that would have been
15  covered during those days or what might have
16  been covered in the latter part of the
17  semester, correct?
18    A.  Yeah, it's my understanding that there's a
19  single charge for tuition for the semester and
20  that students don't pay based on what's going
21  to happen on a particular day, and so my
22  damages framework takes that particular view to
23  plaintiffs' allegations in this case.
24    Q.  Do you know the breakdown of how many
25  student undergraduate students in spring 2020

Page 99

1  were full-time as opposed to part-time?
2     A.  Again, that is part of the calculus in the
3  sense that that's reflected in the tuition
4  amounts, but I don't know off the top of my
5  head what the breakdown is.
6     Q.  Would you agree that at least some
7  University of Delaware students were pleased
8  that the University of Delaware transitioned to
9  online learning in spring of 2020 since the
10  only alternative was to cease instruction?
11    A.  I'm not here to offer an opinion about
12  people's subjective views other than the fact
13  that those types of subjective views at least
14  individually don't impact the tuition that
15  people pay, and that those folks would have
16  been economically better off if they had paid a
17  lower tuition amount even if they were
18  otherwise happy with attending classes remotely
19  as opposed to not having classes at all.
20    Q.  So the individual student's, say, academic
21  success or comfort level with online learning
22  would not affect in any way your opinion?
23    A.  Any one person's subjective views on those
24  things do not impact the damages calculus.  To
25  the extent that there are those types of views

Page 100

1  out there and in the aggregate would have a
2  marketplace impact, that is accounted for by
3  the Gaskin survey.
4     Q.  What about those students who prior to
5  COVID's emergence were already enrolled in
6  online courses and not receiving a discount?
7     A.  Those students also would have been better
8  off if the tuition had been lower in the way
9  that Mr. Gaskin has calculated, but those
10  people also conceptually are in a different
11  position because even if they chose an online
12  class, that was a choice that was available to
13  them as opposed to the latter portion of the
14  semester at issue when that choice was taken
15  away from folks.
16    Q.  Do you know whether any of the plaintiffs
17  themselves were enrolled in an online course?
18    A.  Again, I may have known that at one point,
19  but as I sit here today I don't have a
20  recollection one way or the other.
21    Q.  Do you have an understanding of the
22  instructional method used by the University of
23  Delaware in the fall of 2020?
24    A.  My recollection is that at least part of
25  that semester included online-only classes.

Page 101

1     Q.  Do you know what tuition was charged?
2     A.  I believe I've been told that it was the
3  same as it was for the spring of 2020.
4     Q.  Do you know how many students enrolled in
5  spring 2020 also reenrolled in the fall of
6  2020?
7     A.  That may have been mentioned to me, but I
8  don't recall off the top of my head.
9     Q.  Do you recall an approximate percentage?
10    A.  Maybe it was 85 percent, but I wouldn't
11  swear to that.
12    Q.  Why is that an appropriate measure of how
13  students valued online education rather than a
14  conjoint survey?
15    A.  There are a number of reasons that the
16  fall of 2020 would represent an
17  apples-to-oranges calculation in the way that
18  you have suggested.  And because the analysis
19  is confounded by some of the factors, which
20  I'll enumerate in a moment, it's not
21  appropriate to use that as a way to determine
22  the damages in this case.  Some of the
23  differences include that that particular
24  bargain was struck when COVID was known,
25  whereas in spring of 2020 that was not the

26 (Pages 98 - 101)

1  A.  I believe Mr. Gaskin has indicated that
2  the results are statistically significant.  I
3  don't have a personal opinion about whether
4  they are or are not.
5  Q.  And just to be clear, academic success is
6  not a factor in your analysis at all, correct?
7  A.  How do you mean?
8  Q.  Well, if a student did better academically
9  in online courses than in in-person courses,
10  for example, your calculation still treats that
11  student as being harmed the same as others,
12  correct?
13  A.  Well, I think Mr. Gaskin's sample would
14  kind of include the fact that there are people
15  that, assuming your predicate is true, are out
16  there, but those people that did better with
17  online classes would still have been
18  economically better off paying the lower
19  market-based tuition that has been determined
20  that would be in existence had folks known the
21  truth at the time the bargain was struck.
22  Q.  It sounds like a very circular view,
23  because, of course, everybody is always better
24  off paying less, so how does that actually help
25  inform us in this case?  You said it a couple

1  of times.
2  A.  Right.  It gets back to this conflagrence
3  of things that you keep mentioning that are
4  sort of subjective or individualized and the
5  fact that folks, as you said, and I'm glad you
6  agree, would just be better off if the market
7  price would be less.  And overall, Mr. Gaskin
8  has demonstrated that the market price for
9  tuition would have been less had people known
10  the truth at the time a bargain was struck.
11  And so even if a person graduated, even if they
12  were happy with how things went, I'm just
13  trying to remember the examples that you've
14  given, even if they were academically
15  successful, they still would be better off if
16  they had paid the lower market tuition.  And it
17  is my opinion, based on what Mr. Gaskin has
18  found, that those folks would have paid lower
19  tuition even if they were ultimately satisfied
20  with what they received.
21  Q.  Yeah.  My agreement was on a different
22  point, which is it doesn't strike me as
23  scientific at all to say that people would like
24  to pay less for something.  Not sure I need any
25  degrees to come up with that conclusion.

1  A.  Okay.  But the other conclusion that we
2  have is that those folks would have paid less.
3  So we agree that people are better off if
4  they're paying less.  Mr. Gaskin and I have
5  shown that folks would have paid less.  And so
6  when you ask a question what about some person
7  that was happy about the classes or that
8  graduated, I'm saying that person, per the
9  precepts that we just talked about, would have
10  been better off paying less and would have paid
11  less based on the evidence that Mr. Gaskin has
12  provided.
13  Q.  Have you ever seen a conjoint analysis
14  that concluded people would gladly pay more
15  rather than less?
16  A.  Oh, sure.  People would have paid more for
17  various features of colleges and universities,
18  totally.  I have not seen somebody suggest that
19  on balance the market price would have been the
20  same or higher when you take away people's
21  choice to have in-person classes and access to
22  the campus.
23  Q.  And you haven't seen the conjoint used, as
24  we covered earlier, in this context outside of
25  the Ohio cases and this case, correct?

