# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PENNY NINIVAGGI et al., individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNIVERSITY OF DELAWARE,<br><br>*Defendant*. | Civil Action No. 20-cv-1478-SB |

## REPLY IN FURTHER SUPPORT OF DEFENDANT'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF <u>STEVEN P. GASKIN</u>

*Of Counsel:*
**SAUL EWING LLP**

Jonathan A. Singer (admitted *pro hac vice*)
1001 Fleet Street, 9th Floor
Baltimore, MD 21202
(410) 332-8690
jon.singer@saul.com

**SAUL EWING LLP**

James D. Taylor, Jr. (#4009)
Marisa R. De Feo (#6778)
Jessica M. Jones (#6246)
Juliana G. Clifton (#6980)
1201 N. Market Street, Suite 2300
Wilmington, DE 19801
(302) 421-6800
james.taylor@saul.com
marisa.defeo@saul.com
jessica.jones@saul.com
juliana.clifton@saul.com

*Counsel for University of Delaware*

Dated: November 30, 2022

40840424.8

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................. 1

ARGUMENT .................................................................................................................................. 1

    I.    PLAINTIFFS' OPPOSITION CONFIRMS THAT GASKIN'S MADE-FOR-LITIGATION HYPOTHETICAL MODEL IS DISCONNECTED FROM REALITY .................................................................................................................. 1

    II.    GASKIN'S MEASUREMENT OF DAMAGES IS INCOMPATIBLE WITH PLAINTIFFS' THEORY OF LIABILITY AND OTHER APPELLATE COURTS AGREE ............................................................................................................... 2

    III.    GASKIN'S OPINION IS UNRELIABLE BECAUSE IT GENERATES A WIDE RANGE OF ALLEGED OVERPAYMENT PERCENTAGES AND IS INACCURATE ONE-THIRD OF THE TIME ...................................................... 3

        a.    Gaskin Ignored the Varying Overpayment Percentages His Conjoint Created ............................................................................................................... 4

        b.    Gaskin Admits That the Hypothetical Model is Inaccurate One-Third of the Time ...................................................................................................... 5

    IV.    PLAINTIFFS' OPPOSITION CONFIRMS THAT GASKIN'S OPINIONS ARE UNRELIABLE AND FATALLY FLAWED AND THUS WILL NOT AID THE COURT AT CLASS CERTIFICATION ................................................................ 5

    V.    GASKIN IS NOT QUALIFIED AND HIS OPINION SHOULD BE EXCLUDED ............................................................................................................................. 9

        a.    Gaskin's Testimony Regarding His "Supervision" of AMS Contradicts Plaintiffs' Opposition ............................................................................................ 9

        b.    Plaintiffs Admit Gaskin Has Never Performed a Conjoint to Assess Tuition and Rely Solely on Overturned Cases to Establish Conjoint Analyses Have Been Accepted in Tuition Litigation .............................. 10

        c.    If Gaskin Were Familiar with the Facts and Documents, He Potentially Could Have Created a More Reliable Hypothetical Model ...................... 10

CONCLUSION ............................................................................................................................. 11

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ............................................................................................................. 1

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ........................................................................................................... 3

*In re: Macbook Keyboard Litig.*,
   2021 WL 1250378 (N.D. Cal Apr. 5, 2021) ....................................................................... 4

*Smith v. Ohio State Univ.*,
   No. 22AP-125 (Ohio Ct. App. Nov. 17, 2022) ................................................................... 2

*Tumlinson v. Advanced Micro Devices, Inc.*,
   81 A.3d 1264 (Del. 2013) ................................................................................................... 4

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
   500 F. Supp. 3d 940 (N.D. Cal. 2020), *aff'd sub nom., Schell v. Volkswagen*
   *AG*, 2022 WL 187841 (9th Cir. Jan. 20, 2022) .................................................................. 5

**OTHER AUTHORITIES**

RULE 702 ................................................................................................................................... 1

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Defendant, the University of Delaware (the "University") offers the following memorandum of law in support of its Motion to Exclude the Testimony of Steven P. Gaskin ("Gaskin") and in reply to Plaintiffs' Memorandum of Law in Opposition to the University's Motion to Exclude Gaskin.  In their opposition, Plaintiffs fail to meet their burden to prove that the challenged opinions of Gaskin are reliable and will help the Court understand the evidence or resolve factual issues at class certification, as Rule 702 and *Daubert* require.

