## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF DELAWARE

| | |
|---|---|
| MICHAEL NINIVAGGI, JAKE MICKEY and CAILIN NIGRELLI, HANNAH RUSSO, individually and on behalf of all others similarly situated, | Civil Action No. 20-cv-1478-SB |
| *Plaintiffs*, | |
| v. | |
| UNIVERSITY OF DELAWARE, | |
| *Defendant*. | |

## PLAINTIFFS' BRIEF IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**
Robert J. Kriner, Jr. (#2546)
2711 Centerville Road, Suite 201
Wilmington, DE 19808
(302) 656-2500

*Counsel for Plaintiffs*

Dated: December 5, 2022

## **TABLE OF CONTENTS**

**PAGE(S)**

NATURE AND STAGE OF THE PROCEEDINGS ...................................................... 1

SUMMARY OF THE ARGUMENT ........................................................................... 1

I.      UD MADE IN-PERSON CLASSES PART OF THE BARGAIN................................... 2

II.     UD DID NOT PROVIDE STUDENTS WITH IN-PERSON CLASSES FOR THE
        ENTIRE SPRING 2020 SEMESTER............................................................. 7

III.    UD CANCELLED SEVEN DAYS OF CLASSES ......................................... 11

LEGAL STANDARD............................................................................................... 11

ARGUMENT ....................................................................................................... 12

I.      DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS'
        CONTRACT CLAIMS............................................................................ 12

        A.      Plaintiffs Can Prove That They Entered Into An Implied-In-Fact Contract With
                UD For In-Person Classes And Access To The UD Campus ............................... 12

        B.      Plaintiffs Can Prove Damages .............................................................. 14

        C.      UD's Impossibility Defense Fails........................................................ 16

II.     DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS'
        UNJUST ENRICHMENT CLAIMS .............................................................. 18

CONCLUSION...................................................................................................... 20

i

## <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

**CASES**

*360Heros, Inc. v. Gopro, Inc.*,
   2022 WL 1746854 (D. Del. May 31, 2022) .................................................................. 12

*Arredondo v. Univ. of La Verne*,
   2022 WL 3222376 (C.D. Cal. Aug. 2, 2022) ............................................................... 14

*Doe v. Emory Univ.*,
   2021 WL 358391 (N.D. Ga. Jan. 22, 2021) ................................................................. 14

*Duncan v. Theratx, Inc.*,
   775 A.2d 1019 (Del. 2001) .......................................................................................... 15

*Durbeck v. Suffolk Univ.*,
   547 F. Supp. 3d. 133 (D. Mass. 2021) ........................................................................ 14

*Jutrowski v. Township of Riverdale*,
   904 F.3d 280 (3d Cir. 2018) ........................................................................................ 11

*Metcap Securities LLC v. Pearl Senior Care, Inc.*,
   2009 WL 513756 (Del. 2009) ...................................................................................... 20

*Nat'l State Bank v. Fed. Rsrv. Bank of N.Y.*,
   979 F.2d 1579 (3d Cir. 1992) ...................................................................................... 12

*Nemec v. Shrader*,
   991 A.2d 1120 (Del. 2010) .......................................................................................... 20

*Ninivaggi v. Univ. of Delaware*,
   555 F. Supp. 3d 44 (D. Del. 2021) ...................................................... 2, 12, 13, 14

*Omori v. Brandeis Univ.*,
   2022 WL 10511039 (D. Mass. Oct. 18, 2022) ................................................... 14, 18

*Randall v. Univ. of the Pac.*,
   2022 WL 1720085 (N.D. Cal. May 28, 2022) ............................................................ 13

*Ridley v. Bayhealth Med. Ctr., Inc.*,
   2018 WL 1567609 (Del. Super. Ct. Mar. 20, 2018) ................................................... 12

*Rosado v. Barry Univ. Inc.*,
   499 F. Supp. 3d 1152 (S.D. Fla. 2020) ....................................................................... 19

*Ryan v. Temple Univ.*,
   535 F. Supp. 3d 356 (E.D. Pa. 2021) .......................................................................... 13

*Schaefer Lincoln Mercury v. S. Carlton Jump, Jr.*,
    1987 WL 642758 (Del. Com. Pl. June 8, 1987) ........................................................ 17

**RULES**

Fed. R. Civ. P. 56(a) ........................................................................................................ 11

**OTHER AUTHORITIES**

Restatement (Second) of Contracts.................................................................... 15, 17, 18, 19

Restatement (Third) of Restitution and Unjust Enrichment ........................................... 19

Williston on Contracts (4th ed.).................................................................................... 17

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs Michael Ninivaggi, Jake Mickey and Cailin Nigrelli filed their initial Complaint on August 14, 2020, and Plaintiff Hannah Russo filed her original Complaint on November 18, 2020 (collectively "Plaintiffs").  On August 20, 2021, the Court granted Defendant University of Delaware's  ("Defendant" or "UD") motion to dismiss Plaintiffs' conversion claim and request for punitive damages, but otherwise denied UD's motion to dismiss.  ECF No. 20.  Plaintiffs filed a Consolidated Class Action Complaint on September 3, 2021.  ECF No. 19.  On July 1, 2022, following fact discovery, Plaintiffs moved for class certification.  ECF No. 75.  That motion, along with Defendant's motions to exclude the testimony of experts Steven P. Gaskin and Colin B. Weir, and Plaintiffs' motion to exclude the testimony of expert Benjamin S. Wilner, are currently pending.  ECF Nos. 103, 105, 114.

