IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PENNY NINIVAGGI et al., individually
and on behalf of all others similarly
situated,

  *Plaintiffs,*

  v.                                    No. 20-cv-1478-SB

UNIVERSITY OF DELAWARE,

  *Defendant.*

---

HANNAH RUSSO, individually and on
behalf of all others similarly situated,

  *Plaintiff,*

  v.                                    No. 20-cv-1693-SB

UNIVERSITY OF DELAWARE,

  *Defendant.*

---

Robert J. Kriner, Jr., Scott M. Tucker, CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP, Wilmington, Delaware; Sarah N. Westcot, Joshua D. Arisohn, BURSOR & FISHER, P.A., New York, New York; Christopher P. Simon, CROSS & SIMON, LLC, Wilmington, Delaware.

  *Counsel for Ninivaggi et al.*

Christopher P. Simon, Michael L. Vild, CROSS & SIMON, LLC, Wilmington, Delaware; Blake G. Abbott, Eric M. Poulin, Roy Willey, ANASTOPOULO LAW FIRM, LLC, Charleston, South Carolina; Robert J. Kriner, Jr., CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP, Wilmington, Delaware.

  *Counsel for Russo.*

James D. Taylor, Jr., Charles E. Davis, Marisa R. De Feo, SAUL EWING ARNSTEIN & LEHR LLP, Wilmington, Delaware.

  *Counsel for Defendant.*

## MEMORANDUM OPINION

March 31, 2023

BIBAS, *Circuit Judge*, sitting by designation.

In the spring of 2020, the COVID-19 pandemic forced universities to move their classes online. University of Delaware students complain that when the school did so, it never refunded any of their tuition. Because their claims are amenable to class-wide proof and the other class certification requirements are met, they may proceed as a class action.

## I. BACKGROUND

After the pandemic hit and classes went online, a group of students and parents sued U. Delaware, alleging that what they got was worth less than what they paid for. They claimed breach of contract, unjust enrichment, and conversion on behalf of all people who paid tuition or fees for students enrolled in U. Delaware for the spring 2020 semester. D.I. 19 ¶¶ 55, 67–174; D.I. 15, at 14. Previously, I dismissed the class's conversion claims but let their implied-contract and unjust-enrichment claims survive. D.I. 15, at 14–15.

Matters have been whittled down further since then: The parent plaintiffs stipulated to voluntarily dismiss their claims. D.I. 62. And the rest of the plaintiffs stipulated to dismiss claims that arose from fees they paid to U. Delaware. D.I. 116. So the only claims left are for breach of implied contract and unjust enrichment stemming from U. Delaware's keeping plaintiffs' full tuition payments.

Plaintiffs now move to certify a class of "[a]ll undergraduate students enrolled in classes at the University of Delaware during the Spring 2020 semester who paid tuition." D.I. 75. U. Delaware says that before ruling on this motion, I must first decide any pending *Daubert* motions. *See* Tr. 9:4–17. I disagree. In moving to certify their class, plaintiffs did not rely on expert testimony. *Cf. In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 185–86 (3d Cir. 2015). Nor do I find expert testimony "critical" to assess whether the class meets Rule 23's requirements. *Id.* at 187. So I certify the class without deciding the *Daubert* motions.

## II. PLAINTIFFS HAVE STANDING

Before I get to certification, I deal with a threshold matter: standing. U. Delaware previously argued that parents lacked standing to sue the school because they had not suffered an injury in fact. *See, e.g.*, D.I. 6, at 6–8. I rejected that argument. *See* D.I. 15, at 4–5. Now U. Delaware says the students also lack standing. *See* D.I. 94, at 2–3.

To have standing, plaintiffs must show (1) an injury in fact that is (2) fairly traceable to the defendant and (3) likely to be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). They have shown all three.