1  A.  I believe the places where I have seen
2  conjoint deployed for higher education include
3  the Ohio cases and this case.
4  Q.  But you haven't seen it used to purport
5  the value of the lost educational opportunity
6  for modalities other than in those cases,
7  correct?
8  A.  If I've seen that someplace else, I don't
9  have a recollection.
10  Q.  And Mr. Gaskin's survey does not account
11  for COVID-19 in spring of 2020, correct, in
12  fact, it asks the respondents to ignore it
13  completely?
14  A.  I was going to say there is a treatment of
15  COVID, and that is that people are asked to
16  ignore it.
17  Q.  Actually, that's --
18  A.  That's my understanding.
19  Q.  Okay.  Got it.  So they're told to ignore
20  it.  You believe that's appropriate in this
21  instance?
22  A.  Given that we are calculating damages as
23  of the time and point of sale, which occurred
24  before COVID, yes, I believe that's appropriate
25  in this particular instance.

28 (Pages 106 - 109)

Page 122

1  if you look at the conjoint literature, there
2  are plenty of statistics that are used to
3  objectively evaluate the reliability of the
4  conjoint such as, for example, the hit rate or
5  the root likelihood.  But that margin of error,
6  which is typically used on sort of single up or
7  down vote type of questions, like, how many
8  people would vote for Donald Trump tomorrow,
9  it'll be X percent plus or minus some margin of
10  error, that's not the way the conjoint results
11  are typically presented.
12  Q.  The survey could have informed survey
13  respondents that online courses were only
14  offered for part of the semester and were
15  necessary as part of a public health and safety
16  measure, right?
17  A.  I don't know that that would be the proper
18  way to do things, but as a technical matter the
19  surveys are fairly flexible and could be
20  designed to do that.
21  Q.  Why shouldn't that have been included as a
22  question?
23  A.  Well, again, there's the time and point of
24  sale issue that relates to the public health
25  themes, and that at the time and point of sale

Page 123

1  at issue for spring 2020, that information
2  would not have been in the real world and
3  therefore would not be appropriate to model in
4  the but-for world.
5  Q.  Turning back to the margin of error.
6  Isn't it important to know the margin of error
7  to rely on it for reasonable economic certainty
8  in your report?
9  A.  Because there are other ways of evaluating
10  conjoint surveys and where those other methods
11  are the commonly accepted ways of evaluating
12  them, no, I do not believe you need to know the
13  margin of error to evaluate the economic
14  reasonableness of a conjoint survey.
15  Q.  And indeed you -- just to be clear, you
16  don't know of one here, correct?
17  A.  Because there are other ways of evaluating
18  the conjoint survey that have shown that it is
19  reliable, I have not sought to use an uncommon
20  way of evaluating conjoint results, namely the
21  margin of error.
22  Q.  And what were the ways -- and apologies if
23  you had said this a bit ago.  What were the
24  ways that you used here instead of margin of
25  error?

Page 124

1  A.  I would need to go back and look at the
2  Gaskin report, but I believe he uses hit rates
3  as a way of evaluating the reliability of the
4  conjoint survey.
5  Q.  Did you perform any of your own review or
6  analysis to confirm the validity of the
7  statistical result that he achieved?
8  A.  Based on the fact that Mr. Gaskin ran
9  those tests himself, no, I did not reproduce
10  them.
11  Q.  Do you agree that there's a difference
12  between the market value of a product and the
13  value of various product attributes?
14  A.  I think those things are related, but they
15  may or may not be different depending upon what
16  we're talking about.
17  Q.  And a conjoint survey does not measure the
18  value of all the attributes of a product,
19  right, only those selected by the person
20  designing the survey?
21  A.  I would agree that if you want to know the
22  value of a particular attribute, it must be
23  included in the survey, but there are other
24  data points that can be used to move in one
25  direction or another to understand product

Page 125

1  valuation, especially in a case like this where
2  we try to hold various factors constant.  So,
3  for example, if we know what the stated tuition
4  is, we can use that as a baseline to understand
5  whether or not value is added or subtracted,
6  for example, by removing the ability to choose
7  in-person classes and have access to the
8  campus.  And you need not know all of the other
9  attributes or their particular values, because
10  using the starting tuition amount and the
11  change attributable to the one attribute, we
12  can figure the remaining value for when
13  students no longer have the choice of in-person
14  classes.
15  Q.  And who determined as between you and
16  Mr. Gaskin or AMS which specific attributes to
17  include in the survey conducted here?
18  A.  As to market price and the general
19  attribute and level of interest, those were
20  developed between me and Mr. Gaskin.  And when
21  I say "Mr. Gaskin," I say that generally.  I
22  can't speak, since I don't have firsthand
23  knowledge, of how AMS contributed to
24  Mr. Gaskin's work except only at a very high
25  level.  As to the other attributes, I would say

Page 126

1  that fell to Mr. Gaskin. How that division of
2  labor was laid out as between Mr. Gaskin and
3  AMS, I can't speak to that.
4      Q.  Who selected the -- I'll call them for our
5  purposes the competitor schools that were used
6  in the survey?
7      A.  I would suggest Mr. Gaskin. But, again,
8  as to the division of labor between Mr. Gaskin
9  and his staff, I can't speak to that.
10     Q.  Is it fair to say from that that you did
11 not identify which schools should be named as
12 competitors in the survey?
13     A.  That's correct.
14     Q.  Did you have a view one way or the other?
15     A.  I did not have a view one way or the
16 other.
17     Q.  Do you have a view as to which schools --
18 whether the schools that were included are
19 appropriate competitors?
20     A.  I have no opinion one way or the other.
21     Q.  You have reviewed Mr. Gaskin's report,
22 correct?
23     A.  Yes.
24     Q.  Do you agree with me that his analysis
25 shows that there's a range of overpayment

Page 127

1  percentages ranging from 15 percent to as high
2  as 57 percent?
3      A.  I don't believe that's correct. But if
4  you would like to point me at something, I'm
5  happy to take a peek.
6      Q.  Do you -- if hypothetically that was
7  correct, would you believe that is an
8  appropriate calculation to a reasonable degree
9  of economic certainty?
10     A.  If you're saying that following
11 Mr. Gaskin's instructions could lead to many
12 different answers, I would need you to clarify
13 how that could be, because Mr. Gaskin has
14 pretty explicit instructions that lead to only
15 the determination of one answer, at least as I
16 understand it.
17     Q.  All right. Okay.
18         MR. TAYLOR: Why don't we take a
19 break there, I guess -- what is it, 12:30? May
20 be a good time for a lunch break.
21         THE VIDEOGRAPHER: Off camera. The
22 time is 12:26.
23         (Off the record 12:26 to 1:19.)
24         THE VIDEOGRAPHER: This begins media
25 number 3 in today's deposition. The time is