**ARGUMENT**

I. **PLAINTIFFS' OPPOSITION CONFIRMS THAT GASKIN'S MADE-FOR-LITIGATION HYPOTHETICAL MODEL IS DISCONNECTED FROM REALITY**

"The first step in a damages study is the translation of the **legal theory of the harmful event** into an analysis of the economic impact **of that event**." *Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013) (emphasis in original) (quoting Federal Judicial Center, *Reference Manual on Scientific Evidence* 432 (3d ed. 2011)).  Gaskin does not satisfy this critical step because he failed to tie his alleged damages theory to the onset of COVID-19 and instructed survey respondents to **completely ignore the impact of the COVID-19 pandemic.**  (D.I. 104 Ex. 2 at p. 21, n. 36).

He did this to avoid a stark reality—Fall 2020 data establishing there was **no change in students' willingness to pay.**  Plaintiffs' only response is that "[c]ircumstances were much different for students enrolling in Fall 2020." (D.I. 112 at p. 5).  Yet, as is telling, Plaintiffs do not cite any case or treatise where relevant real world data should be blatantly ignored in favor of a hypothetical "but for world."  Nor could they, because it does not exist.  Likewise, Plaintiffs' attempt to distinguish *Brown* is unavailing and underscores the fundamental flaws with conjoint analyses: that if they are not carefully designed and constructed, they may result in irrelevant and unhelpful data.  (D.I. 112 at p. 6).  That is exactly what occurred here: Gaskin's conjoint analysis

1

included a significant portion of respondents (28.5% of 994 total respondents) who preferred virtual classes, no access to campus to in-person classes, and no campus access. (D.I. 104 Ex. 5 at p. 65). This flatly contradicts Plaintiffs' conclusion that all putative class members were overcharged for the portion of the Spring 2020 completed via virtual instruction. (*Id.*).

II. **GASKIN'S MEASUREMENT OF DAMAGES IS INCOMPATIBLE WITH PLAINTIFFS' THEORY OF LIABILITY AND OTHER APPELLATE COURTS AGREE**

In their Opposition, Plaintiffs argue (without any caselaw or authority) that Gaskin's damages model that measures damages from the time and point of sale (***when students enrolled for Spring 2020 classes***) is compatible with their theory of liability (***when students were damaged two months later—mid-semester*** when the University allegedly breached an implied contract by transitioning to virtual instruction due to the COVID-19 pandemic). Plaintiffs do not explain: (1) how or why these two vastly different points in time are consistent; (2) why survey respondents were instructed to ignore the COVID-19 pandemic; or (3) why damages should be measured ***prior*** to any alleged breach. Nor do Plaintiffs acknowledge the requirements set forth in *Comcast* and *In re POM Wonderful LLC* that "plaintiff's damages case must be consistent with its liability case" and must measure only those damages attributable to that theory.

The only case that Plaintiffs cite is *Smith v. The Ohio State University* that was ***recently reversed*** by the Ohio Court of Appeals. (Opp. Br. at p. 8; *Smith v. Ohio State Univ.*, No. 22AP-125 (Ohio Ct. App. Nov. 17, 2022). In that opinion, the court raised considerable doubts as to Gaskin and stated:

> Second, the trial court did not review the evidence and arguments raised by OSU contesting proof of injury. OSU argued that, having not conducted any portion of the market survey or analysis, Gaskin admitted he could not opine to a reasonable degree of scientific certainty that OSU students were injured in this case. ***Moreover, according to Gaskin's report and testimony, the methodology presented to potentially answer the question of whether the class suffered any***

2

> *common injury due to the campus closure and switch to remote classes excludes any survey questions or consideration of market preferences during an emergency such as the pandemic that forced the closure here. OSU submitted an expert report that made this point, as well as evidence that students paid the same for in-person and online learning and that the in-person teaching modality carried the possibility of substantial remote instruction even in a normal semester.*
>
> …
>
> The trial court, in assuming an injury from the fact of closure and termination of in-person classes, did not assess these complicated and difficult considerations, particularly as they relate to whether Smith presented *any* common evidence—or even a method to possibly determine—that class members suffered an economic injury considering the effect of the pandemic.

*Id.* at ¶¶ 45-46. The same is true here. Gaskin's intentional circumvention of the COVID-19 pandemic in his conjoint analysis renders his opinion incompatible with Plaintiffs' theory of liability and therefore unreliable and inadmissible.