## SUMMARY OF THE ARGUMENT

1.      Defendant is not entitled to judgment as a matter of law on Plaintiffs' breach of contract claims because Plaintiffs raise a genuine dispute as to the existence of an implied-in-fact contract for in-person classes and access to the UD campus.

2.      Defendant is not entitled to judgment as a matter of law on Plaintiffs' breach of contract claims because Plaintiffs raise a genuine dispute as to the existence of damages.

3.      Defendant is not entitled to judgment as a matter of law on Plaintiffs' breach of contract claims because the defense of impossibility does not apply.

4.      Defendant is not entitled to judgment as a matter of law on Plaintiffs' unjust enrichment claims because, when a contract is unenforceable due to impossibility, the parties are each entitled to restitution for the reasonable value of their partial performance.

## STATEMENT OF FACTS

The University of Delaware was founded in 1743.  Ex. 87[1] (Morgan Dep.) at 102:16-18.

In the 277 years that followed, two things were always true: UD always provided its students

with in-person classes and UD always provided its students with access to its campus.  Ex. 87

(Morgan Dep.) at 104:3-10 ("I know of no semester when we had to do what we did in the spring

of 2020.").  Indeed, for centuries, students and schools have understood that college courses are

taught in person and on campus.  Students "trudge bleary-eyed to their 8 a.m.'s, down caffeine

during all-nighters in the library with their study groups, and run from one campus building to

another in between.  That is what it means to go '*off to* college.' "  *Ninivaggi v. Univ. of

Delaware*, 555 F. Supp. 3d 44, 51 (D. Del. 2021) (original emphasis).  In other words, the course

of dealing between UD and its students, as well as the way that UD markets itself to prospective

students, leaves little doubt that access to these in-person services was an indispensable part of

the bargain between the school and students who paid tuition.

## I.   UD MADE IN-PERSON CLASSES PART OF THE BARGAIN

UD has consistently made it clear that in-person classes are part of the service that it

provides to students.  In fact, as former UD Provost Robin Morgan explained at her deposition,

the University requires its students to spend time on the campus:

> Q.   Does the University of Delaware have an online program?
> [objection]
> A.   Our undergraduate programs are largely in-person. . . .
>       [A]n undergraduate student in the Newark campus has to
>       spend some time on that campus.
> . . .
> Q.   So why does the school have that requirement?
> A.   Because we are not a fully online educational institution.
>       We are a resident campus.  We offer a lot of online
>       opportunities, but our -- we are a resident campus.

---

[1] Unless otherwise noted, citations to exhibits refer to documents attached to the 7/1/2022
Declaration of Joshua D. Arisohn (ECF No. 77).

Ex. 87 (Morgan Dep.) at 111:7-112:7.

Likewise, UD's course search website specifically noted that the vast majority of its classes were to be taught "In Person" as opposed to "Online":



Ex. 63; Ex. 87 (Morgan Dep.) at 122:8-10.  That same course search website also stated what campus and rooms classes would be in.  Exs. 62, 64.  And so, prior to the Spring 2020 semester, when students signed up for their classes, they registered for classes with the location and mode of instruction that that they preferred.  Ex. 87 (Morgan Dep.) at 123:18-23.  And, for Spring 2020, the vast majority of UD students chose in-person classes.  Ex. 68 (UD had 6,422 in-person classes at the start of the Spring 2020 semester).

Other portions of the UD website also made it clear that in-person classes and access to the UD campus were fundamental aspects of what the University would provide its students. The "Experience UD" webpage, geared towards prospective students, states that "[t]he best way to experience the University of Delaware is to see it yourself."  Ex. 1.  UD then boasts that "[t]he Newark campus, called 'absolutely the most gorgeous anywhere' in *The Princeton Review*, features a pleasing mix of elegant landscaping, classic Georgian architecture and modern, state-of-the-art teaching, research and performance spaces."  *Id.*  The University's Statement of Respect & Responsibility commits to ensuring "a welcoming campus culture."  Ex. 2. Defendant's webpage on "The UD Community" touts that "UD is the place to hear world-renowned speakers, enjoy first-rate music and theatre, cheer on Fightin' Blue Hens teams and see

3

compelling exhibits, all of which complement the rich academic experience." Ex. 3.

UD's descriptions for its majors similarly indicated that classes would be taught in-person and/or that they would involve in-person laboratories or other in-person and hands-on experiences.  By way of example:

- "UD's central east coast location and the Lerner College's variety of experience-driven learning opportunities make the UID accounting degree a central part of your successful future in any accounting-related profession."  Ex. 6.

- The Animal biosciences degree has "the added benefits of extensive hands-on animal experience and the opportunity to do laboratory or farm-based research."  Ex. 8.

- "Even before they begin student teaching our candidates complete over 75 hours of classroom experience tutoring, mentoring and teaching adolescents in local secondary schools.  In their senior year candidates participate in a year-long placement in the middle or high school where they will complete their student teaching."  Ex. 9.

- "With a locked-step curriculum, the [Applied Molecular Biology and Biotechnology] program will emphasize hands-on training and practical experience . . . ."  Ex. 10.

- "Beginning in their first year, [Biomedical Engineering] students are exposed to the engineering design process [and] hands-on lab skills . . . ."  Ex. 15.