First, plaintiffs suffered an injury in fact. They had a contract with U. Delaware, which U. Delaware allegedly breached. *See* D.I. 102-5, Ex. 102 at 11; *see also Siebold v. Univ. of Del.*, 1975 WL 4178, at *3 (Del. Ch. Mar. 12, 1975). A breach of contract gives rise to standing. *See, e.g., Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 798–802 (2021) (citing "breach of contract" cases to conclude that "*every* legal injury necessarily causes damage" and thus confers standing); *Tenn. Elec. Power Co. v. Tenn. Val.*

*Auth.*, 306 U.S. 118, 137 (1939) (standing exists when a contractual right is "invaded").

The latter two standing requirements, traceability and redressability, are also satisfied. U. Delaware caused plaintiffs' injury by moving classes online. And I could redress that injury by awarding damages or ordering restitution. So plaintiffs have standing to sue.

This conclusion breaks no new ground. Courts dealing with similar cases have reached the same conclusion. *See, e.g.*, *Rynasko v. NYU*, 2023 WL 2604367, at *8 (2d Cir. Mar. 23, 2023); *Dougherty v. Drew Univ.*, 534 F. Supp. 3d 363, 372 (D.N.J. 2021); *Little v. Grand Canyon Univ.*, 2022 WL 266726, at *3–4 (D. Ariz. Jan. 28, 2022); *Metzner v. Quinnipiac Univ.*, 528 F. Supp. 3d 15, 26 (D. Conn. 2021) ("[I]t is the student … that has suffered the alleged injury-in-fact that is traceable to the alleged actions of [the university] for purposes of Article III.").

### III. THE CLASS IS ASCERTAINABLE

With standing out of the way, I consider an implicit requirement of class certification: that the class be ascertainable. *See Byrd v. Aaron's Inc.*, 784 F.3d 154, 161–62 (3d Cir.), *as amended* (2015). To be ascertainable, a class must be objectively defined, and there must be a "reliable and administratively feasible mechanism" for figuring out who falls within it. *Id.* at 163 (internal quotation marks omitted). This class meets both criteria.

1. *The class is objectively defined.* First, the class of students enrolled in U. Delaware in the spring 2020 semester who paid tuition is objectively defined. Both

enrollment and payment are verifiable facts. *See* 1 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 3:3 (6th ed. 2022).

2. *There is a reliable way to determine class membership.* Second, there is a reliable way to figure out who is in the class. U. Delaware has financial records showing which students paid some amount of tuition for the spring 2020 semester. *Cf., e.g.*, D.I. 95-2, Ex. 18.

U. Delaware says it is impossible to know who actually paid tuition because some students might have paid with money from outside sources, like scholarships. *See* D.I. 94, at 5–6. But as plaintiffs have defined this class, the only students excluded are those who received full rides from the school itself. *See* D.I. 102, at 4. Nor is there any need to kick out students who paid with money from outside sources for lack of standing, as U. Delaware suggests. Those students, no less than students who paid out of their own pockets, were parties to a contract that U. Delaware allegedly breached. Because U. Delaware has enough records to figure out which students did not get full rides, there is a reliable way to determine who those students are. *Cf., e.g.*, D.I. 95-2, Ex. 18. So it can reliably figure out who belongs to the class.

U. Delaware points out that another court recently refused to certify a class in a tuition-refund case based on administrative feasibility. *Evans v. Brigham Young Univ.*, 2022 WL 596862, at *3–4 (D. Utah Feb. 28, 2022). That court reasoned that it would be too onerous to figure out who actually paid tuition. But the class there was defined as "*all people* who paid tuition." *Id.* at *3 (emphasis in original; internal quotation marks omitted). So the court construed the class to include anyone who

5

contributed any money to students' tuition. *Id.* at *3–4 (explaining that "the plain language of the class definition" extends beyond students themselves). Here, by contrast, the class is limited to "students" who paid tuition, whatever its ultimate source. Because U. Delaware has records of those payments, the class is administratively feasible.

## IV. THE CLASS SATISFIES RULE 23(a)

Before I may certify a class, plaintiffs must show four more things: numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a). Plaintiffs bear the burden of showing all four "by a preponderance of the evidence." *Byrd*, 784 F.3d at 163. In analyzing whether the class meets those requirements, I must be "rigorous." *Id.*

### A. The class is so numerous that joinder is impracticable

First, the proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Generally, this prong is met if the named plaintiffs "demonstrate[] that the potential number of plaintiffs exceeds 40." *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001). They need not identify exactly how many people belong to their proposed class. *See Moskowitz v. Lopp*, 128 F.R.D. 624, 628 (E.D. Pa. 1989).