Page 128

1  now 1:19. Please continue.
2  BY MR. TAYLOR:
3      Q.  Good afternoon, Mr. Weir. We're back
4  after the lunch break. Let me go back to one
5  of the phrases you used earlier. When I was
6  asking you about fall of 2020 as a useful
7  metric and you referred to that as apples and
8  oranges compared to spring 2020, do you
9  remember that phrase?
10     A.  Yes.
11     Q.  All right. Why is it that if students
12 knew about COVID as they did, of course, in
13 fall of '20 and still paid full tuition, that
14 that isn't a common class-wide point of
15 evidence of the market price that those
16 students would be willing to pay?
17     A.  Again, we don't know what the tuition
18 would have been absent that. We also don't
19 know how the tuition would be if we were in a
20 historical context where all of the students
21 were enrolled instead of only some of the
22 students reenrolling. There are a number of
23 things, as I mentioned before, that I believe
24 would confound that comparison and not make it
25 an apt way to examine damages that relate to

Page 129

1  the spring of 2020.
2      Q.  What percentage reenrollment would make it
3  a more apt comparison?
4      A.  I mean, since we hold supply fixed as a
5  matter of history, we would need a reenrollment
6  of 100 percent to eliminate that as a
7  potentially confounding factor. Now, as I
8  mentioned before, there's potentially a way
9  that you could control for that, but I have not
10 attempted to build that model. Because we
11 already have the conjoint, there's no need to
12 do it.
13     Q.  And if -- I'm giving you an "if" because I
14 know you don't know the amounts. But if the
15 tuition was held the same in fall of 2020 from
16 spring of 2020, why would that need to be
17 adjusted as I think I understood your testimony
18 a moment ago?
19     A.  Right. In most circumstances colleges and
20 universities raise the tuition every year. And
21 so when you have a year when it actually stays
22 the same, that would be something that needs to
23 be accounted for in terms of understanding of
24 there being a potential reduction in value. If
25 the tuition otherwise would have been higher

33 (Pages 126 - 129)

Page 154

1  answers the question.  There's no need to
2  mention it in the report because we have
3  accounted for it.  And, again, I believe that
4  the conjoint appropriately provides a
5  percentage-based overpayment that is then
6  fairly applied to the amounts that people
7  actually paid.
8  Q.  In paragraph 47 earlier today I asked you
9  about the numbers that are captured in that
10  paragraph, and we walked through each of those.
11  The gross tuition amount, do you agree that
12  that amount does not calculate what students
13  actually paid out of pocket?
14  A.  I think it is the face amount that was
15  faced by all students, but that some students
16  as reflected by the fact that there's a lower
17  net number, at least in the aggregate, students
18  paid an amount that is less than the total
19  gross.
20  Q.  And we might have covered this before, but
21  just so I'm clear, did -- the 55 million and
22  change that you deducted for undergraduate
23  student aid, do you know what is subsumed in
24  that category?
25  A.  Again, there was voluminous underlying

Page 155

1  detail that I did review, but I don't have
2  memorized everything that fell into that
3  category.
4  Q.  If for some reason that $55 million number
5  did not include all third-party payments and
6  aid, then the net tuition number would be
7  overstated, correct?
8  A.  Can you tell me what you mean by
9  "third-party aid"?
10  Q.  Well, from any sources, aid that --
11  amounts paid that were not paid by individual
12  students, if that's not subsumed in the 55
13  million, then the net tuition would be
14  overstated, right?
15  A.  Not in terms of calculating the harm
16  caused by University of Delaware, no.
17  Q.  That doesn't hinge on what amounts were
18  actually paid by students in your view?
19  A.  It looks at the amount of money that the
20  University of Delaware took in by virtue of the
21  tuition amounts that it set and the value that
22  was not received by those students as a result
23  of the switch to online-only classes.  Now, if
24  we talk about, you know, delivering amounts of
25  money back to students whether or not they have

Page 156

1  an obligation to then refund, you know, the 4-H
2  club that gave them a third-party scholarship,
3  that seems well beyond the purview of
4  calculating the harm that was caused by
5  University of Delaware, and I would not change
6  my calculus to account for that in terms of
7  determining aggregate class-wide damages.
8  Q.  That wasn't part of your analysis,
9  correct?
10  A.  It was purposefully not part of my
11  analysis, because that would serve to
12  understate the harm caused by University of
13  Delaware.
14  Q.  And nor did you take into account any of
15  the costs incurred by the University of
16  Delaware in spring 2020?
17  A.  I object to the question both in its
18  characterization of my prior answer and in
19  terms of this particular question.  There are
20  things that I've taken into account by
21  considering them and making a determination
22  about how to handle things.  For example, I
23  made an active determination that the
24  third-party aid does not change the amount of
25  harm that University of Delaware has caused.

Page 157

1  Similarly, I did look at the concept of costs
2  as they might have influenced prices and made
3  the determination that by using the real-world,
4  market-based prices, we can account for that
5  supply side factor in our analysis and hold it
6  constant in the real and but-for worlds.  That
7  is the only manner in which that particular
8  issue needs to be addressed given the facts and
9  circumstances of this case.
10  Q.  I think I asked a simpler question.  You
11  did not account for the costs incurred by the
12  University of Delaware in your calculation,
13  correct?
14  MR. ARISOHN:  Objection, asked and
15  answered.
16  THE WITNESS:  I completely disagree
17  for all of the reasons I just set forth in that
18  prior answer.
19  BY MR. TAYLOR:
20  Q.  You didn't calculate the cost, did you?
21  A.  I have done an analysis that shows that to
22  the extent costs impacted the prices that were
23  set for tuition, that our real-world,
24  market-based prices account for that and hold
25  those conditions from a supply side fixed as in

Page 158

1   the real world and the but-for world and our
2   analysis and account and control for them.
3   Q.   Yeah.  You don't know what costs were
4   incurred by the University as a result of
5   COVID-19, correct?
6   A.   As a memory quiz, no, I do not have that
7   information memorized.
8   Q.   No, I'm not asking as a memory quiz.  Did
9   you include that as part of your report or
10  calculation?
11  A.   To the extent that any such costs
12  influenced the tuition that was set by
13  University of Delaware, yes, I have included
14  that in the use of the range of real-world,
15  market-based prices.
16  Q.   Well, it couldn't have been included in
17  the cost set because you used the tuition
18  amount for the school year before COVID
19  erupted, right?
20  A.   I agree with you that COVID was not an
21  element at the time the bargain was struck.
22  Q.   COVID costs could not have been then an
23  element either, right?
24  A.   They were not in existence at the time of
25  the bargain.