### III. GASKIN'S OPINION IS UNRELIABLE BECAUSE IT GENERATES A WIDE RANGE OF ALLEGED OVERPAYMENT PERCENTAGES AND IS INACCURATE ONE-THIRD OF THE TIME

Plaintiffs ask this Court to ignore the blatant errors in Gaskin's methodology because they "go to the weight and not admissibility of [expert] opinions." (D.I. 112 at p. 8). But, *Daubert* **requires** trial courts to apply a reliability analysis to an expert's opinion. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993). The role of the court is to evaluate whether the methodology utilized by the expert is reliable, *i.e.*, whether, when correctly employed, that methodology leads to testimony helpful to the trier in fact. *See Daubert*, 509 U.S. at 591–93 (noting that the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue" and that the trial court's determination "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue"). One of the several factors

in evaluating whether a particular methodology is reliable is "***the known or potential rate of error***." *Daubert*, 509 U.S. at 594 (emphasis added). Plaintiffs cannot meet their burden to establish that Gaskin's methodology is reliable because: (1) Gaskin arbitrarily selected an overpayment percentage from the wide range generated by the Hypothetical Model; and (2) the Hypothetical Model is inaccurate one-third of the time.

### a. Gaskin Ignored the Varying Overpayment Percentages His Conjoint Created

First and foremost, Plaintiffs inaccurately state that "Defendant has not met its burden of proving Gaskin's methodology of determining overpayment percentages is unreliable." (Opp. at p. 9). However, it is **Plaintiffs' burden** to demonstrate the reliability of their expert by a preponderance of the evidence. *Tumlinson v. Advanced Micro Devices, Inc.*, 81 A.3d 1264 (Del. 2013). They have not done so for the following reasons.

*First,* Plaintiffs ask this Court to ignore Wilner's critique that the Hypothetical Model yielded a range of potential overpayment percentages simply because Gaskin "never obtained, and [has] never reported, the overpayment percentages" that the model generated. (D.I. 112 at p. 9). Turning a blind eye on a known weakness to the conjoint analysis does not make it reliable. The only case that Plaintiffs cite to for this argument is *In re: Macbook Keyboard Litig.*, 2021 WL 1250378 (N.D. Cal Apr. 5, 2021) for the general proposition that conjoint analyses are well-recognized. Perhaps, but not in the higher ed context. Moreover, that case is inapposite because it did not involve an analysis of overpayment percentages, let alone generate a wide, unreliable range of percentages from which the expert arbitrarily chose. 2021 WL 1250378 at *5. More importantly, plaintiffs in *Macbook* relied on the expert report at an earlier stage in the proceedings merely for "***the conclusion that a [choice based analysis] offers a workable method to calculate class-wide damages***" under the facts of that case, before the analysis was performed. *Id.*

4

Conversely, here, the subject *Daubert* motions on Gaskin and Weir attack the completed Hypothetical Model as unreliable and methodologically flawed in this case based on, *inter alia,* the range of overcharge percentages it generated (15.2% to 56.7%). Again, Gaskin's model was precluded in *Volkswagen* (which Plaintiffs fail to acknowledge or address) for this very reason, as it should be again here. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.,* 500 F. Supp. 3d 940, 950 (N.D. Cal. 2020) (excluding Gaskin's opinion because the conjoint analysis created radically different overcharge percentages (ranging from 8.5% to 60.5%)), *aff'd sub nom., Schell v. Volkswagen AG,* 2022 WL 187841 (9th Cir. Jan. 20, 2022).

*Second,* Plaintiffs suggest alternative methods that could have been used by Gaskin, but were not. (D.I. 112 at p. 8). Gaskin's pivot to alternative methods and varying results (19.0% and 18.1%) further underscores the unreliability of Gaskin's purported testimony and the differing, unscientific overpayment percentages that can be arbitrarily selected. (D.I. 104 Ex. 5 at p. 63, Figure 8).

### b. Gaskin Admits That the Hypothetical Model is Inaccurate One-Third of the Time

Crucially, Gaskin admits that his hit rate of 65% does not meet Orme's 70-85% requirement. (D.I. 112 at p. 10-11). Plaintiffs again mistake who carries the burden of proof—it is Plaintiffs' burden to establish that a model that is inaccurate one-third of the time is nonetheless reliable. It is not.

## IV. PLAINTIFFS' OPPOSITION CONFIRMS THAT GASKIN'S OPINIONS ARE UNRELIABLE AND FATALLY FLAWED AND THUS WILL NOT AID THE COURT AT CLASS CERTIFICATION

In its Motion to Exclude Gaskin, the University describes the shortcomings of Gaskin's conjoint analysis. Plaintiffs ask this Court to ignore these flaws as they "go to the weight and not the admissibility of Gaskin's testimony." (D.I. 112 at p. 11). Not so.