- "Students gain real-world experience, on our children's campus . . . working with young children from diverse backgrounds and with special needs."  Ex. 20.

- "Undergraduate laboratory experiences give students the chance to practice skills they learn in classes on real devices and to see firsthand the physics that they describe mathematically in classes.  Because of our lab courses, upon graduation our students not only understand the technical world but also have the skills and experience to change it."  Ex. 23.

- "The Patrick T. Harker Interdisciplinary Science & Engineering Laboratory brings together teaching, learning and research in an integrated way, so that research informs the curriculum content and students learn by exploring real-world problems.  The Mechanical Engineering Design Studio is a 3,500 square-foot 'maker-space' for group projects, computer-aided design, prototyping and design validation.  It is a community space that is open 24-7 for mechanical engineering students and their collaborators."  Ex. 25.

- "Our unique, state-of-the-art Center for Experimental and Applied Economics allows students to study, develop, and conduct experiments in behavioral economics."  Ex. 27.

- "Opportunities abound for environmental engineering undergraduates to work with faculty and graduate students in our world-class research program."  Ex. 28.

- "The undergraduate research experiences, hands-on learning in the classroom and close collaboration with environmental experts that you will have in the environmental science major will appeal to employers and graduate programs trying to balance the needs of citizens with environmental sustainability and conservation.  In addition to rigorous traditional classroom and laboratory studies, you will be able to study in locations as close as White Clay Creek—a wild and scenic river whose tributaries begin on campus—to as far as the polar regions or tropical islands while studying abroad during winter session." Ex. 29.

- "You will be part of a program with strong connections between faculty and students in classroom and laboratory settings, on research projects and in club activities.  Invent an ice-cream flavor and perform sensory and market analysis of your new flavor at the UDairy Creamery.  Perform research in one of our food safety labs. . . ." Ex. 31.

- "Our two on-campus learning labs include Vita Nova, a student-run gourmet restaurant, and the Courtyard by Marriott's Lodging Module.  In these labs, you'll gain hands-on, real-world experience of the hospitality industry." Ex. 32.

- "Join our Insect Ecology and Conservation major and experience a hands-on education that will empower you to make a difference in the stewardship of our planet." Ex. 34.

- "Students in the marine science bachelor's program benefit from resources on the main campus in Newark . . . .  With small class sizes, our students can personalize their education and gain hands-on research experience." Ex. 35.

- "Students in [the Medical Laboratory Science] major complete experiential learning through clinical education in laboratories at the program's hospital and private affiliates." Ex. 36.

- "To support the student experience, a state-of-the-art clinical simulation laboratory and resource center allow [Nursing] students to pursue independent and collaborative coursework." Ex. 37.

- "Experiential opportunities are available in and out of the classroom. . . .  Courses include hands-on labs and real world experiences in food service, community and simulated medical settings." Ex. 38.

- "You'll experience in-the-field, hands-on training, applying classroom concepts to solve real OM problems during the capstone course and at multiple plant site trips." Ex. 40.

- "Classes are small and interactive to provide students ample hands-on opportunities to build skills and practice leadership strategies." Ex. 41.

- "Experiential learning is the cornerstone of [the Plant Science] major.  Your collaboration with faculty will include a hands-on approach along with one-on-one interactions both in and out of the classroom. . . .  [O]ur 350-acre outdoor classroom which includes state-of-the-art greenhouses, gardens and research laboratory facilities are located right on our

main campus.  In addition, you will have access to our unique state-of-the-art Delaware Biotechnology Institute. . . ."  Ex. 42.

- "Students work side-by-side with faculty and professionals to address challenges facing communities and organizations using learning from the classroom."  Ex. 45.

- "Clinical observational experiences working with UD's high-level NCAA Division I student-athletes and clinical staff are among the strengths of UD's educational program. . . .  The Health Science brand is alive and well in UD's College of Health Sciences, positioned strategically on the STAR Campus among the contemporary and state-of-the-art health education facilities."  Ex. 46.

Furthermore, a picture is worth a thousand words.  The UD webpages for its numerous

departments show students in physical classrooms, laboratories and studio settings:



Exs. 9-46.  In stark contrast, UD has an entirely separate section of its website for its Online

Program, with a picture of a student in front of his tablet computer:



UD Online Featured Programs

Ex. 60.

UD also holds itself out as a "resident campus."  Ex. 87 (Morgan Dep.) at 102:6-15.

Q.     You use the phrase "resident campus."  What does that

6

> mean?
>
> A. We are a campus that students come to.  They live in our residence halls when they are freshman.  Many of them live in the surrounding community after that.  We are a campus where in-person instruction is the general style, type of instruction that most students want.
>
> . . .
>
> Q. As far as you understand it, is the University of Phoenix online a residential university?
>
> A. No, it's not.

*Id.* at 64:2-18.  Notably, UD has now largely transitioned back to in-person classes because it is "a resident campus" and its "students come [to UD] for the actual experience of living in a campus setting and being able to take their courses in a collegiate setting."  *Id.* at 102:6-15.

In semesters prior to Spring 2020, Plaintiffs had each signed up for and received in-person classes along with access to the UD campus.  Based on all of these facts, Plaintiffs each reasonably "understood that UD was promising to provide [them] with in-person classes." Ninivaggi Decl. (ECF No. 81) ⁋⁋ 4-9; Mickey Decl. (ECF No. 80) ⁋⁋ 4-9; Nigrelli Decl. (ECF No. 82)⁋⁋ 4-9; Russo Decl. (ECF No. 83)⁋⁋ 4-9.