Here, there are far more than forty potential plaintiffs. More than 17,000 undergraduates were enrolled in U. Delaware in spring 2020, and the school collected more than $160 million in tuition. D.I. 77-3, Ex. 88 at 8–9; *id.* at 8. By plaintiffs' conservative calculations, that means that more than 9,000 students paid tuition. *See* D.I. 102, at 4. The number is likely much higher.

And joinder of these thousands of plaintiffs would be impracticable. To reach that conclusion, I consider judicial economy, the geographic dispersion and financial resources of class members, the ability of class members to litigate as joined plaintiffs, the ability to identify future claimants, and whether the claims seek injunctive relief or damages. *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 253 (3d Cir.), *as amended* (2016).

Plaintiffs seek damages rather than an injunction, so that factor weighs against a class action. But all other factors favor it. First, there is judicial economy. This factor "primarily involves considerations of docket control, taking into account practicalities as simple as that of every attorney making an appearance on the record." *Id.* at 257. With thousands of individual plaintiffs and attorneys, docket control in this case would be an administrative nightmare. Plus, I would have to decide many overlapping motions and struggle to coordinate hearings.

Aside from judicial economy, joinder would also be inconvenient to the class members. Plaintiffs are students or recent college grads who likely lack the money to carry on this litigation alone. Plus, many have since graduated, likely scattering across the country. Finally, there are no future claimants to worry about; all class members are identifiable now.

### B. There are questions of law or fact common to the class

Next, plaintiffs must show that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality does not require perfect identity of questions of law or fact among all class members." *Reyes v. Netdeposit, LLC*, 802 F.3d 469,

486 (3d Cir. 2015). The "bar is not a high one"; even "a single common question will do." *Id.* (internal quotation marks omitted).

Here, the parties dispute whether certain questions are common or individual. I deal with that dispute in my discussion of predominance. But commonality is a low bar, and it is easily met by the questions that are indisputably common:

- If there was a contract for in-person classes, did U. Delaware breach it by going online?

- Was U. Delaware's performance impossible?

The answers to these questions do not turn on individualized inquiries about the students. Plus, as I will explain in the predominance section, many of the questions that U. Delaware says are individual questions—such as whether there was an implied contractual term promising in-person classes—are in fact common to the class. So the commonality prong is satisfied.

### C. The class representatives' claims and defenses are typical

Third, the named plaintiffs' claims and defenses must not be "markedly different" from those of the class. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 598 (3d Cir. 2012). U. Delaware says there are six distinctions, but none makes the named plaintiffs markedly different.

1. *Plaintiffs paid tuition.* U. Delaware first says that none of the named plaintiffs paid tuition, so none is a member of the proposed class. *See* D.I. 94, at 7. That is false. The named plaintiffs paid tuition, through either loans or cash from their parents. *See* D.I. 95-4, Ex. 46 at 177:21–23 (Michael Ninivaggi took out loans); D.I. 95-4, Ex.

44 at 21:11–17 (Jake Mickey's parents paid his tuition); D.I. 95-4, Ex. 48 at 47:6–13 (same for Hannah Russo); D.I. 95-4, Ex. 49 at 27:18–23 (same for Cailin Nigrelli). So they all belong to the proposed class.