Page 159

1   Q.   So then they could not have been part of
2   your calculation, correct?
3   A.   Like I said, to the extent that anything
4   had an impact, it's controlled by the use of
5   the real-world, market-based prices.  If you're
6   saying that it didn't have an impact on prices
7   in the real world, then it didn't have an
8   impact on prices in the but-for world that I
9   model holding all of that constant.
10  Q.   I don't know what any of that means.  I'm
11  just saying that you used the tuition amount at
12  the beginning of the school year and obviously
13  there weren't known COVID costs at that time,
14  right?
15  A.   Again, we are modeling damages at the time
16  and point of first sale where that is where the
17  damages occur.  I agree with you that COVID was
18  not extant at that time and that all costs of
19  any kind, to the extent that they did impact
20  prices, are controlled for through the use of
21  the range of real-world, market-based prices in
22  the conjoint.
23  Q.   Do you know in the $55 million and change
24  in paragraph 47 that you deducted whether that
25  is institutional aid or other aid?

Page 160

1   A.   Again, I understand that there is
2   voluminous data that speaks to that, but I
3   don't have that memorized here today.
4   Q.   Do you believe you captured all aid in
5   that number?
6   A.   Based on what was represented to me, it
7   reflects all of the aid provided by the
8   University of Delaware.
9   Q.   And, again, just to be clear, represented
10  to you by plaintiffs' counsel?
11  A.   Correct.
12  Q.   Paragraph 33 of your report, you have a
13  phrase in there that says "...it would be
14  antithetical to the concept of class definition
15  to suggest that the quantity supplied be
16  anything other than the actual number of
17  students enrolled by Defendant."
18      Do you see that?
19  A.   Yes.
20  Q.   Okay.  Maybe you already did, but tell me
21  what that means.
22  A.   There are two ways that you can look at
23  it, but it's the same idea.  And yes, we have
24  talked about it already today.  If I'm trying
25  to determine the amount of value that class

Page 161

1   members did or didn't receive, I cannot run a
2   model that shows that, for example, some class
3   members never purchased at all.  In fact, if
4   you just do the logical conclusion, the only
5   way that a student could receive value from the
6   University of Delaware was to be enrolled and
7   be a student at the University of Delaware.
8   And if you run a model that says that ten
9   percent or 25 percent or 50 percent of the
10  people wouldn't be enrolled, then those people
11  could not possibly receive any value from the
12  University.  And I'm not going to try and
13  suggest that anyone here is due a full refund.
14  They're only due 15 percent on the
15  conjoint-based model.  And that's because those
16  people did receive some value while they were
17  at the University, and the conjoint controls
18  for that.  But you can't run a model that says
19  those people must have received some value if
20  they don't receive anything in the model.  It
21  doesn't make sense.
22  Q.   And when you are calculating real-world
23  prices, is it important to take into account
24  federal aid that's received?
25  A.   No.  Federal aid is just a loan that

41 (Pages 158 - 161)

Page 182

1 that people might consider that were not
2 included in the Gaskin conjoint, because he has
3 followed the principles of conjoint design that
4 would tell you not to put the kitchen sink into
5 the survey design.
6 Q. Do you agree that there are more factors
7 that are taken into account for why someone
8 might select a university than to select a car
9 in your example?
10 A. Do I think there are more factors about a
11 university than in a car? I'm not sure that
12 that's generalizable.
13 Q. You don't agree that there are more
14 factors that come into play as to why someone
15 selects a university as opposed to why someone
16 picks a car?
17 A. I don't believe there's a generalizable
18 answer to that question.
19 Q. How about in order of magnitude, you're
20 comparing the car situation to the university
21 situation, are cars frequently sold at
22 50 percent list price?
23 A. They can be.
24 Q. Are they frequently sold at that list
25 price?

Page 183

1 A. Again, there's no generalizable data that
2 would say one way or the other. That's a
3 circumstance that may or may not happen given
4 any particular automobile or set of
5 circumstances.
6 Q. Do you know what discount ordinarily
7 applies in the automobile context?
8 A. There's no one discount.
9 Q. Do you know what discount ordinarily
10 applies in a university context for tuition?
11 A. Again, I would say there is no single
12 discount.
13 Q. Is it the case that sometimes students
14 receive free tuition, free rides to go to a
15 university?
16 A. I have heard of that happening, yes.
17 Q. And do you know of any situations where
18 someone gets a free car?
19 A. There's certainly ways in which the amount
20 that they pay has been reduced to zero. I've
21 seen that, yes.
22 Q. In what context?
23 A. They may have a trade-in or a dealer
24 credit or financing or some combination of all
25 of those things.

Page 184

1 Q. Well, that's an offset for a payment,
2 that's not what they're actually charged,
3 right?
4 A. Oh, your words, not mine, but okay. Yes,
5 they can be offsets for payment.
6 Q. Right. So my question to you is that in
7 the university context sometimes a student is
8 charged nothing. Have you ever seen a
9 situation where a car is -- where a consumer is
10 charged zero for a car?
11 A. I have seen datasets that show that people
12 are charged zero for cars.
13 Q. And that's what you just described in
14 terms of a trade-in?
15 A. No. I mean, normally when I study cars I
16 get a spreadsheet that has 300,000 transactions
17 in it, so I don't know the facts and
18 circumstances behind every one.
19 Q. But it's your testimony that you've seen
20 situations where a consumer is charged zero for
21 a car?
22 A. That would be what is apparent in the
23 data, yes.
24 Q. Are you familiar with the University's
25 academic calendar for spring of 2020?