- **Plaintiffs Ignore Gaskin's Testimony Establishing that He Failed to Account for Supply-Side Factors.** In its Opening Brief, the University cited Gaskin's admission that "how the University actually sets its tuition pricing" is "outside the scope of [his] assignment" as he merely "ask[ed] students about the change in market value according to them." (D.I. 104 at p. 13). Plaintiffs ignore this admission in their Opposition, instead arguing only that Gaskin's purported use of alleged real world prices and allegedly holding enrollment constant is enough to meet their burden. (D.I. 112 at p. 11-14). This argument, however, is nothing more than an attempt to distract the Court from what Gaskin actually did, *by his own admission*—simply ask students how much less they wanted to pay for tuition after the transition to virtual learning. Overwhelming the Court with citations to other cases, where Gaskin performed different calculations in different contexts for different "products" yielding different results, does not change what Gaskin admitted to doing in this case.

Moreover, Plaintiffs' reliance on Gaskin's own conclusory assertions that he used "actual market tuition list prices," and that he held enrollment constant, does not make it so. (D.I. 112 at p. 11-14). Plaintiffs do not cite any actual choice task within the Hypothetical Model showing that the purported "actual price" associated with any hypothetical university and accompanying hypothetical attributes actually matched any real world university offering to even arguably account for supply side considerations. *Id*. Nor do Plaintiffs show or explain how Gaskin actually modeled the supply "which already existed during the class period." *Id*. Ignoring testimonial admissions and citing their experts' self-serving conclusory statements in their reports is insufficient to withstand *Daubert* scrutiny.

- **The Hypothetical Model Included Unrepresentative Survey Respondents.** In its Opening Brief, the University set forth five reasons why Gaskin's survey respondents were unrepresentative of University students and the putative class. (D.I. 104 at p. 15). Plaintiffs do not respond to these criticisms; do not acknowledge or attempt to distinguish the cases identified by the University that require an appropriate target population to be selected; and do not explain why in other tuition refund class actions, Gaskin designed two separate conjoint analyses to account for differences between in-state and out-of-state tuition prices. *Id.* Gaskin's "say so" is enough according to Plaintiffs. It is not.

- **Plaintiffs Agree that Gaskin's "Closure of the University Campus" Definition Includes Fees.** Plaintiffs also confirm that Gaskin's opinion is limited to tuition, not fees. But how can a definition which explicitly *includes fees* ("access to campus facilities, student activities, health services, and other opportunities") *measure only tuition damages*? It cannot.

- **The Hypothetical Model Implies Respondents Were Enrolling as First Time Students.** In a game of semantics, Plaintiffs argue that Gaskin's instruction to respondents to consider you are "enrolling as an undergraduate" did not explicitly instruct them to assume they were first-time students. If experts cannot understand the meaning of this instruction, neither would respondents. This is critical because: (1) economists have found that "price responsiveness for first time students is more price sensitive compared to students that have already enrolled;" and (2) students would bear monetary and non-monetary transfer costs if they selected another university after their enrollment. (D.I. 104 Ex 5 at p. 32-33).

- **Plaintiffs Argue that the "Abysmally Low" Response Rate Does Not Have Any Impact on the Hypothetical Model.** This is untrue. The Reference Manual on Survey Research states that "[a] large nonresponse rate warns of bias" and *requires* the surveyor to provide "[e]vidence [t]hat [n]on-response [d]id [n]ot [b]ias the [r]esults of the [s]urvey." (D.I. 104 at p. 71.) Gaskin faults the "abysmally low" response rate on the University, yet failed to do what he must: provide evidence that the 0.1% response rate did not result in biased survey results.

- **Plaintiffs Ask This Court to Blindly Accept Pre-Tests Conducted by a Third-Party.** In their Opposition, Plaintiffs baldly state that Gaskin performed "appropriate pretests" and that free form interviews are permissible. (D.I. 112 at p. 16). But neither Gaskin nor Plaintiffs (nor the University or the Court, for that matter) know if the pre-tests were appropriate since Gaskin only attended 2-3 of the 20 conducted. (D.I. 104 Ex. 1 at 174:10-20). Moreover, Gaskin could not identify what questions the respondents were asked or what answers were given. (D.I. 104 Ex. 1 at 176-181). This contradicts Orme's instruction that a pre-test should be used as a screening task to identify the most relevant attributes "especially for high-involvement products and services described by many attributes," like colleges and universities. (D.I. 104 Ex. 5 at p. 38).

- **Gaskin's Self-Selected Competitors to the University Are Not Appropriate.** Plaintiffs admit that Gaskin self-selected the alleged competitor universities without any factual basis to establish that actual, real-world University students considered these universities as competitors. (D.I. 112 at p. 17). In fact, of the four Named Plaintiffs, only one applied to any of the schools Gaskin included, and the other three Named

8

Plaintiffs applied to none of them. (D.I. 104 Ex. 5 at 3-4). It is Plaintiffs' burden to establish the Hypothetical Model is reliable and Plaintiffs have failed to do so.