## II. UD DID NOT PROVIDE STUDENTS WITH IN-PERSON CLASSES FOR THE ENTIRE SPRING 2020 SEMESTER

In Spring 2020, in UD's 278th year, things suddenly changed.  On March 11, 2020, in light of the emerging COVID-19 pandemic, UD announced that it was cancelling classes for the next two days and that Spring Break would be moved up a week.  Ex. 48.  Then, on March 13, 2020, UD President Dennis Assanis announced that the school would close the residence halls and that all courses would transition to remote learning for the remainder of the semester.  Ex. 51.  On March 15, 2020, President Assanis extended Spring Break an additional week.  Ex. 52. Accordingly, from March 12, 2020, through to the end of the semester, UD did not provide students with any in-person classes and it denied them access to the campus.  Ex. 87 (Morgan Dep.) at 94:17-95:23 (noting that facilities across the campus, like the library and laboratories,

were inaccessible to students).

UD made it clear that denying students in-person classes and access to the campus was not what the parties had agreed to.  In a speech to the UD community, President Assanis noted "this is definitely not how we envisioned our Spring semester.  We all miss being together with you on a beautiful campus."  Ex. 66.  Provost Morgan was even more blunt, urging faculty to "[c]onsider reducing the number and scope of some assignments in recognition" that "**online learning is not what most of our students have bargained for**."  Ex. 74 (emphasis added).

The transition to online-only classes represented a major change for UD and its students.  Provost Morgan acknowledged that "Spring '20 was, in [her] opinion, a highly unusual semester" in part because UD "converted all of [its] classes to online instruction."  Ex. 87 (Morgan Dep.) at 93:19-94:4 ("I don't know of any other semester like that.  Highly unusual."); Ex. 56 ("This semester was unlike any we've ever had . . . .").  President Assanis noted that "our entire world ha[d] changed dramatically" and that the University "had to take a series of unprecedented measures . . . ."  Ex. 66.  Provost Morgan added that the transition "had some challenges, including comfort level with teaching and learning remotely, some student behavior issues during class sessions, and the loss of one week in the semester due to the one-week extension of spring break."  Ex. 68; Ex. 87 (Morgan Dep.) at 136:16-18 ("Q. And is it true that the transition had some challenges?  A. Oh, yes."); *id.* at 138:20-24 (recounting a "Zoom bombing" incident with a naked intruder); Ex. 70 ("We know we will have cheating, and we know that many programs will be compromised.  We worked so hard at UD to move toward experiential learning, and this is hard to convert to online. . . .  We can do a lot online, but not everything."); Ex. 73 ("We know this is not a typical spring semester at the University of Delaware . . . ."); Ex. 73 ("Many of you may feel . . . disappointed by the prospect of distance

learning as an alternative to the interactive campus experience we have all come to know and love at UD."); Ex. 75 (An in-person graduation is preferable because it "will give us all another chance to share everything that makes UD so special, including our beautiful campus, rich student and faculty interactions, and our vibrant Blue Hen community!"); *id.* ("This pandemic significantly disrupted your final semester time on campus."); Ex. 77 ("the consequences of being fully online . . . are very negative for students").

In recognition of the significant mid-semester change to its courses, UD offered students the ability to transition to a pass/no record grading option. Ex. 87 (Morgan Dep.) at 91:7-92:17. Likewise, in light of the upheavals during Spring 2020, UD extended its tenure/contract clock and professors were permitted to exclude student course feedback from their evaluations. Ex. 67. Ex. 87 (Morgan Dep.) at 134:6-8 ("Q. Why was the school concerned about what students would say during spring 2020? A. They were pretty angry.").

In other words, prior to the pandemic, it had been the understanding of both the University and its students that UD would provide in-person classes for the entirety of the Spring 2020 semester. UD has also acknowledged that its online classes were not equivalent to the usual in-person experience with access to the campus. President Assanis called it "heartbreaking," adding that "Blue Hen experience" was being "severely disrupted." Ex. 51.

> Q.   What about having to leave campus was heartbreaking?
> A.   That's heartbreaking too.
> Q.   Why?
> A.   Because having students on the University of Delaware campus, that's what we do. Faculty teach students. We are a vibrant resident campus.

Ex. 87 (Morgan Dep.) at 88:19-89:16. The official UD Twitter account noted that it was "hard not being on campus," and that it had "been a challenging semester." Ex. 55; Ex. 58; Ex. 66 ("It's been very hard for everyone in our community.")

9

In a blow to graduating seniors, commencement in Spring 2020 was also entirely remote:

Q.     Can you tell me a little bit of what graduation looked like in
       spring 2020 compared to how it normally looks?
A.     It was very sad.  It was virtual.  So each of the colleges
       could -- we hired someone to help with convocation.  So
       we tried to make it as touching as we could for the students.
       And we streamed it.  They could have their celebrations
       wherever they were.  It was virtual.
Q.     Normally it would, obviously, be in-person.  Right?
A.     Yes.
Q.     That must have been big disappointment for the graduating
       senior class?
[objection]
A.     It was a big disappointment to the faculty and everybody at
       UD, too.  Graduating our students is why we come here.