2. *Plaintiffs never conceded that there was no promise.* Next, U. Delaware says three plaintiffs conceded that it never impliedly promised in-person classes. *See* D.I. 94, at 7. As I explain later, these supposed concessions are irrelevant. But they were not concessions anyway. True, plaintiff Jake Mickey said that U. Delaware did not promise him "unfettered access to campus." D.I. 95-4, Ex. 44 at 127:21–23. But he also said the University did "guarantee [him] in-person classes." *Id.* 127:24–128:5. Plaintiffs Hannah Russo and Michael Ninivaggi, on the other hand, admitted that U. Delaware did not promise in-person instruction. D.I. 95-4, Ex. 46 at 168:1–13, Ex. 48 at 108:18–21. But in context, both meant that U. Delaware never said this explicitly, not that there was no implied promise. *Id.* Plus, all plaintiffs signed a sworn declaration saying they understood that U. Delaware was "promising to provide [them] with in-person classes." *See, e.g.*, D.I. 80 at ¶ 8; D.I. 81 at ¶ 8; D.I. 82 at ¶ 8; D.I. 83 at ¶ 8.

3. *It does not matter that one plaintiff left campus voluntarily.* U. Delaware also says that Russo's claims are atypical because she left campus after someone tested positive for COVID there. *See* D.I. 94, at 7. Thus, it argues, she alone faces the defense of waiver. But Russo testified that she still would have attended in-person classes if they were offered. *See* D.I. 95-4, Ex. 48, at 69:18–71:14. So going home is not enough to show that she waived performance.

4. *Residency and full-time attendance do not affect typicality.* U. Delaware next claims that plaintiffs are atypical because they were all full-time, in-person, out-of-state students. *See* D.I. 94, at 7–8. But it never explains how those attributes make their claims atypical. *See id.* The class naturally includes only students who attended in person. And whether students were full- or part-time might affect the damages to which they are entitled, but it does not affect the school's liability. The same goes for out-of-state status. So these traits do not make plaintiffs' claims or defenses atypical.

5. *It does not matter that plaintiffs got different amounts of CARES Act funding.* U. Delaware says that plaintiffs are atypical because some of them got CARES Act funding. *See* D.I. 94, at 8. But it never explains what federal aid has to do with whether U. Delaware breached a contract or was unjustly enriched by retaining plaintiffs' tuition. *See id.* I see no connection either.

6. *It does not matter that students are different.* Finally, U. Delaware objects that students were harmed in different ways and to different degrees—or not at all. *See* D.I. 94, at 8–9. Some may have preferred online learning. *See id.* But this issue goes to predominance, not typicality. U. Delaware does not identify anything that makes these plaintiffs atypical. Rather, U. Delaware's argument is that *no* plaintiff could ever be typical because liability must be determined on a student-by-student basis. I will consider this argument in discussing predominance.

**D. The representatives will fairly and adequately protect class interests**

The final Rule 23(a) factor asks whether the class is adequately represented by both named plaintiffs and class counsel. U. Delaware says the class falls short on both. I disagree.

10

1. *Adequacy of named plaintiffs.* Plaintiffs' adequacy largely turns on whether there are "conflicts of interest between named parties and the class they seek to represent." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004) (internal quotation marks omitted). U. Delaware does not identify any conflicts of interest, nor do I.

Still, U. Delaware says the named plaintiffs are inadequate class representatives because they do not know enough about the case. But named plaintiffs need only a "minimal degree of knowledge." *In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020) (internal quotation marks omitted). "When Plaintiffs have communicated with their lawyers, reviewed filings prior to their submission to the Court, [helped with] discovery requests[,] and shown a basic understanding of the facts and claims underlying [the] litigation, the adequacy prong is met." *Vrakas v. United States Steel Corp.*, 2019 WL 7372041, at *6 (W.D. Pa. Dec. 31, 2019) (internal quotation marks omitted; final, third alteration in original).

Plaintiffs have done all that here. They have talked to their lawyers, reviewed the complaint, and collected documents. *See, e.g.*, D.I. 95-4, Ex. 46, 62:11–63:8 (collected files and emails), 64:23–65:7 (reviewed complaint); Ex.44, 98:1–3 (answered requests for admissions); Ex. 49, 122:4–11 (collected documents). They understand both the purpose of the litigation and their role as class representatives. *See, e.g.*, D.I. 95-4, Ex. 44, 13:17–21, 36:13–37:6; Ex. 46, 63:14–17. True, most have met with their lawyer only once. *See, e.g.*, D.I. 95-4, Ex. 48, 19:6–20:3. But they have also kept in touch

through phone calls, texts, and emails. *See, e.g.*, D.I. 95-4, Ex. 44, 38:10–22, 112:15–17; Ex. 48, 20:7–11. That is enough.