Page 185

1 A. I have looked at two versions of the
2 calendar that are referenced as being attached
3 to the Robin Morgan deposition. Those are the
4 things that I'm familiar with as it relates to
5 the calendar from this case.
6 Q. And in your report at the bottom of
7 page 11 beginning with page -- sorry,
8 paragraph 44, you say that you determined there
9 were 74 academic days slated for the spring
10 2020 semester, is that right?
11 A. Yes.
12 Q. How did you go about determining there
13 were 74 academic days slated for that semester?
14 A. I looked at the calendar and understood
15 the number of weeks that were shown in the
16 calendar and subtracted from the total of weeks
17 times five days, things like -- sorry. I
18 subtracted from the total number of days
19 weekends, spring break days, days that were
20 not -- days that were not full weeks like at
21 the end where I think it ends on a Thursday,
22 those sorts of things.
23 Q. Is that calculation, the tabulation you
24 just described, captured anywhere?
25 A. The counts should be reflected in the

47 (Pages 182 - 185)

Page 210

1    MR. ARISOHN:  Nothing from
2  plaintiffs.
3    MR. TAYLOR:  I take it that you
4  don't have any questions today?
5    MR. ARISOHN:  I do not.
6    THE VIDEOGRAPHER:  We are off the
7  record at 3:31 p.m., and this concludes today's
8  testimony given by Colin Weir.  Total number of
9  media units used was four and will be retained
10  by Veritext.
11    (Deposition concluded at 3:31 p.m.)
12    ****************
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 211

1    REPORTER'S CERTIFICATE
2
  STATE OF MINNESOTA  )
3    ) ss.
  COUNTY OF HENNEPIN  )
4
5    I hereby certify that I reported the remote
  deposition of Colin B. Weir on Friday,
6  August 19, 2022 in Maple Grove, Minnesota, and
  that the witness was by me first duly sworn to
7  tell the whole truth;
8    That the testimony was transcribed by me
  and is a true record of the testimony of the
9  witness;
10    That the cost of the original has been
  charged to the party who noticed the deposition,
11  and that all parties who ordered copies have been
  charged at the same rate for such copies;
12
    That I am not a relative or employee or
13  attorney or counsel of any of the parties, or a
  relative or employee of such attorney or counsel;
14
    That I am not financially interested in the
15  action and have no contract with the parties,
  attorneys, or persons with an interest in the
16  action that affects or has a substantial tendency
  to affect my impartiality;
17
    That the right to read and sign the
18  deposition transcript by the witness was reserved.
19
    WITNESS MY HAND AND SEAL THIS 31st day of
20  August, 2022.
21
22
23
24  Dana S. Anderson-Larmer
  Notary Public, Hennepin County, MN
25  My commission expires 1/31/2025

Page 212

1  Joshua D. Arisohn, Esquire
2  jarisohn@bursor.com
3    August 31, 2022
4  RE:   Ninivaggi, Penny Et Al v. University Of Delaware
5    8/19/2022, Colin B Weir (#5363898)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-midatlantic@veritext.com
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22    Yours,
23    Veritext Legal Solutions
24
25

Page 213

1  Ninivaggi, Penny Et Al v. University Of Delaware
2  Colin B Weir (#5363898)
3    E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Colin B Weir                    Date
25

54 (Pages 210 - 213)

Page 214

1   Ninivaggi, Penny Et Al v. University Of Delaware

2   Colin B Weir (#5363898)

3           ACKNOWLEDGEMENT OF DEPONENT

4     I, Colin B Weir, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11  _____   _____

12  Colin B Weir            Date

13  *If notary is required

14          SUBSCRIBED AND SWORN TO BEFORE ME THIS

15          _____ DAY OF _____, 20___.

16

17

18          _____

19          NOTARY PUBLIC

20

21

22

23

24

25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

EXHIBIT 3

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF DELAWARE

| | |
|---|---|
| PENNY NINIVAGGI et al., individually and on behalf of all others similarly situated, | Civil Action No. 20-cv-1478-SB |
| *Plaintiffs*, | |
| v. | |
| UNIVERSITY OF DELAWARE, | |
| *Defendant*. | |
| HANNAH RUSSO, individually and on behalf of all others similarly situated, | Civil Action No. 20-cv-1693-SB |
| *Plaintiff*, | |
| v. | |
| UNIVRESITY OF DELAWARE, | |
| *Defendant*. | |

## PLAINTIFFS' INITIAL DISCLOSURES

Plaintiffs Penny Ninivaggi, Michael Ninivaggi, Cailin Nigrelli, James Nigrelli, Todd Mickey, Jake Mickey, and Hannah Russo ("Plaintiffs"), on behalf of themselves and all others similarly situated, pursuant to Federal Rule of Civil Procedure 26(a)(1), serve their Initial Disclosures.

## INTRODUCTION

These Initial Disclosures are based upon information presently known to Plaintiffs and are made without prejudice to producing, during discovery or at trial, information, documentation, or data that are subsequently discovered and determined to be relevant, or a product of ongoing investigation and/or evaluation.

With these Initial Disclosures, Plaintiffs are not identifying documents protected from disclosures by any applicable privilege. Nor do Plaintiffs waive the right to object to Defendant's discovery request on any basis.

Plaintiffs incorporate all individuals identified by all other parties in their Initial Disclosures and reserves the right to depose, and rely upon the testimony of, all such individuals in support of Plaintiffs' claims.

Lastly, Plaintiffs reserve the right to amend and/or supplement these Initial Disclosures at any time.

**A.    The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.**

The following individuals are likely to have discoverable information:

- **Penny Ninivaggi** (contact through counsel). Ms. Ninivaggi has knowledge or information concerning Michael Ninivaggi's attendance at University of Delaware, including the payment of tuition and fees, Michael's contract with Delaware, Michael's courses, and Michael's access to facilities.

- **Michael Ninivaggi** (contact through counsel). Mr. Ninivaggi has knowledge regarding the issues raised in the Complaint including, but not limited to, his contracts with Defendant for on-campus classes and services for the Spring 2020 semester, his payment of tuition and fees (as defined in the Complaint) payments to Defendant for the entire Spring 2020 semester; Defendant's failure to provide the on campus classes and services for which he paid; and Defendant's retention of her funds he paid for the Spring 2020 semester for on-campus classes and other services for which the tuition and Fees were paid.

- **Jake Mickey** (contact through counsel).  Mr. Mickey has knowledge regarding the issues raised

in the Complaint including, but not limited to, his contracts with Defendant for on-campus classes and services for the Spring 2020 semester, his payment of tuition and Fees (as defined in the Complaint) payments to Defendant for the entire Spring 2020 semester; Defendant's failure to provide the on campus classes and services for which he paid; and Defendant's retention of his funds he paid for the Spring 2020 semester for on-campus classes and other services for which the tuition and Fees were paid.