- **The Hypothetical Model Should Have Included Important Attributes Considered by Students.** Plaintiffs suggest that just because no conjoint analysis could possibly include every product attribute, it was appropriate for Gaskin to ignore important attributes that students consider. (D.I. 112 at p. 17-18). Gaskin did so without any prior experience in higher education. (D.I. 104 Ex. 1 at 42:11-44:2). Lastly, Plaintiffs provide no response to the cases identified by the University on "focalism bias" that likewise require the Hypothetical Model to be excluded.

## V. GASKIN IS NOT QUALIFIED AND HIS OPINION SHOULD BE EXCLUDED

### a. Gaskin's Testimony Regarding His "Supervision" of AMS Contradicts Plaintiffs' Opposition

Faced with the stark reality that ***AMS spent 327.5 hours*** designing, executing, and analyzing the conjoint and Gaskin only worked a ***total of 16.25 hours***, Plaintiffs assert without support that Gaskin "supervised all work by the staff at AMS." Yet, at his deposition, Gaskin was unable to answer simple questions regarding that alleged supervision, such as who at AMS conducted the preliminary pretesting (he could not even recall the names of AMS employees) and said it was "hard to tell exactly what each did." (D.I. 104 Ex. 1 at 16:14-24; 178:2-9). Plaintiffs likewise have no response to *Traharne* and *Balluff*, where experts were excluded because they devoted less than 30 hours to develop their opinion. Here, Gaskin asks the Court to accept that he "fully supervised" AMS ***and*** drafted a 475-page report in a mere 16 hours. (D.I. 104 Ex. 1 at 16:14-24; 178:2-9).

### b. Plaintiffs Admit Gaskin Has Never Performed a Conjoint to Assess Tuition and Rely Solely on Overturned Cases to Establish Conjoint Analyses Have Been Accepted in Tuition Litigation

Plaintiffs do not identify a single instance in which a conjoint analysis was used to assess tuition in higher education in the real world, nor do they identify any treatise or publication that would demonstrate acceptance in the community. Nor could the University's expert. Plaintiffs rely solely upon other class action tuition refund cases pending in Ohio. (D.I. 112 at p. 20). However, the opinions in which Plaintiffs rely has now been ***reversed*** and Gaskin's methodology called into doubt, to say the least. *See Supra Section II __*. Nor do Plaintiffs acknowledge the distinction made by the University to the traditional consumer product cases where Gaskin's conjoint analyses have been accepted.

### c. If Gaskin Were Familiar with the Facts and Documents, He Potentially Could Have Created a More Reliable Hypothetical Model

Plaintiffs' response to the University's criticism with Gaskin's unfamiliarity with the factual background incorrectly faults the University for not explaining "how those documents are relevant to his opinion or what difference it could have possibly made in the design of the survey." (D.I. 112. at p. 20). The University's expert report contains numerous ways in which a mastery of the facts potentially could have led to a more reliable conjoint. (*See generally* D.I. 104 Ex. 5). For example, understanding what other universities the Named Plaintiffs applied to; what attributes they considered when enrolling; or what actually comprised tuition and fees. These documents and client resources were at his fingertips, yet he failed to avail himself in the sixteen hours he dedicated to this matter.

40840424.8

## **CONCLUSION**

For the reasons set forth above and in the University's opening brief, the University requests that the Court grant the University's Motion to Exclude the Expert Testimony of Steven P. Gaskin.

|  |  |
|---|---|
|  | **SAUL EWING LLP** |
|  | /s/ *Marisa R. De Feo* |
|  | James D. Taylor, Jr. (#4009) |
|  | Marisa R. De Feo (#6778) |
|  | Jessica M. Jones (#6246) |
|  | Juliana G. Clifton (#6980) |
| *Of Counsel:* | 1201 N. Market Street, Suite 2300 |
| **SAUL EWING LLP** | Wilmington, DE 19801 |
|  | (302) 421-6800 |
| Jonathan A. Singer (admitted *pro hac vice*) | james.taylor@saul.com |
| 1001 Fleet Street, 9th Floor | marisa.defeo@saul.com |
| Baltimore, MD 21202 | jessica.jones@saul.com |
| (410) 332-8690 | juliana.clifton@saul.com |
| jon.singer@saul.com |  |
|  | *Counsel for University of Delaware* |

Dated: November 30, 2022