Ex. 87 (Morgan Dep.) at 109:13-110:6; Ex. 59 ("We know graduation celebrations look a bit

different than we thought . . . .").

While UD extended the period for students to withdraw from classes, it did not offer or

give students any refunds, even if they withdrew.  Ex. 87 (Morgan Dep.) at 84:6-12.  In fact, UD

provided students with no tuition refunds whatsoever in Spring 2020.  *Id.* at 160:16-18.

Meanwhile, UD agreed that, in light of the transition to online classes, "50% tuition [was] fair

for The College School," an elementary school run by the University.  Ex. 82; Ex. 87 (Morgan

Dep.) at 177.

Numerous students and their parents complained to UD about online classes and the lack

of a refund.  *See, e.g.*, Ex. 80 ("[I]t is extremely concerning that UD is considering moving

classes to an online platform for the rest of the semester."); Ex. 81 ("[A] fair number of contacts

are for those requesting tuition rebates as courses moved online; students are saying they paid for

face-to-face interactions and not online and that online courses should be discounted."); Ex. 83

("[O]nline instruction isn't what parents had been expecting and is falling short of expectations. .

. . My daughter is teaching herself and I'm still paying full price.  What she has is not 'online

instruction' it's assignments and reading and turn it in for a grade."); Ex. 84 ("We no longer

meet up for class and instead meet up only to discuss homework.  We are expected to self teach

and it is just not working out for many people in the class, me included. . . .  I didn't pay

thousands of dollars to teach myself calculus . . . ."); Ex. 87 (Morgan Dep.) at 173:22-174:1 ("Q.

You were aware that some students thought that a tuition -- partial tuition refund was in order?

A. Yes.").

## III.    UD CANCELLED SEVEN DAYS OF CLASSES

Originally, UD's Spring break was scheduled to start on March 27, 2020 and last for one

week.  Ex. 49.  On Wednesday March 11, 2020, however, the University announced that it was

suspending classes for the remainder of that week and also moving up the start of Spring break

by a week, extending it to two weeks.  Ex. 50.  These changes to the schedule shortened the

Spring 2020 semester by seven class days, but UD neither extended its schedule on the back end

nor refunded students for this shortfall:

> Q.    And so the extra week [of] spring break and then the two
>       days when classes were suspended on March 12 and 13, the
>       school never made up for those 7 days on the calendar.
>       Right?
> A.    That's correct.

Ex. 87 (Morgan Dep.) at 86:14-18; Exs. 49-50 (showing that the last day of classes and the exam

period remained the same).  UD provided no refund for these seven class days that it failed to

provide in any form.

## LEGAL STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact"

and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A

dispute of a material fact exists if the evidence presented "is such that a reasonable jury could

return a verdict for the nonmoving party."  *Jutrowski v. Township of Riverdale*, 904 F.3d 280,

288 (3d Cir. 2018).  When reviewing a motion for summary judgment, "courts must view all facts 'in the light most favorable to the non-moving party, with all reasonable inferences drawn in that party's favor.'"  *360Heros, Inc. v. Gopro, Inc.*, 2022 WL 1746854, at *1 (D. Del. May 31, 2022) (internal citations omitted).  The moving party has the burden of proof.  *Nat'l State Bank v. Fed. Rsrv. Bank of N.Y.*, 979 F.2d 1579, 1581 (3d Cir. 1992).

## ARGUMENT

### I.    DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CONTRACT CLAIMS

#### A.    Plaintiffs Can Prove That They Entered Into An Implied-In-Fact Contract With UD For In-Person Classes And Access To The UD Campus

Defendant argues that Plaintiffs' breach of contract claims fail as a matter of law because it never expressly promised in-person classes and/or access to its campus.  The Univ.'s Br. In Supp. Of Its Mot. For Summary J. (ECF No. 118) ("MSJ").  That is incorrect; implied-in-fact contracts do not require express promises.

"[T]o prevail on a theory of implied-in-fact contract, a plaintiff must establish that the parties, through their actions, demonstrated a meeting of the minds on all essential terms."  *Ninivaggi*, 555 F. Supp. 3d at 49 (quoting *Ridley v. Bayhealth Med. Ctr., Inc.*, 2018 WL 1567609, at *7 (Del. Super. Ct. Mar. 20, 2018)).  "To do so, the plaintiff may rely on evidence like the parties' 'course of dealing or usage of trade or course of performance.'"  *Id.* (quoting Restatement § 4 cmt. a).  For implied-in-fact contracts between a university and its students, documents considered include, but are not limited to, "the school's course catalog or student handbook."  *Id.*  "Although these documents can supply some terms of an education contract, no Delaware court has held that they are the *only* source of those terms."  *Id.* To the contrary, "[s]chools and students show their intent to contract mostly through their actions, not words: the school admits them, the students enroll and pay tuition, and the students go to class."  *Id.*

12

Here, every aspect of the course of conduct between Plaintiffs and UD suggested that the University was promising to provide in-person classes and access to its campus in exchange for tuition payments. From its founding in 1743 through the beginning of the Spring 2020 semester, UD had always provided its students with in-person classes, as opposed to exclusively online or correspondence classes, and UD students had always gone "*off* to college." UD holds itself out as a "Resident Campus," with a residency requirement and where the expectation is that the education is largely hands-on, experiential and in-person. Ex. 87 (Morgan Dep.) at 111:7-112:7. UD's course website specifically listed most of the classes in Spring 2020 as in-person. Exs. 62-64, 68; Ex. 87 (Morgan Dep.) at 122:8-10. In advertising to prospective students, UD touted its beautiful campus and state-of-the-art facilities. Ex. 1. UD described numerous majors as providing hands-on experiences in laboratories and other facilities. Exs. 6-46. Its website was replete with pictures of students and teachers together in-person in physical classrooms. Taken as a whole, these facts demonstrate that the parties each intended to form a contract for in-person classes and access to the UD campus.