Finally, U. Delaware says the named plaintiffs are inadequate because they are not credible. As it notes, some admitted in their depositions that their prior, sworn responses to requests for admissions were wrong. For example, in a request for admission, Michael Ninivaggi "denied" that he had completed all courses for which he was enrolled in spring 2020. D.I. 95-3, Ex. 37, at 72–73. But in his deposition testimony, he admitted that this was mistaken: he had completed all his courses. *See* D.I. 95-4, Ex. 46, at 146:3–149:16. He also admitted that several other written responses were incorrect. *See id.*

Despite these mistakes, I find that all named plaintiffs are adequate. They readily admitted their errors, which mostly appear to be oversights. *See id.* Some supposed errors might simply reflect that plaintiffs' interpretation of the questions changed when they were couched differently: the questions had different lead-ins when asked in the depositions than in the requests for admissions. *See id.* at 146:15–21 (correcting answer to question about whether degree progress was "slowed or impeded"). But class counsel is advised to make sure that, going forward, plaintiffs take care when responding to questions and requests.

2. *Adequacy of class counsel.* Quality counsel is particularly important in a class action, as "it is primarily class counsel, not the class representative, who controls the class's interest." 1 *Newberg and Rubenstein on Class Actions* §3:72. So I must

scrutinize counsel to make sure that they are "qualified, experienced and generally able to conduct the litigation." *Id.* (internal quotation marks omitted).

They are. First, several law firms involved in this litigation have experience with class actions. *See, e.g.*, D.I. 77-3, at 181–85, 215–16. Even better, they have experience with class actions relating specifically to the subject of this one—remote learning during the pandemic. *See id.* at 208. So I find that they are qualified.

I do see a few potential issues with class counsel. First, there were, as mentioned, errors in some of the students' requests for admissions. *See, e.g.*, D.I. 95-4, Ex. 46, at 146:3–149:16. Though I take this seriously, I do not find that they render counsel inadequate. On the whole, counsel's performance has been satisfactory. Their briefing and arguments have been up to snuff. *See* 1 *Newberg and Rubenstein on Class Actions* § 3:72. And their experience in similar litigation will be valuable to the class. Plus, my appointment of lead counsel should ensure that no more errors slip through the cracks. But I will keep checking class counsel's performance as this litigation progresses.

Finally, U. Delaware points out that another court recently ruled that one law firm involved in this case was inadequate. *See Garcia De León v. NYU*, 2022 WL 2237452, at *15–17 (S.D.N.Y. June 22, 2022). That court's reasoning, however, was tied to the circumstances of that case. I do not find similar issues here. In any event, I am appointing a different firm as lead counsel.

## V. BOTH RULE 23(b)(3) REQUIREMENTS ARE SATISFIED

Because plaintiffs seek damages, they must also satisfy Rule 23(b)(3). They must first show that "questions of law or fact common to class members predominate over

13

any questions affecting only individual members." Fed. R. Civ P. 23(b)(3). They must also show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* Again, plaintiffs prevail on both.

### A. Common questions predominate

Predominance involves a two-step inquiry. First, I classify the questions in the case as common or individual. 2 *Newberg and Rubenstein on Class Actions* § 4:50. An individual question is one requiring proof that varies from member to member. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). A common question is one where "the issue is susceptible to generalized, class-wide proof." *Id.* (internal quotation marks omitted). Second, I decide whether the individual or common questions predominate. That inquiry requires me to "formulate some prediction as to how specific issues will play out." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008), *as amended* (Jan. 16, 2009). This prediction is not set in stone.

Plaintiffs claim breach of contract and unjust enrichment. Common questions predominate for both.

1. *Breach of contract*. Start with the contract claim. To prevail on that, the students must show the existence of a contract and its breach. *See Doe v. Del. State Univ.*, 2022 WL 613361, at *6 (D. Del. Mar. 2, 2022), *report and recommendation adopted*, 2022 WL 823580 (D. Del. Mar. 18, 2022).