- **Todd Mickey** (contact through counsel). Mr. Mickey has knowledge or information concerning Jake Mickey's attendance at University of Delaware, including the payment of tuition and fees, Jake's contract with Delaware, Jake's courses, and Jake's access to facilities.

- **Cailin Nigrelli** (contact through counsel). Ms. Nigrelli has knowledge regarding the issues raised in the Complaint including, but not limited to, her contracts with Defendant for on-campus classes and services for the Spring 2020 semester, her payment of tuition and Fees (as defined in the Complaint) payments to Defendant for the entire Spring 2020 semester; Defendant's failure to provide the on campus classes and services for which she paid; and Defendant's retention of her funds she paid for the Spring 2020 semester for on-campus classes and other services for which the tuition and Fees were paid.

- **James Nigrelli** (contact through counsel). Mr. Nigrelli has knowledge or information concerning Cailin Nigrelli's attendance at University of Delaware, including the payment of tuition and fees, Cailin's contract with the University of Delaware, Cailin's courses, and Cailin's access to facilities.

- **Hannah Russo** (contact through counsel). Ms. Russo has knowledge regarding the issues raised in the Complaint including, but not limited to, her contracts with Defendant for on-campus classes and services for the Spring 2020 semester, her payment of tuition and Fees (as defined in the

Complaint) payments to Defendant for the entire Spring 2020 semester; Defendant's failure to provide the on campus classes and services for which she paid; and Defendant's retention of her funds she paid for the Spring 2020 semester for on-campus classes and other services for which the tuition and Fees were paid.

- **Defendant, University of Delaware ("Defendant")** (contact through counsel).  Defendant likely has knowledge regarding the issues raised in the Complaint and any of its defenses.

- **Dennis Assanis** (contact through counsel). Dr. Assanis is the President of The University of Delaware. As the leader of the University, Mr. Assanis may have knowledge regarding annual meetings with the Board of Trustees, support of academic programs, and operation of the University, as well as other information relevant to this case.

- **Robin Morgan** (contact through counsel). Dr. Morgan is Defendant's Provost and Chief Academic Officer. Dr. Morgan may have knowledge regarding decision-making authority pertaining to the transition to online learning.  Additionally, she may have information related to academic judgements, communications, as well as other information relevant to this case.

- **John Long** (contact through counsel). Mr. Long serves as Executive Vice President and Chief Operating Officer. Mr. Long may have knowledge regarding budget planning, public safety, human resources, information technology investments, internal audits, as well as other information relevant to this case.

- **Glenn Carter** (contact through counsel). Mr. Carter serves as Defendant's Vice President for Communications and Marketing. Mr. Carter may have knowledge regarding marketing, advertising, communications, decision-making, academic programs, enrollment, and the transition to remote instruction, as well as other information relevant to this case.

- **Sharon Pitt** (contact through counsel). Ms. Pitt serves as Defendant's Vice President for

Information Technology.   Ms. Pitt may have knowledge regarding the transition to remote instruction, announcements, as well as other information relevant to this case.

- **Lynn Okagaki** (contact through counsel). Ms. Okagaki serves as Defendant's Deputy Provost for Academic Affairs. Ms. Okagaki may have knowledge regarding University compliance, academic programs, policies, decisions, and communications regarding admission and enrollment for the 2019-2020 academic year.  Additionally, she may have information regarding the decision and transition to remote instruction, as well as other information relevant to this case.

- **Rodney Morrison** (contact through counsel).  Mr. Morrison serves as Defendant's Vice President for Enrollment Management. Mr. Morrison may have knowledge of University compliance and privacy, budget planning, business services, academic programs, policies, and communications regarding enrollment for the 2019-2020 academic year, as well as other information relevant to this case.

- **Michael Vaughan** (contact through counsel). Mr. Vaughan serves as Defendant's Vice President of Diversity. Mr. Vaughn may have knowledge of policies, decisions, registration, and communication regarding admission and enrollment for the 2019- 2020 academic year, as well as other information relevant to this case.

- **José-Luis Riera,** (contact through counsel). Mr. Riera serves as Defendant's Vice President of Student Life. Mr. Riera may have knowledge relating to University compliance, academic programs, policies, and communications regarding admission and enrollment for the 2019-2020 academic, as well as other information relevant to this case.

- **Unknown Members of Defendant's Board of Trustees** (contact through counsel). Members of Defendant's Board of Trustees may have knowledge regarding day-to-day management of The University of Delaware; administration, contract information, financial information, knowledge

regarding academic programs, policies, transition to remote instruction, announcements, decisions, and communications regarding enrollment for the 2019-2020 academic year, as well as other information relevant to this case.

- To the extent Plaintiffs intend to rely upon expert witnesses, those witnesses will be identified at the appropriate time pursuant to the Scheduling Order.

- Any named witness detailed in Defendant's Rule 26(a) Disclosures.

**B.    A copy of, or a description by category and the location of all documents, data, compilations, and tangible things in the possession, custody or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.**

Counsel for Plaintiffs have copies of Plaintiffs' Spring 2020 Schedules, Plaintiffs' Spring 2020 E-Bills, and information available on Defendant's website that is referenced in the Complaint, including Defendant's undergraduate catalog. Plaintiffs reserve the right to amend this Initial Disclosure and to use any and all documents produced by any other party or non-party in this action or any coordinated action. of, or a description by category and the location of all documents, data, compilations, and tangible things in the possession, custody or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment.

**C.    Computation of any category of damages claimed by the disclosing party making available for inspection and copying under Rule 24 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of the injury suffered.**

On behalf of themselves and the proposed classes, as defined in the Consolidated Complaint, Plaintiffs seek actual damages and equitable relief as the Court finds just and proper, as well as reasonable attorneys' fees and costs.

Plaintiffs cannot provide a precise computation of class-wide damages at this time because

they have not obtained discovery of Defendant.  Plaintiffs reserve the right to supplement this Initial Disclosure on the basis of information obtained during discovery and upon completion of Plaintiffs' ongoing claim evaluation efforts.

> **D.** **Any insurance agreement under which any person carrying on insurance business may be liable to satisfy any part or all of the judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

None known to Plaintiffs.