Defendant's authorities are not to the contrary. In *Randall v. Univ. of the Pac.*, 2022 WL 1720085, at *5 (N.D. Cal. May 28, 2022), the court held that an express contract controlled at the exclusion of both an implied-in-fact contract and implied terms. But that is contrary to how implied-in-fact contracts works under Delaware law. *Ninivaggi*, 555 F. Supp. 3d at 50 ("U. Delaware's contract with its students has some implied terms. The school does not dispute that.").[2] In addition, in both *Randall* and *Ryan v. Temple Univ.*, 535 F. Supp. 3d 356, 369 (E.D. Pa. 2021), the courts took issue with the lack of a specific promise to provide in-person classes.

---

[2] The Court previously rejected UD's argument that "it expressly reserved the right to go online." *Ninivaggi*, 555 F. Supp. 3d at 52. It should now likewise reject UD's invitation to reconsider that decision.

But those cases are contrary to this Court's holding that implied contracts arise from "actions, not words" and are determined by looking at the overall course of conduct as opposed to discrete written promises.  *Ninivaggi*, 555 F. Supp. 3d at 49.

Most courts now agree with this Court's view of how to determine the existence and contents of an implied-in-fact contract in COVID-19 tuition cases.  *See, e.g.*, *Durbeck v. Suffolk Univ.*, 547 F. Supp. 3d 133, 145 (D. Mass. 2021) ("The implied-in-fact contract alleged here derives not from these representations standing alone, but from these representations viewed in context with . . . Plaintiffs' registration for and attendance at on-campus classes prior to the campus closure."); *Doe v. Emory Univ.*, 2021 WL 358391, at *6 (N.D. Ga. Jan. 22, 2021) (Although promotional statements alone "cannot represent an offer to form an express contract . . . these statements can help define the scope of any implied contract" in combination with evidence of the school's "customary practice of providing in-person instruction after the payment of tuition . . . ."); *Omori v. Brandeis Univ.*, 2022 WL 10511039, at *4 (D. Mass. Oct. 18, 2022) (Denying summary judgment based on the "totality" of the evidence of an implied contractual right to an in-person education).[3]

### B.     Plaintiffs Can Prove Damages

Defendant argues that Plaintiffs cannot prove damages because they "have not offered evidence of an actual loss."  MSJ at 14.  That is incorrect.  Plaintiffs each sustained damages because they did not receive the benefit of their bargain; they paid for a full semester of in-person classes with access to the UD campus but they received a semester with seven days of no

---

[3] In any event, Plaintiffs present numerous pieces of evidence demonstrating that UD made specific statements about its provision of in-person classes and access to the campus.  Exs. 1-3, 6-46, 62-64.  *See also Arredondo v. Univ. of La Verne*, 2022 WL 3222376, at *5 (C.D. Cal. Aug. 2, 2022) ("Taken together, ULV's statements in its publications demonstrate a 'definiteness, specificity, or explicit nature' of an implied promise for an in-person, on-campus education.").

instruction and over half a semester that was online without campus access.

"Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will . . . put him in as good a position as he would have been in had the contract been performed." *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001) (quoting Restatement (Second) of Contracts § 347 cmt. a). Here, Plaintiffs can prove damages because what they received was worth less than what they bargain for.

First, while Plaintiffs bargained for a full semester at UD, the semester they received was cut short by seven days. Ex. 87 (Morgan Dep.) at 86:14-18; Exs. 49-50. These seven days amounted to 9.46% of the 74 days in the Spring 2020 semester. 8/1/22 Weir Decl. (ECF No. 113-2) ¶ 45. For these seven days, because UD provided Plaintiffs with no value, they are entitled to a prorated full refund. Accordingly, each Plaintiff sustained damages for missed days in the amount of the tuition that they paid multiplied by 9.46%:

| **Plaintiff** | **Tuition Paid** | **% Missed** | **Damages For Missed Days** |
|---|---|---|---|
| Michael Ninivaggi | $17,080 | 9.46% | $1,615.76 |
| Jake Mickey | $16,987 | 9.46% | $1,606.97 |
| Cailin Nigrelli | $17,080 | 9.46% | $1,615.76 |
| Hannah Russo | $15,718 | 9.46% | $1,486.92 |

9/30/2022 Arisohn Decl. (ECF No. 102) at Exs. 99-101; 12/5/2022 Arisohn Decl. Ex. 102.