Certainly, there was *some* contract between U. Delaware and its students. *Siebold*, 1975 WL 4178, at *3 ("The relationship between a student and the university he attends is one of contract."). The question is whether in-person classes were a part

of that contract. Though U. Delaware nowhere promised in-person classes expressly, it may have done so impliedly through its conduct. *See* D.I. 15, at 7–11.

The parties dispute whether the existence of this implied contractual term is amenable to common proof. Plaintiffs say yes, because the relevant U. Delaware conduct did not differ from student to student. *See* D.I. 76, at 16. Since its founding, U. Delaware had always held classes in person for all students (other than those enrolled in separate online programs). *Id.* U. Delaware counters that plaintiffs must show that each student thought that U. Delaware had impliedly promised in-person classes. *See* D.I. 94, at 15–16. That would require a student-by-student inquiry.

I agree with plaintiffs that the existence of an implied contractual term about in-person learning is subject to class-wide proof. The conduct necessary to show that in-person education was part of the bargain will be the same for all class members. For example, plaintiffs might show that all class members enrolled in U. Delaware's in-person program (rather than one of its separate online programs) and attended classes in person for the first half of spring 2020. Such major actions are enough to show an implied contractual term. The minor individualized questions U. Delaware emphasizes, like whether each student saw the website, would not move the needle. So I can address the existence of a term about in-person learning for the whole class.

The terms also cannot depend on students' subjective beliefs, as the school suggests. "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal

quotation marks omitted). Whether in-person classes were part of the parties' "implied contract" depends on what a reasonable third party would think based on the parties' "conduct," "regardless of what [they] subjectively believed or understood." *Cabreja v. Elkton Carpet & Tile*, 2007 WL 9658584, at *4 (Del. Ct. Com. Pl. June 15, 2007). To decide whether holding classes in person was part of the parties' bargain, I anticipate looking at evidence of how U. Delaware advertised itself and whether students were attending classes in person before the pandemic. *See also* D.I. 15, at 10 (noting evidence that may give rise to implied contract).

Because the existence of an implied contract is amenable to class-wide proof, it is a common question. So is the breach of that contract. There is no evidence that in spring 2020, U. Delaware held classes in person for some students but not others.

Plus, U. Delaware will raise a common question through its key affirmative defense: impossibility. U. Delaware will argue that even if it did promise to hold classes in person, doing so was impossible during the pandemic. And this too presents a common question. Whether U. Delaware's performance was impossible does not vary from student to student. Rather, it can be shown through the governor's order cancelling classes. *See Peckham v. Indus. Sec. Co.*, 31 Del. 200, 113 A. 799, 801 (Del. Super. Ct. 1921) ("[W]here performance is made impossible by governmental act … [it] will be excused; no one will be compelled to carry out an illegal agreement."); Restatement (Second) of Contracts § 377 cmt. a.

Thus, all three questions that are likely to arise in deciding whether U. Delaware is liable for breach of contract are common questions.

2. *Unjust enrichment*. I now move on to plaintiffs' unjust-enrichment claim. Pause first, however, to consider the relation between plaintiffs' contract and unjust-enrichment claims. Plaintiffs plead unjust enrichment as an alternative to breach of contract. But the two converge here, as plaintiffs recognized at argument. *See* Tr. 74:2–75:17. If plaintiffs' contract with U. Delaware did not promise in-person classes, they would have no unjust-enrichment claim. U. Delaware would have given plaintiffs exactly what they bargained for and thus would not be unjustly enriched. *Cf. Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (omission in original) ("Delaware courts … have consistently refused to permit a claim for unjust enrichment when the alleged wrong arises from a relationship governed by contract.").