Dated: October 6, 2021

**CROSS & SIMON, LLC**

*/s/ Christopher P. Simon*
Christopher P. Simon (No. 3697)
Michael L. Vild (No. 3042)
1105 N. Market Street, Suite 901
P.O. Box 1380
Wilmington, Delaware 19801-1380
Tel: (302) 777-4200
Email: csimon@crosslaw.com
        mvild@crosslaw.com

-AND-

**ANASTOPOULO LAW FIRM, LLC**
Eric M. Poulin (*Pro Hac Vice*)
Roy T. Willey, IV (*Pro Hac Vice*)
Blake G. Abbott (*Pro Hac Vice*)
32 Ann Street
Charleston, SC 29403
Tel: (843) 614-8888
Email: eric@akimlawfirm.com
        roy@akimlawfirm.com
        blake@akimlawfirm.com

-AND-

**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**
Robert J. Kriner, Jr. (#2546)
Scott M. Tucker (#4925)
2711 Centerville Rd., Suite 201
Wilmington, DE 19808

Tel: (302) 656-2500

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn
888 Seventh Avenue
New York, NY 10019
Tel: (646) 837-7150
Facsimile: (212) 989-9163
Email: jarisohn@bursor.com

**BURSOR & FISHER, P.A.**
Sarah N. Westcot
2665 S. Bayshore Drive, Suite 220
Miami, FL 33133
Tel: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com

*ATTORNEYS FOR PLAINTIFFS*

# EXHIBIT 4



**Applied Marketing Science, Inc.**
303 Wyman Street, Ste 205
Waltham, MA  02451
+1 7812506300
amsaccounting@ams-inc.com
www.ams-inc.com

## INVOICE

| | |
|---|---|
| BILL TO | |
| Joshua D. Arisohn | |
| Partner, Bursor & Fisher, P.A. | |
| 888 Seventh Avenue | |
| New York, NY  10019 | |

| | |
|---|---|
| INVOICE | 20586 |
| DATE | 06/09/2022 |
| TERMS | Net 30 |

PROJECT
Ninivaggi v U of Delaware

| SERVICES | TOTAL HOURS | HOURLY RATE | AMOUNT |
|---|---|---|---|
| Professional Services Fees, May 2022 | | | |
| P. Yanes Professional Services | | | |
| - Planning & Design | 3 | 475.00 | 1,425.00 |
| - Fieldwork Monitoring & Coordination | 1 | 475.00 | 475.00 |
| C. Blasko Professional Services: | | | |
| - Planning & Design | 22.50 | 365.00 | 8,212.50 |
| G. Atik Professional Services: | | | |
| - Planning & Design | 0.75 | 285.00 | 213.75 |
| - Expert Report Development/Support | 1 | 285.00 | 285.00 |
| K. Ashley Professional Services: | | | |
| - Programming & Testing | 6.25 | 285.00 | 1,781.25 |
| R. Mendizabal Professional Services: | | | |
| - Planning & Design | 11.25 | 285.00 | 3,206.25 |
| - Programming & Testing | 2 | 285.00 | 570.00 |
| S. Schomp Professional Services: | | | |
| - Fieldwork Monitoring & Coordination | 3.50 | 265.00 | 927.50 |
| V. Nesdale Professional Services: | | | |
| - Fieldwork Monitoring & Coordination | 16.50 | 265.00 | 4,372.50 |
| Reimbursable Expenses: | | | |
| - Online Study | | | 426.20 |

BALANCE DUE                                        **$21,894.95**



# Invoice

DATE : 5/9/2022

INVOICE #  **20527**

Joshua D. Arisohn
Partner, Bursor & Fisher, P.A.
888 Seventh Avenue
New York, NY 10019

| TERMS |
|---|
| **Net 30** |

| PROJECT |
|---|

Ninivaggi v U of Delaware

| Services | Total Hours | Hourly Rate | AMOUNT |
|---|---|---|---|
| Professional Services Fees, April 2022 | | | |
|    P. Yanes Professional Services | | | |
|      - Planning & Design | 8.5 | 475.00 | 4,037.50 |
| | | | |
|    C. Blasko Professional Services: | | | |
|      - Planning & Design | 12 | 365.00 | 4,380.00 |
| | | | |
|    R. Mendizabal Professional Services: | | | |
|      - Case Document Review | 0.5 | 285.00 | 142.50 |
|      - Planning & Design | 7.5 | 285.00 | 2,137.50 |
| | | | |
|    S. Schomp Professional Services: | | | |
|      - Fieldwork Monitoring & Coordination | 3.25 | 265.00 | 861.25 |

**Total Due:**   **USD 11558.75**

Fed ID# 04-3035339
For questions on this invoice, call (781) 250-6309

**303 WYMAN STREET, WALTHAM, MA 02451   (781) 250-6300   www.ams-inc.com**



**Applied Marketing Science, Inc.**
303 Wyman Street, Ste 205
Waltham, MA  02451
(781) 250-6300
amsaccounting@ams-inc.com
www.ams-inc.com

# INVOICE

| BILL TO | | INVOICE | 20689 |
|---|---|---|---|
| Joshua D. Arisohn | | DATE | 07/31/2022 |
| Partner, Bursor & Fisher, P.A. | | TERMS | Net 30 |
| 888 Seventh Avenue | | | |
| New York, NY  10019 | | | |

PROJECT
Ninivaggi v U of Delaware

| SERVICES | TOTAL HOURS | HOURLY RATE | AMOUNT |
|---|---|---|---|
| Professional Services Fees, July 2022 | | | |
| P. Yanes Professional Services | | | |
| - Planning & Design | 4 | 475.00 | 1,900.00 |
| - Expert Report Development/Support | 3 | 475.00 | 1,425.00 |
| C. Blasko Professional Services: | | | |
| - Planning & Design | 19 | 365.00 | 6,935.00 |
| - Data Entry/Coding/Analysis | 8 | 365.00 | 2,920.00 |
| - Expert Report Development/Support | 17 | 365.00 | 6,205.00 |
| K. Ashley Professional Services: | | | |
| - Programming & Testing | 0.50 | 285.00 | 142.50 |
| R. Mendizabal Professional Services: | | | |
| - Planning & Design | 2 | 285.00 | 570.00 |
| - Fieldwork Monitoring & Coordination | 3.25 | 285.00 | 926.25 |
| - Data Entry/Coding/Analysis | 7 | 285.00 | 1,995.00 |
| - Expert Report Development/Support | 8.25 | 285.00 | 2,351.25 |
| A. Mishra Professional Services: | | | |
| - Data Entry/Coding/Analysis | 14.50 | 265.00 | 3,842.50 |
| - Expert Report Development/Support | 9.25 | 265.00 | 2,451.25 |
| R. Kelley Professional Services: | | | |
| - Expert Report Development/Support | 5 | 265.00 | 1,325.00 |