Second, while Plaintiffs bargained for a full semester at UD with in-person classes and access to the UD campus, 44 days of the 74-day semester (59.46%) were online without access to the campus. 8/1/22 Weir Decl. (ECF No. 113-2) ¶ 45. The conjoint analysis conducted by Plaintiffs' expert Steven Gaskin demonstrate that these online classes without campus access were worth 15.2% less than in-person classes with access to the UD campus. 8/1/2022 Gaskin Decl. (ECF No. 112-4) ¶ 61. Accordingly, each Plaintiff sustained damages for the switch to

15

online classes in the amount of the tuition that they paid, multiplied by the portion of the Spring

2020 semester at issue (59.46%), multiplied by the overpayment factor (15.2%):

| Plaintiff | Tuition Paid | % Online | Overpayment Factor | Damages For Online Classes |
|---|---|---|---|---|
| Michael Ninivaggi | $17,080 | 59.46% | 15.2% | $1,543.68 |
| Jake Mickey | $16,987 | 59.46% | 15.2% | $1,535.27 |
| Cailin Nigrelli | $17,080 | 59.46% | 15.2% | $1,543.68 |
| Hannah Russo | $15,718 | 59.46% | 15.2% | $1,420.58 |

9/30/2022 Arisohn Decl. (ECF No. 102) at Exs. 99-101; 12/5/2022 Arisohn Decl. Ex. 102.

These damages calculations do not turn on whether Plaintiffs failed to receive particular

job opportunities, lost income or failed to receive credits because those are not the basis for

Plaintiffs' claims.  Instead, Plaintiffs claim that the education they received during Spring 2020

was worth less than what they paid for because classes were either moved online or cancelled

altogether.  And that is exactly what Plaintiffs' damages calculations measure.

### C.    UD's Impossibility Defense Fails

Defendant argues that Plaintiffs' breach of contract claims are barred because its

performance was impossible.  MSJ at 13.  That is incorrect.  Impossibility is not a defense to

breach of contract where performance is merely delayed temporarily.

The Restatement of Contracts (Second) addresses precisely the kind of "impossibility" at

issue in this case:

> Impracticability of performance or frustration of purpose that is
> only temporary suspends the obligor's duty to perform while the
> impracticability or frustration exists but does not discharge his
> duty or prevent it from arising unless his performance after the
> cessation of the impracticability or frustration would be materially
> more burdensome than had there been no impracticability or
> frustration.

Restatement of Contracts (Second) § 269; 30 Williston on Contracts § 77:102 (4th ed.) (same).

Accordingly, courts reject impossibility as a defense to breach of contract when

16

circumstances prevent performance only temporarily.  For instance, in *Schaefer Lincoln Mercury v. S. Carlton Jump, Jr.*, 1987 WL 642758, at *2 (Del. Com. Pl. June 8, 1987), the defendant argued that he could not be sued for breach of his car lease agreement because the car was damaged in an accident and so there was a frustration of purpose.  The court noted that the defense was not applicable because the inability to use the car was only temporary:

> The defendant next contends that there has been a frustration of the
> purpose of the lease because of impossibility of the performance
> by the lessor.  The defendant's contention is rejected.  This is not a
> case of permanent impossibility of performance because of the
> total destruction of the leased vehicle.  This is a case of temporary
> frustration of purpose.

*Id.* at *2.

Here, the COVID pandemic prevented UD from providing in-person classes and access to its campus for the latter part of the Spring 2020 semester, but that was only a temporary situation.  By Spring 2021, UD was once again offering in-person classes and has done so ever since.  12/5/2022 Arisohn Decl. Ex. 103 (Morgan Dep.) at 100:12-102:01.  So, while performance may have been impracticable during Spring 2020, it was only temporarily impracticable.  And UD presents no evidence that it would have been materially more burdensome for it to provide students with the in-person services that they bargained for at a later date.  To the contrary, UD did exactly that in at least one instance:

> Q.   Earlier we were talking about scuba diving class.  Do you
>      remember that?
> A.   Sure.
> Q.   And you had said that students in that class got an
>      incomplete and they completed it later when it was safe to
>      do so.
> A.   That's correct.
> Q.   Could the school have done that for all the classes if it had
>      wanted to do that?
> A.   I suppose they could, but there was no need to do that . . . .

17

*Id.* at 84:13-23.  Because the impracticability of providing in-person classes was only temporary,

UD was not excused from its performance and Plaintiffs' breach of contract claim remains

actionable.  Likewise, because UD could have made up the seven cancelled days of classes at the

end of the semester or some other later date, it is not excused from its performance for that time

period.

## II.    DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' UNJUST ENRICHMENT CLAIMS

UD argues that Plaintiffs' unjust enrichment claims fail because it was less profitable

during the COVID pandemic and therefore it "was not enriched."  MSJ at 17.  That is incorrect.

If the contract between the parties is deemed unenforceable due to impossibility, then they are

each entitled to offsetting restitution for the reasonable value of their partial performances.

"A party whose duty of performance . . . is discharged as a result of impracticability of

performance [or] frustration of purpose . . . is entitled to restitution for any benefit that he has

conferred on the other party by way of part performance or reliance."  Restatement (Second) of

Contracts § 377.[4]  Here, because both Plaintiffs and UD "have rendered some performance, each

is entitled to restitution against the other."  *Id.* at Cmt. a.  In calculating the proper amounts for

restitution, the "measure of reasonable value" is generally appropriate.  *Id.* at Cmt. b.