But if in-person classes were a part of the bargain, then unjust enrichment may play a role in plaintiffs' case. As discussed, U. Delaware will likely argue that holding in-person classes was impossible. And when a contract is voided due to impossibility, the "benefits conferred by way of partial performance have no basis in a valid agreement." Restatement (Third) of Restitution § 34 cmt. c. Thus, the party "whose performance is more advanced"—in this case, the students, who had already paid full tuition—may have "a claim in restitution as necessary to prevent the unjust enrichment of the other." *Id.*; *cf. Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1063 (Del. 1988) (finding that the plaintiff had a claim in restitution when performance of an exclusive licensing agreement was impossible due to a court order that was later reversed); *see also* D.I. 15, at 13–14. Alternatively, if U. Delaware's performance was only partly impossible, then the contract was not voided but the students may have

a claim in restitution for the part not performed. *Id.* §270 & cmt. b (discussing partial impracticability).

Whether plaintiffs have a claim in restitution depends on two factors. First, it depends on whether the contract assigns the risk of supervening circumstances to the students. *See* Restatement (Third) of Restitution §34 cmt. c; *see also Murphy Marine Servs. of Del., Inc. v. GT USA Wilmington*, 2022 WL 4296495, at *14 (Del. Ch. Sept. 19, 2022) (listing elements of impossibility defense). If so, then it is just for the school to keep the money. Restatement (Third) of Restitution §34 cmt. c. This presents a common question, which can be resolved by looking at things like the student hand-book. *Cf.* D.I. 15, at 3–7; 8–10 (explaining how Delaware figures out the terms of a contract between students and their schools). Second, plaintiffs' right to restitution depends on U. Delaware's "net enrichment." Restatement (Third) of Restitution §34 cmt. c. If U. Delaware got a greater benefit than the students, then it was probably unjust for the school to keep the students' money, as that enrichment has no basis in a valid agreement. *Id.* But if an online education in spring 2020 was worth full tuition, then there was no net enrichment. *Id.*

The parties dispute whether this second question is a common one. I measure net enrichment by taking the amount U. Delaware received from each student and sub-tracting the fair market value of the services it provided to each of them. *See* Restate-ment (Third) of Restitution §34 cmt. c, illus. 10; Restatement (Second) of Contracts §377 cmts. a, b; *see LCT Cap., LLC v. NGL Energy Partners LP*, 2022 WL 17851423, at *4 (Del. Super. Ct. Dec. 22, 2022), *modified*, 2023 WL 1115628 (Jan. 30, 2023);

*Hynansky v. 1492 Hosp. Grp., Inc.*, 2007 WL 2319191, at *1 (Del. Super. Ct. Aug. 15, 2007) (plaintiff is entitled to "reasonable value of his services"); *Vickery v. Ritchie*, 88 N.E. 835, 836–37 (Mass. 1909) (plaintiff entitled to "fair value of his labor and materials"). Though U. Delaware may have gotten different amounts from different students (by giving some scholarships), these amounts are ascertainable from the school's financial records. *See, e.g.*, D.I. 95-2, Ex. 18 (showing how much a student got in school-sponsored scholarships). So it presents individual questions, but ones that are readily resolved.

U. Delaware says that the value of the services it provided also requires individualized proof. It does not. The fair market value of an online education does not vary by student. U. Delaware protests that some students got better grades in spring 2020 than any other semester. But that does not change the value of the education they received. Just as the fair market value of an in-person education does not differ depending on whether an individual student got straight As or straight Cs, so too with the value of an online education. Nor does it vary by how many clubs the student joins, how often the student uses the career services office, or how many times the student ends up in the university health center. These services are available to all students for the same fixed price. And though students may make more or less (or better or worse) use of them, that does not change their fair market value.

That is not to say that calculating the fair market value of the semester the students got will be easy—far from it. I cannot simply compare the value of an in-person education to that of an online education under typical circumstances. Spring 2020

19

was unique. But net enrichment is hard to calculate because of the nature of the claim, not the presence of thousands of plaintiffs. *See* Restatement (Third) of Restitution § 34 cmt. d ("Measuring the benefit … of an interrupted performance presents characteristic difficulties."). So I still find that common questions predominate.