S. Schomp Professional Services:

- Fieldwork Monitoring & Coordination                                                8        265.00            2,120.00

Reimbursable Expenses:

- Online Study                                                                                                          6,981.00

BALANCE DUE                            **$42,089.75**



**Applied Marketing Science, Inc.**

303 Wyman Street, Ste 205
Waltham, MA 02451
(781) 250-6300
amsaccounting@ams-inc.com
www.ams-inc.com

# INVOICE

BILL TO
Joshua D. Arisohn
Partner, Bursor & Fisher, P.A.
888 Seventh Avenue
New York, NY 10019

| | |
|---|---|
| INVOICE | 20641 |
| DATE | 07/07/2022 |
| TERMS | Net 30 |

PROJECT
Ninivaggi v U of Delaware

| SERVICES | TOTAL HOURS | HOURLY RATE | AMOUNT |
|---|---|---|---|
| Professional Services Fees, June 2022 | | | |
| P. Yanes Professional Services | | | |
| - Fieldwork Monitoring & Coordination | 12 | 475.00 | 5,700.00 |
| L. Thomas Professional Services: | | | |
| - Programming & Testing | 2 | 265.00 | 530.00 |
| - Data Entry/Coding/Analysis | 4 | 265.00 | 1,060.00 |
| C. Blasko Professional Services: | | | |
| - Planning & Design | 52.50 | 365.00 | 19,162.50 |
| G. Atik Professional Services: | | | |
| - Planning & Design | 0.50 | 285.00 | 142.50 |
| - Expert Report Development/Support | 4 | 285.00 | 1,140.00 |
| K. Ashley Professional Services: | | | |
| - Programming & Testing | 2.50 | 285.00 | 712.50 |
| R. Mendizabal Professional Services: | | | |
| - Planning & Design | 12 | 285.00 | 3,420.00 |
| - Fieldwork Monitoring & Coordination | 5 | 285.00 | 1,425.00 |
| - Data Entry/Coding/Analysis | 1 | 285.00 | 285.00 |
| - Expert Report Development/Support | 3.50 | 285.00 | 997.50 |
| R. Kelley Professional Services: | | | |
| - Planning & Design | 0.50 | 265.00 | 132.50 |

S. Schomp Professional Services:

- Fieldwork Monitoring & Coordination | 11 | 265.00 | 2,915.00

V. Nesdale Professional Services:

- Fieldwork Monitoring & Coordination | 8.75 | 265.00 | 2,318.75

Reimbursable Expenses:

- Online Study | | | 10.00

---

BALANCE DUE | **$39,951.25**

EXHIBIT 5

**Steven P. Gaskin, LLC**

52 North Newcastle Road
Newcastle, ME  04553 US
+1 7818123226
steven_gaskin@outlook.com



## INVOICE

| BILL TO | | INVOICE | 1260 |
|---|---|---|---|
| Mr. Joshua Arisohn | | DATE | 05/02/2022 |
| Bursor & Fisher, P. A. | | TERMS | Net 30 |
| 888 Seventh Ave. | | DUE DATE | 06/01/2022 |
| New York, NY  10019 USA | | | |

| DATE | ACTIVITY | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|---|
| 05/02/2022 | Planning & Design | Univ. of Delaware - Planning & Design | 2.25 | 800.00 | 1,800.00 |

| | | |
|---|---|---|
| | PAYMENT | 1,800.00 |
| | **BALANCE DUE** | **$0.00** |
| | | **PAID** |

**Exhibit
SG 0002**

**Steven P. Gaskin, LLC**

52 North Newcastle Road
Newcastle, ME  04553 US
+1 7818123226
steven_gaskin@outlook.com



## INVOICE

BILL TO
Mr. Joshua Arisohn
Bursor & Fisher, P. A.
888 Seventh Ave.
New York, NY  10019 USA

| | | | | | |
|---|---|---|---|---|---|
| INVOICE | 1272 |
| DATE | 06/01/2022 |
| TERMS | Net 30 |
| DUE DATE | 07/01/2022 |

| DATE | ACTIVITY | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|---|
| 06/01/2022 | Retainer | Ninivaggi et al. v. University of Delaware - Retainer | 1 | 10,000.00 | 10,000.00 |
| 06/01/2022 | Planning & Design | Univ. of Delaware - Planning & Design | 1 | 800.00 | 800.00 |

| | | |
|---|---|---|
| PAYMENT | | 10,800.00 |
| BALANCE DUE | | **$0.00** |
| | | **PAID** |

**Exhibit
SG 0003**

**Steven P. Gaskin, LLC**

52 North Newcastle Road
Newcastle, ME  04553 US
+1 7818123226
steven_gaskin@outlook.com



## INVOICE

| BILL TO | | INVOICE | 1283 |
|---|---|---|---|
| Mr. Joshua Arisohn | | DATE | 07/01/2022 |
| Bursor & Fisher, P. A. | | TERMS | Net 30 |
| 888 Seventh Ave. | | DUE DATE | 07/31/2022 |
| New York, NY  10019 USA | | | |

| DATE | ACTIVITY | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|---|
| 07/01/2022 | Retainer | Ninivaggi et al. v. University of Delaware - Declaration, Survey Fielding | 6.75 | 800.00 | 5,400.00 |

| | PAYMENT | 5,400.00 |
|---|---|---|
| | BALANCE DUE | **$0.00** |
| | | **PAID** |

**Exhibit**
**SG 0004**

**Steven P. Gaskin, LLC**

52 North Newcastle Road
Newcastle, ME  04553 US
+1 7818123226
steven_gaskin@outlook.com



## INVOICE

| BILL TO | | INVOICE | 1293 |
|---|---|---|---|
| Mr. Joshua Arisohn | | DATE | 08/01/2022 |
| Bursor & Fisher, P. A. | | TERMS | Net 30 |
| 888 Seventh Ave. | | DUE DATE | 08/31/2022 |
| New York, NY  10019 USA | | | |

| DATE | ACTIVITY | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|---|
| 08/01/2022 | Analysis & Report | Univ. of Delaware - Analysis & Report | 6.25 | 800.00 | 5,000.00 |

| | BALANCE DUE | **$5,000.00** |
|---|---|---|