Translated to this case, Plaintiffs are due restitution in the full amount of the tuition that

they paid for the Spring 2020 semester, offset by restitution to Defendant in the amount of the

value of the education that it actually provided.  *Omori v. Brandeis Univ.*, 2022 WL 10511039,

at *7 (D. Mass. Oct. 18, 2022) ("[I]n light of the full tuition paid by plaintiffs and the partial in-

---

[4] Defendant argues that Plaintiffs' unjust enrichment claims fail because they have an adequate
remedy at law in the form of their breach of contract claims.  But as the law on impracticability
makes clear, that rule does not apply in this case.  To the extent that impossibility bars Plaintiffs'
contract claims, then restitution necessarily fills the void.

person instruction provided by Brandeis, plaintiffs may be entitled to restitution of the difference between the amount of tuition paid and the objective value of the online education they ultimately received.").  This calculation is no different from Plaintiffs' methodology for estimating contract damages: they are entitled to a refund for the seven days that were cancelled and not made up and a 15.2% refund for the period of the semester that was online.

Defendant's reliance on the costs that it incurred during the COVID pandemic is misplaced for several reasons.  First, the Restatement explains that restitution in lieu of impracticable performance turns on the "reasonable value" of their performance, not the profits that the other has retained or the costs that they incurred.  Restatement (Second) of Contracts § 377 at Illustrations 4 and 5; Restatement (Third) of Restitution and Unjust Enrichment § 34 ("Liability is measured by the benefit to the recipient, not by the claimant's cost of performance."); *Rosado v. Barry Univ. Inc.*, 499 F. Supp. 3d 1152, 1159 (S.D. Fla. 2020) ("[I]n the absence of specific contractual provisions, courts often attempt to return the parties to their precontractual positions, insofar as possible, when nonperformance is excused.").  Second, even if costs could be considered, there is no evidence that UD incurred any costs directly as a result of moving courses online.  The costs that it references may have been related to the pandemic generally, but they have nothing to do with its switch to online classes.  Preexisting fixed debt service obligations, refunds for housing, dining and parking, and lost revenues related to cancelled events are not costs related to UD's move to online classes.  A-174-75.  While Defendant vaguely refers to costs related to its purchase of "Zoom licenses," it provides no specifics and it admits that those costs were offset at least in part by the over $6 million that the University received pursuant to the CARES Act.  A-175.

Defendant's argument that "Plaintiffs were not impoverished" can be rejected out of

hand.  MSJ at 17.  As an initial matter, under Delaware law, "impoverishment" is "not critical to an unjust enrichment claim because restitution may be awarded based solely on the benefit conferred upon the defendant, even in the absence of an impoverishment suffered by the plaintiff."  *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (citing *Metcap Securities LLC v. Pearl Senior Care, Inc.*, 2009 WL 513756, at *5 n. 26 (Del.Ch. Feb. 27, 2009)).  But here, an impoverishment is clear.  Plaintiffs each paid thousands of dollars out of pocket (or incurred debt) without receiving the benefit of their bargain.

Next, Defendant argues that its enrichment was not unjust because it was legally required to close its campus, it incurred additional expenses during the pandemic and it provided "quality virtual instruction."  MSJ at 18.  But none of these arguments change the central facts of this case: Plaintiffs paid thousands of dollars for in-person classes with access to the UD campus, and, instead, UD cancelled seven days of classes and then provided online classes instead.  As to the cancelled classes, UD provides no explanation for why it did not make these up as other schools did in Spring 2020.  In other words, Defendant has no excuse for failing to provide these seven days of classes and its decision to retain the portion of tuition associated with this period is entirely without justification.  UD's retention of funds related to its move to online classes was unjust as well.  Regardless of the quality of the online classes that UD provided, they were worth significantly less than what Plaintiffs paid for.  While the University was required to cancel in-person classes during Spring 2020, it did not have to keep all of the tuition that it charged for the in-person classes that it could no longer provide.  In any event, these are disputed issues of fact that are not proper for determination on summary judgment.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs request that the Court deny Defendant's motion for summary judgment.

Dated: December 5, 2022

Respectfully submitted,

**CHIMICLES SCHWARTZ KRINER &
DONALDSON-SMITH LLP**

_____*/s/ Robert J. Kriner, Jr.*_____
Robert J. Kriner, Jr. (#2546)
Scott M. Tucker (#4925)
2711 Centerville Road, Suite 201
Wilmington, DE 19808
(302) 656-2500

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (admitted *pro hac vice*)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: jarisohn@bursor.com

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (admitted *pro hac vice*)
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com

**CROSS & SIMON, LLC**
Christopher P. Simon (No. 3697)
Michael L. Vild (No. 3042)
1105 N. Market Street, Suite 901
P.O. Box 1380
Wilmington, Delaware 19801-1380
(302) 777-4200
csimon@crosslaw.com
mvild@crosslaw.com

**ANASTOPOULO LAW FIRM, LLC**
Eric M. Poulin (admitted *pro hac vice*)
Roy T. Willey, IV (admitted *pro hac vice*)
Blake G. Abbott (admitted *pro hac vice*)
32 Ann Street
Charleston, SC 29403

(843) 614-8888
eric@akimlawfirm.com
roy@akimlawfirm.com
blake@akimlawfirm.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Robert J. Kriner, Jr., hereby certify that service of the foregoing was caused to be made

on December 5, 2022 via e-mail upon the below parties.


Dated: December 5, 2022                              */s/ Robert J. Kriner, Jr.*
                                                       Robert J. Kriner, Jr. (#2546)


**SAUL EWING ARNSTEIN & LEHR LLP**
James Darlington Taylor , Jr.
Marisa R. De Feo
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
james.taylor@saul.com
marisa.defeo@saul.com