## B. A class action is superior to other methods

Finally, Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). It lists four factors to consider. All show that a class action is superior here. Indeed, this case fits the policy "at the very core of the class action mechanism." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (internal quotation marks omitted). The small recovery the students seek is not enough for any plaintiff to bring an individual claim. *Id.*

1. *Interests in individual control over litigation.* First, plaintiffs have no significant interest in individually controlling this litigation. They were not physically injured. *Cf. Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 633 (3d Cir. 1996), *aff'd sub nom. Amchem Prods.*, 521 U.S. 591. Their claims are likely to be of minimal value; they seek damages for half of a semester that was moved online. Plus, plaintiffs who want to litigate their claims separately can opt out. *See* D.I. 76, at 19; *In re Warfarin Sodium*, 391 F.3d at 534.

2. *Pending litigation.* This class action is a consolidation of two separate class actions. I am not aware of any other pending litigation related to U. Delaware's move to online learning. *See* Tr. 62:12–22; Reply., D.I. 102, at 10. The absence of other

lawsuits also shows that interest in litigating these claims individually is low. *Cf. In re Warfarin Sodium*, 391 F.3d at 534.

3. *Desirability of concentrating claims in one forum*. As I have already said, it makes sense to concentrate these low-value claims in a single forum. Plus, this forum (the District of Delaware) is most convenient for plaintiffs, who are current students or recent graduates of U. Delaware. *See 2 Newberg and Rubenstein on Class Actions* § 4:71. It is also most convenient to the defendant, U. Delaware. *See id.*

4. *Likely difficulties in management*. Finally, I find that this class is manageable. There are only two claims, and only Delaware law is relevant. *Cf. In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 124, 163–65 (E.D. Pa. 2015) (finding that a class action was unmanageable because it involved unjust-enrichment laws of seventeen states).

## VI. I APPOINT BURSOR & FISHER LEAD COUNSEL

In the Third Circuit, class certification must precede appointment of counsel. *See Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010). Now that I have certified the class, I appoint lead counsel. *See* Fed. R. Civ. P. 23(g) ("[A] court that certifies a class must appoint class counsel.").

Plaintiffs have four law firms serving as class counsel, a relic from this case's origin in two separate class actions. Plaintiffs point out that multiple firms may serve as co-lead counsel. *See In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 267 n.4 (3d Cir. 2005). But as discussed, things have slipped through the cracks. The appointment of a single lead counsel should prevent further errors. So I will appoint Bursor

& Fisher, which has taken the lead in this litigation since consolidation, sole lead counsel. *See* Tr. 52:24–53:1.

Bursor & Fisher satisfy the four factors that Rule 23(g) directs me to consider. Though this inquiry overlaps with my adequacy inquiry under Rule 23(a)(4), my analysis here focuses on Bursor & Fisher alone.

1. *Work in identifying claims.* Before these two cases were consolidated, Bursor & Fisher did pre-complaint investigatory work of identifying claims. *See* Tr. 53:7–8. Since consolidation, it has taken most of the depositions and done most of the briefing. *Id.* at 53:14–16. It has also been responsible for overall strategy. *Id.* at 53:11–14.

2. *Experience with class actions and complex litigation.* Bursor & Fisher has litigated multiple multimillion-dollar class actions, including several to a jury verdict. *See* D.I. 77-3 at 181; Tr. 57:9–19. So it has the needed experience with class actions and complex litigation.

3. *Knowledge of the law.* Bursor & Fisher is litigating other cases involving universities' transitions to remote learning during the pandemic, including at least one that has already been certified. *See id.* at 184–85; 342–43 (certifying class and appointing Bursor & Fisher lawyers as class counsel); Tr. 57:20–58:9. So it has experience with the novel legal issues here.

4. *Resources.* Bursor & Fisher is a national law firm. It has tried several class actions to jury verdicts and shown that it has the resources to litigate this action. *See id.* at 181; Tr. 57:14–15.

\* \* \* \* \*

Because plaintiffs show standing, ascertainability, the Rule 23(a) prerequisites, and the Rule 23(b)(3) requirements, I certify their class. And because this class will benefit from a single firm's taking the lead, I appoint Bursor & Fisher, which meets the Rule 23(g) requirements, sole lead counsel.